# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Fort Pierce Division

Case No.: 2:21mc14073

Case Pending in the U.S. District Court for the Northern District of California:
*Sweet, et al. v. Rosenfelt, et al.*, 3:19-cv-03674-ALSUP (N.D. Cal.)

|  |  |
|---|---|
| IN RE SUBPOENA SERVED ON ELISABETH DEVOS | ) ) ) ) ) ) ) ) ) ) ) ) |

## MOTION TO QUASH RULE 45 DEPOSITION SUBPOENA
## AND INCORPORATED MEMORANDUM OF LAW

JESSE PANUCCIO

Boies Schiller Flexner LLP
401 E. Las Olas Blvd.
Ste. 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Email: jpanuccio@bsfllp.com

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

R. CHARLIE MERRITT
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Telephone: (202) 514-3183
Email: kevin.p.hancock@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.      STATUTORY AND REGULATORY BACKGROUND .................................................. 3

II.     THE DEPARTMENT'S BORROWER DEFENSE PROGRAM ....................................... 4

III.    THE UNDERLYING LITIGATION .............................................................................. 5

      A.     Plaintiffs' Unreasonable Delay Claim Under APA § 706(1) ................................. 5

      B.     The Parties' Settlement Agreement ..................................................................... 6

      C.     The District Court's Denial of the Settlement and Ordering of Discovery ........... 7

      D.     Plaintiffs' Discovery ......................................................................................... 8

      E.     Plaintiffs' Demand to Depose the Former Secretary ............................................ 9

ARGUMENT ................................................................................................................... 11

I.      FORMER HIGH-RANKING GOVERNMENT OFFICIALS ARE PROTECTED
      FROM TESTIFYING ABOUT THEIR OFFICIAL DECISIONS .................................. 11

II.     PLAINTIFFS CANNOT ESTABLISH EXTRAORDINARY CIRCUMSTANCES
      TO JUSTIFY A DEPOSITION OF A FORMER CABINET OFFICIAL ...................... 16

      A.     Plaintiffs Failed to Exhaust Potential Alternative Sources for the
           Information They Claim to Seek from the Former Secretary .............................. 17

      B.     Plaintiffs Cannot Demonstrate that the Former Secretary Has First-Hand
           Knowledge that Is Unique and Essential to Their Case ...................................... 20

           1.     Information Regarding the Form Denial Letters ...................................... 21

           2.     Information Regarding the Department's Alleged Delay ......................... 23

           3.     Information Regarding Borrower Defense Policy .................................... 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**

*Bey v. City of New York*,
No. 99 CIV.3873LMMRLE, 2007 WL 3010023 (S.D.N.Y. Oct. 15, 2007) ...................... 11, 12

*Bogan v. City of Boston*,
489 F.3d 417 (1st Cir. 2007) ........................................................................................... 11, 12

*Calvillo Manriquez v. DeVos*,
345 F. Supp. 3d 1077 (N.D. Cal. 2018) .................................................................................. 4

*City of Fort Lauderdale v. Scott*,
No. 10-61122-CIV, 2012 WL 760743 (S.D. Fla. Mar. 7, 2012) .................................. 12, 18, 19

*Croddy v. FBI*,
No. 00-cv-0651, 2005 WL 8168910 (D.D.C. Mar. 30, 2005) .................................................. 14

*Cruz v. Green*,
No. 18-60995-CIV, 2019 WL 5208913 (S.D. Fla. Feb. 7, 2019) ................................. 13, 14, 18

*Cusumano v. Microsoft Corp.*,
162 F.3d 708 (1st Cir. 1998) ............................................................................................ 14, 15

*Dobson v. Vail*,
No. C10-5233/KLS, 2011 WL 4404146 (W.D. Wash. Sept. 21, 2011) ................................... 14

*FDIC v. Galan-Alvarez*,
No. 1:15-mc-00752, 2015 WL 5602342 (D.D.C. Sept. 4, 2015) ...................................... *passim*

*Franklin Sav. Ass'n v. Ryan*,
922 F.2d 209 (4th Cir. 1991) ................................................................................................. 12

*Gil v. Cty. of Suffolk*,
No. CV06-1683(LDW)(ARL), 2007 WL 2071701 (E.D.N.Y. July 13, 2007) ........................ 14

*Gray v. Kohl*,
No. 07-10024-CIV, 2008 WL 1803643 (S.D. Fla. Apr. 21, 2008) .......................................... 13

*In re Cheney*,
544 F.3d 311 (D.C. Cir. 2008) ............................................................................................... 12

*In re Commodity Future Trading Comm'n*,
941 F.3d 869 (7th Cir. 2019) ................................................................................................. 12

*In re FDIC*,
    58 F.3d 1055 (5th Cir. 1995) .......................................................................... 12

*In re McCarthy*,
    636 F. App'x 142 (4th Cir. 2015) ................................................................. 12

*In re United States (Bernanke)*,
    542 F. App'x 944 (Fed. Cir. 2013) .............................................................. 14

*In re United States (Holder)*,
    197 F.3d 310 (8th Cir. 1999) ........................................................... 12, 17, 22

*In re United States (Jackson)*,
    624 F.3d 1368 (11th Cir. 2010) ............................................................. 11, 12

*In re United States (Kessler)*,
    985 F.2d 510 (11th Cir. 1993) ..................................................................... 12

*K.C.R. v. Cty. of Los Angeles*,
    No. CV 13-3806 PSG (SSx), 2014 WL 3434257 (C.D. Cal. July 11, 2014) ........... 13

*Lederman v. N.Y.C. Dep't of Parks & Recreation*,
    731 F.3d 199 (2d Cir. 2013) ............................................................... *passim*

*Marllantas, Inc. v. Rodriguez*,
    806 F. App'x 864 (11th Cir. 2020) .............................................................. 12

*Moriah v. Bank of China Ltd.*,
    72 F. Supp. 3d 437 (S.D.N.Y. 2014) ........................................................... 14

*Raymond v. City of New York*,
    No. 15-cv-6885, 2020 WL 1067482 (S.D.N.Y. Mar. 5, 2020) .............................. 13

*Simplex Time Recorder Co. v. Sec'y of Labor*,
    766 F.2d 575 (D.C. Cir. 1985) ............................................................. 12, 16

*Sweet v. Dep't of Educ.*,
    No. 3:19-cv-3674-WHA (N.D. Cal.) ............................................................... 4

*Sykes v. Brown*,
    90 F.R.D. 77 (E.D. Pa. 1981) ..................................................................... 13

*United States v. Morgan*,
    313 U.S. 409 (1941) ............................................................... 11, 12, 16

*United States v. Wal-Mart Stores, Inc.*,
  No. CIV.A.PJM-01-CV-152, 2002 WL 562301 (D. Md. Mar. 29, 2002) ......................... 13, 14

*Walker v. NCNB Nat'l Bank of Fla.*,
  810 F. Supp. 11 (D.D.C. 1993) ........................................................................... 12, 13

*Warren Bank v. Camp*,
  396 F.2d 52 (6th Cir. 1968) .................................................................................. 12

**STATUTES**

5 U.S.C. § 706(1) ....................................................................................................... 5

5 U.S.C. § 5312 ....................................................................................................... 14

20 U.S.C. § 1070 ....................................................................................................... 3

20 U.S.C. § 1087a ..................................................................................................... 3

**FEDERAL RULES**

Fed. R. Civ. P. 26(c) ............................................................................................... 11

Fed. R. Civ. P. 45(d)(3)(A) ................................................................................. 1, 10

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

34 C.F.R. § 685.222(i)(1) ........................................................................................... 3

Office of Postsecondary Education,
  60 Fed. Reg. 37,768-01 (July 21, 1995) ................................................................. 3

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
  Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher
  Education Assistance for College and Higher Education Grant Program
  81 Fed. Reg. 39330 (June 16, 2016) ....................................................................... 3

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family
  Education Loan Program, William D. Ford Federal Direct Loan Program, and
  Teacher Education Assistance for College and Higher Education Grant Program
  81 Fed. Reg. 75,926 (Nov. 1, 2016) ....................................................................... 3

Student Assistance General Provisions, Federal Family Education Loan Program, and
  William D. Ford Federal Direct Loan Program
  84 Fed. Reg. 49,788-01 (Sept. 23, 2019) ............................................................... 3

**OTHER AUTHORITIES**

Press Release, Student Borrowers Ask Court to Allow Deposition of Betsy DeVos
    on Borrower Defense (Jan. 11, 2021),
    https://predatorystudentlending.org/news/press-releases/student-borrowers
    -ask-court-to-allow-deposition-of-betsy-devos-on-borrower-defense-press-release/
    (last visited Feb. 4, 2021) ..................................................................................................... 10

**EXHIBIT LIST**

Ex. A:  Subpoena and Notice of Deposition

Ex. B:  Excerpts from Dec. 15, 2020 Deposition of Mark A. Brown

Ex. C:  Excerpts from Dec. 9, 2020 Deposition of Colleen M. Nevin

Ex. D:  Excerpts from Dec. 17, 2020 Deposition of James Manning

Ex. E:  Excerpts from Nov. 20, 2020 Deposition of Diane Jones

Ex. F:  Defendants' Dec. 7, 2020 Responses and Objections to Plaintiffs' First Set of
        Interrogatories

Ex. G:  Defendants' Jan. 14, 2021 Supplemental Responses and Objections to Plaintiffs' First Set
        of Interrogatories

Former U.S. Secretary of Education Elisabeth ("Betsy") DeVos, and the U.S. Department of Education, through undersigned counsel, respectfully move this Court under Federal Rule of Civil Procedure 45(d)(3)(A) to quash the non-party subpoena Plaintiffs have served upon the former Secretary, which orders her to appear for a deposition in this District on February 25, 2021.[1]

## INTRODUCTION

This is an action to prevent discovery abuse in the form of an extraordinary non-party deposition of a former Cabinet secretary. The underlying lawsuit is an Administrative Procedure Act ("APA") case pending in the Northern District of California, where a class of student-loan borrowers alleges that Defendant U.S. Department of Education ("Department") unreasonably delayed deciding their loan-discharge applications. Federal law permits certain borrowers to file claims with the Department for discharge of their loans based on the misconduct of the schools they attended. Since 2015, the Department has been inundated with such claims, after receiving only a small number of them over the previous 20 years. In 2018, the Department was making progress on deciding claims until May of that year, when a district court in the Northern District of California in a separate case preliminarily enjoined the Department from using its methodology for determining how much relief to provide to qualified applicants. As a result of that injunction and several other factors, the Department paused issuing decisions until December 2019, at which time the agency restarted notifying thousands of applicants as to whether their claims were eligible or ineligible for relief. Even though Plaintiffs' June 2019 Complaint claims that it seeks only to

---

[1]     Former Secretary DeVos is represented in her personal capacity by undersigned private counsel, and is represented in her capacity as former U.S. Secretary of Education by the U.S. Department of Justice ("DOJ"), pursuant to DOJ's representation of the U.S. Department of Education in the underlying litigation. The former Secretary resides part-time in this District and will be present in this District on February 25, 2021. *See* Fed. R. Civ. P. 45(c)(1)(A). Accordingly, this Court is the proper venue for this motion. *See* Fed. R. Civ. P. 45(d)(1) ("The court for the district where compliance is required must enforce th[e] duty" to avoid undue burden).

require the Department to "start granting or denying their borrower defenses," and the Department did just that, Plaintiffs now argue that the Department has determined as ineligible too many claims too quickly since December 2019.  And even though the underlying case is an APA challenge typically confined to the administrative record and discovery against agencies is disfavored, the Northern District of California has allowed Plaintiffs to take limited discovery on this new and shifting aspect of their case.  The Department has, in addition to the certified administrative record, produced four deponents who gave nearly 28 hours of testimony and responded to 49 requests for production of documents and 20 interrogatories.  Not satisfied, Plaintiffs now seek to depose the former head of the agency.

Plaintiffs' subpoena of a former Cabinet secretary is an *extraordinary* request:  current and former heads of government agencies are almost never subject to deposition in civil litigation. And in the rare instances where district courts have granted attempts to depose agency heads, courts of appeals across the country have consistently vacated their orders.  As those courts have explained, such officials rarely have unique information regarding administrative challenges and other civil litigation, and if the judiciary were to subject current and former high-level Executive branch officials to deposition in such cases, it would threaten the separation of powers, chill agency decisionmaking, discourage public service, and create potential for abuse or harassment.

The extraordinary circumstances that must exist in the face of these dangers to justify a deposition of a former Cabinet official do not exist here.  Plaintiffs cannot show, as they must, that the information they seek is both (1) unavailable from an alternative, less-intrusive source, and (2) essential to their case.  Indeed, Plaintiffs appear to be more interested in the deposition itself (and the press attention that might come with it) than in the information they claim to seek.  Plaintiffs rebuffed Defendants' offers to explore alternative sources, and instead hastily rushed to the district

court in the underlying action (overlooking the need for a Rule 45 subpoena) to try to secure their sought-after deposition while also filing a celebratory press release. Meanwhile, during the now-concluded discovery period, Plaintiffs used only four of the five depositions for other Department officials made available to them by the Northern District of California's discovery order, never took a Rule 30(b)(6) deposition, failed to use all of their interrogatories, and indeed, failed to even use those interrogatories to inquire into topics they now claim—incorrectly—are uniquely within the former Secretary's knowledge. This Court should quash the subpoena.

## BACKGROUND

### I.    STATUTORY AND REGULATORY BACKGROUND

Congress enacted Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, "to assist in making available the benefits of postsecondary education to eligible students" through financial assistance to students and institutions of higher education, *id.* § 1070(a). Under this authority, Congress created the William D. Ford Federal Direct Loan Program, *see* 20 U.S.C. § 1087a *et seq.*, under which the federal government makes direct loans to students to pay for their educational expenses, *id.* § 1087*ll*.

Although borrowers under Title IV are generally obligated to repay any federal loans received, the Department has promulgated regulations specifying the wrongful acts or omissions by a school that a borrower may assert as a defense against repayment (*i.e.*, a "borrower defense" claim). *See* 60 Fed. Reg. 37,768 (July 21, 1995); 81 Fed. Reg. 75,926 (Nov. 1, 2016); 84 Fed. Reg. 49,788-01 (Sept. 23, 2019). If a borrower defense claim is approved, the Department then "determines the appropriate amount of relief to award the borrower," which may constitute the entire amount of the loan "or some lesser amount." 34 C.F.R. § 685.222(i)(1).

## II.     THE DEPARTMENT'S BORROWER DEFENSE PROGRAM

Prior to 2015, the Department's borrower defense regulation was "rarely used."  81 Fed. Reg. 39,330, 39,330 (June 16, 2016).  In May 2015, however, Corinthian Colleges, Inc., filed for bankruptcy, precipitating a "flood of borrower defense claims submitted by Corinthian students[.]" *Id.*  The Department lacked a process for addressing claims, *id.* at 39,335, and so "[t]o address the unprecedented number of pending borrower defense claims," the Department appointed a Special Master in June 2015, Admin. R. ("AR") 339 (Decl. of Colleen Nevin ("Nevin Decl.") ¶ 11, Nov. 14, 2019), ECF No. 55.[2]  Eventually, the Department created a "Borrower Defense Unit" ("BDU") within its Federal Student Aid office ("FSA") to oversee and implement the borrower defense adjudication process.  AR 340-41 (Nevin Decl. ¶¶ 13, 19).

Following the change in administrations in January 2017, the Department conducted a re-view of the existing borrower-defense process.  AR 348-49 (Nevin Decl. ¶ 55).  At the conclusion of the Department's review, it announced, among other things, the development of a new method-ology for determining the amount of relief to be awarded to borrowers whose claims were ap-proved on certain bases.  AR 006-07 (Decl. of Diane Jones ("Jones Decl.") ¶¶ 15-16, Nov. 14, 2019); AR 350 (Nevin Decl. ¶ 62).  Between December 2017 and May 2018, the BDU applied the new methodology to submit for approval over 16,000 borrower defense claims and to determine as ineligible over 10,000 claims.  *See* AR 350 (Nevin Decl. ¶¶ 63-64).

On May 25, 2018, a district court preliminarily enjoined the Department from using its methodology due to a potential violation of the Privacy Act.  *See Calvillo Manriquez v. DeVos,*

---

[2]     All case-docket citations in this brief are to the electronic docket in the underlying case, *Sweet v. Dep't of Educ.*, No. 3:19-cv-3674-WHA (N.D. Cal.).

345 F. Supp. 3d 1077 (N.D. Cal. 2018).  The Department appealed,[3] and paused issuing borrower-defense decisions, and subsequently began the challenging work of developing a new relief methodology for approved claims that would ensure an appropriate level of debt relief while also avoiding any Privacy Act issues.  AR 008-099 (Jones Decl. ¶¶ 20, 23).

Other factors affected the Department's borrower-defense work.  For instance, in separate litigation, court orders were issued in the months following the *Calvillo Manriquez* injunction that resulted in a new borrower-defense regulation taking effect in October 2018, which necessitated considerable time and effort to implement.  *See* AR 005 (Jones Decl. ¶¶ 10-11); *see also generally* AR 320-24 (Decl. of Ian Foss, Nov. 14, 2019).  The relevant regulatory framework entails a time-intensive analysis to determine whether a borrower-defense application (and any supporting evidence) establishes the borrower's eligibility for a defense to repayment.  *See* AR 345-47 (Nevin Decl. ¶¶ 39-44).

On December 10, 2019, approximately six months after Plaintiffs filed their Complaint, the Department adopted a new relief methodology, and, as a result, resumed issuing tens of thousands of final defense decisions.  Supp. AR 588-601 (Jan. 9, 2020), ECF No. 71.

## III.   THE UNDERLYING LITIGATION

### A.   Plaintiffs' Unreasonable Delay Claim Under APA § 706(1)

In June 2019, Plaintiffs filed a class action complaint in the Northern District of California, challenging the Department's alleged delay in issuing borrower-defense decisions.  *See* Compl. ¶¶ 377-89, ECF No. 1.  The Complaint asserts a single claim under APA § 706(1), which authorizes courts to "'compel agency action unlawfully withheld or unreasonably delayed.'"  *See id.* ¶ 380

---

[3]      The Ninth Circuit did not issue a ruling before the underlying litigation was stayed pending the parties' still-ongoing settlement negotiations.

(quoting 5 U.S.C. § 706(1)). As relief, the Complaint—still operative to this day—alleges only that Plaintiffs seek a "simple" order compelling the Department to "start granting or denying their borrower defenses." *Id.* ¶ 10.[4]

On November 14, 2019, the Department lodged a certified administrative record, ECF No. 56, and later moved for summary judgment, arguing that the Department's temporary delay in making final borrower-defense decisions was caused by multiple factors and reflected the agency's reasonable balancing of competing priorities and the needs of federal student loan borrowers. *See* Defs.' Mot. for Summ. J. at 1-2 (Dec. 5, 2019), ECF No. 63.

**B.    The Parties' Settlement Agreement**

In April 2020, before any ruling on summary judgment, the parties executed a class-action settlement agreement, in which the Department agreed to issue final borrower-defense decisions on the applications of class members according to a specified timeline. ECF No. 97-2. The court preliminarily approved the proposed settlement agreement in May 2020, ECF No. 103, and the parties subsequently worked toward final approval of the deal. In the meantime, the Department continued to steadily issue final borrower-defense decisions (both approvals and denials), notwithstanding that the timelines set forth in the agreement had not yet begun to run. *See* ECF No. 116. On September 17, 2020, however, Plaintiffs moved not only for final approval of the agreement, but also to enforce it. ECF No. 129. Specifically, Plaintiffs took issue with the substance of certain denial (but not approval) notices that the Department had been issuing throughout the parties'

---

[4]    The court certified a class consisting of all people who borrowed a qualifying Title IV loan "who have asserted a borrower defense to repayment," and "whose borrower defense has not been granted or denied on the merits," while carving out members of a separate class action. ECF No. 46 at 14. The Complaint's second count was dismissed in 2019. ECF No. 41.

settlement negotiations, and claimed that these notices provided insufficient reasoning in violation of the APA and due process.  *Id.*

### C.     The District Court's Denial of the Settlement and Ordering of Discovery

On October 19, 2020, after holding a hearing, the district court denied final approval of the settlement agreement, and denied the motion to enforce as moot, concluding that the parties had failed to reach a meeting of the minds on what constitutes a "final decision."  Order Denying Class Settlement, to Resume Disc., and to Show Cause ("Oct. 19 Order") at 7-10 (Oct. 19, 2020), ECF No. 146.

Although the only relief Plaintiffs sought remained a "simple" order compelling the Department to "start granting or denying their borrower defenses," the district court *sua sponte* ordered a two-month "expedited discovery" period, at the end of which "the class shall move for summary judgment as to the lawfulness of the Secretary's delay, and the lawfulness of the perfunctory denial notice."  Oct. 19 Order at 16.  The court stated that discovery in this APA case was justified because the Department's administrative record was "incongruent" with the explanation provided in its denial notices.  *Id.* at 12 (citation omitted).  Moreover, the court determined that, after the Department restarted issuing decisions in December 2019, the Department issued decisions too quickly and had denied too many claims.  *See id.* at 14.  The court found that because the agency had allegedly justified the timing of decisions "largely on the backbreaking effort required to review individual applications" there was "a strong showing of agency pretext" and thus some discovery was warranted.  *Id.* at 15.

The district court set several limits on Plaintiffs' ability to take "limited" discovery, "[b]earing in mind that discovery against agencies is disfavored."  Oct. 19 Order at 15-16.  First, it limited discovery to an approximately two-month period, with a deadline of December 24,

2020.[5]  *Id.* at 16-17.  Second, it limited discovery to three discrete topics: (1) the Department's "development and use of the form denial letters"; (2) the "extent to which the difficulty of reviewing borrower-defense applications actually caused or justified the Secretary's eighteen-month delay"; and (3) the "extent to which the Secretary has denied applications of students who have attended schools" subject to certain findings of misconduct.  *Id.* at 16.  Third, the court allowed Plaintiffs to take written discovery and up to "five fact depositions of relevant decisionmakers" from offices "within the Office of the Under Secretary."  *Id.*

Finally, the court also specified that "given '[h]eads of government agencies are not normally subject to deposition,' class counsel may not yet depose the Secretary," and that only "[e]xtraordinary circumstances"—such as "if the Secretary has unique first-hand knowledge or necessary information cannot be obtained through other, less intrusive means"—could "justify such a deposition at a later date."  Oct. 19 Order at 16 (citation omitted).

### D.    Plaintiffs' Discovery

Nearly three weeks after the October 19 discovery order, Plaintiffs served Defendants with two sets of written discovery requests consisting of 49 requests for production and 20 interrogatories.  After serving timely objections and responses, Defendants responded to Plaintiffs' first and second sets of interrogatories on December 7 and 10, 2020, respectively; made a substantial production of documents on December 23, 2020; and supplemented their interrogatory responses and document production on January 14, 2021.  Additionally, Plaintiffs noticed and conducted four of the five depositions that the court made available to them for "relevant decisionmakers" other than the Secretary.  The four deponents were then-Under Secretary Diane Jones, BDU Director Colleen

---

[5]     The Court later entered an order allowing Defendants to complete their production of documents by January 14, 2021, but otherwise did not disturb the original December 24, 2020 discovery cut-off date.  ECF No. 170 at 2.

Nevin, FSA Chief Operating Officer Mark Brown, and former Under Secretary and Acting FSA
Chief Operating Officer James Manning.

     **E.**      **Plaintiffs' Demand to Depose the Former Secretary**

     On January 6, 2021, Plaintiffs informed Defendants by telephone that they intended to seek
to depose then-Secretary DeVos.  ECF No. 171 at 5.  The next day, January 7, Defendants sent
Plaintiffs a letter requesting "precisely the information that you seek to solicit from the Secretary
that you have not been able to obtain elsewhere," and stating that they were "open to exploring
other, less intrusive means of providing your requested discovery."  *Id.*  Defendants pointed out
that Plaintiffs had taken only four of their five available depositions, and that Defendants would
be "open to further conferring about a different deponent who might have relevant knowledge."
*Id.*  Defendants also pointed out that the parties had seven days to work out any differences relating
to Defendants' responses to interrogatories.  *Id.*  Later that evening, Secretary DeVos announced
her resignation, which was effective the next day.

     Plaintiffs responded to Defendants' letter the next day, January 8, asserting that the four
Department officials they deposed "all left holes that can only be filled by Secretary's DeVos's
personal knowledge" on topics "including but not limited to" (1) "[t]he development and approval
of" the form denial notices; (2) "[w]ho ordered FSA to stop issuing borrower defense decisions"
and why; and (3) "Borrower Defense Policy."  ECF No. 171 at 8-9 (emphasis omitted).  Plaintiffs
acknowledged that the parties had agreed that Defendants would let Plaintiffs know by January 14
whether they would supplement their response to Interrogatory No. 16, which is similar to Plain-
tiffs' first proposed deposition category for the former Secretary.  *Id.* at 9; *see also id.* at 1 & n.2.
But Plaintiffs stated that their desire to depose the former Secretary "would not be satisfied by a

more fulsome response to Interrogatory No. 16." *Id.* at 9.  Plaintiffs' letter concluded by giving Defendants less than 24 business hours to respond.  *Id.*

Defendants responded the next business day, January 11, and informed Plaintiffs that the Department was exploring whether it could provide the information Plaintiffs sought through less intrusive means.  ECF No. 171 at 11.  Defendants requested a "reasonable amount of time for the Department to continue this investigation." *Id.*  Two-and-a-half hours later, Plaintiffs responded with a letter stating that they had "given you enough time to consider our request," and that "today we will move the Court accordingly."  ECF No. 171 at 14.  No further meet-and-confer was necessary, in Plaintiffs' view, because "'less intrusive means' have already been tried." *Id.*

Less than two-and-a-half hours later, Plaintiffs filed a letter brief with the Northern District of California district court seeking leave to take the former Secretary's deposition.  ECF No. 171.  Counsel for Plaintiffs also issued a press release.[6]  The next day, the court ordered that Plaintiffs could only pursue a private party's deposition through a Rule 45 subpoena.  ECF No. 172.

On January 27, 2021, the Department agreed to accept service of Plaintiffs' subpoena on behalf of the former Secretary.  *See* Ex. A (DeVos Subpoena and Notice of Deposition).  The subpoena commands the former Secretary to sit for a deposition in Vero Beach, Florida on "February 25, 2021 or a date mutually agreeable to the Parties."[7]  *Id.*

---

[6]     *See* Press Release, Student Borrowers Ask Court to Allow Deposition of Betsy DeVos on Borrower Defense (Jan. 11, 2021), https://predatorystudentlending.org/news/press-releases/student-borrowers-ask-court-to-allow-deposition-of-betsy-devos-on-borrower-defense-press-release/ (last visited Feb. 8, 2021).

[7]     The parties have agreed that the compliance date for the subpoena should be stayed, if necessary, pending a final order on this motion to quash.

**ARGUMENT**

## I.   FORMER HIGH-RANKING GOVERNMENT OFFICIALS ARE PROTECTED FROM TESTIFYING ABOUT THEIR OFFICIAL DECISIONS

"[A] district court should rarely, if ever, compel the attendance of a high-ranking official in a judicial proceeding." *In re United States (Jackson)*, 624 F.3d 1368, 1376 (11th Cir. 2010). Under Rule 45, the Court "must quash or modify a subpoena that . . . subjects a person to undue burden," or that "requires disclosure of privileged or other protected matter, if no exception or waiver applies[.]"  Fed. R. Civ. P. 45(d)(3)(A)(iii) & (iv).  "Generally, courts afford greater protection to non-parties in discovery, and nonparty subpoenas must meet a higher standard of relevance than subpoenas directed toward parties." *Conforti v. St. Joseph's Healthcare Sys., Inc.*, No. 2:17-cv-0050, 2019 WL 3847994, at *2 (D.N.J. Aug. 15, 2019).  And although the party moving to quash ordinarily bears the burden of persuasion, *Linder v. Dep't of Defense*, 133 F.3d 17, 24 (D.C. Cir. 1998), where, as here, the subpoena is issued to a high-ranking government official, courts apply the "apex doctrine," which requires the party seeking to depose the official to demonstrate that "extraordinary circumstances" justify the deposition.  *See, e.g.*, *FDIC v. Galan-Alvarez*, No. 1:15-MC-00752 (CRC), 2015 WL 5602342, at *3 (D.D.C. Sept. 4, 2015).

In *United States v. Morgan*, the Supreme Court held that the Secretary of Agriculture should not have been subjected to a deposition because it was improper "to probe [his] mental processes[.]"  313 U.S. 409, 421-22 (1941).  Since then, the Eleventh Circuit and other courts across the nation have routinely held under the apex doctrine that high-ranking government officials, both current and former, should not—absent exceptional circumstances—be deposed or called to testify regarding an agency's reasons for taking, or facts regarding, official action.  *See, e.g.*, *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203-04 (2d Cir. 2013); *In re United States (Jackson)*, 624 at 1372-73; *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir.

2007); *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993); *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586-87 (D.C. Cir. 1985); *Warren Bank v. Camp*, 396 F.2d 52, 56 (6th Cir. 1968); *City of Fort Lauderdale v. Scott*, No. 10-61122-CIV, 2012 WL 760743, at *2 (S.D. Fla. Mar. 7, 2012).  Courts of appeals have even utilized the extraordinary remedy of a writ of mandamus to prevent such testimony.  *See, e.g.*, *In re Commodity Future Trading Comm'n*, 941 F.3d 869, 874 (7th Cir. 2019); *In re McCarthy*, 636 F. App'x 142, 145 (4th Cir. 2015); *In re United States (Jackson)*, 624 F.3d at 1369-70; *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008); *In re United States (Holder)*, 197 F.3d 310, 316 (8th Cir. 1999); *In re FDIC*, 58 F.3d 1055, 1057 (5th Cir. 1995); *In re United States (Kessler)*, 985 F.2d at 513.

Three separate rationales underlie this robust protection.  *First*, it "would have serious repercussions for the relationship between two coequal branches of government" to allow parties litigating against federal agencies to ascertain the thoughts and mental processes by which high-ranking agency officials exercise their official discretion (as opposed to those agencies' decisions).  *In re United States (Jackson)*, 624 F.3d at 1372 (citation omitted); *see Morgan*, 313 U.S. at 422 ("Just as a judge cannot be subjected to such a scrutiny, . . . so the integrity of the administrative process must be equally respected." (citations omitted)); *Marllantas, Inc. v. Rodriguez*, 806 F. App'x 864, 867 (11th Cir. 2020) ("[J]udicial inquiry into executive motivation represents a substantial intrusion into the workings of another Branch of Government[.]" (citation omitted)).

*Second* and relatedly, subjecting high-level government officials to depositions in civil actions involving their agency would impede the exercise of official duties by exerting a chilling effect on official decision-making.  *See Lederman*, 731 F.3d at 203.  That is, "subjecting officials to interrogation about how they reached particular decisions would impair that decision-making

process by making officials less willing to explore and discuss all available options, no matter how controversial." *Walker v. NCNB Nat'l Bank of Fla.*, 810 F. Supp. 11, 12 (D.D.C. 1993); *see also Sykes v. Brown*, 90 F.R.D. 77, 78 (E.D. Pa. 1981) ("Should the agency head be subject to deposition in every resulting case and be repeatedly required to explain the various mental steps he took to reach his decision, the decision may be his last.").

*Third*, allowing depositions of high-ranking Government officials as a matter of course when their agencies are sued over one of their policies would create "a tremendous potential for abuse or harassment[,]" *K.C.R. v. Cty. of Los Angeles*, No. CV 13-3806 PSG (SSx), 2014 WL 3434257, *3 (C.D. Cal. July 11, 2014) (citation omitted), and "would likely discourage [people] from accepting positions as public servants," *United States v. Wal-Mart Stores, Inc.*, No. CIV.A.PJM-01-CV-152, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002); *see also Gray v. Kohl*, No. 07-10024-CIV, 2008 WL 1803643, at *1 (S.D. Fla. Apr. 21, 2008) ("[Courts] generally restrict parties from deposing high ranking officials lacking personal knowledge of the issues being litigated because they are vulnerable to numerous, repetitive, harassing, and abusive depositions, and therefore need some measure of protection from the courts." (citation omitted)).

These rationales apply fully to high-ranking public officials after they leave office, and, as noted above, numerous courts, including this District, have precluded depositions of *former* high-ranking officials regarding their decisionmaking while in office.  *See, e.g.*, *Lederman*, 731 F.3d at 203-04 (former deputy mayor); *Raymond v. City of New York*, No. 15-cv-6885, 2020 WL 1067482, at *5 (S.D.N.Y. Mar. 5, 2020) (former police commissioners); *Cruz v. Green*, No. 18-60995-CIV,

2019 WL 5208913, at *2-4 (S.D. Fla. Feb. 7, 2019) (former county sheriff).[8]  As the *Galan-Alvarez* court explained:

> The integrity of administrative proceedings and the underlying decisionmaking process of agency officials are just as important where the official to be questioned no longer serves in the same position.  And indiscriminate depositions of high-ranking government officials would . . . likely discourage people from accepting positions as public servants irrespective of whether those deposed were current or former officials.

2015 WL 5602342, at *4 (citation omitted); *see In re United States (Bernanke)*, 542 F. App'x 944, 949 (Fed. Cir. 2013); *Cruz*, 2019 WL 5208913, at *3; *Wal-Mart*, 2002 WL 562301, at *5.  The apex doctrine's concerns thus do not arbitrarily dissipate the moment a former Cabinet secretary has left office; "[i]f the immunity *Morgan* affords is to have any meaning, the protections must continue upon the official's departure from public service." *Wal-Mart*, 2002 WL 562301, at *3.

The concerns of the apex doctrine all apply to Plaintiffs' attempt to depose former Secretary DeVos, who held one of the highest-ranking federal offices as a member of the Cabinet reporting directly to the President.  5 U.S.C. § 5312.  Although she no longer holds that office, the apex doctrine protects the former Secretary just the same.  And now that the former Secretary is no longer a party to the underlying lawsuit, Rule 45 also entitles her to greater protection from Plaintiffs' attempt to impose the burdens of discovery upon her. *See, e.g., Cusumano v. Microsoft*

---

[8]    *See also FDIC v. Galan-Alvarez*, No. 1:15-mc-00752, 2015 WL 5602342, at *4-5 (D.D.C. Sept. 4, 2015) (former FDIC chair and senior deputy director); *Croddy v. FBI*, No. 00-cv-0651, 2005 WL 8168910, at *1 (D.D.C. Mar. 30, 2005) (former FBI director); *Moriah v. Bank of China Ltd.*, 72 F. Supp. 3d 437 (S.D.N.Y. 2014) (former House Majority Leader of the House of Representatives); *Gil v. Cty. of Suffolk*, No. CV06-1683(LDW)(ARL), 2007 WL 2071701, at *2 (E.D.N.Y. July 13, 2007) (former Suffolk County Police Commissioner); *Bey v. City of New York*, No. 99 CIV.3873LMMRLE, 2007 WL 3010023, at *3 (S.D.N.Y. Oct. 15, 2007) (former Commissioner of the New York City Department of Correction); *Wal-Mart*, 2002 WL 562301, at *1 (former Chair of the Consumer Product Safety Commission); *Dobson v. Vail*, No. C10-5233/KLS, 2011 WL 4404146, at *1 (W.D. Wash. Sept. 21, 2011) (former Secretary of the Washington State Department of Corrections).

*Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs [under Rule 45].").

Indeed, the concerns of Rule 45 and the apex doctrine apply with extra force in this case given the way in which Plaintiffs conducted their previous four depositions.  The transcripts of those depositions are littered with inappropriate attempts by Plaintiffs to probe the motivations, mental impressions, and deliberations of Department officials—including those of the former Secretary.  *See, e.g.*, Ex. B (Brown Dep. 78:20-79:16 (asking the witness, "what do you take that to mean, [Secretary DeVos's] comment?," and "what caused her extreme displeasure?"); 227:21-230:7 (asking the witness to read a statement the former Secretary made at a speech, and then asking, "what do you understand this statement to mean[?]," and "have you ever heard Ms. DeVos in your private meetings with her express these same sentiments?"), Dec. 15, 2020); Ex. C (Nevin Dep. 130:10-21 (asking the witness, "[w]hat did you take the Secretary's comment to mean[?]"), Dec. 9, 2020); Ex. D (Manning Dep. 69:20-70:4 ("After [the former Secretary] signed this document, did you talk to her about her extreme displeasure?"), Dec. 17, 2020).[9]

---

[9]     Plaintiffs' questioning also repeatedly targeted the motivations, mental impressions, and deliberations of other Department officials.  *See, e.g.*, Ex. E (Jones Dep. 138:9-12 ("[B]efore the methodology went into effect in December 2019 and the claim decisions restarted, was the backlog an ongoing concern of yours?"); 156:12-157:15 (Plaintiffs' counsel arguing that it was appropriate to ask whether "the witness, who's in charge of policy, agrees with this statement about the risk of unsubstantiated claims" appearing in the Department's 239-page regulation); 278:6-10 ("And when you were reviewing the form denial letters, did you think about or consider whether or not they would provide enough information for a borrower to seek reconsideration?"); 283:16-18 ("What other information did you think when you reviewed this template would be included there?"), Nov. 20, 2020); Brown Dep. 46:4-5 ("So was the stoppage a concern when you joined [the Department?]"); 51:1-3 ("And when you made those requests [for additional staff members], how did — for instance, how did the Secretary respond?"); 84:1-4 ("And, so, when BDU came up with its performance metric, what deliberations did you have with the BDU?").

In addition, Plaintiffs used their depositions as an opportunity to interrogate Department deponents on topics that lie far outside of the limited boundaries set by the district court for discovery, despite Defendants' repeated objections.  For instance, Plaintiffs questioned witnesses about their bonuses and compensation, *see, e.g.*, Ex. E (Jones Dep. 133:11-19, Nov. 20, 2020); Brown Dep. 34:21-22; their performance reviews, *see, e.g.*, Jones Dep. 134:25-135:15; Brown Dep. 30:24; the valuation of the Department's loan portfolio, *see, e.g.*, Jones Dep. 230:8-231:21; decisions to recuse from certain matters, *see, e.g.*, *id.* at 217:23-221:12; matters relevant to other litigation against the Department, *see, e.g.*, *id.* at 154:12-13; events occurring both long before and after the alleged delay in this case, *see, e.g.*, *id.* at 256:18-257:1, such as consulting work one witness performed while not employed by the Department, *see* Manning Dep. 146:6-150:5; and another witnesses' routine "discussions about borrower defense with the Trump transition team in January, February of 2017," Nevin Dep. 112:3-25, among other irrelevant matters.

There is thus every reason to expect that Plaintiffs will use the same tactics on the former Secretary that they used in other depositions in this case, directly implicating all three of the serious concerns—separation of powers, preventing harm to agency decisionmaking, and preventing harassment and the deleterious effect harassment would have on public service—underlying the rule against depositions of current and former Cabinet officials.

## II.   PLAINTIFFS CANNOT ESTABLISH EXTRAORDINARY CIRCUMSTANCES TO JUSTIFY A DEPOSITION OF A FORMER CABINET OFFICIAL

Given these serious concerns, courts have held that a deposition of a current or former high-ranking government official can be justified only by a showing of "extraordinary circumstances." *Simplex Time Recorder Co.*, 766 F.2d at 586 (citing *Morgan*, 313 U.S. at 422).  Extraordinary circumstances have been found to exist only where it is shown that "'the official has *unique* first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained

through other, less burdensome or intrusive means.'"  *Galan-Alvarez*, 2015 WL 5602342, at *3

(quoting *Lederman*, 731 F.3d at 203) (emphasis added).  This standard requires the party seeking

discovery to make two distinct showings: first, that the information sought "is not obtainable from

another source," and second, that it is "essential to his case."  *In re United States (Holder)*, 197

F.3d at 313-14 (requiring a showing that "the discovery sought [from the high-level government

official] is relevant and necessary").  Plaintiffs have not made, and cannot make, either showing.

A.     **Plaintiffs Failed to Exhaust Potential Alternative Sources for the
       Information They Claim to Seek from the Former Secretary**

As an initial matter, Plaintiffs' rush to the courthouse in the face of Defendants' offers to

explore alternative sources, *see supra* pp. 9-10, indicates that they are more interested in obtaining

a deposition of the former Secretary than they are in the information they claim to need.  Plaintiffs

filed their letter brief seeking the former Secretary's deposition just three business days after rais-

ing the topic with Defendants on January 6.  *Id.*  During those three days, Defendants told Plaintiffs

that the Department was "open to exploring other, less intrusive means of providing your requested

discovery."  *Id.* at 9.  After Plaintiffs specified what information they sought, the Department re-

sponded that it had started investigating whether it could provide that information and requested

"a reasonable amount of time for the Department to continue this investigation."  *Id.* at 10.  But

instead, Plaintiffs waited less than five hours before filing their request for the former Secretary's

deposition—followed by a celebratory press release.[10]  *Id.* at 9-10.  Plaintiffs offered no reason

---

[10]     In that press release, class counsel frankly reveal that they view a deposition of the former
Secretary as necessary because she allegedly has a generalized "obligation to explain why de-
frauded student borrowers were ignored for years by the Education Department and then summar-
ily denied their rights."  *See supra* p. 10 n.6.  But the APA creates no such legal obligation, and
the press release's statement stands in stark contrast to Plaintiffs' claim to the district court that
they merely seek narrow categories of information that is unavailable from other sources.  And, of

for their hurry, and there was none:  no deadline for their deposition request loomed and summary judgment briefing was not due for more than two months.

In three specific ways, Plaintiffs failed to even attempt to use both the available time and means of discovery at their disposal to exhaust alternative sources.  First, and most tellingly, Plaintiffs used only four of the five depositions that the district court made available to them for use in the now-concluded discovery period before seeking the former Secretary's deposition.  *See supra* pp. 8-9; *cf. Cruz*, 2019 WL 5208913, at *4 (denying attempt to depose former sheriff under the apex doctrine where "Plaintiff apparently has not yet deposed other officials or officers of the Broward County Sheriff's Office").  Defendants pointed out this omission to Plaintiffs and even offered to confer "about a different deponent who might have relevant knowledge," but Plaintiffs' response simply ignored the offer.  *Supra* p. 9.  With that fifth and unused deposition, Plaintiffs could have questioned another current or former Department employee with relevant knowledge, such as one of the 15 such individuals identified in Defendants' interrogatory responses whom Plaintiffs did not depose.  Ex. F (Defs.' Resps. and Objs. to Pls.' First Set of Interrogs. at 3-4, Dec. 7, 2020).  That list of potential witnesses shows that Plaintiffs are incorrect when they claim that "[t]aken together," their "four deponents account for . . . the operations of FSA and the Office of the Under Secretary (OUS) for the relevant time period."  ECF No. 171 at 1.  But even if Plaintiffs were correct, they still could have conducted a Rule 30(b)(6) deposition.  That alternative would have allowed Plaintiffs to ask the designated witness about information known or reasonably available to the Department as a whole—including the former Secretary.  *See City of Fort Lauderdale*,

---

course, the press release shows that Plaintiffs' counsel is seeking, through this high-profile deposition, to get much more than the only thing sought in the Complaint: a "simple" order compelling the Department to "start granting or denying their borrower defenses."  Compl. ¶ 10.

2012 WL 760743, at *4 (denying deposition under the apex doctrine because "Plaintiffs never attempted to obtain the information sought through a Rule 30(b)(6) deposition").

Second, Plaintiffs also declined Defendants' offer to negotiate whether any of Defendants' interrogatory responses could be supplemented to provide the information Plaintiffs seek through the extraordinary deposition of the former Secretary. *See supra* pp. 9-10. Plaintiffs used just 20 of their 25 available interrogatories, *see id.* at 8, and only one of those 20 (No. 16) even asked about a specific topic upon which Plaintiffs now claim to have an urgent need to depose the former Secretary, *compare* Ex. F at 22, *with* ECF No. 171 at 8. Plaintiffs rejected Defendants' offer even though the parties still had six days at that time to negotiate supplemental interrogatory responses. *See supra* p. 9. Plaintiffs asserted categorically that the alleged basis to depose the former Secretary "would not be satisfied by a more fulsome response to Interrogatory No. 16." *Id.* And yet just three days later, Plaintiffs argued to the district court that the former Secretary's deposition was justified in part because Defendants' initial response to Interrogatory No. 16 was *not fulsome enough.* ECF No 171 at 1 (objecting that the response was "one paragraph long, [and] provide[d] no names"). On January 14, Defendants supplemented their response to Interrogatory No. 16, providing further detail, including the names of additional individuals involved in the development of the denial letters. Ex. G (Defs.' Suppl. Resps and Objs to Pls' First Set of Interrogs. at 4-5). Plaintiffs have not sought to depose any of these additional individuals.

Third, and finally, Plaintiffs also could have propounded Rule 36 requests for admission seeking the information they want to elicit from a deposition of the former Secretary. Instead, they did not propound a single request for admission during the entire discovery period.

In short, Plaintiffs did not exhaust—and did not even attempt to exhaust—the many avenues of discovery that were available to them short of an extraordinary deposition of a former

Cabinet secretary.  Instead, Plaintiffs improperly rushed to issue a third-party subpoena despite their obligation to avoid imposing undue burden.  Fed. R. Civ. P. 26(c), 45(d)(3)(A)(iii) & (iv).

### B.  Plaintiffs Cannot Demonstrate that the Former Secretary Has First-Hand Knowledge that Is Unique and Essential to Their Case

Despite not even trying to exhaust alternative sources, Plaintiffs claim that the former Secretary "must be deposed."  ECF No. 171 at 1.  Their flawed argument boils down to this:  Because Plaintiffs did not obtain certain information from the four individuals they chose to depose during two months of expedited discovery, "[t]his has made it clear that only Secretary DeVos, as the senior-most policy-setting individual at the agency," has unique first-hand relevant knowledge. *Id.*; *see also, e.g.*, *id.* at 14 ("In sum: the four depositions we have taken, and the approximately 2500 documents you have thus far produced do not fully answer the questions at the heart of this case.  Secretary DeVos can.").

Plaintiffs are wrong.  Just because four Department employees purportedly could not testify to certain alleged facts does not establish that the former Secretary could—or that even if she could, that her knowledge would be both *unique* and *essential* to the case, as Plaintiffs must show under the apex doctrine.  *Supra* pp. 16-17.  The Department's four deponents and its discovery responses do not state that the former Secretary has any relevant first-hand knowledge of the topics Plaintiffs seek testimony about, while identifying more than a dozen other individuals who do. *See, e.g.*, Ex. E at 3-4, Ex. F at 4-5.  And the unremarkable fact that the former Secretary was in charge of policy at the agency she led cannot justify her deposition.  *Every* Cabinet head is in charge of policy at his or her agency.  And so even if the former Secretary had knowledge relevant to this case—a point for which Plaintiffs have provided no support—it would "merely reinforce the point that former [Secretary DeVos] was high-ranking," not "that any knowledge she gained .

. . was unique." *Galan-Alvarez*, 2015 WL 5602342, at *5. These flaws undermine each of Plaintiffs' three claims that the former Secretary possesses knowledge that is unique and essential.

### 1.  Information Regarding the Form Denial Letters

Plaintiffs' claim that they "have exhausted the available means of discovery and have been unable to extract information about [the denial letters]," ECF No. 171 at 1, is patently incorrect both because Plaintiffs did not in fact exhaust the available means of discovery, *see supra* pp. 17-20, but also because the discovery they did take elicited plenty of relevant information about the development and use of the denial letters. The three (of the four) deponents who were at the Department when the letters were developed and used testified *at length* about them. For example, Ms. Nevin testified, among other things, about which denial letter would go to which borrowers, Nevin Dep. 80:24-81:9; how the Department determined how to insert the appropriate review recommendation reason in the letter, *id.* at 81:10-83:9; how the denial notices were developed by "an FSA communication team and our borrower defense program management team," along with "our senior leadership at the department and the Office of General Counsel," *id.* at 86:8-25; how her BDU team served "in a consulting role" on the development of the letters, *id.* at 87:9-88:3; how the development of the letters was "a weeks' long process," *id.* at 89:19-20; when the letters would state the applicable legal standard, *id.* at 90:12-92:3; the meaning of particular language used in an actual denial notice received by an individual Plaintiff, *id.* at 93:2-95:13; 98:1-99:25; when the form denial letters were finalized, *id.* at 162:7-10; and the letters' discussion of the reconsideration process, *id.* at 211:24-216:23.[11]

---

[11]    In addition, then-Under Secretary Jones described, among other things, how the Department sends those letters to borrowers, Jones Dep. 188:2-189:9; the Department's internal process for developing the denial letters, *id.* at 189:10-190:6; how long it took to develop the letters, *id.* at 190:7-17, the complexity and challenges involved with developing the letters, *id.* at 190:18-

In addition, Defendants' supplemental response to Interrogatory No. 16 generally describes the drafting and review process for the denial letters and ends with the statement that "there is no indication that former Secretary DeVos was involved in the review or approval of the template letters A, B, C or D." Ex. F at 5. Although Plaintiffs' January 11 letter brief complains that Defendants' initial response to Interrogatory No. 16 "provides no names," ECF No. 171 at 1, the Department's deponents had already named specific individuals or groups who drafted, reviewed, and provided input for the drafts, *see, e.g.*, Nevin Dep. 88:4-89:21 (stating that "a lot of people worked on" the letters, including "Nicki Meoli," "Chad Schrecengost," and OGC); Jones Dep. 202:18-203:6 (identifying Ms. Nevin); Brown Dep. 170:22-173:25 (stating that FSA's "policy liaison" team led by "Ian Foss" and BDU helped draft the letters, which were reviewed by OGC and the Office of the Under Secretary). Defendants' January 14 supplemental response provides additional names, stating that the letters were "sent to other officials in the Department, including Jed Brinton . . . and other attorneys in [OGC], as well as Diane Jones (the Principal Deputy Under Secretary) and Robert Eitel (then Counselor to the Secretary)." Ex. F at 5.

In any event, the identity of "who gave the final sign-off on the form denial templates," ECF No. 171 at 2, is not essential—and indeed, irrelevant—to the merits of this APA case. The subpoena can and should be quashed on that ground alone. *In re United States (Holder)*, 197 F.3d at 313-14. It is not disputed that the Department in fact approved these letters and sent them to certain borrowers. And the district court authorized discovery only on the "*development* and *use* of the form denial letters," Oct. 19 Order at 16 (emphases added), not on who gave final approval on the letters. Indeed, the name of "who gave the final sign-off" has no bearing on whether the

---

195:25; how she helped edit the letters, *id.* at 202:13-17; the meaning of particular language used in the letters, *id.* at 202:18-205:5; and when a denial letter would include the applicable legal standard, *id.* at 211:7-213:24. *See also* Brown Dep. 176:8-187:16 (testifying about the letters).

Department's timing in issuing decisions was unreasonble, whether the letters contain insufficient analysis, or whether Plaintiffs are entitled to the "simple" order the Complaint seeks compelling the Department to "start granting or denying their borrower defenses."  Compl. ¶ 10.

## 2.     Information Regarding the Department's Alleged Delay

Plaintiffs' contention that the former Secretary also has unique knowledge of "[w]ho ordered FSA to stop issuing borrower defense decisions from June 2018 through December 2019 and why," ECF No. 171 at 8 (emphasis omitted), is based on a misrepresentation of the record. Plaintiffs assert that James Manning identified the former Secretary as "the only individual with authority to stop or restart issuing borrower defense decisions," *id.*, but he testified only that he "expects that the Secretary has that authority," Manning Dep. 123:24-25.  He did not say he knows anything at all, but just that he surmised or expected as much.  And he did not even say that he expected she was the *only* individual that would have such authority, that she actually exercised that authority, or, most importantly, that she was the only individual with knowledge about how such a decision would be made or was made.  Instead, Mr. Manning stated that he "would expect that [the Secretary would] be briefed by others, including the general counsel on an issue before an action like that was taken." *Id.* 123:25-124:3.  Indeed, Plaintiffs do not explain how the former Secretary could have ordered FSA to stop issuing decisions while also keeping that decision to herself—as would be necessary to possess any unique information on the subject.  *Cf. Galan-Alvarez*, 2015 WL 5602342, at *5 (FDIC chair's knowledge of an FDIC project "is further evidence that lower-ranking officials generated the information presented to Chairperson Bair").

Plaintiffs also illogically claim that the former Secretary is the only person who knows *why* the agency's delay occurred, but their own letter brief contradicts that claim, as it cites and details

testimony offered by the Department's witnesses on the multifaceted reasons for the delay (including the *Calvillo Manriquez* injunction, need for a new relief methodology, and staffing issues). ECF No. 171 at 2.  Plaintiffs' self-serving assertion that there could be only one "real" reason for the agency's delay is contrary to the record, *supra* pp. 4-5, and in any event does not mean that the former Secretary possesses any unique knowledge on the topic.  And even if, somehow, the Secretary had been uniquely responsible for the agency's pause of borrower-defense determinations, questioning her about her reasons would be precisely the kind of probing into a high-ranking agency official's thoughts and mental processes that the apex doctrine disallows.

Finally, the information Plaintiffs seek from the former Secretary is also non-essential and irrelevant to the case.  The district court allowed discovery on the "extent to which the difficulty of reviewing borrower-defense applications" actually caused Defendants' delay, ECF No. 146 at 16, but did not authorize the unbounded inquiry into the supposed "*real* reasons for the delay," ECF No. 171 at 2, that Plaintiffs would like to conduct.

### 3.      Information Regarding Borrower Defense Policy

Finally, Plaintiffs' claim that they also must depose the former Secretary because she allegedly has unique first-hand knowledge on the breathtakingly broad topic of "Borrower Defense Policy." ECF No. 171 at 8-9 (emphasis omitted).  Yet each of the four witnesses Plaintiffs already deposed testified regarding their extensive knowledge of borrower-defense policies.  *See, e.g.*, Jones Dep. 103:1-110:12, 114:17-117:2; Nevin Dep. 72:16-75:12;100:10-104:10; Brown Dep. 91:21-92:21, 105:21-121:25; Manning Dep. 235:3-241:3, 268:2-270:20.  And those deponents also testified that persons other than themselves and the former Secretary would of course have knowledge of various Department policy decisions.  *See, e.g.*, Jones Dep. 22:15-23 (explaining that there are "a group of people" involved in policy decisions made by the Secretary's Office,

24

including "the secretary's chief of staff, the Counselor to the secretary, [and] the deputy secretary"); 21:12-18 ("[T]he development of policy . . . involves the Office of Postsecondary Education, it involves my office, the Office of the Secretary and the Office of General Counsel.").

Not only is information about "Borrower Defense Policy" not uniquely within the former Secretary's knowledge, but such information is not essential and is irrelevant to the case, as it extends *far* beyond the limited parameters for discovery set by the California district court. *See* Oct. 19 Order at 16.  In fact, the sheer breadth of Plaintiffs' third proposed deposition topic only reinforces that they seek to subject the former Secretary to a broad interrogation on—in the words of their own press release—"why defrauded student borrowers were ignored for years by the Education Department and then summarily denied their rights," as opposed to seeking narrow categories of unique and essential information that is unavailable from other sources.

## CONCLUSION

Plaintiffs' demand for a former Cabinet official's deposition is extraordinary, unnecessary, and unsupported.  It is a transparent attempt at harassment—part of a PR campaign that has been central to Plaintiffs' litigation strategy from the outset.  It should be rejected and the Court should quash the subpoena.  In addition, given the parties' agreement that the compliance date for the subpoena should be stayed, if necessary, pending a final order on this motion to quash, *see supra* p. 10 n.7, movants respectfully request that the Court stay the subpoena or any order requiring a deposition for 30 days to allow them to consider seeking appellate relief, and pending completion of any appellate proceedings.  Given the important issues implicated by this motion, movants would suffer prejudice without adequate time to consider and pursue their appellate options.[12]

---

[12]     After filing this motion to quash and thus initiating this case, Movants will file an unopposed motion requesting leave to exceed this District's applicable page limit by five pages.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(B), I certify that counsel for the Movants have conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised by the attached motion and have been unable to do so.


Dated:  February 8, 2021                          Respectfully submitted,


JESSE PANUCCIO                                    BRIAN M. BOYNTON
                                                  Acting Assistant Attorney General

Boies Schiller Flexner LLP
401 E. Las Olas Blvd.                             MARCIA BERMAN
Ste. 1200                                         Assistant Branch Director
Fort Lauderdale, FL  33301
Telephone: (954) 356-0011                         /s/ *Kevin P. Hancock*
Email: jpanuccio@bsfllp.com                       R. CHARLIE MERRITT
                                                  KEVIN P. HANCOCK (Special Bar No.
                                                  A5502375)
                                                  Trial Attorneys
                                                  U.S. Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L Street, N.W.
                                                  Washington, DC  20530
                                                  Telephone: (202) 514-3183
                                                  Email: kevin.p.hancock@usdoj.gov

                                                  *Attorneys for Movants*

26

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 8, 2021, the foregoing motion, brief in support, exhibits, civil cover sheet, and certificate of conference were served using the following methods on the below interested parties and non-parties to this action.

By Email: Counsel for Respondents

Eileen M. Connor
Rebecca C. Ellis
Toby R. Merrill
Margaret E. O'Grady
Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715
Email: mogrady@law.harvard.edu
      rellis@law.harvard.edu
      tomerrill@law.harvard.edu
      econnor@law.harvard.edu

Joseph Jaramillo
Claire Torchiana
Housing & Economic Rights Advocates
3950 Broadway, Suite 200
Oakland, CA 94611
Tel: (510) 271-8443
Fax: (510) 868-4521
Email: ctorchiana@heraca.org
      jjaramillo@heraca.org

 

*/s/Kevin P. Hancock*
KEVIN P. HANCOCK