# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4      - - - - - - - - - - - - - - - X

 5      THERESA SWEET, et al., on      :

 6      behalf of themselves and all   :   Case No.:

 7      others similarly situated,     :   19-cv-03674-WHA

 8                 Plaintiffs,         :

 9      vs.                            :

10      ELISABETH DEVOS, in her        :

11      official capacity as           :

12      Secretary of the United        :

13      States Department of           :

14      Education, et al.,             :

15                 Defendants.         :

16      - - - - - - - - - - - - - - - X

17

18         Remote Videotaped Deposition of MARK BROWN

19               Tuesday, December 15, 2020

20                    10:03 a.m. (EST)

21

22

23      Job No. 332249

24      Pages:  1 - 250

25      Reported by:  Dana C. Ryan, RPR, CRR
```

Page 34
1  because things could go around for, you know,
2  different parts of the organization, so I -- I
3  won't say that none of the other organizations
4  work with the borrower defense unit.  I can only
5  say that they report to Robin Minor.
6      Q    Okay.  The BDU reports to Robin Minor?
7      A    That's correct.
8      Q    You say here -- we've talked about this
9  a bit.  You say here, Federal Student Aid is an
10 apolitical, performance-based organization.
11      Could you tell me a little bit more
12 about what that means?
13      A    That means that we go across -- we
14 don't change in or out based on political
15 appointments; that we go across administrations.
16 Much like the careers of public servants, we -- we
17 don't attribute or work toward any political end.
18 We work toward the execution of whatever
19 legislation and authorities that we are given
20 without regard to political affiliations.
21      Q    Okay.  And on that subject, how is your
22 compensation related to your performance?
23           MR. HANCOCK:  Objection: exceeds the
24 scope of the court-ordered discovery.
25           BY MS. TORCHIANA:

Page 35
1      Q    Okay.  How does your compensation
2  related to processing borrower defense claims?
3           MR. HANCOCK:  Objection: exceeds the
4  scope of the court-ordered discovery.
5           BY MS. TORCHIANA:
6      Q    You can still answer unless your
7  counsel instructs you not to.
8           MR. HANCOCK:  The witness may answer.
9           THE WITNESS:  I'm sorry.  I couldn't
10 hear the counsel.  Say that again?
11          MR. HANCOCK:  The witness may answer.
12          THE WITNESS:  How does my -- could you
13 repeat the question again?  I'm sorry.  I got
14 caught up in the --
15          BY MS. TORCHIANA:
16     Q    I said how -- how is your compensation
17 related to processing borrower defense
18 applications?
19     A    Well, my compensation is not related to
20 processing borrower defense applications.  I'm
21 a -- I'm a -- there is no relationship that I'm
22 aware of.
23     Q    Okay.  And when you started at FSA in
24 March 2018 -- 2019, sorry, what were your
25 understandings of the goals and priorities of FSA?

Page 36
1      A    When I started at Federal Student Aid?
2      Q    Well, as COO.
3      A    As COO?
4      Q    Uh-huh.
5      A    When I started at Federal Student Aid
6  as COO, I was not clear on what the goals and
7  objectives of Federal Student Aid was at the time,
8  so I couldn't -- if you were to ask me what were
9  they -- which I think you're asking me what were
10 the goals and objectives of Federal Student Aid in
11 March of 2019, I was not given a set of goals and
12 objectives in March of 2019.
13     Q    Okay.  So when you started -- so when
14 you started, it was not clear to you that FSA had
15 any goals?
16     A    That's not what I said.  No, what I --
17 I thought what you said was what were the goals
18 presented to me when I started at my job as the
19 chief operating officer at Federal Student Aid.
20          Is that your question or --
21     Q    Yes.  What were the goals and
22 priorities that were presented to you that FSA
23 had?
24     A    So my answer is that there were no
25 goals or priorities presented to me when I started

Page 37
1  the job as chief operating officer of Federal
2  Student Aid.  I -- I read the strategic plans of
3  Federal Student Aid to -- to learn what the -- the
4  goals and objectives had been across several years
5  and found them to be broad.
6      Q    Okay.  And did you -- when you started,
7  did you meet with anyone, you know, for example,
8  who onboarded you and explained to you the
9  direction that FSA wanted to go in?
10     A    So I did not go through a formal
11 onboarding process at Federal Student Aid.  My --
12 I simply started in March of 2019 and onboarding
13 of myself.
14     Q    Okay.  And what did you see as the
15 goals and priorities of FSA?
16     A    I -- I believe we needed -- broadly, we
17 needed to be a student center and responsive, and
18 we needed to deliver on a large transformational
19 objective which was called the next generation of
20 Federal Student Aid.
21     Q    Okay.  And when you joined, did you
22 know that the Department of Education had not
23 issued any borrower defense decisions since
24 June 2018?
25     A    I knew what I had read in the media.  I

Page 46

```
 1     A    I -- I don't know.  As I said earlier,
 2  I would classify it as confusion because I -- I
 3  don't know why they -- why they thought that.
 4     Q    Okay.  So was the stoppage a concern
 5  when you joined or, you know, you . . .
 6          MR. HANCOCK:  Objection.  Potentially
 7  calls for deliberative information.
 8          MS. TORCHIANA:  The witness can still
 9  answer.
10          THE WITNESS:  I was just trying to make
11  sure I understood your question.  I didn't know if
12  you were through with your question.  You said was
13  this guidance a concern.  For -- for me when I
14  started?
15          BY MS. TORCHIANA:
16     Q    When you started, was it a concern that
17  no decisions had been issued?
18     A    When I started, the overall backlog in
19  production, borrower defense processes and system
20  were a concern to me because of -- of -- as I said
21  earlier, the sheer volume and the fact that they
22  were not moving.
23          And, so, not just -- not just the fact
24  that the decisions weren't going out, but that the
25  methodology and other things needed to be known so
```

Page 47

```
 1  that we could move on with the cases.
 2          So I would -- I would say borrower
 3  defense as a whole was a concern for me when I
 4  started in March of 2019.
 5     Q    Okay.  And did you take any -- what
 6  steps did you take about the backlog when you
 7  started?
 8     A    Specifically, and through -- through
 9  the deliberation with the team, I concluded that
10  we needed more people.  Specifically, we needed
11  more attorneys and we needed more financial
12  resources if we were to fix the systems that --
13  that manage, collect, case management systems that
14  support the team.  And, so, as the operating
15  officer, I went about focusing on -- on that and
16  fixed it in the next several months.
17     Q    Okay.  So when you say "fixed it," what
18  do you mean?
19     A    Hire attorneys, recruit, hire, bring on
20  board attorneys so that there would be more hands
21  doing the work.
22     Q    Okay.  And do you know --
23     A    Secure the financial resources --
24  secure the financial resources necessary to
25  upgrade and fix the systems that those -- that
```

Page 48

```
 1  borrower defense cases would be -- would be
 2  managed by.  That's when I use the term "fix it."
 3  To answer your question, that's what I mean,
 4  getting those -- getting those things in place so
 5  that this process could start moving.
 6     Q    Okay.  And do you know -- we'll discuss
 7  this more later, but do you know -- had there been
 8  any staff requests for the BDU before you joined?
 9     A    I -- I actually don't know if there had
10  been more staff requests for BDU before I joined
11  because I would not have necessarily seen those.
12     Q    Okay.  And how many -- how many staff
13  people were working at the BDU when you joined?
14  Do you remember?
15     A    I -- I don't know precisely, but it
16  was -- in terms of attorneys, I would say probably
17  10 to 12 at the most.
18     Q    Okay.  And how many staff people did
19  you estimate were needed to clear the backlog?
20     A    So estimate being the correct term,
21  I -- I did not estimate.  I -- I went to the
22  borrower defense team and worked with them to see
23  what they thought they needed based on the --
24  based on the caseload.  I can't tell you about
25  their internal workings.  I don't -- I don't know
```

Page 49

```
 1  that, but collectively I do know we came out to a
 2  number of something around 60 -- we needed
 3  somewhere in that amount of attorneys in order to
 4  have people to adjudicate what was a growing
 5  backlog of cases, but I don't know how much -- I
 6  could not tell you today that that was some
 7  scientific equation.  I can tell you it was the
 8  internal workers of BD team as you would go to
 9  your experts and ask about what do we need to --
10  to tackle this issue.
11     Q    Okay.  And did you make any requests to
12  hire more staff for the BDU?
13     A    I did.
14     Q    Okay.  And when -- when was the
15  first -- or just how many times did you make --
16  did you request?
17     A    I don't know.  I don't know how many
18  times I -- I made a request.  I just know that my
19  request was approved.  I believe it was approved
20  the first time I asked, so I don't know that there
21  were more than one -- there was more than one time
22  that I had to ask.
23     Q    And when was the first time you asked?
24     A    Shortly after taking over, but I -- but
25  I can't tell you the exact time, but it was
```

Page 50

1    shortly after taking over, shortly after I had
2    been educated on the process of borrower defense
3    and -- and what we needed.
4         Q    Okay. And who -- who did you -- when
5    you made a request to hire more staff, who did you
6    make that request to?
7         A    I -- I made it through our HR system.
8    I made it verbally to the under secretary, and I
9    made it to the secretary verbally. And that's
10   what I'm calling the request. In other words, it
11   was all the same one; right? I was verbally
12   saying I would like to hire more people in order
13   to address the backlog.
14        Q    And do you have an estimate -- I know
15   you said you don't remember, but do you have a
16   rough estimate of when that was?
17        A    I do not other than what I just said,
18   which is shortly after I took over.
19        Q    Okay. So sometime in the spring of
20   2019?
21        A    Yes, and -- and I would just emphasize
22   that that's rough. I don't have a -- I can't -- I
23   can't tell you the exact -- I can't tell you the
24   exact time. I just simply don't recall that exact
25   time.

Page 51

1         Q    ==Okay. And when you made those==
2    ==requests, how did -- for instance, how did the==
3    ==secretary respond?==
4              MR. HANCOCK: Objection: calls for
5    deliberative information.
6              MS. TORCHIANA: Are you instructing the
7    witness not to answer or --
8              MR. HANCOCK: I am.
9              MS. TORCHIANA: Okay.
10             BY MS. TORCHIANA:
11        Q    Okay. And, generally, how -- when you
12   made those requests, what was the response?
13        A    Yes.
14        Q    Okay. And do you know before -- you
15   said you don't remember, but what was your
16   understanding of why -- why there wasn't more
17   staff at the BDU?
18        A    I -- I didn't have an understanding of
19   why. You know, historically, I just wouldn't -- I
20   don't know. I wasn't -- you know, the borrower
21   defense unit is several years old. They precede
22   me by several years, and I just don't know what
23   the -- you know, what all the deliberations were.
24             I think, as with most federal agencies,
25   you make decisions on resources and dollars and

Page 52

1    budget, and that normally drives hiring practices,
2    but I don't know what the decisions were prior to
3    March 2019.
4         Q    Okay. And do you know if there had
5    been any requests for more staff?
6         A    I -- I do not know. I would have no
7    firsthand knowledge of that. I'd only started
8    working with issues related to borrower defense
9    March of 2019. Prior to that, I did not have any
10   relationship with the borrower defense unit.
11        Q    Okay. Before, when you were a senior
12   advisor and working on human capital management
13   which started in October of 2018, did you have
14   any -- any work relating to hiring for the BDU?
15        A    Again, I was dealing with the speed at
16   which we hire, not -- and there's a nuanced
17   difference here, I think, in your question and
18   what I did. My job is about process improvement.
19   Why does it take long -- too long to hire a person
20   into -- why did it take too long to recruit them
21   or go find an expertise. I wasn't dealing with
22   this section or that section, use this person or
23   that person. I was looking to implement the
24   processing improving, and I don't remember any
25   conversations specifically about borrower defense.

Page 53

1         Q    Okay. So when you were a senior
2    advisor before you were COO, you hadn't heard of
3    any issues with staffing the borrower defense
4    unit?
5         A    I don't -- I don't recall any
6    discussions about borrower defense group with me,
7    at least, before I became COO. Our -- our
8    questions were about the process, as I just said,
9    that's required for hiring, the process.
10        Q    So if you could turn to -- still in
11   tab 25, if you could turn to paragraph 4 of your
12   declaration.
13             It says, Among FSA's responsibilities
14   is to make decisions on applications.
15             Could you tell me a bit about what that
16   means in terms of your -- your role?
17        A    One -- one minute, please, if I could
18   read it.
19             (Witness reviews document.)
20             So if -- if I could just make sure I
21   understand your question, what that means as it
22   pertains to my role as the chief operating
23   officer?
24        Q    Uh-huh. Yes.
25        A    So the responsibilities of Federal

Page 78

```
 1   heard of who instructed BDU to stop developing
 2   these memoranda?
 3              MR. HANCOCK:  Objection: calls for
 4   speculation.
 5              THE WITNESS:  I don't know, ma'am.
 6        BY MS. TORCHIANA:
 7        Q    Okay.  And did you ever hear of this
 8   decision or learn of it?
 9        A    So in -- I -- I would not -- ma'am, I
10   would not be able to tell you what -- you know,
11   what was -- what was told in 2017.  I -- I was not
12   a part of the Department of Education in 2017.
13        Q    Okay.  Okay.  We can move on, then.
14              If you could turn to Exhibit 7 in your
15   hard copies.
16              (Exhibit 7 referred to.)
17              THE WITNESS:  It says it's -- yes,
18   Exhibit 7.
19        BY MS. TORCHIANA:
20        Q    And are you familiar with this
21   document?
22        A    (Witness reviews document.)
23              I'm not familiar with the front part of
24   this memorandum at -- at all, the letter.  But I
25   am aware of the secretary's signature on the back
```

Page 79

```
 1   that says "with extreme displeasure" because it
 2   was a -- it was a matter of a media article that I
 3   read.
 4              So that's my knowledge of this
 5   document.
 6        Q    Okay.  And what do you take that to
 7   mean, her -- her comment?
 8              MR. HANCOCK:  Objection: exceeds the
 9   scope of the court-ordered discovery.
10        BY MS. TORCHIANA:
11        Q    You can still answer.
12        A    I don't -- I don't know other than -- I
13   read it in a media article.  I don't know -- I
14   don't know that -- I don't know.
15        Q    Okay.  Do you know what -- what caused
16   her extreme displeasure?
17        A    So I -- I think this was signed in
18   2017, and -- and I was not a part of the
19   Department of Education then, so, no, ma'am, I
20   wasn't a part of this.  I don't know.
21        Q    Okay.  And when you -- since you've
22   started, has the secretary expressed any
23   displeasure with any aspects of the BDU's work?
24        A    With any aspects of the BDU work?
25        Q    Yes.
```

Page 80

```
 1        A    Not -- not to me, no.  I -- I have
 2   the -- no, I can't think of anything that would be
 3   considered displeasure or -- if that's your
 4   question.
 5        Q    Okay.  Okay.  And, you know, to get
 6   back to some general questions not about this
 7   document specifically -- we'll get back to it
 8   after.
 9              But before -- just turning back to
10   something you've said, before you mentioned --
11   when we were talking about performance metrics for
12   the BDU, do you remember a couple of moments ago,
13   how -- how do you assess -- you said you -- you
14   installed performance metrics and, you know,
15   you -- you were trying to install metrics at the
16   department.
17              How do you measure the output of the
18   BDU unit?
19              MR. HANCOCK:  Objection: misstates
20   testimony.
21        BY MS. TORCHIANA:
22        Q    Okay.  How do you -- do you assess the
23   output of the BDU unit?
24        A    So with -- with all of Federal Student
25   Aid metrics, they normally are production
```

Page 81

```
 1   oriented.  How many have -- so we are a
 2   performance-based organization, so we're a
 3   production organization.
 4              And, so, we routinely look at input,
 5   output and quality, and that would be the same for
 6   the BDU -- the BDU unit.
 7        Q    Okay.  And how do you assess the input
 8   and the output and the quality of the BDU unit's
 9   work?
10        A    So keeping in mind that -- I can just
11   tell you generically, I'm not a borrower defense
12   unit expert.  What I can -- what I can tell you is
13   that we look at how many claims that we have in
14   and how many claims we have adjudicated either
15   positively or -- or negatively or approved or
16   disapproved, and at -- and how we're doing at the
17   overall process of -- of getting those answers
18   to -- to the students.
19              So all of those elements of it would --
20   would be at the macro level how the BDU unit is
21   doing.
22        Q    Okay.  And, so, when you came up with
23   the fiscal year 2020 -- not you, but when the
24   performance metric was set, did you have to
25   approve it or sign off on it?
```

Page 82

1  A    I signed off on all of the -- all of
2  the metrics that go into the strategic plan and
3  the annual plan, one of which is the metric.  And
4  in signing, I denote my confidence in the process
5  of the development of those things.
6       Q    Okay.  So would you ever agree to a
7  performance metric that wasn't reasonable or that
8  you think wasn't attainable?
9       A    So when I look at a performance metric
10 in general, I look to see if we provided the
11 resources necessary to achieve it.  And if we
12 provided the resources necessary to achieve it,
13 then, you know, I would feel comfortable that it
14 was reasonable.
15           But you asked me if I would ever sign
16 off on a performance metric that is not
17 reasonable; am I -- am I correct?
18      Q    Yes.
19      A    I would not knowingly do so; however, I
20 am not beyond flaw and -- and we have a large
21 organization, and as I've said, they all have
22 metrics.  I have to build and trust the process
23 that it would not bring me an unachievable metric,
24 and so -- but it is not without flaw.
25           So there -- there could be one that

Page 83

1  would have to be changed or adjusted if it were
2  not -- if it were found to be, I think as you
3  said, unrealistic.
4       Q    Okay.  And how did you inform yourself
5  that the BDU -- BDU unit's metrics were achievable
6  or attainable?
7            MR. HANCOCK:  Objection: vague; and
8  potentially calls for deliberative information.
9            BY MS. TORCHIANA:
10      Q    You can still answer.
11      A    So we have metrics updates as I was --
12 as I was saying, and -- and -- and a process by
13 which they are developed.  So the way I inform
14 myself in general is by listening and having
15 dialogue and asking questions that I think are
16 challenging that would make those who develop and
17 think deeply about them and looking at, you know,
18 their responses and the history and seeing if
19 together we can agree that this is something that
20 can be done.  And then ultimately they are
21 established that way.
22           So I -- I know that's not a one, two,
23 three answer, but neither is the process.  It is a
24 very deliberative back-and-forth process that
25 leads to what you are calling the metrics.

Page 84

1       Q    Okay.  And, so, when BDU came up with
2  its performance metric, what deliberations did you
3  have with the BDU?  Did you meet with them about
4  the performance metrics?
5            MR. HANCOCK:  Objection: calls for
6  deliberative privileged information.  I instruct
7  the witness not to answer.
8            BY MS. TORCHIANA:
9       Q    Okay.  And how -- when you signed off
10 on the performance metrics, how did you come to
11 understand that that was an achievable goal?  What
12 told you that?
13      A    So what -- so if -- what told me that
14 the goals were achievable?
15      Q    Uh-huh.  Yes.
16      A    From my level -- and I have to explain
17 this a little bit, though -- but from my level,
18 I'm more concerned that the process is in place
19 for the voices to be heard and the development to
20 occur.  And, so, I am spending my time on the
21 process; in other words, are they from the ground
22 up.  Do subject matter experts have an opportunity
23 to say something; are we, you know, not listening
24 to any voices; or how do they look on a historical
25 basis.

Page 85

1  Those kinds of questions when you
2  manage a large organization, you have to become
3  confident that those will help bring out the best
4  in those you manage.
5            And, so, the way -- the reason I'm
6  confident is because I spend an intense amount of
7  time on the process to make sure the process is in
8  place to deliver that.  I don't -- I'm not a
9  borrower defense attorney.  I don't -- I can't
10 tell you perhaps the intricacies that you're
11 looking for in terms of all of those things that
12 happen inside of the borrower defense unit, but I
13 can tell you what process I had used.
14      Q    And who told you about the processes at
15 the BDU?
16      A    Who told me about how borrower defense
17 unit processes the work?  Is that your question,
18 ma'am?
19      Q    Sure.
20           Well, you said you were listening to --
21 when you set the performance metrics you were
22 listening to different voices and it's a
23 deliberative process.
24           Who were you deliberating with to set
25 those numbers?

Page 90

```
 1  guess you would put it in a broad -- broad
 2  category of recruiting and -- and hiring.  That's
 3  what we went about doing in a very aggressive way.
 4       Q    Okay.  And when did that start or when
 5  did you start doing that?
 6       A    Again, I don't know when the very first
 7  hiring fair was and when the very first -- I -- I
 8  didn't -- I don't conduct the hiring fair myself.
 9  I don't physically go.  I tell our experts to do
10  that and I know that they had them.  I don't
11  actually go to the law school and visit and try
12  and -- you know, we send -- we send people who are
13  attorneys who know the business to go do that.
14            I can tell you that shortly after my
15  arrival, we began to try and buildup the number of
16  attorneys after we were -- were given the approval
17  to do so as I said earlier, and then all of those
18  actions began to take place.  It wasn't an
19  overnight thing.  It was -- as you would expect,
20  you get ten, you get five more, you get seven
21  more, you know, until you build up your personnel.
22       Q    And would you say before you joined,
23  were there enough attorneys in the BDU unit?
24       A    So while I would not talk about --
25  because I don't know because enough is -- enough
```

Page 91

```
 1  would have to do with how many cases you had at
 2  the time, so I can't talk to you, ma'am, about
 3  anything prior to March 2019.  I really don't know
 4  what -- I can tell you that, as I have said
 5  earlier, there were around 10 or 12 when I started
 6  in March of 2019.  And that was not enough for the
 7  number of cases we had to get adjudicated and
 8  worked, and therefore we did all those things that
 9  I was just going through earlier.
10       Q    Okay.  And did you -- did you have any
11  sense of whether there were any requests to hire
12  more attorneys before you joined?
13       A    As I said earlier, I -- I really don't
14  know.  I don't know.
15       Q    Okay.  Okay.  All right.
16            We'll talk about the IT platform more
17  later.  I'd now like you to go to Exhibit 10.
18            (Exhibit 10 referred to.)
19            THE WITNESS:  Yes, ma'am.
20            BY MS. TORCHIANA:
21       Q    Okay.  And just before we get into
22  that, so when you started in March 2019, it sounds
23  to me like that you made your issues -- or --
24  or -- I guess when you started in March 2019, what
25  was your understanding of why no decisions had
```

Page 92

```
 1  been issued since June 2018?
 2            MR. HANCOCK:  Objection: asked and
 3  answered.
 4            THE WITNESS:  I think --
 5            BY MS. TORCHIANA:
 6       Q    You can answer.
 7       A    Yeah, I think as I said before, I
 8  believe there was confusion, and so it -- my -- my
 9  understanding was that there was confusion.
10  That's -- that's how I would classify it.
11       Q    Confusion about what?
12       A    The borrower defense unit believed that
13  they had guidance to -- to not do so, policy
14  guidance not -- not to do so, and had not done so
15  after the Manriquez case, and I'm not certain that
16  the -- at the time that the -- the department was
17  under the understanding that they had provided
18  that guidance.
19            So if you're asking about that time
20  frame when I initially took over in -- in March, I
21  would classify it as confusion.
22       Q    Okay.  So just looking at Exhibit 10,
23  are you familiar with this testimony by Diane Auer
24  Jones?
25       A    I am not familiar with this particular
```

Page 93

```
 1  testimony.  I know that Ms. Jones provided
 2  testimony, but I have not read this document that
 3  is -- that you have here as Exhibit 10.
 4       Q    So it was in -- on May 22nd, 2019, so
 5  after you joined.  Have you ever read through her
 6  testimony or looked at it?
 7       A    I -- I don't believe so.  At least I
 8  don't recall reading through this one.
 9       Q    Okay.  And at the top, could you turn
10  to page 50?
11       A    Uh-huh.
12       Q    Okay.  And at the top, could you read
13  the testimony that starts -- so Ms. Jones says,
14  There is not a policy.  Could you read that
15  sentence?
16       A    There is not a policy that prevents the
17  review of claims.  However, we are not able to
18  determine the level of harm or the level of relief
19  that a borrower should get because the methodology
20  we use is now being challenged by the California
21  courts.  So we continue to process.
22       Q    Okay.  And could you tell me what you
23  think this means or explain that statement?
24            MR. HANCOCK:  Objection: Speculative.
25            BY MS. TORCHIANA:
```

Page 102

1  Ms. Jones was using the term because, as I said
2  earlier, how someone uses the term, I think,
3  differs.
4          So I -- I can't tell you how Ms. Jones
5  was using the term.
6      Q    Okay. And when you joined the
7  department and, you know, no decisions had been
8  made since June 2018, did you understand whether
9  either Step 1 eligibility determinations -- were
10 any of those proceeding?
11     A    Could you -- would you mind repeating
12 the -- the last part of that question?
13     Q    When you started in March 2019 and
14 going forward, did -- no decisions had been issued
15 since June 2018, did you understand whether any
16 Step 1 decisions were continuing, so as you
17 described it, eligibility?
18     A    Step 1, to my knowledge, never stopped.
19     Q    Okay.
20     A    Those -- that part which we now call
21 Step 1, we're talking about it as Step 1, to my
22 knowledge that had never stopped.
23     Q    Okay. And -- and how -- was that being
24 reported to you?
25     A    So the metrics and the measurements and

Page 103

1  all the things that we've been talking about
2  didn't exist on day one in March to my knowledge,
3  and -- and nothing was being reported to me other
4  than I was aware that we only had 10 to 12
5  attorneys, as I said before, and the numbers were
6  not that large of the number of claims we were
7  able to even get through Step 1 because BD claims
8  were growing, and as I've said earlier, we simply
9  did not have enough of those two things I
10 mentioned, attorneys and the resources against the
11 systems necessary.
12     Q    Okay. And so how did you know that
13 Step 1 was continuing?
14     A    So in March I started an education --
15     Q    Not just in March, but, you know, when
16 you started and moving forward.
17          How about from March when you started
18 until December of 2019?
19     A    How did I -- how did I know that Step 1
20 was continuing?
21     Q    Uh-huh. Yes.
22     A    So -- and I know -- I believe I
23 mentioned that when I first started in March, the
24 BD team immersed me into what they were doing.
25 And, so, part of that is we are adjudicating

Page 104

1  claims. However, we -- we're not able to
2  adjudicate as many as we would like because we
3  don't have enough resources.
4          And, so, when you say how do I know it
5  was continuing, they -- they told me that they
6  were continuing to adjudicate claims. That didn't
7  automatically get boiled down to a metric that I
8  was getting automatic weekly updates on. It took
9  a while, some time for that to come about. And I
10 don't know exactly when that came about, but it
11 didn't happen immediately.
12         But that's -- that's how I knew that
13 that's what we were doing.
14     Q    Okay. And as part of your performance
15 metrics, so you -- do you know how many claims
16 have gone through Step 1 eligibility or have been
17 processed at Step 1?
18         Was that ever reported?
19     A    Today you mean or --
20     Q    At any point.
21     A    So, yes, at some -- at some point
22 across during the process of metric building and
23 measurements, I would have an indication of how
24 many claims had been processed and adjudicated and
25 if we were at a point where notifications were

Page 105

1  going out, how many notifications had been sent.
2          That would be a part of the metric.
3      Q    Okay.
4      A    Could I ask, ma'am, for a -- a
5  five-minute break?
6      Q    Sure.
7          MR. HANCOCK: And, Claire, this might
8  be a good time to just talk generally about lunch
9  break. It's now 12:43 here on the East Coast,
10 so --
11         THE VIDEOGRAPHER: Do you want to have
12 this conversation off the record?
13         MR. HANCOCK: Oh, sure.
14         THE VIDEOGRAPHER: We're now off the
15 record. The time is 17:43 UTC time.
16         (Lunch recess -- 12:43 p.m.)
17         (After lunch recess -- 1:18 p.m.)
18         THE VIDEOGRAPHER: Okay. We're now
19 back on the record. The time is 18:18 UTC.
20         BY MS. TORCHIANA:
21     Q    ==Okay. So, Mr. Brown, we were just==
22 ==talking about the Calvillo or the Manriquez==
23 ==injunction and what you understood the effect of==
24 ==it to be. You mentioned that there was confusion==
25 ==within the BDU unit and the BDU unit believed that==

Page 106

1   it -- that they couldn't issue any decisions.
2           Do you know -- where would you say --
3   all right.  Let me rephrase it.
4           How did you seek clarification about
5   this confusion?
6       A   So I -- I wouldn't say -- and I
7   don't -- I don't believe I said that there was
8   confusion within the BD unit.  I think what I said
9   was that there was confusion, meaning the BD unit
10  believed they had guidance or policy not to go
11  further with decisions, meaning to send them out.
12          When I asked the department if, in
13  fact, that was the case, the answer I got back was
14  that they didn't believe they had told the BD unit
15  that.
16          That, it's those two positions early on
17  in my time, that I define as confusion.
18      Q   Okay.  So who did you ask from the
19  Department of Education about -- about this
20  confusion?  Who did you talk to?
21      A   I -- I spoke with Under Secretary Jones
22  to get clarification on what the -- you know, what
23  had been told to the BD unit.
24      Q   Okay.  And what did she tell you?
25      A   She responded at the time.  This is in

Page 107

1   the March/April time frame.  I didn't know that
2   the BD unit was not sending out -- or I'm not sure
3   why the BD unit is not sending out decisions.
4   That was the initial response, and this was a
5   verbal conversation.  I don't have this in -- in
6   any form of documentation.
7       Q   So she -- she was the one who said to
8   you she wasn't sure why the BDU -- the BDU unit
9   wasn't issuing decisions?
10      A   Initially.
11      Q   Okay.  And did you seek any
12  clarification?
13      A   I -- I did.  At some point, and I -- I
14  cannot specify for you the exact point because I
15  don't recall the exact point, but at some point it
16  moves to the point of a new methodology was being
17  developed, and once that new methodology was
18  developed, it would allow for the issuance of
19  both -- on -- of decisions, meaning both approval
20  and denials.
21      Q   Okay.  That wasn't quite my question in
22  terms of -- so Ms. Diane Auer Jones told you the
23  BDU unit told you they couldn't issue decisions.
24          Did you seek clarification within the
25  BDU unit asking why they thought that they

Page 108

1   couldn't issue decisions?
2       A   No.  No, no, I -- maybe I don't
3   understand -- understand you.  Ms. -- I asked the
4   BD unit as we were going through that educational
5   process, you know, what we were doing, why were
6   decisions not going out.
7           The BD unit believed that after the
8   Manriquez case decision that they were only to
9   adjudicate cases; they were not to send out any --
10  any answers.  They believed that was the guidance
11  that they had.
12          I asked --
13      Q   Did you seek clarify -- did you seek
14  clarification about why they believed that was the
15  guidance that had been issued?
16      A   Yes.  I -- I asked the under secretary
17  why was the BD unit not sending out decisions.
18  The initial answer or response, if you go back,
19  was I didn't know that the BD unit was not sending
20  out decisions.  That was the initial answer when I
21  first -- when I first started in March/April time
22  frame looking into this.
23      Q   Okay.  And did you ask anyone in the
24  BDU why they thought they'd received that
25  guidance?

Page 109

1           MR. HANCOCK:  Objection: asked and
2   answered.
3           BY MS. TORCHIANA:
4       Q   I think he mentioned -- or you can go
5   ahead and answer.
6       A   No, it's -- as I had previously stated,
7   the BD unit believed, which I believe gets to your
8   why, that after the Manriquez case decision that
9   they were not to send out any notifications.  They
10  were simply to continue adjudicating cases.
11      Q   And did you talk to anyone in the BDU
12  unit about that belief?
13      A   I -- no, I don't believe that I -- I
14  didn't go any further into -- any further in the
15  history of it because it was answer right -- the
16  answer is they weren't sending any out because
17  they believed they weren't supposed to at the
18  time.
19      Q   And, so, did you do anything to clarify
20  that confusion?
21      A   Yes.  I stated earlier I asked the
22  under secretary, and the initial reply I got back
23  was I didn't -- I didn't know the BD unit was not
24  sending out, but that was only the initial reply
25  that I got back.

Page 110

```
 1            Later on -- and I can't give you the
 2   exact time of this -- it was decided that we would
 3   continue that same posture while the new
 4   methodology was being developed, and that once the
 5   new methodology would be developed, we would be
 6   going forward with all types, you know, both the
 7   adjudications and the notifications.
 8       Q    Okay.  When did you decide -- when you
 9   say you decided to continue that posture, what do
10   you mean?
11       A    Not that I decided; that the department
12   at that point decided that we would continue the
13   same posture that we were in and not issue
14   notifications but continue to do adjudications
15   until the point at which the methodology was
16   completed, and then that -- and then we would
17   begin doing both.
18       Q    Okay.  And who made that decision?
19       A    I don't know exactly.  I can tell you
20   that that was a decision communicated to me
21   through the under secretary.  I don't know that I
22   could tell you, you know, if that was her sole
23   decision or if there was some other parties
24   involved.
25            I would not know that.
```

Page 111

```
 1       Q    Okay.  And how was that communicated to
 2   you?
 3            When you say the under secretary
 4   communicated that to you, how was that
 5   communicated?  Was it -- in what form?
 6       A    Yeah, to -- to my knowledge it was
 7   verbal.  I don't -- I don't know that there's a
 8   document that says effective this date.  My
 9   recollection of that is just that it was given to
10   me verbally.
11       Q    Okay.  So would you say there was a
12   policy not to issue any decisions until a new
13   relief methodology was in place?
14       A    I don't know if I would go as far as to
15   define it as policy, but I would certainly go far
16   enough to call it a set path going forward.
17       Q    Okay.  And that guidance was coming
18   from the Office of the Under Secretary?
19            MR. HANCOCK:  Objection: asked and
20   answered.
21            BY MS. TORCHIANA:
22       Q    Okay.  You can still answer it.
23       A    Yeah -- yes, ma'am, as I just -- as I
24   just stated.  That's who it was communicated to me
25   from.  Exactly where it was coming from and how it
```

Page 112

```
 1   was developed, I don't -- I don't know.  Only I
 2   can relate to you what was communicated to me.
 3       Q    Okay.  If you can turn back to your
 4   declaration which is -- it should be behind
 5   Exhibit 25 -- behind tab 25, sorry.
 6       A    I have it.
 7       Q    Okay.  And we'll start at -- we'll get
 8   back to paragraph 5.  So, you know, you say, On
 9   December 10th, 2019, the department issued a
10   policy statement setting forth a tiered relief
11   methodology.
12            So who -- who came up with this tiered
13   relief methodology?
14       A    Who came up with it?
15       Q    Yes.
16       A    So what I would -- what I would say is
17   that the -- the methodology itself is determined
18   by the department.  In terms of the building of
19   it, if that answers your who that came up with it,
20   I'm sure like most other things, it was collective
21   effort of providing information to help decision
22   makers, but the methodology is a statement of
23   policy of the secretary's, and so it would not be
24   inside of Federal Student Aid.
25       Q    Okay.  So who would you say was the
```

Page 113

```
 1   main decision maker then in coming up with the
 2   tiered relief methodology?
 3       A    I -- I wouldn't say that because I --
 4   you know, I don't know how to -- I don't know how
 5   to measure what you mean by who was the main
 6   decision maker.  The methodology is a statement of
 7   policy, so it comes from the department.  And then
 8   our job is to execute that -- that policy.  Who --
 9   who weighed in the most or the least, I -- or
10   made, to use your term, I -- I don't know that
11   name.
12       Q    Okay.  And when was it decided to
13   develop on this tiered relief methodology?
14       A    I don't know exactly when it was
15   decided.  I know that we started using that.  I
16   can tell you that.  But exactly when it was
17   decided, I -- I don't know.
18       Q    Okay.  And when you -- let's say in
19   March 2019 when you joined the department, had
20   you -- was there any development of this
21   alternative methodology?
22            MR. HANCOCK:  Objection: misstates
23   testimony.
24            THE WITNESS:  I don't know if I
25   understand that question.  I'm not sure I
```

Page 114

1   understand your question.
2        BY MS. TORCHIANA:
3        Q    My question was when did this tiered
4   methodology start being developed, and you say you
5   don't remember.  So, you know, in the spring of
6   2019 when you started, do you remember any
7   discussions about this new tiered relief
8   methodology?
9        A    I don't.
10       Q    Okay.  And when do discussions about
11  this tiered relief methodology begin?
12       A    I don't know when the -- again, I don't
13  know when the discussions or the decisions, the
14  inner workings of what would be the policy making,
15  I can't tell you exactly when that began.
16            What I can -- what I can tell you is
17  that in -- in March, I wasn't aware of it if
18  that's your -- if that's your question.
19       Q    Okay.  What about later on, let's
20  say -- when did you become aware that a tiered
21  methodology was being developed?
22       A    So what -- what I know is that as we
23  got into the April/May time frame -- and I don't
24  remember precisely that time frame, but somewhere
25  within there -- the answer to our question of

Page 115

1   moving forward with notification was related to
2   the fact that a methodology was being developed.
3            But I'm not telling you that it started
4   then or it started before then or later because I
5   don't know other than at that point I became aware
6   that it was being developed.  I can't give you
7   the -- I can't give you the parameters of when it
8   started or when it ended or anything like that
9   other than I -- other than I know it was being
10  developed.
11       Q    Okay.  And did you ever discuss the
12  development of the tiered relief methodology with
13  Diane Auer Jones?
14       A    Did I ever discuss that we were -- that
15  she was -- that she and the department
16  collectively were working on this methodology?
17       Q    Yes.
18       A    Yes, I -- I knew that they were working
19  on it.  I -- I did know that.  After that time
20  frame, after that discussion, I -- I knew that.
21       Q    Okay.  And how was that communicated to
22  you?  How -- how -- what form did those
23  discussions take?
24       A    Just that, discussions in meetings, and
25  the reason it was -- would have been discussed is

Page 116

1   because it was key to us moving forward in the
2   borrower defense.
3        Q    Okay.  And what was your involvement in
4   developing this tiered relief methodology?
5        A    So my personal involvement would have
6   been very limited.  If you mean "my", the
7   organization of Federal Student Aid, I would have
8   a slightly different answer.
9        Q    When you say it was very limited, what
10  did you do as part of developing this tiered
11  relief methodology?
12       A    Little -- little to nothing.  When I
13  say very limited, I am -- I'm referring to the
14  fact that I'm the chief operating officer at
15  Federal Student Aid, so anything that Federal
16  Student Aid might provide data for or those kind
17  of things, I can't totally detach myself from it
18  because they are -- that is my organization.
19            But in terms of my personal
20  involvement, that -- that's not what I do.  I
21  would not have personally been sitting with
22  someone developing methodology.
23       Q    Okay.  And who within FSA was working
24  on it?
25       A    So while I can't -- I wouldn't be able

Page 117

1   to give you the details of who, I can tell you
2   that we have a policy -- the liaison office and we
3   have data people who pull data out of systems and
4   run algorithms and those kind of things.  They
5   provide the decision support to the policy makers
6   to help them understand kind of the -- the numbers
7   and the data and those kind of things that they're
8   trying to make decisions on.
9            So I could tell you organizationally we
10  have sections that do that.  We have data
11  analytics; we have data scientists, if you will,
12  that do those kinds of things, and policy liaisons
13  which do that.  And they would have been involved
14  with running various programs and pulling data to
15  be supportive of that effort.
16       Q    Okay.  And how many staff within FSA
17  would you say were working on developing this
18  partial relief methodology?
19       A    I would not know.  This is a dynamic --
20  dynamic kind of thing.  You know, today I need one
21  person; tomorrow I need two; I need a couple of
22  hours on the phone.
23            It's just -- it's very dynamic, and I
24  could not associate it with a particular number of
25  persons or times, nor do I believe we accounted

Page 118

1   for it in any kind of way.
2           So I would not want to speculate.  I
3   don't know, ma'am.
4       Q   Okay.  Was it time-consuming for FSA to
5   developed this tiered relief methodology?
6       A   So by "time-consuming," do you mean
7   that we had to put some time into it, or do you
8   mean that it took an inordinate amount of time?
9           Can you help me understand what you
10  mean by that?
11      Q   Did it take a lot of time for staff
12  members at FSA to develop this tiered relief
13  methodology?  Was it something that -- how much
14  time would you say staff spent on developing this?
15          MR. HANCOCK:  Objection: misstates
16  testimony.
17          MS. TORCHIANA:  You can still answer.
18          THE WITNESS:  Yeah, I wouldn't want to
19  give you a specific amount of time.  I don't know.
20  I could look back and see if we had written that
21  down somewhere, but, you know, I couldn't -- I
22  couldn't tell you exactly how much time was spent
23  on it, not -- not off the top of my head.
24          BY MS. TORCHIANA:
25      Q   Okay.  And did you have a sense that it

Page 119

1   was taking a lot of time for FSA to -- to develop
2   this partial relief methodology?
3           MR. HANCOCK:  Objection: misstates
4   testimony.
5           THE WITNESS:  So the methodology is
6   developed by the department.  The methodology is a
7   statement of policy, and so the -- the role of
8   FSA, and -- and by association my role, is to
9   provide data and analytics for the decision
10  makers.  But we don't develop that policy document
11  which -- which you referred to as a methodology.
12          BY MS. TORCHIANA:
13      Q   So within FSA, what staff was working
14  on developing this methodology?
15      A   So, again, I cannot give you names.  I
16  don't know all of the names.  I can tell you we
17  have a policy liaison office and that only has a
18  couple of people in it.  And we have data
19  analytics, people who pull data.  That could have
20  been one or -- you know, one or two people that
21  got that request and worked that particular
22  request, but it would have been a combination of
23  those kind of folks.
24      Q   Okay.  And -- and what resources would
25  you say were required to develop this partial

Page 120

1   relief methodology?
2           MR. HANCOCK:  Objection: misstates
3   testimony.
4           THE WITNESS:  Could you say it again,
5   ma'am?  I'm sorry.  I didn't understand.
6           BY MS. TORCHIANA:
7       Q   I said, what resources were required to
8   develop this methodology within FSA?
9           So you mentioned staff . . .
10      A   So we have people that pull out data,
11  do data analytics and metrics.  We have people
12  who -- who I would call policy liaison folks who
13  help -- help understand what -- what the policy
14  (audio distortion) locations of them are.  So
15  within their job jar would be to support this kind
16  of effort.
17          But if you're asking for me to quantify
18  it -- or are you asking for me just to give you
19  those organizational elements within FSA?
20      Q   What were the organizational elements
21  within FSA that were needed?
22      A   Data analytics and policy liaison.
23      Q   Okay.  Could you explain to me how this
24  partial relief methodology -- how it works?
25          MR. HANCOCK:  Objection: exceeds the

Page 121

1   scope of the court-ordered discovery.
2           BY MS. TORCHIANA:
3       Q   Okay.  Okay.  And then -- what is your
4   understanding of why loan relief tied to earnings
5   is a relevant measure, if relevant?
6       A   So I would -- would tell you that
7   that's not something I would have a deep
8   understanding of.  It is -- that's essentially, I
9   think, the policy that you're reading from of how
10  the methodology works, and -- and while we do have
11  technicians that compute it, the how or -- or why
12  of the policy would not be within my -- kind of my
13  statement of work.
14      Q   Okay.  Okay.  And then if we could go
15  to paragraph 6, could you just read the -- the
16  first sentence for me?
17      A   After adoption of the tiered relief
18  methodology discussed in the policy statement, FSA
19  resumed issuing decisions on pending borrower
20  defense claims.  If FSA determined that a borrower
21  had submitted an application which met the
22  requirements for a borrower defense discharge, FSA
23  used the methodology described in the policy
24  statement to determine the amount of relief that
25  would be provided to the borrower.

Page 170

1  here.
2       Q    Okay.  We're going to switch tacks a
3  little bit and talk about something you mentioned
4  earlier in this declaration.  Sorry to keep going
5  back and forth, but if you go to paragraph 18, you
6  mention that since December 2019, borrower defense
7  applicants whose applications are found ineligible
8  receive one of four form ineligibility letters.
9            Do you know who drafted these form
10 ineligibility letters?
11      A    So the ineligibility letters are -- are
12 drafted.  Do you mean -- and, again, if I can just
13 make sure that I -- that we're using the words the
14 same way.  So the traditional draft, who is the
15 first person that -- that puts the words on a page
16 and -- and asks everyone else what they think
17 about it.
18           That -- drafts would begin in Federal
19 Student Aid inside of our borrower defense unit
20 and of our folks, drafts would begin there.  I'm
21 sure they were created there.
22      Q    Okay.  And who would have drafted them?
23      A    It would have come from our policy
24 liaison and borrower defense units.
25      Q    And who is your policy liaison?

Page 171

1       A    So it's a team of folks.  The -- the
2  leader on the -- in the policy liaison area is a
3  Mr. Ian Foss, and the leader on the borrower
4  defense team I believe is Colleen Nevin.
5            And, so, something like preparing what
6  words should go on a form, which is preparing a
7  draft, would be done collectively between those
8  two parts of the organization.
9       Q    Okay.  So would you say Ian Foss helped
10 draft these form letters?
11      A    Yes, that's what I'm saying.  These
12 letters have been done collaboratively between
13 those two units, one providing --
14      Q    Anybody else?
15      A    Inside of FSA?  I can't say that
16 there's no one else, but from an organizational
17 perspective, it would be those two parts of the
18 organization.  It could be several other people
19 that are involved that have questions or those
20 kind of things, but those two parts of the
21 organization would be involved.
22      Q    Okay.  When you say could be several
23 other people, who do you think those several other
24 people are?
25      A    So what I'm trying to allude to here is

Page 172

1  if they have a question and they go ask somebody
2  that question, it could be anybody in the
3  organization, right.  They may have to ask is this
4  the appropriate line for this or that, and they
5  may want to talk to someone on the loan servicing
6  side or one on the technical writing side.
7  They -- they're working, so they are -- they are
8  bringing their files together to produce a draft.
9            I couldn't tell you everybody they
10 talked to.  I'm just saying that it's possible.
11      Q    And were you involved at all in
12 drafting these form ineligibility letters?
13      A    So when you say "involved," you mean
14 that I knew what was going on?  That I saw the
15 staffing process?  Or do you mean that I was
16 helping to draft it?
17      Q    Any and all of those things.
18           How were you involved in drafting these
19 letters?
20      A    I was not helping to draft the letter.
21 I was not helping to write what words would go on
22 the letter.  I would not be the right person to do
23 that.
24           What I -- what I was doing was making
25 sure that we had an appropriate staffing process

Page 173

1  and that the controls were in place to make sure
2  the right people saw the letter -- letters before
3  they go final.
4            I was very well aware of that.
5       Q    Okay.  And who would you say were the
6  right people to review those letters before they
7  went out?
8       A    The letters are a statement of policy,
9  and -- and so the final letters would have to be
10 gone through the policy outline of the Department
11 of Education and -- and that might be a general
12 counsel review and an ultimate approval through
13 the under secretary.
14      Q    Okay.  So could you -- so would that be
15 Diane Auer Jones would have reviewed them before
16 they went out?
17      A    Yes, if it was a poll- -- it's the
18 policy letter, she or -- now, I don't work inside
19 of her office, so she may have protocols
20 established where someone else in the office sees
21 it.  So I could not say it was absolutely her that
22 saw every letter.
23           I could tell you the Office of the
24 Under Secretary would be a part of the staffing
25 process.

Page 174

1  Q   Okay. And what was the process for
2  drafting these letters?
3  A   Inside of Federal Student Aid?
4  Q   Yeah.
5  A   I can -- I can tell you that -- I can
6  tell you the offices that worked to put
7  together -- put together these statements and then
8  put together a staff -- what I would call a staff
9  summary sheet for it to be seen by the relevant
10 parties and sent outside Federal Student Aid.
11 That's -- that's essentially the process.
12     So the borrower defense unit, knowing
13 what the law requires in order for a person to
14 come out and come back in with a -- with a claim
15 and then a policy team working to get that on
16 paper and get it approved.
17 Q   Do you know when that process
18 started -- when the process started for drafting
19 these letters?
20 A   No, I don't, and I don't believe it's a
21 specific time because there are four letters, and
22 they don't all begin or end at the same time. I
23 think they evolved into -- into having four
24 letters.
25     So to answer your questions, no, I

Page 175

1  don't believe I could tell you exactly when the
2  process began.
3  Q   Okay. We'll -- we'll go through each
4  one and you can tell me when you think the
5  drafting of that specific letter began.
6      And -- and do you know how -- how long
7  it took to develop these letters?
8  A   I do not.
9  Q   Okay. And in terms of who approved
10 them, it sounds like that was Diane Auer Jones?
11 A   The process --
12 Q   Is that right?
13 A   Yeah, what I would -- what I would say,
14 ma'am, is the approval process involves the policy
15 element, people that could review -- could require
16 review from the Office of General Counsel, and for
17 it to go through the Office of the Under
18 Secretary.
19     As I stated earlier, I can't tell you
20 their internal protocols, if the under secretary,
21 Diane Jones, approved each particular letter. But
22 I could tell you that the Office of the Under
23 Secretary would have been involved in the approval
24 of those letters.
25 Q   Do you have a sense of how many drafts

Page 176

1  of these letters were produced?
2  A   I do not.
3  Q   Okay. So if you could turn to
4  Exhibit 13, which has already been marked as
5  Exhibit 13.
6      (Exhibit 13 referred to.)
7  BY MS. TORCHIANA:
8  Q   It will be behind tab 13. If you could
9  turn to the exhibits, the first one is Exhibit A.
10 There's a cover page that says Exhibit A?
11 A   Okay.
12 Q   So this letter, I can represent to you,
13 is for Corinthian borrowers who assert job
14 placement reclaims that do not meet the
15 eligibility criteria for such a claim.
16     So do you know who prepared this
17 particular letter?
18 A   I do not.
19 Q   Okay. And do you know --
20 A   Regarding an individual. When you say
21 "who," you're meaning an individual; correct?
22 Q   Or multiple individuals. Which people?
23 A   So what I -- what I would say, just to
24 be clear, on none of the letters will I be able to
25 tell you what individual put pen to paper and

Page 177

1  drafted the letter, but I can tell you from an
2  organizational perspective where those kinds of
3  things happen and where -- and where they come
4  from.
5      So if -- if that's the answer to who,
6  you know, that's -- that's what I know about --
7  about the letters and drafting them.
8  Q   Okay. Sure. So --
9  A   So if you ask me that question about
10 this particular letter, I would say it is most
11 likely the borrower defense unit and the policy
12 liaison working together collaboratively to
13 bring -- to come together with the draft and then
14 putting it through the staffing process to be seen
15 by the policy element of the Department of
16 Education.
17 Q   Okay. And do you know if this form is
18 still being used?
19 A   (Witness reviews document.)
20     I don't know if this paper form is
21 still being used, but there is likely a version of
22 this form still being used.
23     So if you mean this exact form produced
24 in this exact way, I don't think so. I think that
25 hopefully it's been digitized with the other forms

Page 178

1    and being used in that manner.
2        Q    But is it still going out -- is this
3    format of the letter still going out to borrowers?
4    Obviously filled in with relevant information for
5    the borrower specifically.
6        A    I -- I believe in general that is true,
7    but there -- there may be -- you said format, so
8    it doesn't mean it's the exact same letter.  But
9    if you mean the general format is still continuing
10   on today, I don't believe we're sending out
11   notifications.
12            But if we were sending out
13   notifications, if that's your question, would this
14   form be in presence.  I believe in some form, it
15   would be.
16       Q    Okay.  Now could we turn to Exhibit B,
17   which is a couple of pages down.
18       A    Okay.
19       Q    And this is for current payment
20   borrowers who assert the claim other than job
21   placement rights -- or other than job placement
22   reclaim.
23            And if you turn to -- let's see.
24   Sorry.  If you turn to the bottom of page 2, it
25   says, In order to have a successful borrower

Page 179

1    defense claim based on ED's CCI findings, you must
2    have enrolled in one of the covered programs
3    during a listed time period.
4            So do you -- do you know if it's
5    possible for a borrower defense claimant to have a
6    successful claim if he enrolled in CCI outside of
7    the listed time period?
8        A    There may be some other form of --
9    of -- of damage or concern for the borrower, so
10   I -- I wouldn't want to make a blanket statement
11   that said there is nothing.  I -- I would say it
12   just depends on how that attorney would adjudicate
13   the claim.  I don't -- it depends on the
14   circumstances.
15       Q    Okay.  And then if you could turn to
16   Exhibit C, and this form is for non-Corinthian
17   borrowers who attended a school for which the
18   department does not have any common evidence in
19   its possession.
20            And so do you -- what do you understand
21   as -- what is common evidence?
22       A    As I understand it, and I just want to
23   provide the context that I -- I don't adjudicate
24   borrower defense cases, so I'm not an attorney.
25            But my general understanding of this is

Page 180

1    that common evidence is just that; it is things
2    that have been determined, like a program review,
3    where a finding was found against the school and
4    determined to be validated.
5            And, so, it's available for the
6    attorney doing the adjudication to use as a source
7    of evidence.  That could also be Attorney General
8    determinations or other determinations made
9    against a school where -- where if even if the
10   borrower doesn't submit it themselves, it's
11   common -- commonly known and available to be
12   utilized.
13           That's what I believe we -- we mean
14   when we use the term.
15       Q    Okay.  And do you know if --
16       A    I just want to clarify that -- that
17   last -- what I just -- what I just said, I'm
18   giving you my understanding of it as a lay -- from
19   a layman's perspective.  That's not something I
20   practice against a borrower defense claim because
21   I don't do it.  So I'm just telling you from a
22   layman's perspective and management of borrower
23   defense, the team, that's how the attorneys have
24   generally explained it.
25       Q    Right.

Page 181

1            And if there's no common evidence, can
2    a borrower's claim be granted?
3        A    So in -- in general and for
4    generalities, can it be?  I would say every --
5    every claim is adjudicated on its own merit as
6    stated earlier, and it just depends on what other
7    things there are and what other things have been
8    brought forth.
9            And, so, I would never say it
10   absolutely could not be or absolutely could be.  I
11   could say that every -- every claim is adjudicated
12   based on its own merit.
13       Q    Okay.  And do you know whether since
14   you've started has any claim been granted for a
15   borrower who attended a school for which there is
16   no common evidence?
17       A    I don't know.
18       Q    Okay.  And if we could turn to the last
19   form, form D, this form is for non-Corinthian
20   borrowers who attended a school for which the
21   department does have common evidence.
22           Could you tell me when form D was
23   developed?
24       A    I -- I could not tell you exactly when
25   it was developed.

Page 182

1  Q   Do you know roughly when it was
2  developed?
3  A   I -- I do not. I think it evolved over
4  time in the -- in the BD unit and possibly liaison
5  as circumstances dictated that an additional type
6  of form would be needed.
7  Q   Okay. And what circumstances dictated
8  that an additional form would be needed?
9  A   I don't know exactly other -- other
10 than these -- these forms are created based on
11 what is seen in the claims that are being
12 adjusted.
13      So if you see a circumstance occur
14 enough and you believe that claimants need to be
15 able to have certain information in order to file
16 a particular claim, you might adjust or make sure
17 you design a form with that in mind.
18 Q   Okay. And, again, for this form D, who
19 designed the form?
20 A   So, again, I would say -- I don't know
21 exactly who, other than forms are a collaboration
22 between our liaison office and our borrower
23 defense office. That's how forms are drafted and
24 then approved through our policy element at the
25 Department of Education.

Page 183

1  Q   Okay. And did you have to approve this
2  form before it started being used?
3  A   I don't necessarily approve each form.
4  They go -- they go through the staffing process.
5  The approval of a form is the -- is -- is the
6  policy element of what we do because the forms
7  represent an extension of policy.
8  Q   Okay. So would you say the denial
9  forms are -- they're under policy?
10     MR. HANCOCK: Objection: asked and
11 answered.
12     BY MS. TORCHIANA:
13 Q   Okay. Are the denial forms part of
14 operations?
15 A   So what I -- what I would say is the
16 drafting of policy forms like the ones that we
17 just went through, A through -- through D, begins
18 inside of Federal Student Aid.
19     So it -- it begins as part of
20 operations, but the final form and the decision on
21 what the form -- that the form is appropriate is a
22 policy decision.
23 Q   Okay. So if you look at form D, it
24 says, applicable law, and is this somewhere where
25 you would expect the state law standard under

Page 184

1  which an application was decided would be if it
2  was decided under the 1995 regs?
3  A   If the appropriate state law?
4  Q   Yes.
5      If -- if a borrower's application was
6  decided according to state law, do you think that
7  law would be stated under the applicable law
8  section?
9  A   Yeah, that would -- exactly where to
10 put something on the form would not be something
11 I'd be prepared to opine on. Exactly where to put
12 it on the form, I don't know. I would leave it to
13 those in charge with that to -- to tell me --
14 Q   Okay.
15 A   -- the laws.
16 Q   Do you think it would be somewhere on
17 the form?
18 A   I don't know. I would -- I would look
19 to my attorneys to tell me if state law needed to
20 be on the form or not. And if -- and if they
21 believe that it would be, it would need to then be
22 put through that staffing process I described
23 earlier to make sure those in charge of the forms
24 and policy elements came to an agreement that, in
25 fact, it should be.

Page 185

1  Q   Okay. And if you -- if you go to the
2  next page, the section it says, What if I do not
3  agree with this decision?
4  A   Yeah.
5  Q   And then it says, number three is,
6  Identify and provide any evidence that
7  demonstrates why ED should approve your borrower
8  defense repayment claim.
9      And, you know, you noted actually
10 earlier in your declaration -- and we can turn
11 back to it if you want to see that, but you say
12 that FSA will consider any evidence under
13 reconsideration which includes both new evidence
14 and evidence already submitted.
15     When was the choice made to consider
16 any evidence as opposed to new evidence?
17 A   So I don't -- I don't know the exact
18 point -- point in time when that became a matter
19 of policy and certainly a matter of our forms. I
20 know that it is today, but exactly how -- how long
21 ago that was determined, I -- I don't know.
22 Q   Okay. And would you say that was a
23 policy decision?
24 A   I'm -- I would -- I would say that
25 those kind of elements on a form, like, time

Page 186

```
 1   periods and what's allowed are policy decisions.
 2       Q     Okay.  And if a borrower received a
 3   letter, for instance, where the only reason for
 4   denial under each allegation was insufficient
 5   evidence, how would you expect them to reply?
 6             MR. HANCOCK:  Objection: calls for
 7   speculation.
 8             THE WITNESS:  I'm not -- I'm not
 9   certain, ma'am, on how they would reply.  So for
10   an individual, how they would react to that; is
11   that what you're asking me?
12   BY MS. TORCHIANA:
13       Q     If they were to submit a request for
14   reconsideration but the only thing that their
15   denial letter said was insufficient evidence, what
16   would you expect them to submit?
17             MR. HANCOCK:  Objection: calls for
18   speculation.
19             THE WITNESS:  So I don't -- I don't
20   believe I'm understanding your question.  Are you
21   asking me to kind of assume what -- what a
22   borrower should do if they get that letter?  What
23   does a borrower do if they have a question; is
24   that -- or -- they don't --
25   BY MS. TORCHIANA:
```

Page 187

```
 1       Q     No.
 2       A     -- know what to do or --
 3       Q     We'll get into this more -- we'll get
 4   into a specific letter later, but -- but here you
 5   say, Identify and provide any evidence that
 6   demonstrates why ED should approve your borrower
 7   defense to repayment claim.  And let's say that
 8   the reason someone got the denial was just
 9   insufficient evidence.
10             How do you think -- what would they put
11   in their request for reconsideration?
12             MR. HANCOCK:  Objection: calls for
13   speculation.
14             THE WITNESS:  I -- I don't know.  I
15   don't think I can answer your -- I don't think I
16   can answer your question.
17   BY MS. TORCHIANA:
18       Q     Okay.  Okay.  And do you know -- have
19   any requests for reconsideration been granted that
20   you know of?
21       A     One second, please.
22             (Witness reviews document.)
23             I don't know if any have been -- have
24   been granted.  I only know that some have -- have
25   come in through -- through the process.  I -- I
```

Page 188

```
 1   don't know -- I can't tell you if any have been
 2   granted or where those that have come in stand
 3   right now today.
 4       Q     Okay.  And how many have come in
 5   approximately?
 6       A     I don't know.  It's a dynamic process
 7   where, you know, things come in each day and
 8   they're sorted out, and at some point when we do
 9   our next update, if some new have come in, I
10   probably would see it visible through our metrics
11   or be told, but right now today I couldn't
12   speculate on how many would come in.
13       Q     Okay.  When was the last update -- when
14   did you receive the last update that had those
15   numbers?
16       A     I believe it was at end-of-November
17   time frame.
18       Q     Okay.  And at the end of November, do
19   you remember roughly how many requests for
20   reconsideration had been received?
21       A     I do not believe it was that many in
22   relative terms, meaning given the number of claims
23   that we do.  But I don't remember exactly how
24   many.
25       Q     And again, these are -- these are the
```

Page 189

```
 1   weekly performance metrics we discussed before,
 2   correct, that have these numbers?
 3       A     They -- they are the metrics for
 4   borrower defense, correct.
 5             MS. TORCHIANA:  Okay.  And I think I've
 6   already asked, but I think we will be asking for
 7   those to be produced.
 8   BY MS. TORCHIANA:
 9       Q     Okay.  Do you know if any requests for
10   reconsideration have been denied?
11       A     As I said earlier, I -- either way, I
12   don't know in the process if we have gotten around
13   to decisions one way or the other on those yet.
14       Q     Okay.
15             MS. TORCHIANA:  Okay.  Why don't we
16   take a ten-minute break if that's okay with
17   everyone.
18             THE WITNESS:  Okay.
19             MR. HANCOCK:  That's fine.
20             THE VIDEOGRAPHER:  Okay.  We are now
21   going off the record.  The time is 20:41 UTC time.
22             (Recess -- 3:41 p.m.)
23             (After recess -- 3:55 p.m.)
24             THE VIDEOGRAPHER:  We're now back on
25   the record.  The time is 20:55 UTC time.
```

Page 226

```
 1         MR. HANCOCK:  Objection.  It exceeds
 2   the scope of discovery.
 3         THE WITNESS:  I don't know, ma'am.
 4   BY MS. TORCHIANA:
 5      Q   You don't know.
 6          Okay.  Do you think knowing that
 7   information would have been relevant to setting
 8   your -- your target metrics for the number of
 9   adjudications going out?
10      A   Just to be clear, I said I didn't know.
11   I didn't say that there wasn't someone who may
12   have known and may have been a part of that and it
13   may have been a part of the setting and the
14   establishing of metrics.
15          But if you are assuming the premise
16   that it wasn't used in that discussion, I can't
17   validate that that premise is correct.  I could
18   only say that I don't know.  You know, I couldn't
19   tell you which ones were in and which ones were
20   out at that time.  I couldn't tell you that the
21   subject matter experts and the technicians and the
22   policy liaison folks and the folks that are inside
23   the bowels of the organization, they may have been
24   familiar with that, and it could have been a part
25   of their deliberations, but I don't know
```

Page 227

```
 1   personally.
 2      Q   Okay.  And that 150,000 number of
 3   targeted adjudications for borrower defense
 4   applications, by adjudications, is that decisions
 5   that have been processed and sent to borrowers, or
 6   what do you consider an adjudicated decision that
 7   counts towards that 150,000?
 8      A   So when I look at the metric, I take a
 9   holistic look at it.  And so to get a check in
10   that column, I'm looking for the full circle,
11   which is what we have called today Step 1 and Step
12   2, to have been completed.
13      Q   Okay.  Okay.  I have a couple more
14   things to go over, and then -- so -- so could you
15   turn to tab 33?
16         MS. TORCHIANA:  And could we mark that
17   as Exhibit 30?
18         (Deposition Exhibit 30 was marked for
19   identification and attached to the transcript.)
20         BY MS. TORCHIANA:
21      Q   And are you familiar with this speech
22   by Secretary DeVos?
23      A   (Witness reviews document.)
24          I'm familiar with the event.  The --
25   the speech itself, I have not read through this
```

Page 228

```
 1   full -- through this full speech.  But if you --
 2   by familiar, do you mean if I know when this was
 3   given, the title that's up at the top and --
 4      Q   Were you there?
 5      A   It's all -- it was a virtual
 6   conference.
 7      Q   Okay.  Were you listening -- did you --
 8   did you hear this speech?
 9      A   I was virtually there.  I -- I was -- I
10   was on the -- on the platform, I think would be
11   the way to -- to explain it.  And I did the
12   introduction, and I listened while the speech was
13   given.
14      Q   Okay.
15      A   So if -- if that -- if that is what you
16   mean by am I familiar with it, in that regard, I
17   am.  But if -- but if you mean have I read this
18   speech, the script that was provided here in the
19   information that you sent me, then the answer to
20   that is I have not.
21      Q   Okay.  And could you go to page 3 of 6?
22   It's in small -- it's on the bottom right-hand
23   side of the page.
24      A   Yes, ma'am.
25      Q   And could you read me the paragraph
```

Page 229

```
 1   that starts with, Still more advance?
 2      A   Still more advance the truly insidious
 3   notion of government gift giving.  We've heard
 4   shrill calls to cancel, to forgive, to make it all
 5   free.  Any innocuous label out there can't
 6   obfuscate what it really is: wrong.
 7      Q   Okay.  And what do you -- what did you
 8   understand this to mean, or what do you understand
 9   this to mean?
10         MR. HANCOCK:  Objection: exceeds the
11   scope of discovery.  What's the relevance of this
12   to the court's three categories?
13         BY MS. TORCHIANA:
14      Q   You can still answer.
15      A   You're asking me what do I believe that
16   statement is?
17      Q   Yeah, what do you understand this
18   statement to mean.
19         MR. HANCOCK:  Calls for speculation.
20         THE WITNESS:  I am -- can you give me a
21   second to read it again?
22         BY MS. TORCHIANA:
23      Q   Yeah.
24      A   (Witness reviews document.)
25          I don't know what it means.  It was --
```

Page 230

1  it was obviously written by a speechwriter.  Those
2  are not -- those are not terms I use.  I don't --
3  I don't know what it means.
4      Q    Okay.  And -- sure.
5           And have you ever heard Ms. DeVos in
6  your private meetings with her express these same
7  sentiments?
8           MR. HANCOCK:  Object to the scope of
9  discovery, and I'm going to instruct the witness
10 not to answer.
11          MS. TORCHIANA:  Okay.  Could -- could
12 we go off the record?
13          MR. HANCOCK:  Sure.
14          MS. TORCHIANA:  I think that's
15 exactly --
16          THE COURT REPORTER:  Wait, wait, wait.
17 Wait a minute.  Wait a minute.  You're not off.
18 He's got to read you off.
19          MS. TORCHIANA:  I'm sorry.
20          THE COURT REPORTER:  That's okay.
21          THE VIDEOGRAPHER:  We're going off the
22 record; right?
23          THE COURT REPORTER:  Yes.
24          MS. TORCHIANA:  It seems to be --
25          THE COURT REPORTER:  Yes.

Page 231

1           Wait a minute.
2           MS. TORCHIANA:  -- relevant --
3           THE COURT REPORTER:  Wait a minute.
4           MS. TORCHIANA:  -- to point --
5           THE COURT REPORTER:  No.  He asked the
6  question.
7           Dan, yes, please take us off the
8  record.
9           THE VIDEOGRAPHER:  Thank you.  We're
10 now off the record at ten -- 23:07 UTC.
11          (Recess -- 5:07 p.m.)
12          (After recess -- 5:09 p.m.)
13          THE VIDEOGRAPHER:  We're now back on
14 the record.  The time is 22:09 UTC time.
15          BY MS. TORCHIANA:
16     Q    Okay.  And, so, Mr. Brown, are you --
17 are you declining to answer what you think this
18 sentence means?
19     A    The answer is I don't know.
20     Q    You -- you don't know.  Okay.
21          Okay.  Let's move on.  Let's go to our
22 final exhibit, and then we'll be done.
23          Could you turn to Exhibit -- let's
24 see -- Exhibit 12?
25          (Exhibit 12 referred to.)

Page 232

1           THE WITNESS:  Yes.
2           BY MS. TORCHIANA:
3      Q    Okay.  And are you familiar with this
4  PowerPoint?  Have you seen it before?
5      A    (Witness reviews document.)
6           So, ma'am, I believe I have seen it
7  before.
8      Q    Okay.  So when did you see it?
9      A    I cannot -- I cannot tell you when, but
10 I believe in some of our staff at work and our
11 updates, I have seen these charts before.
12     Q    Okay.  And in what context would you
13 have seen it?
14     A    Updates from the borrower defense team,
15 preparing for updates, those kinds of things.
16     Q    Okay.  And did you receive regular
17 updates from the borrower defense team?
18     A    So I don't know.  I would say the
19 updates from the borrower defense team I receive
20 vary, as I stated earlier.  It just depends on
21 what's going on, you know, what needs to be
22 discussed, and I'm not sure if you would consider
23 that regular or not.
24     Q    Okay.  And this presentation is from
25 August 21st, 2019.  And if you turn to page 2, it

Page 233

1  says, Total borrower defense applications as of
2  the week ending August 6th, 2019.
3           Do you know whether these presentations
4  were given weekly or . . .
5      A    (Witness reviews document.)
6           No, I can't tell you that they were
7  given weekly.
8      Q    Okay.  And were you -- was this
9  presentation given to you, or in what context did
10 you see this PowerPoint?
11     A    Because these -- because I have seen, I
12 think, most of these slides at different times and
13 perhaps some more than once over time.  Your
14 particular question of when was this presentation
15 given to me, I don't -- I don't know that date.  I
16 just can say for sure that I have seen the slides
17 that you are talking about.
18     Q    Okay.
19     A    It's not all at the same time is my
20 point.  Different things, different types,
21 different updates.
22     Q    Okay.  And the second line says, 38,700
23 applications have been adjudicated but not yet
24 processed.
25          As -- as we've been describing it,