# EXHIBIT C

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4   - - - - - - - - - - - - - - - X

 5   THERESA SWEET, et al., on       :

 6   behalf of themselves and all    :   Case No.:

 7   others similarly situated,      :   19-cv-03674-WHA

 8              Plaintiffs,          :

 9   vs.                             :

10   ELISABETH DEVOS, in her         :

11   official capacity as            :

12   Secretary of the United         :

13   States Department of            :

14   Education, et al.,              :

15              Defendants.          :

16   - - - - - - - - - - - - - - - X

17

18   Remote Videotaped Deposition of COLLEEN M. NEVIN

19              Wednesday, December 9, 2020

20                   9:11 a.m. (EST)

21

22

23   Job No. 332242

24   Pages:  1 - 268

25   Reported by:  Dana C. Ryan, RPR, CRR
```

Page 70
1  participated in and brought -- maybe even not just
2  a lawsuit.  Sometimes we're aware that there was
3  an investigation that didn't result in a filing of
4  a complaint.
5           We would reach out to them to ask them,
6  you know, what the scope of their investigation
7  was, and if, you know, some of them are in the
8  process of submitting materials, so we would want
9  to know before we adjudicate the cases if they are
10 in the process of putting any materials together
11 to send to us if that's their intention.
12          So we try to do that upfront before we
13 adjudicate anything.
14     Q    What about before this year?
15     A    We really didn't have communications
16 with the AGs until probably last fall, I'd say.
17     Q    Does BDU ever initiate or request
18 another group in the department to initiate a
19 further investigation of a school based on common
20 evidence that you have?
21          So, for instance, if you have -- if you
22 have information that a school was misrepresenting
23 its job placement rates for criminal justice in
24 2010 to 2012, would you ever investigate or ask
25 someone to investigate whether they also were

Page 71
1  making similar misrepresentations for other
2  programs during that period of time or for that
3  same program during other periods of time?
4      A   Investigations isn't -- investigations
5  isn't really staffed to handle that much right
6  now, but we, I think, have been -- they're focused
7  generally, we know, for the last few years for
8  something that is currently ongoing and, you know,
9  therefore, potentially going forward.
10          So what we're keeping an eye open for
11 by way of referring to them is if we see something
12 that has happened recently at an open school, you
13 know, whether that's something that they would
14 look at and I think that that would kind of fall
15 within their -- their purview right now.
16          In terms of if we know of, like, the
17 criminal justice program and whether we would
18 refer it for something -- you know, for a school
19 that's been closed or, you know, for something
20 that happened a long time ago, we probably would
21 not.
22     Q    If investigations were properly
23 staffed, is -- would you be able to make those
24 kind of requests for investigations into conduct
25 that happened in the past?

Page 72
1      A   I don't know that I would opine on what
2  a proper staffing is for them because it's not my
3  unit, but I think it would allow for maybe some
4  further exploration on their part.  I'm just
5  working with what we have at this point, so, you
6  know, to the extent that we're already taking up a
7  fair amount of their time in terms of the things
8  that I had already mentioned.
9           Given their very limited resources, we
10 haven't had conversations about expanding that.
11     Q    Again, in terms of what's considered
12 among the common evidence, does BDU consider
13 evidence that's provided by the schools
14 themselves?
15     A    Yes.
16     Q    Under what circumstances does BDU
17 communicate with a school to get evidence
18 regarding borrower defense?
19     A    Well, currently there are some open
20 policy issues or discussions relating to that, but
21 in the spring we -- I'm sorry.  Can you restate
22 your question?
23     Q    Under -- under what circumstances does
24 BDU reach out to a school to ask for evidence
25 regarding a borrower defense issue?

Page 73
1      A   Yeah.  Well, obviously, if the school
2  is closed and no longer doing business, there's
3  nothing we can do about that.
4           If the school is still open, then
5  starting this past spring, there were four school
6  groups that we had reached out to for two reasons.
7  One is to let them know that they were about to
8  receive individual applications as part of the
9  notification process under the 2016 regulations,
10 so really more of just a heads up that their email
11 box was about to get flooded with a whole lot of
12 applications.  But also to request documents that
13 we thought would be helpful in our assessment of
14 the -- the borrower applications.
15          So we had done kind of a preliminary
16 review of what the nature of the claims were with
17 respect to those schools and had come up with a
18 list of documents that we thought would be
19 relevant to that -- that fact-finding process.
20     Q    And what were those four school groups
21 that you reached out to in the spring?
22     A    DeVry, Phoenix, Ashford, I guess,
23 depends on how you define "school group."
24 Technically speaking, DeVry is a school group and
25 a school.  Phoenix, I think, really is just a

Page 74

1  school.  Within a school group, Charlotte School
2  of Law, and Ashford which is part of Bridgepoint,
3  I believe.
4      Q    So from each of those schools, you
5  requested a list of documents that you thought
6  would be helpful to your assessment?
7      A    We wrote them a letter, and that letter
8  included a number of requests, yes.
9      Q    Did you also invite them to submit any
10 other evidence that they wanted you to see?
11     A    The -- that's related to what I was
12 saying in terms of flooding their in-box.  So when
13 they receive an individual borrower's application,
14 they can respond to that application individually
15 with evidence, or they could submit something to
16 us more globally in terms of responses to the
17 overall applications.
18     Q    Okay.  You referred to an ongoing
19 policy debate.  Could you describe what you mean
20 by that?
21     A    I don't know if I would call it a
22 debate, but there's an open question on what that
23 process will look like going forward in terms of
24 what the communications to the school will look
25 like.

Page 75

1      Q    And who's involved in those
2  discussions?
3      A    OUS and with the assistance of the
4  Office of General Counsel.
5      Q    Does OGC make policy decisions
6  regarding borrower defense?
7      A    I think you'd have to ask them.  I
8  don't really understand exactly what the
9  relationship is, or it has some folks that kind of
10 have moved in and out of lane.  So I don't know,
11 as a general proposition, what the answer to that
12 would be.
13     Q    Okay.  Whose idea was it or whose
14 decision was it to reach out to these four schools
15 in spring 2020?
16     A    I don't think it was an idea.  I think
17 it -- my and my senior team's reading of the 2016
18 regulations is that it requires a fact-finding
19 process, and in order to do that fact-finding
20 process for, you know, the circumstances in these
21 schools, we felt like we needed records from the
22 school.
23          So -- so I made the decision to -- to
24 have my team draft those letters and send them.
25     Q    Before the 2016 regs went into effect,

Page 76

1  did BDU ever contact schools to ask for relevant
2  evidence?
3      A    Before the regs went into effect --
4  that was late 2018 -- we were just treading water
5  trying to keep up with Corinthian applications, so
6  we really weren't even at that point.
7      Q    Have -- have any of the four schools
8  who you reached out to in spring 2020 provided the
9  documents that you asked for?
10     A    All have responded, and some have sent
11 most or all of what we requested, and I think one
12 of them may have said that they were sending
13 something, but I don't know if we ever got it.
14     Q    And how is that information used by
15 BDU?
16     A    The documents that they provide?
17     Q    Uh-huh.  Yes.
18     A    We review the evidence regardless of
19 the source.  You know, we might request from them
20 a program manual that we might otherwise have
21 gotten in the course of our oversight at FSA or
22 that might have been provided from an AG's office.
23          So I would look at the nature of the
24 evidence based -- I don't think it's used
25 differently in that sense.  It's -- you know, it's

Page 77

1  what the document purports to be.  Obviously, the
2  source is important to know for the purpose of
3  kind of veracity of the document, but beyond that
4  we don't necessarily treat a program manual or,
5  you know, different kind of advertising material
6  differently depending on the source.
7      Q    So the information you received from
8  schools is incorporated into the general pool of
9  evidence that you're considering regarding that
10 school?
11     A    Yes.
12     Q    In -- you said that the school has the
13 option to respond to an application individually.
14 Is there a mechanism for the borrower to see the
15 evidence that the school submits in response to
16 their application?
17     A    Not under the 2016 regulations.  There
18 will be for the 2020 regulation.
19     Q    Okay.  What about the -- does the 2019
20 regulation have any rule there?
21     A    Sorry.  So when I say 2020, the 2019
22 regulation went into effect July 1, 2020.
23     Q    Oh, I see.
24     A    I refer to that as the 2020 regulation.
25 So that's the new one.

```
                                        Page 78
 1         And just to clarify, the '95 regulation
 2  is the old regulation.  2016, we refer to as the
 3  2016 regulation because that's when it was
 4  published, but it actually went into effect by
 5  court order in 2018.  We still refer to it as the
 6  2016 regulation.
 7     Q    Okay.  Understood.
 8         Let's switch back for a second to the
 9  law applicable to -- to claims under the '95 regs.
10  So you said that you've just recently developed
11  protocols for ITT claims, non-California
12  employment-prospect-ITT claims under both the '95
13  and 2016 regs; is that correct?
14     A    That's correct.
15     Q    Okay.  So how would a borrower know
16  what law applies to their claim?
17     A    I'm not sure.  Are you asking about the
18  letters?  I'm not sure I understand.
19     Q    Yes, in communications to the borrower.
20         Do communications to the borrower state
21  what law has been applied to their claim?
22     A    I think the CCI ones reference
23  California law.  I don't think the non-CCI ones
24  state an applicable state law.  With respect to
25  those applications, though, because either the
```

```
                                        Page 79
 1  borrower failed to make an allegation that's
 2  potentially the kind that could be approved or the
 3  evidence to support it, so regardless of what law
 4  you would apply, it's our position that the
 5  application would be denied.
 6         So those aren't being denied based on,
 7  you know, not being able to fulfill a specific
 8  element of a particular state law or a specific
 9  element of the 2016 regulation.  They're either
10  just kind of something that wouldn't get through a
11  12(b)(6) analysis or they're just lacking in
12  evidence.
13     Q    Are you talking specifically about ITT
14  claims?
15     A    No.  I thought you were referring to
16  the letters, so the ones that have gone out so
17  far, we haven't issued any denials that were based
18  on kind of an application of specific elements of,
19  you know, state law where there could be a
20  different answer in California versus Nebraska.
21     Q    Okay.  Let's look at the denial
22  letters.  That is tab -- give me a second.  That's
23  tab 13 in the hard copies.  On the Dropbox, that's
24  the bracket number 13 ECF 116, Defendants'
25  Response to 8/31.  I think that should say 2020
```

```
                                        Page 80
 1  Order.
 2         And that was marked as Exhibit 13 in
 3  the Jones deposition.
 4         (Exhibit 13 referred to.)
 5         THE WITNESS:  Just to make sure I have
 6  the right document, it's Defendants' Response to
 7  August 31, 2020 Order.
 8     BY MS. ELLIS:
 9     Q    Yes, that's correct.
10     A    Okay.
11     Q    So this document, I'll represent to
12  you, is a filing in this case where -- where the
13  government attached the four types of form denial
14  letters, which we've been referring to as forms A,
15  B, C and D according to their attachment letters
16  here in this document.
17         So if you flip to the bottom of page 2
18  of the motion which is page 3 of the document,
19  there's a heading near the bottom of the page,
20  Form of denial letters utilized by the department
21  since December 2019.
22         Do you see that?
23     A    Yes.
24     Q    Okay.  And then at the bottom of the
25  page going onto the next page, it lists -- it
```

```
                                        Page 81
 1  describes the purposes of the four different
 2  letters that are attached as exhibits A, B, C and
 3  D to the motion.
 4         So for applications from ITT that have
 5  been so far denied, which of these four form
 6  denial letters would they have received?
 7     A    I think it's D.  Yes, I think D is the
 8  one that's non-Corinthian but where there is
 9  common evidence related to the school.
10     Q    Okay.  So let's flip to form D.  That's
11  the page 22 of the PDF for those looking at it
12  electronically.  And then the actual text of it
13  starts on page 23 of the PDF.  It's document 116-4
14  on the ECF stamps at the top of the page.
15     A    Thank you.
16     Q    So this is an example of form D, and
17  then you can see at the bottom of this first page
18  it shows where someone would fill in blanks for
19  allegation type, primary school and review
20  recommendation reason.
21     A    Correct.
22     Q    Okay.  Is it the case that review
23  recommendation reason is sometimes filled in with
24  the phrase failure to state a claim?
25     A    It's a -- it's a drop-down in our
```

Page 82

1  platform, but it's filled in by my team, and then
2  that's used to populate these letters by our
3  contractor.
4      Q    Uh-huh.
5           And one of the options in the drop-down
6  is failure to state a claim?
7      A    Correct.
8      Q    So what -- what does that mean?
9      A    It's like a 12(b)(6) analysis, does the
10 borrower make an allegation that could potentially
11 lead to, you know, an illegal case filed in court.
12 Is it something that a court would not dismiss on
13 a 12(b)(6) motion kind of thing.  So an example
14 will be does the borrower allege that the school
15 made a misrepresentation to the borrower on which
16 they relied to, you know, enroll in the school or
17 whatever, based -- something along those lines.
18     Q    How is it determined that an
19 application fails to state a claim if it hasn't
20 yet been determined what law applies?
21     A    It's -- the bar is just -- you know, is
22 an alleged misrepresentation, generally, would be
23 the most common.  So, you know, we get
24 applications on folks who say my loans were too
25 expensive; my school is terrible; my teacher was

Page 83

1  abusive; things that are not borrower
2  defense-related issues; sexual harassment by a
3  staff member; didn't get the classes I wanted.
4           You know, just a whole variety of
5  different things that borrowers may include in
6  their application, but are not something that are
7  of the type that would, you know, provide
8  eligibility for borrower defense relief
9  potentially.
10     Q    Do you know how many form D notices
11 have been mailed out since this form was --
12 started being used?
13     A    I don't.
14     Q    Do you have a sense of what percentage
15 of claims denied under form D fit the description
16 you're giving of someone who doesn't provide any
17 allegation that could potentially state a borrower
18 defense claim?
19     A    As to one of the allegations?  So, in
20 other words, if you see in this letter, there
21 are -- I don't know how many are here -- there's
22 two on this example, but there could be five
23 different allegations in one claim or one
24 application, so those would be five separate
25 claims, and one of the claims might be denied for

Page 84

1  failure to state a claim and another might be
2  denied for insufficient evidence.  It depends on
3  the nature of the claim and what the borrower
4  states for that particular claim.
5      Q    So you're saying that you -- you can't
6  estimate the number of applications that have been
7  denied -- that have received a form denial letter
8  solely because they failed to state any sort of
9  claim?
10     A    I -- I don't know the number off the
11 top of my head, no.
12     Q    Are there department records that would
13 show how many applicants who received form D
14 denial letters -- it was based solely on failure
15 to state a claim?
16     A    It's data in our system, so I'm sure
17 there's some way to pull that.  Yeah, I'm sure
18 there's some way to pull it out of our system, but
19 I don't know that there's a record existing
20 somewhere.  I think somebody would have to do some
21 kind of a data pull.
22     Q    So if -- if an allegation was this
23 school made job-placement-rate-misrepresentation
24 claims, that would not be rejected for failure to
25 state a claim?

Page 85

1      A    It should not be.  I can't say that we
2  have never made a mistake, but the protocol would
3  be that that would then go to, you know, whether
4  there's evidence.  So that would not -- the -- the
5  claim itself, if it were rejected or if the -- if
6  that particular claim was denied, would not be
7  denied based on that.
8      Q    If someone alleged that the school made
9  a job-placement-rate-misrepresentation claim, but
10 the applicant did not specifically state that they
11 relied on that misrepresentation, would that be
12 denied for failure to state a claim?
13     A    I believe so.  I'm trying to remember
14 the drop-downs and what the available drop-down --
15 what the protocol calls for.  The -- I believe the
16 protocol references lack of reliance, so it
17 actually -- that might be an option -- I don't
18 recall, though.  I'd have to look at the protocols
19 to see what -- what the particular entry would be
20 that would show up there.
21     Q    Other than a new protocol that's been
22 developed for ITT non-California
23 employment-prospects claims, has BDU also
24 developed a new form of denial letter to go with
25 that protocol, or would claims denied under that

Page 86

```
 1  protocol continue to receive form D letters?
 2       A    Well, your question assumes that BDU
 3  develops the letters, and we -- these are not our
 4  letters.
 5       Q    Okay.  Let me -- let me back up, then,
 6  to ask more generally about the -- about the
 7  denial letters.
 8            So who did develop forms A through D
 9  denial letters?
10       A    I think there were a lot of folks
11  involved in it.  At the time, the crew at Mark
12  Brown had wanted my team, the borrower defense
13  unit, to focus on adjudications.  So there was an
14  FSA communications team and our borrower defense
15  program management team, which was a new -- new
16  group, that were kind of tasked with sharing the
17  process for having the letters done.
18            And that was approval letters and
19  denial letters because that -- there were several
20  approval letters, I believe, that were originally
21  developed.  So it's all kind of done at the same
22  time.
23            And then they worked with our senior
24  leadership at the department and the Office of
25  General Counsel on the letters.
```

Page 87

```
 1       Q    Who ultimately was responsible for
 2  approving the form denial letters?
 3       A    I can't answer that.  I don't know that
 4  there was one person, but I think Mark Brown would
 5  probably be a better person to ask because he
 6  would have interacted with the folks at LBJ on
 7  whether they were given the green light to
 8  proceed.
 9       Q    How did you find out about the form
10  denial letters?
11       A    About their existence?
12       Q    Yes.
13       A    I was always kind of kept in the loop
14  because my team -- the data that shows up -- so
15  all of these kind of highlighted areas -- it's
16  gray on mine, but I think the original versions
17  are yellow highlights.  Those are fields that are
18  in our platform.  So, you know, we were kind of in
19  a consulting role for what available fields could
20  be pulled into the letter.
21            So I was -- I was on a number of the
22  calls and emails and things along those lines to
23  get the letters finalized, so I don't know when I
24  first became aware -- I mean, I became aware that
25  they were drafting them around the time of when
```

Page 88

```
 1  they finalized the relief methodology or were
 2  close to finalizing the relief methodology for the
 3  approvals.
 4       Q    And who did you -- who did you consult
 5  with about this information that BDU was able to
 6  provide for the denial letters?
 7       A    Like who asked for input on them?
 8       Q    Yeah.
 9       A    The head of the communications team
10  that was working on this was a woman named Nicki
11  Meoli.  M-E-O-L-I.  And we worked closely with
12  Chad Schrecengost.  I'm going to get the spelling
13  wrong on this, I think.  S-C-H-R-E-C-E-N-G-O-S-T.
14  I'm pretty sure that's wrong, but that's close.
15       Q    Good effort.
16       A    And I think those were the two folks at
17  FSA who would have asked me or my team for, you
18  know, what is this field; how do you we -- what do
19  we have to fill out, that kind of thing.
20            And then I -- I was also on some calls
21  to that effect with GC.
22       Q    With who?
23       A    Our Office of General Counsel.  I'm
24  sorry.
25       Q    Okay.
```

Page 89

```
 1            MR. MERRITT:  I'll note for the record
 2  that Chad Schrecengost is listed in defendants'
 3  response, interrogatory number 2, for spelling and
 4  whatever else.
 5            BY MS. ELLIS:
 6       Q    Okay.  But then beyond Meoli,
 7  Schrecengost and some people from OGC, you don't
 8  know who was actually involved in the drafting or
 9  approval of these letters?
10       A    You broke up a little bit there.  I'm
11  sorry, Rebecca.  Could you repeat that again?
12       Q    No problem.
13            So besides Meoli, Schrecengost and
14  certain people from OGC, you don't know who else
15  was involved in drafting or approving the letters?
16       A    Well, I think those are two different
17  things, the drafting and the approving.  And I
18  don't know all of the people who had a hand in
19  drafting the letter.  I know it was a weeks' long
20  process, so I'm sure there were a lot of people
21  who worked on them.
22            And then I was not involved in, you
23  know, kind of the final sign-off on it, so as I
24  said, I think Mark Brown would probably be the
25  best person to ask that.
```

Page 90
1   Q   Do you think he would know who was
2   involved in the final sign-off process?
3   A   I would think so.  That would be the
4   typical process, yeah.
5   Q   Okay.  You said you believe it took a
6   matter of weeks to develop these form letters.
7   A   That's my recollection, yes.
8   Q   Do you know what -- what made it
9   complicated or time-consuming to put these
10  together?
11  A   I don't know.
12  Q   Is there anywhere in -- in this form D
13  letter where the applicable law would be filled
14  in?
15  A   I mean, there's an applicable law
16  section.  It doesn't -- I think this letter is for
17  both.  I'm sorry.  I'm just reading.  It's been a
18  while.
19  Q   Go ahead.
20  A   (Witness reviews document.)
21      Yeah, it looks like this is for both
22  regulations.  The applicable state law is not in
23  here for the 2016 regulation.  Obviously, it's a
24  federal standard, so there wouldn't be anything
25  along this line.

Page 91
1   Q   Were you ever involved in any
2   discussions about whether the applicable state law
3   under the '95 regs would be listed in a denial
4   letter?
5   A   There was a conversation about that,
6   and the -- that was not necessarily populated in
7   all of the cases for the reason I mentioned
8   before, which is that the cases that were going
9   out with this letter -- this letter was drafted
10  after a bunch of cases were already adjudicated
11  and not the other way around.
12      And, so, the intent was to send out --
13  actually, I don't know if it was this letter or C
14  because they're pretty similar.  I think it might
15  have been C actually that I'm thinking of.
16      But I -- my recollection is that there
17  was discussion of whether or not to include state
18  law as a field but that would have required more
19  time for my team to go back and, you know, fill in
20  any data that needed to -- with respect to state
21  law where it really wasn't being denied because of
22  state law; it was being denied for the reasons
23  that I mentioned before.
24  Q   Uh-huh.
25  A   And, so, I think the conclusion was

Page 92
1   that that wasn't necessary because it was argued
2   that regardless of what state law might have
3   applied that the application would be denied.
4   Q   So I'd like to look at an example of a
5   completed form D denial letter.
6       MS. ELLIS:  So this will be behind tab
7   15 in your hard copies.  On the Dropbox, the
8   bracket 15 ECF 129-1, Connor declaration.  This
9   was marked as Exhibit 15 in the deposition of
10  Diane Jones.
11      (Exhibit 15 referred to.)
12  BY MS. ELLIS:
13  Q   And there's a number of attachments
14  here.  I'm looking at the affidavit of Theresa
15  Sweet that begins at page 24 of the PDF, page 24
16  of the ECF filing.
17  A   Okay.
18  Q   And then attached to -- further
19  attached to the affidavit of Theresa Sweet all the
20  way down at page 51 of the document is a -- an
21  example of form D.  This is the form D that
22  Theresa Sweet, the named plaintiff in this case,
23  received.
24  A   That's exhibit B to her affidavit?
25  Q   Exhibit B to her declaration.

Page 93
1   A   Yeah.  Got it.
2   Q   Okay.  So if you -- if you go down to
3   the second page of this attachment, there's that
4   section as we were just looking at in the form
5   denial where it lists the allegations and then the
6   reasons for denial.
7       Allegation 1:  Employment Prospects.
8   You allege that Brooks Institute engaged in
9   misconduct related to employment prospects.  This
10  allegation fails for the following reason(s):
11  Failure to state a legal claim.
12      Is there any way that we could tell
13  from reading this letter what was wrong with
14  Theresa Sweet's employment-prospects allegations?
15  A   Well, clearly, all we can tell from
16  this is my team concluded that their -- the
17  specific claim with respect to the employment
18  prospects did not state a legal claim.  That's
19  what's in here.
20  Q   And is that also the case with regard
21  to allegations 2 and 3?
22  A   That is the -- the reason that's
23  included, right.
24  Q   We discussed earlier that it should be
25  unlikely that an allegation of employment

Page 94

```
 1   prospects would be denied for failure to state a
 2   legal claim.
 3           Is there any way to tell from this
 4   letter why --
 5       A   Sorry.  I --
 6       Q   Wait.
 7       A   You broke up again.  And I don't know
 8   if it's a problem on my end or if it's other folks
 9   or -- I missed the first half of the question,
10   though.  Would you please repeat it?
11       Q   Okay.  We talked earlier that an
12   allegation of misrepresentation of employment
13   prospects should probably be unlikely to be denied
14   for the reason of failure to state a legal claim.
15           Is there any way to tell from this
16   letter why her particular allegations were
17   insufficient?
18           MR. MERRITT:  Objection to the
19   characterization of the prior testimony.
20           BY MS. ELLIS:
21       Q   You can answer.
22       A   I'm not sure I can.  Can you rephrase?
23       Q   It's all right.  I'll move on.
24           Let's move down to allegations 4 and 5.
25   The letter states that these allegations were
```

Page 95

```
 1   rejected for insufficient evidence; is that
 2   correct?
 3       A   That's what it says, yes.
 4       Q   Is there any way to tell from this
 5   letter what about Theresa Sweet's evidence was
 6   insufficient?
 7       A   Well, your -- I think you're assuming
 8   that there was evidence, which I don't know from
 9   this, necessarily, but, you know, it could be that
10   there was no evidence, but the drop-down -- the
11   available drop-down is insufficient evidence.  So
12   the conclusion was that whatever it was that was
13   included was insufficient to support the claim.
14       Q   Are borrowers' own statements on their
15   applications considered evidence?
16       A   They're -- they're evidence.  The
17   statement in and of itself without any
18   corroborating evidence would not be sufficient to
19   approve an application, though.
20       Q   The statements on -- of our defense
21   application are made under the penalties of
22   perjury; is that correct?
23       A   Yes.
24       Q   So why wouldn't the borrower's sworn
25   statement be considered sufficient evidence?
```

Page 96

```
 1       A   That's always been a policy in borrower
 2   defense going back to 2016; that one borrower's
 3   statement without corroboration would not be
 4   sufficient to -- to approve an application.
 5       Q   What sort of documentation does BDU
 6   expect borrowers to provide in order to rise to
 7   the level of sufficient evidence?
 8       A   I would take issue with the way you
 9   framed that.  We don't have any particular
10   expectation one way or another.  We're just
11   adjudicating based on the evidence in front of us,
12   so, you know, whether that comes from the borrower
13   or from some other source, we make an assessment
14   of the evidence.  But I don't have a particular
15   expectation one way or the other.
16       Q   Does the borrower defense application
17   state that the applicant must submit corroborating
18   materials in order for their claim to be
19   considered?
20       A   Which application are you referring to?
21       Q   I'm referring to the standard form
22   application that's available on the department's
23   Web site.
24       A   I don't recall exactly what the wording
25   is.  I know it requires the borrower to provide
```

Page 97

```
 1   detailed information, encourages the borrower to
 2   provide supporting evidence, but I don't remember
 3   exactly what the language is.
 4       Q   Do you know who originally set the
 5   policy that the borrower's statement alone would
 6   be insufficient to make out a borrower defense
 7   claim?
 8       A   I don't, but that was the policy when I
 9   joined in October of 2016.
10       Q   Is that a written policy?
11       A   It's in -- I remember seeing documents
12   somewhere along the way back at that point, so I
13   guess it depends on what you mean by a written
14   policy, but it's -- it's recorded in -- I can
15   remember PowerPoints or something.  I'm sure
16   there's other documentation going back that far.
17       Q   Do you know if that PowerPoint has been
18   provided for production in this case?
19       A   I don't know.
20       Q   Would that be considered a policy
21   decision?
22       A   Yes.
23       Q   So that's a decision that would not be
24   made by someone at FSA?
25       A   That's correct.
```

Page 98

1  Q   Looking back at tab 15, Exhibit 15, the
2  first page of Theresa Sweet's denial letter states
3  that she was enrolled at Brooks Institute; is that
4  correct?
5  A   I'm sorry.  You're on her affidavit
6  now?
7  Q   Yeah.  I'm sorry.  It's the first page
8  of the denial letter which is page 51 of the ECF
9  filing.
10 A   Yes, it says she was enrolled at Brooks
11 Institute.
12 Q   Yes.
13     Is Brooks Institute a school for which
14 BDU has common evidence?
15 A   If memory serves, Brooks Institute is
16 part of the CEC school group, if I am remembering
17 correctly.  I could be wrong on that, but I think
18 it is.  And we do have common evidence relating to
19 CEC.  Whether or not it specifically relates to
20 Brooks, I don't recall.
21 Q   Let's look back at your declaration,
22 tab 21, marked as Exhibit 21.  And I'm looking at
23 paragraph 68 which is on page 16.
24 A   Okay.
25 Q   Could you read the second sentence of

Page 99

1  that paragraph, please?
2  A   Sure.  The second sentence?
3  Q   Of paragraph 68, beginning with,
4  Additionally?
5  A   Additionally, BDU has initiated its
6  review and analysis of the evidence relating to
7  ITT (including campuses outside of California),
8  DeVry University and Brooks Institute but has not
9  had available staff to complete that work and
10 proceed to adjudicate applications from borrowers
11 who attended those schools.
12 Q   So does that refresh your recollection
13 on whether there's common evidence on Brooks
14 Institute?
15 A   Yes.
16 Q   If the review and analysis of common
17 evidence for Brooks Institute was not yet
18 complete, how could Theresa Sweet's application be
19 denied for insufficient evidence?
20 A   Well, your question, I think, is
21 premised on a timing -- you know, if it's not
22 true, it's not true.  This was in November of
23 2019, and I don't know what the date of her letter
24 is.  July of 2020.  So we were in a different
25 stage when we issued her letter.

Page 100

1  Q   So the review and analysis of evidence
2  relating to Brooks Institute is now complete?
3  A   No, but we've done the preliminary
4  analysis that I referred to earlier more generally
5  in terms of the scope of the evidence.  So we must
6  have included that whatever time period that she
7  attended or her program or whatever it is that we
8  concluded the scope of Brooks is, that she falls
9  outside that scope.
10 Q   Whose decision was it to take an
11 approach to borrower defense adjudication where
12 applications would be ruled out by common evidence
13 rather than ruled in by common evidence?
14 A   Well, in 2019, we were directed to move
15 forward at a very accelerated pace, and so, you
16 know, there were a lot of discussions about how to
17 do that and how to get through the backlog in
18 2020.  They wanted all of the cases adjudicated in
19 2020.
20     And the only way to hit the metrics
21 that were required of us were to focus on cases
22 that had established protocols, so the same ones
23 that we were talking about earlier, and cases
24 where either there was no common evidence, which
25 we did those first, or where we could assess what

Page 101

1  the scope of the common evidence was and then move
2  forward on adjudicating other cases.
3      So it was kind of a sequencing issue so
4  that we could continue to meet the -- the weekly
5  numbers that we needed to meet in order to
6  adjudicate the cases.
7      In a perfect world, we would review all
8  of the evidence relating to the school before
9  adjudicating a single case, but if that were the
10 case, then we probably would not be issuing
11 decisions for most of 2020 because, you know, to
12 the extent that, you know, most of the cases that
13 are left right now, at least potentially, are
14 related to some common evidence or the borrower
15 provided substantial evidence of their own or at
16 least some evidence that could potentially support
17 the claim.
18     So it's a -- it was just a sequencing
19 issue that been ordered to the numbers.  That's
20 the way we moved forward.
21 Q   Who set the target numbers?
22 A   The secretary set the elimination of
23 the backlog, and my understanding is that, based
24 on the numbers that were pending at the time, that
25 Mark Brown just did the math essentially and set a

Page 102
1  target of us for 5,000 adjudications per week.
2      Q     But it was the secretary who said this
3  number of cases in the backlog must be eliminated
4  in 2020?
5      A     I don't know that she said anything
6  about the number.  I think she just said -- it was
7  actually eliminate the backlog and adjudicate any
8  new case that comes in within 90 days.
9      Q     And when did that directive come down?
10     A     That specific directive, I believe, was
11 the fall of 2019, but there were already
12 conversations to that effect earlier in 2019.
13     Q     I'm sorry.  It glitched a little.
14          What was earlier in 2019?
15     A     There were already conversations about
16 elimination of the backlog in early 2019.  The
17 specific directive of elimination of the backlog
18 and adjudicating cases within 90 days of receipt,
19 I believe, was in the fall of 2019.
20     Q     And who are the conversations among
21 that were earlier in 2019 about elimination of the
22 backlog?
23     A     Well, I don't know who over in LBJ,
24 but, certainly, Mark Brown made all of us within
25 FSA that are related to BD aware, so that included

Page 103
1  Robin Minor, the then chief enforcement officer
2  Jeffrey Appel, the -- I'm trying to think.  There
3  were other policy folks that were involved because
4  they were working on the relief methodology, so,
5  particularly, it was communicated to FSA to just
6  get it done, essentially.
7      Q     So once that directive came down, whose
8  decision was it about how to approach the
9  sequencing of which claims would get adjudicated
10 first?
11     A     Well, it wasn't really a point in time.
12 I know initially there was a lot of interest in --
13 there's always been a lot of interest in getting
14 through the Corinthian cases, so that was one of
15 the big priorities.
16          But, then, I know some of the folks
17 over in LBJ wanted us to do ITT next, and I -- at
18 the time, we had five full-time and one part-time
19 attorney, so we just didn't have the bandwidth to
20 hit any kind of numbers and review the volume of
21 evidence that we had on ITT because I think we
22 have not quite a million pages of records, but
23 there was a lot of documents that we had, that we
24 weren't in a position to adjudicate the cases
25 because we were pretty confident that there were

Page 104
1  documents in there that would support other claims
2  that we just didn't know what they were or where
3  they were.
4          So I pushed back on that and there were
5  a lot of conversations about what else could be
6  done, and, you know, one of the things that could
7  be done was first the cases that didn't have
8  common evidence and then the cases where the
9  common evidence didn't seem to be related to those
10 cases, so that's kind of how it evolved.
11     Q     For the cases that didn't have common
12 evidence, what would a borrower need to provide in
13 order to be eligible for relief?
14     A     I can't answer that hypothetically.  It
15 really depends on the claim.
16     Q     Are -- are the people who are reviewing
17 individual applications given any instructions on
18 how to assess whether a borrower has provided
19 enough to support their claim?
20     A     They're not really making an assessment
21 of -- they're not weighing evidence.  They're, you
22 know, issue spotting and flagging cases that have
23 something that could potentially warrant approval.
24 So it's a very low bar at that review stage.
25          And, so, the junior attorney, if they

Page 105
1  think there's anything that could lead at all to a
2  possibility of approval, they're supposed to
3  escalate it to one of the senior attorneys.
4          So those cases are all supposed to be
5  set aside.
6      Q     Are they given written instructions on
7  what to look for in order to set aside an
8  application?
9      A     They're trained on that.  The protocols
10 to some extent include that, but there's also --
11 you know, when new attorneys come on, we do a full
12 week of training, and then they go through kind of
13 a probationary period where every case that they
14 adjudicate gets adjudicated by somebody more
15 senior who, you know, walks them through what is
16 or isn't something that states a claim or what is
17 or isn't something that would potentially support
18 approval that they should be setting aside.
19          So they get fairly extensive training
20 on that.
21          MS. ELLIS:  Okay.  Let's take a
22 five-minute break.
23          THE VIDEOGRAPHER:  All parties agree to
24 go off the record?
25          MR. MERRITT:  Agree.

Page 110
1  Letter A is the letter that was used for people
2  who only alleged a job-placement-rate claim.
3  There were job-placement-rate claims that were
4  adjudicated late 2017 to 2018, and there was a
5  letter that met that same criteria, essentially,
6  in terms of who it would go out to that was a
7  different letter.
8       Q    Who drafted that letter, that form
9  letter?
10      A    I believe we did.  I think it was
11 edited by OGC, but I know my team did the initial
12 draft, I believe.
13      Q    And it contained basically the same
14 information that's now in form denial A?
15      A    I don't remember to be honest with you.
16 I mean, it was intended to address the same
17 claims, but I don't remember exactly what the
18 contents were in that one versus this one.
19      Q    Before form denials B, C and D started
20 being used, had any claims other than Corinthian
21 job-placement claims been denied?
22      A    In terms of denied, meaning just not
23 sent out?
24      Q    Meaning had any borrowers been notified
25 of the denial of their claims other than CCI JPR

Page 111
1  applicants?
2       A    There were two denials issued in 2017,
3  summer of 2017, I think.
4       Q    Two denials total, not two schools?
5       A    Two -- two individuals, yeah.
6       Q    Did they receive individual denial
7  letters, or was there a form in place?
8       A    They were individual letters.
9       Q    Okay.
10      A    You froze again there for half a
11 second.  Did you ask me if it was a form?
12      Q    Yeah.  You -- you froze as well.
13           Did you say that they got individual
14 denial letters?
15      A    They received individual denial
16 letters, yes.
17      Q    Okay.  And other than those two
18 individuals, no other borrowers were notified of
19 the denial of their claims until forms B, C and D
20 started going out?
21      A    Other than --
22      Q    Other than Corinthian JPR?
23      A    Yes, making sure I understand your
24 question.  Other than two individual denials in
25 summer of 2017 and the job-placement-rate denials

Page 112
1  in 2017 to 2018, no denials went out.
2       Q    All right.  Thank you.
3            I'm going to back up in time a little
4  bit back to 2017.  When the new administration
5  came in in January '17, did you have any
6  discussions with the transition team about
7  borrower defense?
8            MR. MERRITT:  Objection as beyond the
9  scope.
10           MS. ELLIS:  Are you instructing the
11 witness not to answer?
12           MR. MERRITT:  You can answer that
13 question.  I just do want to note that that is not
14 related to one of the topics the court has
15 authorized discovery on, so . . .
16           MS. ELLIS:  Well, I disagree, and if
17 you'd like to move to strike after today, you can
18 feel free to.
19           MR. MERRITT:  Okay.  You can answer
20 that question, but . . .
21           THE WITNESS:  Yes.
22      BY MS. ELLIS:
23      Q    So did you have any discussions about
24 borrower defense with the Trump transition team in
25 January, February of 2017?

Page 113
1       A    Yes.
2       Q    Who did you discuss that with?
3       A    Oh.  Well, there was the -- a beachhead
4  team and a landing team.  I can't remember which
5  was which.  But there was, you know, the team that
6  came in prior to the inauguration, and we had
7  meetings with them, and then there was a team that
8  came in after that, and we had meetings with them.
9       Q    So what did you talk about with members
10 either of the beachhead team or the landing team
11 with regard to borrower defense?
12           MR. MERRITT:  Objection: beyond the
13 scope.  I'm going to instruct not to answer to
14 enforce the limitation order by the court.
15           MS. ELLIS:  I don't believe that's
16 consistent with the judge's standing order on
17 depositions.
18           MR. MERRITT:  It's consistent with
19 Federal Rule of Civil Procedure 30(c)(2).
20           MS. ELLIS:  Can we talk about this off
21 the record?
22           MR. MERRITT:  Okay.
23           THE VIDEOGRAPHER:  We are now off the
24 record.  The time is 16:56 UTC.
25           (Recess -- 11:57 a.m.)

Page 130

1  BY MS. ELLIS:
2      Q   Is this a document that you've seen
3  before?
4      A   Yes.
5      Q   And this is a memorandum recommending
6  the -- the discharge of approximately 16,000 loans
7  that have been adjudicated before January 20th,
8  2017; is that correct?
9      A   That's correct.
10     Q   If you look at the last page, please,
11 this document is signed by Secretary DeVos and
12 under the other/comment section she wrote, With
13 extreme displeasure.
14         Is that accurate?
15     A   That's what she wrote.
16     Q   When did you first see this document?
17     A   It was later.  It was quite a bit
18 later.  I don't remember exactly.  It might have
19 been in even 2018 or later.
20     Q   What did you take the Secretary's
21 comment to mean?
22     A   That she was not happy to be signing
23 off on discharges for the previously
24 (indiscernible) cases or the loans related to the
25 previously (indiscernible) cases.

Page 131

1      Q   Were you aware of the secretary
2  expressing displeasure about BDU's adjudication of
3  borrower defense applications, otherwise?
4          MR. MERRITT:  Objection: beyond the
5  scope.
6          MS. ELLIS:  Can the witness answer?
7          MR. MERRITT:  Can you explain how it's
8  relevant for one of the topics?
9          MS. ELLIS:  It's relevant to the
10 reasons for the delay.
11         MR. MERRITT:  That's not one of the
12 topics.
13         MS. ELLIS:  I'll move on.
14 BY MS. ELLIS:
15     Q   In the spring of 2017 when -- when you
16 were told that no more approvals would be
17 processed, was it also your understanding that no
18 denials would be processed?
19     A   Yes, but we weren't really positioned
20 to issue denials at that point.  As I mentioned,
21 there's kind of a -- it's not just sending out a
22 notice which, you know, it's not just drafting a
23 letter.  We also have to have requirements with
24 the servicers set up so that they know how to
25 handle it.

Page 132

1      So if a case were denied in total, then
2  the servicers have to have instructions for how to
3  take the borrower out of forbearance.  There were
4  discussions going on -- I don't know if it was
5  this early, but in 2017 about, you know, whether
6  there would be some kind of an interest credit
7  because some of these borrowers' claims had been
8  pending for a while, so there was some
9  conversation about that.
10         So long story short, we weren't -- we
11 weren't holding off on issuing a whole lot of
12 denials in early 2017 because there weren't that
13 many that we had ready to send out at that point.
14     Q   At that time, were you told to stop
15 developing memoranda or protocols for additional
16 categories of claims other than the Corinthian and
17 ITT protocols that were already in place?
18     A   We were told to stop seeking approval
19 for such things, but we weren't told to stop
20 reviewing evidence, that kind of thing.
21         So that work continued, but we weren't
22 staffed at the level that would have allowed us to
23 develop a whole lot of new review protocols at
24 that point anyway.
25     Q   So you weren't -- you weren't

Page 133

1  developing protocols during that period, but you
2  were reviewing evidence?
3      A   Yes.
4      Q   And what -- what was the result of --
5  of that review?  Was it -- was it memorialized in
6  any way other than in a application-review
7  protocol?
8      A   We didn't even get to the review
9  protocols at that point.  A lot of 2017 we spent,
10 you know, a fair amount of time working on both
11 the IG review, the development of a system because
12 we've been working off of, you know, I don't know
13 how many -- I think over a thousand Excel
14 spreadsheets.  There was no system.
15         So that was my biggest priority when I
16 came in, in terms of operations, was to -- to
17 develop some kind of a system that we could use so
18 that we could track the cases and pull data and do
19 reports and things like that.
20         So there was a lot of work going on
21 with that in 2017, and there were just a number of
22 different kind of moving parts operationally that
23 we were working on so that we were better
24 positioned to move out once we got the green light
25 to move forward, whatever that looked like.

Page 162

1  A    Yes.  The -- that didn't happen,
2  obviously.  I believe the -- that was to coincide
3  with -- no, I'm sorry.  I'm trying to remember the
4  timeline here.  It was a decision to hold off, and
5  I don't know if it was this particular time,
6  but -- I'm not sure.  I'm sorry.
7  Q    **As of August 2019, had the form A**
8  **through D denial letters been finalized?**
9  A    **No, they had not.  In fact, I don't --**
10 **I don't know if they even started.**
11 Q    Was the -- was the ongoing development
12 of those letters one of the reasons why denial
13 decisions did not resume by mid-September?
14 A    No, they were held until we had the
15 approval -- the (audio distortion) approvals which
16 was tied to the relief methodology.
17 Q    So does it follow then that issuance of
18 approvals were scheduled to resume by
19 mid-September 2019?
20 A    Well, like I said, I didn't draft this
21 and I don't know who did, but it may have been in
22 connection with whether or not to hold them.  I'm
23 guessing, so I really -- I don't know.
24 Q    Okay.  So going -- going back to your
25 declaration, looking at paragraph 66, could you

Page 163

1  read the first sentence of paragraph --
2  A    Sorry.  Sixty-six?
3  Q    Yes, 66 at the top of page 16.
4       Could you read the first sentence,
5  please?
6  A    Because BDU has been instructed to
7  maximize the number of applications adjudicated
8  per week, the streamlined JPR claims have been
9  prioritized.  For the same reason, BDU also has
10 focused on application from borrowers who did not
11 provide any evidence and who attended schools for
12 which BDU is not aware of evidence that would
13 support the approval of the applications.
14 Q    Okay.  So this is circling back to
15 something we talked about early on, but who made
16 the decision to maximize the number of
17 applications adjudicated per week?
18 A    That was the direction that we were
19 given from the department leadership, and it was
20 carried out by the chief operating officer and his
21 very clear mandate to me.
22 Q    When did you receive this instruction
23 to maximize the number of applications adjudicated
24 per week?
25 A    Really, as soon as Mark Brown started

Page 164

1  as the chief operating officer, he was very
2  focused on the backlog, the issues that were kind
3  of keeping us from getting through the backlog,
4  and how do we -- how do we eliminate the backlog.
5  So almost from the get-go I would say --
6       THE COURT REPORTER:  I'm sorry.  I'm
7  sorry.  You cut out.
8       THE WITNESS:  I think --
9       THE COURT REPORTER:  Excuse me.  You
10 cut out on me.  Right after you said, Really, as
11 soon as Mark Brown started as the chief operating
12 officer, he was very focused on the backlog, the
13 issues that were kind of keeping us from getting
14 through the backlog, and how do we -- how do we
15 eliminate the backlog, and then you distorted on
16 me.  Sorry.
17      THE WITNESS:  Okay.  I don't think I
18 said anything helpful after that so -- and I don't
19 remember exactly what I said.
20      But, yeah, that was his focus so I
21 guess it was -- you know, when he started at that
22 period of time in February, March 2019, that he
23 started asking about it, and probably very soon
24 thereafter, you know, started pushing us to hit
25 numbers and, you know, have to report on it very

Page 165

1  regularly.
2       I'd say no later than the fall of 2019,
3  but it might have been a little earlier than that,
4  too.
5  BY MS. ELLIS:
6  Q    Did the -- did the number of --
7  A    (Inaudible.)
8  Q    I'm sorry.  What?
9  A    Sorry.  Everybody just froze on me
10 there, so -- I don't know if it's my connection
11 or --
12      MR. MERRITT:  It might be yours, I
13 think, from my perspective at least you're --
14      THE WITNESS:  Can you hear me?
15      MR. MERRITT:  Now, yes.
16 BY MS. ELLIS:
17 Q    Okay.  Can you hear me?
18 A    I can hear you, yep.
19 Q    Okay.  We'll keep going and see what
20 happens.
21 A    Yep.
22 Q    So did -- did the number of
23 applications adjudicated become part of FSA's
24 annual performance metrics this year?
25 A    I believe so, but, yes.

Page 210

1  A    Yes.
2  Q    So this was a project you were working
3  on in anticipation of when processing began again?
4  A    Yeah.  Yeah.
5  Q    So for all of the borrowers who have
6  received form C or D denial letters since the end
7  of 2019, and those are the ones for non-Corinthian
8  claims, is it fair to say that none of -- none of
9  those applications had any evidence weighed in
10 relation to their claim?
11 A    Unless it was an ITT case for which we
12 had a protocol, so that would have been -- the
13 reviewer didn't do the weighing, but the weighing
14 was done before the approval protocol, but I think
15 with that exception your statement is correct.
16 Q    Okay.
17 A    One thing I just wanted to clarify
18 because I'm not sure I was clear on before.  When
19 we were talking about -- I think it was
20 Ms. Sweet's letter, you were also asking about
21 reliance kind of in a related thread.  I just
22 wanted to make clear that the letters C and D that
23 have gone out were not -- those were not based on
24 a denial related to reliance.
25      Those were based on the reasons that we

Page 211

1  just talked about.  Either a failure to state a
2  claim in the sense that they said, you know, I
3  couldn't transfer my credits, but they didn't say
4  that they -- you know, that there was a
5  misrepresentation.
6       That kind of thing is the failure to
7  state a claim that would be reflected in what went
8  out for the C and D category.
9       MS. ELLIS:  Okay.  I think we've been
10 going for a while with the exception for our tech
11 breaks, so let's take a real five-minute break
12 here if that's all right.
13      THE WITNESS:  Great.
14      MR. MERRITT:  Yes.
15      THE WITNESS:  Thank you.
16      MS. ELLIS:  All right.  Thank you.
17      THE VIDEOGRAPHER:  We are now off the
18 record.  The time is 20:21 UTC.
19      (Recess -- 3:21 p.m.)
20      (After recess -- 3:37 p.m.)
21      THE VIDEOGRAPHER:  We're now on the
22 record.  The time is 20:37 UTC.
23      BY MS. ELLIS:
24 Q    Okay.  So I'd like to go back to the
25 denial letter that Theresa Sweet received that we

Page 212

1  were looking at earlier that was tab 15,
2  Exhibit 15 from the Jones deposition and the
3  denial letter starts at page 51 of that document.
4  A    Sorry.  Is this the declaration of
5  Eileen Connor document?
6  Q    Yes, that's right.  And attached to the
7  declaration of Eileen Connor is the affidavit of
8  Theresa Sweet and attached to that is the denial
9  letter near the end of the document.
10 A    Got it.  Okay.
11 Q    Okay.  So looking down on the third
12 page of the denial letter, which is page 53 of
13 this document overall, there's a heading, What if
14 I do not agree with this decision.
15      Do you see that?
16 A    Yes.
17 Q    And it continues on the next page, In
18 your request for reconsideration, please provide
19 the following information, and there's a list of
20 three things to include in the reconsideration
21 application.
22      Do you see that?
23 A    I do.
24 Q    Okay.  Can you read item 2 on that
25 list, please?

Page 213

1  A    Item 2 is, Why you believe that ED
2  incorrectly decided your borrower defense
3  repayment application.
4  Q    Okay.  Based on reading this form D
5  denial letter, what basis would a borrower have to
6  assert that ED incorrectly decided her borrower
7  defense application?
8  A    Which claim, I guess, is she requesting
9  reconsideration on?
10 Q    Well, let's start theoretically with
11 Allegation 1, Employment Prospects.
12 A    So failure to state a legal claim.  I'm
13 sorry.  Can you repeat your question?
14 Q    I guess I'll -- I can rephrase.  How
15 would the borrower know what failure to state a
16 legal claim means in this context?
17 A    I don't really have an answer to that.
18 I don't know.
19 Q    Is there a standard reconsideration
20 form that a borrower can fill out?
21 A    Not currently.  There's a whole process
22 that has to happen for forms that collect data
23 from borrowers, so that was something that was
24 discussed a while back.  We've actually expanded
25 the reconsideration process beyond what the

Page 214

```
 1   regulation requires because under the 2016
 2   regulation, you can only -- well, you can seek
 3   reconsideration if you have new evidence that
 4   wasn't considered in connection with your
 5   application.
 6              I had already advocated for having a
 7   reconsideration process, period, going back to the
 8   beginning of time, but in particular I think with
 9   respect to the pace that we're working on these
10   adjudications now, we wanted to make sure that we
11   had a mechanism for correcting any mistakes that
12   we made.
13              So -- so we've actually got a more
14   expansive reconsideration.  You know, it's more
15   expansive in terms of who can -- who can seek it.
16              You know, to the extent that these
17   letters maybe aren't perfect and could provide
18   better information, I don't know what the borrower
19   would look to in particular, but, you know,
20   certainly if they -- on that one if she, you know,
21   articulated her claim more fully -- sometimes we
22   get very short statements in the allegations, and
23   if she gave more information that perhaps could
24   lead to a different result.
25              We do have a lot of applications that
```

Page 215

```
 1   came in before there was even an application, so
 2   they were on emails, there was a template or an
 3   entity called the Debt Collective.  I think
 4   there's still an entity called the Debt Collective
 5   that had their own form.  Sometimes it's just a
 6   factor of how it came in, and there could be a
 7   scenario where a borrower could provide more
 8   detail in the request for reconsideration that
 9   would result in a different result.
10       Q    Okay.  But there's nothing in the
11   denial letter that explains that to the borrower;
12   is that correct?
13       A    I think that's fair.
14       Q    And then looking at -- back at the list
15   of what to provide in the reconsideration
16   application, item 3 says, Identify and provide any
17   evidence that demonstrates why ED should approve
18   your borrower defense to repayment under the
19   applicable law set forth above.
20              So do I understand from what you've
21   just said that this isn't meant to require new
22   evidence; it's any evidence?
23       A    It could be new evidence.  It could be
24   that the borrower referenced evidence and then
25   didn't actually include it.  Maybe they thought we
```

Page 216

```
 1   had.  I don't know.
 2              But, you know, certainly, if they have
 3   evidence that they didn't provide that wasn't with
 4   their application, then that would be something
 5   that would be helpful to do.  But it could just
 6   be, you know, identifying evidence that may be
 7   available elsewhere, too, because we may not know
 8   about it.
 9       Q    Okay.  But if a -- if a borrower were
10   to resubmit the same evidence they submitted the
11   first time but with a more fulsome explanation,
12   that would receive review as a -- as a complete
13   reconsideration application?
14       A    Under current policy, yes.
15       Q    Right above this section here above,
16   What if I do not agree with this decision, there's
17   another section that's titled, What evidence was
18   considered in determining my application's
19   ineligibility.
20              Is there any way for the borrower to
21   find out more about what was considered under this
22   heading beyond the description provided here?
23       A    Currently, no.
24       Q    How many people have applied for
25   reconsideration in 2020?
```

Page 217

```
 1       A    I don't know if I've seen data on that
 2   lately.  I believe it was at least a few thousand
 3   as of a couple of months ago, but I can't be sure
 4   of exact numbers.
 5       Q    And what's the process for handling
 6   reconsideration applications when they come in?
 7       A    Well, we're -- we're adding some
 8   enhancements to our -- our platform to kind of
 9   provide a -- a better mechanism to do it, but
10   right now the -- the request comes in -- it can
11   come in -- sometimes it's immediately in response
12   to the email, so these notifications go out to the
13   borrower by email, and this tells them how to
14   respond.  So sometimes shortly after they get
15   their decision, they submit a request.  Other
16   times, they gather additional evidence and then
17   submit it later.
18              But it goes through our intake process
19   kind of -- sort of along the lines of the way the
20   application comes in, and then it's associated
21   with their application on the review platform.
22       Q    And then how long does it take between
23   when the application gets entered into the review
24   platform and someone actually reviews it?
25       A    We haven't actually started the reviews
```