# EXHIBIT D

```
                                                  Page 1
 1                  - JAMES MANNING -

 2   UNITED STATES DISTRICT COURT

 3   NORTHERN DISTRICT OF CALIFORNIA

 4   ------------------------------- X

 5   THERESA SWEET, et al., on behalf

 6   of themselves and all others

 7   similarly situated,

 8                 Plaintiffs,

 9   vs.

10   ELISABETH DEVOS, in her official

11   capacity as Secretary of the

12   United States Department of

13   Education, et al.

14                 Defendants.

15   ------------------------------- X

16

17   DATE:  December 17, 2020

18   TIME:  9:36 a.m.

19

20            VIDEOTAPED VIDEOCONFERENCE DEPOSITION

21   OF JAMES MANNING, pursuant to Agreement, before

22   Hope Menaker, a Shorthand Reporter and Notary

23   Public of the State of New York.

24

25
```

Page 66

1              - JAMES MANNING -
2      A.      I -- I briefed her that that was the
3  determination after review by the Office of
4  General Counsel.  There was no option and I -- I
5  recommended she sign.
6      Q.      That she sign what?
7      A.      The discharge of those 16,000 loans
8  -- $200 billion worth of loans.
9      Q.      And was that an actual document
10 discharging the loans?
11     A.      She signed recognizing that, that her
12 -- her action authorized the process to go
13 forward.
14     Q.      And were you involved in drafting the
15 written document for that action?
16     A.      I was not.
17     Q.      Did you give her, the Secretary, any
18 written communication about the action?
19     A.      I believe I may have.  I expect I
20 did, yes.
21     Q.      Why don't we look at Tab 11 in your
22 documents and this was previously submitted as
23 Exhibit 7 in the Jones deposition.
24          (Whereupon, Exhibit 7, having been
25          previously marked, was tendered to the

Page 67

1              - JAMES MANNING -
2      witness for identification.)
3      Q.      And I'll ask you to just skip past
4  the first page that says "Exhibit 7" because that
5  was just used to get it into the court file; and
6  if you turn to the second actual page of the
7  document, do you recognize this document?
8      A.      Uh-huh.
9      Q.      And can you tell me what it is?
10     A.      This is a memo from me to the
11 Secretary.
12          MR. JARAMILLO: And I'm not sure that
13     I did this, but we should mark this -- I'm
14     sorry, we don't have to mark this.  Strike
15     that.
16     Q.      Did you write this memo, Mr. Manning?
17     A.      I signed it.  I don't believe that I
18 was the author.
19     Q.      Do you know who authored it?
20     A.      Probably a committee.
21     Q.      And what committee would that be?
22     A.      Oh, I, I -- I don't know.  I would
23 say that I, you know, ultimately read it and sent
24 it forward.
25     Q.      Who gave you the draft of it?

Page 68

1              - JAMES MANNING -
2      A.      I have no recollection of who gave me
3  the draft.
4      Q.      Do you know if this resulted from the
5  borrower defense Review Panel?
6      A.      I do not.  I think that I would say
7  that -- so the paragraph that reads, "We
8  established a review panel consisting of Joe
9  Connolly, Lynn Mahaffy -- we established a review
10 panel consisting of Joe Connolly, Lynn Mahaffy,
11 Phil Rosenfelt, Justin  Riemer and myself who
12 examined the claims and background explanation and
13 made recommendations on how to resolve the pending
14 claims and proceed in the future."
15          So this memo preparation was made in
16 and amongst the group of people represented here.
17     Q.      And was this the action you referred
18 to previously of the -- of Secretary DeVos
19 authorizing the discharge of approximately 16,000
20 borrower defense claims?
21     A.      Yes.  It was --
22     Q.      I'm sorry, go ahead.
23     A.      The answer to what you said so far is
24 yes.  It was a recommendation to the Secretary
25 signed by me to "proceed with discharge for direct

Page 69

1              - JAMES MANNING -
2  and non-direct loans for all impacted borrowers
3  direct for U.S. or in the CFO's Internal Control
4  Unit to set up interim procedures to process
5  claims until new borrower defense regulations are
6  operable and take effect.  Proceeding with
7  requesting OIG launch a review of the borrower
8  defense program."
9      Q.      And you're reading from Page 4 of
10 this exhibit?
11     A.      Correct.
12     Q.      And you see that Secretary DeVos
13 signed it and checked the -- the line that says
14 "Approved"?
15     A.      I do.
16     Q.      And this is a document that shows
17 that she approved the action listed in the
18 recommendation?
19     A.      It is.
20     Q.      And you see your comment at the
21 bottom that says "With extreme displeasure"?
22     A.      I do.
23     Q.      After, did you -- do you recall
24 seeing that after she signed this document?
25     A.      Well, I -- I don't recall that,

James Manning
12/17/2020
70 to 73

Page 70

1             - JAMES MANNING -
2     but --
3         Q.    After she signed this document, did
4     you talk to her about her extreme displeasure?
5             MR. MERRITT:  Objection, asked and
6         answered.
7         Q.    You can answer.
8         A.    Well, I know she was not happy about
9     it and I know that she would have preferred that
10    the action was taken on fully under Trump's
11    administration, but she -- she knew she had an
12    obligation and she signed it and was not happy
13    about it, the way it had been handled up to then.
14        Q.    And after she signed the document, do
15    you know if the 16,000 applications were actually
16    discharged?
17        A.    Yes, they were.
18        Q.    Do you know when they were
19    discharged?
20        A.    I do not.
21        Q.    Do you have an estimate as to when
22    they were discharged?
23        A.    Not long after she signed this.
24        Q.    And were they all discharged with a
25    hundred percent relief?

Page 71

1             - JAMES MANNING -
2         A.    That's my understanding.
3         Q.    During the time period in which the
4     borrower defense Review Panel was -- was meeting
5     to evaluate the borrower defense program, did FSA
6     issue any decisions on borrower defense
7     applications?
8         A.    I don't recall if they issued any or
9     not.  They certainly were receiving applications
10    and were making judgments whether they were
11    acceptable for consideration or not, but I don't
12    recall that.  I --
13        Q.    Do you recall there being -- sorry,
14    go ahead.  I talked over you.
15        A.    That's okay.  Sorry.  I don't recall
16    that there were any that were finally fully
17    settled beyond these.
18        Q.    Was there a decision to put a pause
19    on issuing final decisions during the time period
20    of the borrower defense Review Panel?
21        A.    During a period that involved the
22    panel?  I -- I don't recall a -- a formal
23    decision, but -- I don't -- I don't recall a
24    decision that ordered that.
25             I think there was certainly

Page 72

1             - JAMES MANNING -
2     discussion about moving forward with the
3     methodology and getting to a point where we would
4     be able to move forward, as I said before, fairly
5     for the borrower and the taxpayer by considering
6     the harm that was done to student borrowers and
7     providing relief at an appropriate level that
8     ultimately was between a hundred percent and ten
9     percent.
10        Q.    To your recollection, when was that
11    new methodology put into effect?
12        A.    Oh, I'm -- I'm trying to recall.  I
13    can't remember specifically when it was put into
14    effect, you know, obviously it would take
15    some -- some time to stand up.  It was in
16    effect -- started being worked on through '17.
17             You know, it was in effect for a
18    certain period of time before it was put aside by
19    the court in 2018.  I, I -- I can't remember the
20    specific start date in terms of when it was up for
21    operation.
22        Q.    Until it was up in operation, is it
23    true that the Department did not issue any other
24    final borrower defense decisions except for the
25    approximately 16,000 that were approved by the

Page 73

1             - JAMES MANNING -
2     Secretary in the memo we just looked at?
3         A.    I don't specifically recall, but I
4     expect that it's true though.
5         Q.    And this memo, as you read, did
6     authorize the CFO's Internal Control Unit to set
7     up interim procedures to process claims, right?
8             MR. MERRITT:  Objection, ambiguous.
9         What -- what document?
10            MR. JARAMILLO:  The document we
11        looked at which was the May 4th, 2017 memo
12        that's Exhibit 7 in this case.
13        Q.    Tab 11 for you, Mr. Manning.
14        A.    Yes.  That's Page 4 of Exhibit 7; is
15    that right.
16        Q.    Yes, the authorization of the setting
17    up of interim procedures.
18        A.    Yes, I see what you're saying there.
19    "Direct OUS and the CFO's Internal Control Unit"
20    -- sorry, I'll read the whole thing so you have
21    it.
22             "Proceed with discharge for direct
23    and non-direct loans for all impacted borrowers.
24    Direct OUS and the CFO's Internal Control Unit to
25    set up interim procedures to process claims until

Page 122
1            - JAMES MANNING -
2    Secretary has the authority to give a part in the
3    whole in that -- in principle, but again I'd want
4    guidance from general counsel at the Department
5    before going forward but --
6        Q.    Would anyone else besides Secretary
7    DeVos have authority to issue such a decision?
8        A.    I don't know.
9        Q.    Would you have authority to issue
10   such a decision?
11       A.    I would have to see the decisions
12   like in front of me for consideration.  I --
13       Q.    Well, we don't -- I'm not aware of
14   such a decision document per se, but there was
15   obviously as you've seen a stoppage in the
16   issuance of borrower defense claims and for an
17   extended period of time.
18       A.    Right.
19       Q.    So you would expect that decision to
20   come from Department leadership, correct?
21       A.    I would expect that's correct, but I
22   don't know where that decision ultimately came
23   from.
24       Q.    Would you have authority to issue
25   such a decision?

Page 123
1            - JAMES MANNING -
2        A.    I would have -- if I had that option
3    in front of me, I would have discussed so with the
4    general counsel's office to clarify that because
5    it's not clear to me.
6        Q.    But you -- in consultation with the
7    Office of General Counsel, you would have the
8    authority to issue such a decision or not?
9        A.    I, I -- I don't know.  I'd have to
10   have their counsel advise me to that.  I don't
11   know.
12       Q.    But one thing that's absolutely clear
13   is that Secretary DeVos would have that
14   decision-making authority, correct?
15           MR. MERRITT:  Objection,
16       mischaracterization of prior testimony.
17       Q.    I'm just asking the question:  One
18   thing that's clear, Mr. Manning, is that of
19   anybody at the Department of Education, Secretary
20   DeVos would have the authority to issue a decision
21   that would require stopping the issuance of
22   borrower defense approvals and denials; is that
23   right?
24       A.    I expect the Secretary has that
25   authority and so I would expect that she'd be

Page 124
1            - JAMES MANNING -
2    briefed by others, including general counsel on an
3    issue before an action like that was taken.
4        Q.    But she would have the authority to
5    take the action after that briefing, correct?
6        A.    I expect that's correct.  I --
7        Q.    Did you ever at any time issue an
8    order regarding borrower defense?
9           MR. MERRITT:  Objection, vague.
10       Q.    Did you ever issue a decision
11   regarding borrower defense in your tenure at the
12   Department of Education?
13       A.    Did I have --
14           MR. MERRITT:  Objection, vague.
15       Q.    You can answer the question, Mr.
16   Manning, and I'll repeat it.  Did you ever at any
17   time issue a decision regarding borrower defense?
18       A.    A specific decision?
19       Q.    Any decision.
20       A.    I don't recall.
21       Q.    But you might have issued a decision
22   about borrower defense, but you just don't recall;
23   is that right?
24       A.    It's possible.
25       Q.    I want you to turn to Tab 16, if you

Page 125
1            - JAMES MANNING -
2    could.  This was previously marked as Exhibit 12
3    and it appears to be a PowerPoint presentation
4    that's titled "Borrower Defense to Repayment
5    August 21, 2019."
6           (Whereupon, Exhibit 12, having been
7       previously marked, was tendered to the
8       witness for identification.)
9        Q.    And I recognize, Mr. Manning, that
10   this postdates your tenure at the Department, but
11   there is something in this document that I want to
12   ask you about.
13       A.    Okay, fair enough.  I have it.
14       Q.    Okay.  Thank you, Mr. Manning.  If
15   you could turn -- the page numbers are located in
16   the lower left-hand corner.
17       A.    I see them.  What number?
18       Q.    I want to go to Page 6 or Slide 6.
19       A.    Okay.
20       Q.    And there's a question on top "Why
21   are BD applications on Hold" and for approvals it
22   says, "'Manriquez' tier relief methodology for CCI
23   subject to injunction (as of May, 2018) and no
24   alternative methodology available."
25           Do you have any recollection of that

Page 146

```
1                - JAMES MANNING -
2    Clinton, but I was a career officer, a career
3    member of the senior executive service.  At the
4    beginning of my service, I was in the Career
5    Foreign Service.
6          Q.      And immediately prior to joining the
7    Trump transition team, were you self-employed
8    doing consulting work?
9          A.      Yes.
10         Q.      So what were the types of clients
11   that you had?
12                MR. MERRITT:  Objection, it's beyond
13         the scope of the discovery that's been
14         authorized.
15         Q.      Did you have any higher education
16   clients?
17         A.      What's your definition of higher
18   education?
19         Q.      How about student loan guarantors?
20         A.      I did work for Strata Education, you
21   know, a former student loan guarantee agency
22   that's no longer a guarantee agency.
23         Q.      Anybody else?
24         A.      Nobody else in higher education.
25         Q.      No -- no institutions of higher
```

Page 147

```
1                - JAMES MANNING -
2    education?
3          A.      That I worked for as a consultant?
4          Q.      Yes, prior to joining the Department
5    or the Trump transition team.
6                MR. MERRITT:  I going to object to
7          the scope of this line of questioning and how
8          it's relevant to the discovery the court
9          authorized.
10         Q.      You can answer the question.  You
11   mentioned Stratta Education.  Was there any other
12   higher education-related institution that you had
13   as a client?
14         A.      No.
15         Q.      What about USA Funds?
16         A.      USA -- USA Funds was a pre -- Stratta
17   was spun off from USA Funds.  I did not work for
18   you USA Funds.
19         Q.      Did any of your consulting work
20   involve the discharge of federal student loans?
21                MR. MERRITT:  Objection, it's beyond
22         the scope.
23         Q.      Your answer, sir?
24         A.      No.
25         Q.      And did you ever consult in
```

Page 148

```
1                - JAMES MANNING -
2    connection with the Penn Hill Group after leaving
3    the Department of Education?
4                MR. MERRITT:  Objection, and I'm
5          going to object to that question, beyond the
6          scope.  This has gone on long enough.  I'm
7          going to instruct the witness not to answer
8          to enforce a court order limitation on
9          discovery.
10         Q.      Have you done any work after leaving
11   the administration related to the discharge of
12   student loans?
13                MR. MERRITT:  Objection.  Beyond the
14         scope.  I instruct not to answer to protect
15         the limitation, the court ordered limitation
16         on discovery.
17         Q.      Have you done any the work on behalf
18   of institutions of higher education as in your --
19   in your consulting work after leaving the Trump
20   Administration?
21                MR. MERRITT:  Objection to this line
22         of questioning, we objected to it, beyond the
23         scope of what the court authorized discovery
24         on.  Continue to instruct not to answer.
25                MR. JARAMILLO:  Well, I think it's --
```

Page 149

```
1                - JAMES MANNING -
2          I think it's relevant.  It goes to
3          credibility and it goes to bias.
4                MR. MERRITT:  Was that one of the
5          topics the court authorized discovery on?
6                MR. JARAMILLO:  That's always an
7          issue when you're talking about a discovery.
8          I don't think Judge Alsup would disagree with
9          that.
10               MR. MERRITT:  And this an ATA case
11         and as you just said the Judge also
12         recognized, a discovery of the agency is
13         favored, that's the presumption.  He
14         obviously authorized discovery in this case,
15         but it must be limited to the topics he
16         actually set forth and this is not related to
17         any of the -- the topics described --
18         (unintelligible crosstalk).
19         Q.      Did your work at the President Forum
20   involve any work for non-for-profit schools?
21                MR. MERRITT:  Objection, still beyond
22         the scope.
23         Q.      Does your work at President Forum,
24   Mr. Manning, involve any discharge of federal
25   student loans?
```

Page 150

```
1                - JAMES MANNING -
2            MR. MERRITT:  Objection, beyond the
3        scope of the court-authorized discovery.  I
4        instruct the witness not to answer to protect
5        the limitation ordered by the court.
6        Q.    After leaving the Trump
7   Administration, Mr. Manning, did you have any
8   discussions with anybody at the Department of
9   Education regarding borrower defense issues?
10       A.    After I left the Trump
11  Administration?
12       Q.    Yes, sir.
13       A.    Did I have any conversations with
14  people at the Department about borrower defense,
15  is that what you said?  Repeat the question    ,
16  please.
17       Q.    That's it.  You got it, Mr. Manning.
18  That's -- that's the question.  You repeated it
19  accurately.
20       A.    After I left the Trump
21  Administration, did I have conversations
22  with -- none that I recall.
23       Q.    I would like you to turn to Tab 12
24  and this is a document that we need to mark as the
25  next exhibit, which I believe is 34.
```

Page 151

```
1                - JAMES MANNING -
2            (Whereupon, Exhibit 34 was marked at
3        this time.)
4        Q.    And this is a document that has on
5   top "U.S. Department of Education Borrower
6   Defenses and Financial Responsibility Negotiated
7   Rulemaking Committee 2017-2018  Session 1."
8        A.    Yes.
9        Q.    Have you seen this document before,
10  Mr. Manning?
11       A.    It looks like a transcript of the
12  remarks I gave at the beginning of this session.
13       Q.    Have you seen it before?
14       A.    Have I seen this document before?
15       Q.    Yes, sir.
16       A.    In this form, not that I recall.
17       Q.    Okay.  I want you to turn to Page 8,
18  please.
19       A.    Happy to.
20       Q.    And I would like you to look at the
21  sentence beginning in the middle of Line 11.
22       A.    Can I just point out, just for my own
23  clarification, this document -- there's a couple
24  of pages Number 1 and the back of the cover page
25  is Number 7, 8, 9, 10.  So is this -- is this a
```

Page 152

```
1                - JAMES MANNING -
2   complete document?
3        Q.    Well, sir, I -- thanks for pointing
4   that out.  I think that we just excerpted here
5   your -- your remarks as they appear in this
6   transcript.
7        A.    Okay.
8        Q.    If you could turn to Page 8 on Line
9   11.  Can you read for me the second beginning with
10  "As you know"?
11       A.    Yes.  "As you know, the borrower
12  defense regulations enacted in 2016 have been
13  delayed and so the Department has and will
14  continue to consider claims under the regulatory
15  status quo which assesses a claim under applicable
16  state law and commits to the Secretary's
17  discretion how to fashion reliefl"
18       Q.    And do you recall making that
19  statement to this committee?
20       A.    Yes.
21       Q.    I would like you to turn to Page 10.
22       A.    Okay.
23       Q.    Can you read the sentence beginning
24  at Line 5.
25       A.    "Throughout the winter and early
```

Page 153

```
1                - JAMES MANNING -
2   spring, a team consisting of both career and
3   non-career Department leadership evaluated the
4   program and worked to implement controls and
5   procedures for reviewing claims and processes for
6   discharging loans for successful claimants."
7        Q.    And was that the Borrower Review
8   Defense Panel that we discussed earlier?
9        A.    I believe so.
10       Q.    And what controls and procedures were
11  implemented?  You -- you say that they "worked to
12  implement controls and procedures for reviewing
13  claims and processes for discharging loans for
14  successful claimants."
15            Do you recall any more about those
16  controls and procedures?
17       A.    Well, what came out of that was the
18  establishment of the methodology.
19       Q.    Did anything else come out of that
20  that was related to controls and procedures for
21  reviewing claims and processes for discharging
22  loans?
23       A.    I don't recall.
24       Q.    Can you look at -- on the same page,
25  the sentence starting at Line 17.
```

James Manning
12/17/2020                                                                    234 to 237

Page 234

```
 1              - JAMES MANNING -
 2      A.     I wasn't aware of it when it occurred
 3  that former Deputy Chief Enforcement Officer
 4  communicated to BDU not to submit additional
 5  claims.
 6      Q.     Did you ever become aware of that
 7  communication?
 8      A.     Apparently when I read this, I must
 9  have become aware of it, but I skimmed over it.  I
10  don't recall but --
11      Q.     Did you direct FSA's former Deputy
12  Chief Enforcement Officer to communicate to BDU
13  not to submit additional claims for approval?
14      A.     I don't remember anything like that.
15      Q.     Do you --
16          MR. MERRITT:  Joe, we -- oh, sorry.
17          MR. JARAMILLO:  Go ahead.
18          MR. MERRITT:  I was going to say
19      we've gone for a little over an hour again.
20      We missed our break window, sometime soon.
21          MR. JARAMILLO:  All right.  Let's
22      unpack this sentence a little bit and then
23      we'll take our break.  I don't think it will
24      take that long.
25          THE WITNESS:  Sure.
```

Page 235

```
 1              - JAMES MANNING -
 2          MR. JARAMILLO:  All right.
 3      Q.     Do you have any idea who would have
 4  made a decision to communicate to the BDU not to
 5  submit additional claims for approval?
 6      A.     I don't know.  I can't tell from
 7  this.  I -- I read this and --
 8      Q.     At this time, sir.  I'm just asking
 9  for your memory.
10      A.     Well, I, I, I -- I know, but I read
11  this and the "FSA's former Deputy Chief
12  Enforcement Officer communicated to the BDU not to
13  submit additional claims."  According to the
14  director of BDU, FSA's former Deputy Chief
15  Enforcement Officer communicated to the BDU not to
16  submit additional claims for approval or to
17  continue developing memoranda."
18          It goes on, but the confusion for me
19  here is that former Deputy Chief Enforcement
20  Officer, I mean is -- is that Laura Kim?  Is that
21  who we're talking about, communicating to the --
22  the BDU to Colleen Nevin not to submit additional
23  claims?  On whose authority was that?  I don't
24  know.  I can't tell by reading this.
25      Q.     Those are precisely my questions, Mr.
```

Page 236

```
 1              - JAMES MANNING -
 2  Manning.
 3          So your answer is you don't know.
 4  You're telling me that as you sit here today you
 5  don't remember one way or another whether you
 6  directed FSA to stop issuing decisions for
 7  approval?
 8      A.     I don't have any recollection of
 9  relaying that information to the former Deputy
10  Chief Enforcement Officer to, to -- to relay; and
11  if I had I -- I expect that I would remember that,
12  but I have no recollection of doing anything like
13  that.  That's outside of a normal procedure.
14      Q.     Now, let's put aside the relaying
15  information.  I want to just back up because my
16  question really was focused on whether you
17  directed FSA to stop issuing decisions for
18  approval.
19      A.     I --
20      Q.     Did you?
21      A.     I don't recall doing that, no, but I
22  don't see that reference or inference being made
23  here.
24      Q.     I'm not asking for an inference.  I'm
25  kind of backing up for now because I don't want to
```

Page 237

```
 1              - JAMES MANNING -
 2  get caught up in, in the -- you know -- in the
 3  relay of information.
 4          I just --- really just the important
 5  part of this for my purposes is to know whether
 6  you directed FSA to stop issuing decisions for
 7  approval and your answer was you don't recall; is
 8  that correct?
 9      A.     I don't recall.
10      Q.     Could you have directed FSA to stop
11  issuing decisions for approval?
12      A.     When are we talking about, what date?
13  As what?
14      Q.     Any time -- any time in your tenure
15  as Acting Undersecretary, could you have directed
16  FSA to stop issuing decisions for approval?
17      A.     Well, would I have had the legal
18  authority?  I'm not -- it's not clear to me that I
19  would have to do that and would have done that.
20      Q.     It's not clear to you whether you had
21  the legal authority to do that?
22      A.     I would have to -- to consult with
23  the attorneys at OGC to be clear on that.
24      Q.     Did you ever direct that no more
25  decisions for borrower defense be issued?
```

U.S. LEGAL SUPPORT
(877) 479-2484

Page 238

```
1                - JAMES MANNING -
2         A.      I have no recollection of ever saying
3   that.
4         Q.      Is that something that you would have
5   had the authority to do?
6         A.      As I said, I would want to check with
7   the OGC to confirm that before I made a statement
8   like that.
9         Q.      Did you ever check with OGC about
10  that issue?
11        A.      Not that I recall.
12        Q.      Did you ever check with anybody about
13  that issue of being able to direct that no more
14  decisions by borrower defense be issued?
15        A.      No, I don't remember.
16        Q.      And it's your testimony that within
17  the department, it's office-of-the-general-counsel
18  that would know whether or not you had the
19  authority to do something like that?
20        A.      I think checking with the attorneys
21  always a good thing to do at the Department of
22  Education when you have a question about lawful
23  authority.
24        Q.      Certainly Secretary DeVos would have
25  authority to issue such a decision, correct?
```

Page 239

```
1                - JAMES MANNING -
2         A.      I -- I expect that is correct.
3         Q.      Did the Secretary ever direct FSA
4   that no mire borrower defense decisions should be
5   issued?
6         A.      I never heard her say that.
7         Q.      Did you ever see any documents that
8   -- implying that she make such a decision?
9         A.      I never -- I don't recall seeing
10  anything like that.
11        Q.      Did anyone ever tell you that she had
12  made such a decision?
13        A.      I don't recall ever hearing that.
14        Q.      Did you ever hear Secretary DeVos
15  express an interest in stopping borrower defense
16  decisions?
17             MR. MERRITT:  Objection, vague.
18        Q.      Did you ever come to know that the
19  Secretary directed that no decisions on borrower
20  defense should be issued?
21        A.      I don't recall ever hearing that.
22        Q.      As you sit here today, you're not
23  aware of Secretary DeVos ever directing that no
24  borrower defense decisions be issued by the
25  Department?
```

Page 240

```
1                - JAMES MANNING -
2             MR. MERRITT:  Objection, asked and
3   answered.
4         Q.      You can answer, sir.
5         A.      I don't recall ever hearing Secretary
6   DeVos say that.
7         Q.      And you don't recall anybody ever
8   saying that Secretary DeVos issued such a
9   decision?
10        A.      That -- I don't recall that.
11        Q.      You don't have any awareness that she
12  issued such a decision?
13             MR. MERRITT:  Objection, asked and
14  answered several times.
15        Q.      Do you have any awareness, sir, as
16  you sit here today that she issued such a
17  decision?
18        A.      Awareness as I sit here today?
19        Q.      Yes, sir.
20        A.      Do you have a document here to show
21  me this and I can see --
22        Q.      I'm just asking whether you have any
23  awareness, you can tell me --
24        A.      No, I don't --
25        Q.      You can tell me --
```

Page 241

```
1                - JAMES MANNING -
2         A.      I don't have any awareness or
3   recollection.  No, do not.
4         Q.      Okay.  Now, let's turn back to the
5   bottom of Page 3.
6         A.      Do you mind, could I take two
7   minutes.
8             MR. JARAMILLO:  Oh, I'm sorry, you
9   had asked about that earlier.  We can go off
10  the record.
11            THE VIDEOGRAPHER:  Off the record.
12  The time is 22:09 UTC.
13            (Whereupon, there was a brief recess
14  in the proceedings.)
15            THE VIDEOGRAPHER:  We are now on the
16  record, the time is 22:22 UTC.
17        Q.      Mr. Manning, we were looking at Tab 3
18  which has been marked as Exhibit 3.  That's the
19  Inspector General's report and I think when we
20  left off, we were at the bottom of Page 3 of the
21  report and in a sentence that carried over to Page
22  4.
23        A.      Page 3 -- okay, at the bottom?
24        Q.      Or if you want to look at the top, it
25  would say Page 186 of 270.
```

Page 266

1              - JAMES MANNING -
2          The response listed here says "We
3  agree with this recommendation?"
4          Doesn't that signal to you, Mr.
5  Manning, that Mr. Johnson is acting -- as COO of
6  FSA is agreeing to request approval from you to
7  "resume consideration and determination of whether
8  additional categories of claims with common facts
9  qualify for discharge"?
10     A.    I don't recall receiving anything
11  from Wayne specific to this.
12     Q.    Okay.  Do you recall receiving
13  anything from anybody specific to this?
14     A.    No, I don't recall.
15     Q.    If can look at Footnote Number 21 at
16  the bottom of this Page 34.  I'm just going to
17  read it.  "We want to clarify statement in the
18  Report regarding the pause in submitting claims
19  for approval and in developing additional
20  memoranda for new categories of claims that
21  qualify for discharge.  Although the Report
22  suggests that the Deputy Chief Enforcement Officer
23  made a decision to stay this work, we wanted to
24  clarify that the Deputy Chief Enforcement Officer
25  actually just communicated to the Director of BDU

Page 267

1              - JAMES MANNING -
2  the guidance and direction provided by OUS and the
3  Review Panel."
4          So does that refresh your
5  recollection about whether or not OUS provided
6  guidance and direction to the BDU to pause
7  submitting claims for approval?
8      A.    The direction provided by OUS to the
9  Review Panel.
10     Q.    And does that refresh your
11  recollection about providing the guidance and
12  direction?
13     A.    No, it doesn't.
14     Q.    Okay.  What about providing direction
15  for the development of additional memorandum for
16  new categories of claims that qualify for
17  discharge, does that refresh your recollection
18  that the pause --
19     A.    I don't recall that either.  Sorry.
20     Q.    Borrower defense was part of your
21  portfolio in your tenure at the Department as
22  Acting Undersecretary, right?
23     A.    It was housed at FSA, but OUS oversaw
24  all of higher education so, yes, borrower defense
25  is under it.

Page 268

1              - JAMES MANNING -
2      Q.    And is it your understanding that
3  borrower defense is a matter of policy?
4      A.    Borrower de -- borrower defense is a
5  matter of policy?
6      Q.    Is that your understanding?
7      A.    I -- I'm not sure that I -- I
8  understand what you mean when you say that.
9      Q.    Was the Department's policy during
10  your tenure at Department of Education to
11  implement a -- to have a program for borrowers to
12  discharge their federal student loans based on
13  borrower defense to repayment policies?
14     A.    Yes.
15     Q.    And -- and how was that a matter of
16  policy?
17     A.    I -- I don't understand where you're
18  coming from on that.
19     Q.    That's okay.  Earlier we did have a
20  discussion, if you'll recall, that the Office of
21  the Undersecretary was involved in the policy end
22  in -- in creating policy and FSA was involved in
23  standard operating procedures and implementing
24  policy; is that correct?
25     A.    Generally, and -- but they -- the

Page 269

1              - JAMES MANNING -
2  Office of the Undersecretary during my tenure --
3  I'm trying to remember how many staff people were
4  there; two or three, the Secretary, young intern.
5  The policy work that it would move forward through
6  involving, you know, other members, including the
7  Office of Postsecondary Education, FSA, the other
8  -- those higher education organizations within
9  FSA.
10     Q.    And, and -- and who was in charge of
11  the borrower defense policy at the Department?
12     A.    I think it was shared responsibility.
13     Q.    Okay.  Who -- who shared the
14  responsibility?
15     A.    All the people that were part of the
16  borrower defense review team.
17     Q.    Anybody else?
18     A.    Well, the head of -- the Acting
19  Deputy Secretary.  Generally those people.
20     Q.    Well, the borrower defense review
21  team, wouldn't they be part of FSA in -- involved
22  in implementing policy rather than establishing
23  and creating policy?
24          MR. MERRITT:  Objection, misstatement
25  of prior testimony.

Page 270

1            - JAMES MANNING -
2        Q.      Would the Borrower Defense Unit be in
3    charge of creating borrower defense policy or
4    would that come from somewhere else in the
5    Department?
6        A.      The Borrower Defense Unit at FSA?
7        Q.      Yes.
8        A.      Would they be in charge of developing
9    policy?
10       Q.      Correct.
11       A.      Without oversight?
12       Q.      Sure, let's start there.  I mean, I'm
13   -- I think I have an idea what the answer is, but
14   I want to hear it from you.
15       A.      No, they didn't develop their own
16   policy.
17       Q.      Okay.  Who developed their policy
18   with regard to borrower defense?
19       A.      I don't recall all the participants
20   who were involved.
21       Q.      Okay.
22            MR. MERRITT:  (Unintelligible
23   crosstalk)  the witness mentioned he was
24   tired, so I mean  we can go off the record if
25   you want to, but I just want to ask for a

Page 271

1            - JAMES MANNING -
2    time check and maybe a break.
3            MR. JARAMILLO:  Let's -- let's -- I
4    mean, if you don't mind, just a couple more
5    questions on this topic and then we can do
6    that.  If that -- unless -- Mr. Manning, are
7    you requesting a break right now or can you
8    bear with a couple more annoying questions?
9            MR. MERRITT:  Okay.
10           THE WITNESS:  You're just doing your
11   job.  How -- how much longer are we going to
12   go?
13           MR. JARAMILLO:  Well, I have a few
14   more questions on this topic and then we
15   might not have that much time left, but with
16   the time left I do have some other things I
17   wanted to cover relatively quickly.
18           THE WITNESS:  Go ahead.  What were
19   you saying?
20           MR. JARAMILLO:  So can I ask you a
21   few more questions or do you want to take a
22   break now?
23           THE WITNESS:  Well, let's power
24   through it because I --
25           MR. JARAMILLO:  All right.  Let me

Page 272

1            - JAMES MANNING -
2    ask you a few more questions and then we'll
3    take the break and then we'll get a time
4    check and wrap up.
5            THE VIDEOGRAPHER:  The time --
6            THE WITNESS:  You know what, if we're
7    going to do it that way, let me go ahead and
8    just take a -- a break now and let's get back
9    and finish it up.
10           MR. JARAMILLO:  Okay, fine.  Off the
11   record.
12           THE WITNESS:  Thank you.
13           THE VIDEOGRAPHER:  And the time is
14   23:09 UTC.
15           (Whereupon, there was a brief recess
16   in the proceedings.)
17           THE VIDEOGRAPHER:  We're now on the
18   record.  The time is 23:17 UTC.
19       Q.      So, Mr. Manning, we were talking
20   about pol -- policy decisions at the Department
21   regarding borrower discharge and I would like to
22   know:  If there was a policy to delay issuing
23   borrower defense decisions for an extended period
24   of time, who is the person responsible in the
25   Department for making such a decision or who would

Page 273

1            - JAMES MANNING -
2    be, to your experience?  Who?
3        A.      I'm thinking.  I just -- you know --
4    who would be the person responsible for
5    recommending a decision like that?
6        Q.      And for making a decision like that.
7        A.      Well, responsible or have the
8    authority or -- I mean --
9        Q.      Okay, let's -- who would have the
10   authority to make a decision like that?
11       A.      Well, it depends on what the policy
12   is you're talking about.
13           Are you talking about real policy or
14   policy changes, then that was the purpose of us
15   reopening the negotiated rulemaking in November,
16   2017.
17       Q.      Okay, let's -- I don't want to talk
18   about the administrative policy that required, you
19   know, publication and notice.
20           I want to talk about an internal
21   Department policy about how to handle borrower
22   discharge claims and specifically a policy or
23   decision that would call for not reviewing -- I
24   mean, strike that -- not issuing decisions on
25   borrower defense claims.