# EXHIBIT E

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4      - - - - - - - - - - - - - - - X

5      THERESA SWEET, et al., on      :

6      behalf of themselves and all  :

7      others similarly situated,     :

8                    Plaintiffs,      :

9      vs.                            :

10     ELISABETH DEVOS, in her        :

11     official capacity as           :

12     Secretary of the United        :

13     States Department of           :

14     Education, et al.,             :

15                    Defendants.     :

16     - - - - - - - - - - - - - - - X

17

18     Remote Videotaped Deposition Of DIANE AUER JONES

19              Friday, November 20, 2020

20                 9:15 a.m. (EST)

21

22

23     Job No. 330599

24     Pages:  1 - 301

25     Reported by:  Dana C. Ryan, RPR, CRR

Page 18

1   witness, was that on behalf of the Center for
2   Excellence in Higher Education?
3        A    Yes.
4             MS. O'GRADY:  Okay.  We're going to
5   mark as Exhibit 2 the declaration that you had no
6   specific -- that you used to prepare for this
7   deposition.  And in the folder, that is going to
8   be ECF number 56-3, Jones Declaration.  It is
9   about the eighth file down in the folder.
10            THE WITNESS:  This is the declaration?
11            MS. O'GRADY:  Yes, Jones declaration.
12            (Jones Deposition Exhibit 2 was marked
13   for identification and attached to the
14   transcript.)
15       BY MS. O'GRADY:
16       Q    And do you have that open and ready?
17       A    I do.
18       Q    So, Ms. Jones, did you write this
19   document?
20       A    Yes.
21       Q    Did you have anyone assist you in
22   writing it?
23       A    Yes.
24       Q    And who helped you write it?
25       A    Office of General Counsel at the

Page 19

1   Department of Ed.
2        Q    Anything else?
3        A    No.
4        Q    And on the last page, that's your
5   signature?
6        A    Yes, it is.
7        Q    Okay.  And I just want to note for the
8   record you signed this under penalty of perjury?
9        A    Yes.
10       Q    Now, I'm just -- use your declaration
11   as a jumping off point for getting a sense of your
12   job history and then eventually your
13   responsibilities at the Department of Education.
14            So if we can just go to paragraph 2
15   which discusses your job title and
16   responsibilities.
17       A    I can see it.
18       Q    Thank you.  Okay.  I'm hoping you can
19   expound upon this right now and give me a broader
20   sense of what you at this point consider your job
21   responsibilities to be?
22       A    So I serve currently as the principal
23   deputy under secretary and am delegated the duties
24   of under secretary at the Department of Ed.
25       Q    And what are the main areas that you

Page 20

1   are responsible for?
2        A    I'm responsible for overseeing the
3   Office of Postsecondary Education and that
4   includes both the regulatory, the policy and
5   regulatory division of the Office of Postsecondary
6   Ed.  That hasn't -- the direct supervisor of the
7   assistant secretary ultimately reports up to the
8   media office.  That also includes our grant
9   programs and all our postsecondary ed grant
10   programs.
11            I also receive the office of what's
12   called OCTAE, the Office of Career, Technical and
13   Adult Education.  And again, they have a number of
14   grant programs, and the Perkins loan program --
15   I'm sorry, the Perkins Act programs and those
16   report up to me.
17            And then federal student aid also
18   reports to me.  In the case of federal student
19   aid, it is a performance-based organization, and
20   so the relationship between the department and the
21   FSA is slightly different than OPE or OCTAE, the
22   other two divisions that report up to me.
23            With regard to FSA, I am -- I have
24   oversight over the policy that is implemented by
25   FSA.  So policy and operations are divided in

Page 21

1   statute, and the operations of FSA are the domain
2   of the chief operating officer, and then policy
3   oversight is the domain of both the Office of
4   Postsecondary Ed and then my oversight in the
5   Office of the Under Secretary.
6        Q    So who else besides you oversees policy
7   at FSA?
8        A    Do you mean the implementation of
9   policy or the development of policy?
10       Q    I'll ask both.  First the development
11   of policy?
12       A    So the development of policy, you know,
13   it involves the Office of Postsecondary Education,
14   it involves my office, the Office of the Secretary
15   and the Office of General Counsel.
16            Policy development involves all of
17   those offices in the process, and in some cases
18   the Office of Management and Budget as well.
19       Q    And then the implementation of policy,
20   was that the second prong?
21       A    (Witness nods head.)
22       Q    Okay.  And who oversees that?
23       A    So there -- at FSA, there is a policy
24   implementation office.  They are involved in the
25   actual implementation of the policy at which point

Page 22

1  my role becomes making sure that the
2  implementation of the policy aligns with our
3  regulations.
4        Q    Is anyone else besides you performing
5  that role of, I think as you put it, ensuring the
6  implementation of the policies within the
7  regulations?
8        A    Yes, the Office of the Secretary, the
9  Office of General Counsel and, in some cases, the
10 Office of Management and Budget.
11       Q    And when you say "the Office of the
12 Secretary," do you mean the secretary herself, or
13 are there other certain individuals that are
14 tasked with that?
15       A    There are a group of people that are
16 involved depending upon which policy decision
17 you're discussing, so in some cases it would
18 involve the secretary's chief of staff, the
19 Capitol floor to the secretary, the deputy
20 secretary.  And in some cases where there's a
21 formal decision on loans, for example, the
22 secretary, you know, would be the person who would
23 sign off.
24       So it depends on the issue.  It depends
25 on the topic.  But it could involve her, the

Page 23

1  entire group or some subset of that group.
2        Q    With regard to borrower defense
3  policies, does that include the secretary herself?
4        A    Again it would depend on the issue
5  within the -- under the umbrella of borrower
6  defense, there are many, many issues that fall
7  under that.  Some could include the secretary and
8  some might not.
9        Q    And when has the secretary herself been
10 included?
11       A    Are you asking me about conversations
12 or decisions?
13       Q    I'm asking about decisions.  You said
14 there are certain instances where she might become
15 personally involved, and I'm wondering what those
16 instances are if you can give me examples, if not
17 an exhaustive list?
18       A    Right.  I can't give you an exhaustive
19 list because, you know, I haven't been witness to
20 every decision so I'm not always sure who exactly
21 made the decision.  But I can tell you that with
22 regard to the development and approval of the new
23 relief methodology that was announced in
24 December 2019, I believe, the secretary did sign
25 off and authorize the use of a new methodology.

Page 24

1  So in that case she did sign off.  I -- I was part
2  of that meeting.
3        In other cases, I don't always know who
4  the decision maker was.  There were conversations,
5  but I don't always know who the decision maker
6  was.
7        Q    But regarding the 2019 regulations, the
8  secretary herself was a decision maker?
9        A    Oh, you're talking about our -- our
10 rule-making effort in December 2019?
11       Q    Well, I was just talking about the
12 meeting that you just referenced.
13       A    The meeting I just referenced was with
14 regard to the relief methodology --
15       Q    Okay.
16       A    -- that was determined in 2019.
17       If you're asking me about negotiated
18 rule making, that is a fundamentally different
19 process in -- in which case, no, the secretary is
20 not -- does not, you know, directly sign off on
21 that.  There's negotiator rule-making process, a
22 public comment period, a response.  So that is a
23 much longer process.  That is not just an effort
24 of the secretary making a decision.
25       Q    Okay.  And in terms of the relief

Page 25

1  methodology decision, was she involved just in
2  that one meeting or in decision-making meetings up
3  to that meeting?
4        MR. MERRITT:  Objection: scope.
5        BY MS. O'GRADY:
6        Q    I want to get a sense of whether or not
7  there was a single meeting where the secretary
8  signed the relief methodology or if there had been
9  previous involvement with her personally.
10       MR. MERRITT:  Well, the relief
11 technology is not a topic on which the court
12 authorized discovery.
13       MS. O'GRADY:  Well, I would disagree.
14 I believe it's related.  But for purposes of just
15 getting us started, I'll move on.
16       BY MS. O'GRADY:
17       Q    Okay.  Ms. Jones, who do you report to?
18 I just want to get a sense of the general
19 reporting structure in your current role.
20       A    I report to the Secretary of Education.
21       Q    And is there anyone else between you
22 and her that you report to?
23       A    Directly or indirectly?
24       Q    I suppose -- if there's no one
25 directly, I suppose indirectly.

Page 102
Page

1     A     Well, I didn't invent the terminology,
2  but the terminology as I understand it is that
3  adjudication is step one, reviewing the merit.
4  Step two is the determination of relief.  And then
5  when that is done, the borrower is notified.
6     Q     Okay.  So processing is not a term of
7  art, then?  It goes adjudication, decision
8  notification?
9     A     I think FSA uses the term "processing"
10  to mean the notification of the borrower.
11     Q     Okay.  Now, with this step-one,
12  step-two division, if a claim in step one is
13  adjudicated as denied, step two is not necessary;
14  is that right?
15     A     I -- I don't recall exactly how the
16  10 percent decision is applied to Corinthian, so I
17  can't answer the question there.
18     Q     Taking that aside.
19     A     Outside of that group, I -- I wouldn't
20  imagine that if they're ineligible you'd have to
21  do a determination, so I would imagine that step
22  two the sep- -- it would be separate.
23     Q     So in your role, you've only ever had
24  involvement with grants of borrower defense
25  applications; is that right?

Page 103
Page

1     A     I'm not involved in granting any
2  borrower defense applications.  My role has been
3  around the policy for the regulations and the
4  methodology for determination of relief.
5     Q     Okay.  So my question is the
6  methodology for determination of relief is solely
7  about the percentage of relief once an application
8  has been granted; it doesn't involve a denied
9  application?
10     A     That is correct, you know, with this
11  carve-out for this 10 percent Corinthian.
12     Q     Okay.  In paragraph 25, I want to just
13  read the first sentence of that paragraph for the
14  record.  It's a little bit long.
15     A     Sure.
16            As explained in other declarations
17  submitted as part of this administrative record,
18  the department has continued to adjudicate claims
19  since the injunction was issued in Manriquez,
20  consistent with that injunction, including making
21  step-one determinations that some borrowers have
22  established a successful borrower defense in
23  accordance with the applicable standard.
24     Q     Okay.  So this is -- here you say that
25  claims -- this was written in November.  So as of

Page 104
Page

1  November 2019, step-one determinations were being
2  made pending the development of the new partial
3  relief methodology; is that right?
4     A     That's what I've been told.  I mean, I
5  don't have supervision over that unit, so it
6  was -- I guess you could say I'm speculating here,
7  but that is the information I was provided.
8     Q     And, again, by whom?
9     A     It would either -- you know, I -- I
10  am -- I'm sure Mark Brown would have given me that
11  information, but I may have also gotten it from
12  Colleen Nevin in a meeting.
13     Q     Okay.  And the second part of this
14  sentence is, you know, determinations that some
15  borrowers established successful borrower defense
16  in accordance with the applicable standard, and
17  that standard is the standard governing step-one
18  determinations; right?
19     A     That is correct.
20     Q     Okay.  I think -- we've talked a lot
21  about your lack of involvement with that standard?
22     A     Right.
23     Q     I -- I just want to understand your
24  role.  Is there a reason that you have had no
25  involvement in step one?

Page 105
Page

1     A     I -- I think there are two reasons.
2  One is I'm not an attorney.  I -- I have no
3  expertise or professional experience or ability to
4  evaluate evidence.  I just don't.  So I think, you
5  know -- so one of the reasons is that, you know,
6  I'm not an attorney.
7            But the second reason is that the --
8  the legislation that establishes federal student
9  aid as a performance-based organization makes very
10  clear the division between policy and operations.
11  And with the borrower defense unit residing in
12  FSA, those are operational decisions.  The -- the
13  application of a regulation is FSA's decision to
14  make, right.  So when there is a policy question
15  about that, I get involved; but outside of the
16  policy questions, you know, they are a
17  semi-autonomous unit, so not only --
18     Q     So what --
19     A     -- (indiscernible) experience, you
20  know, that would be crossing the separation of
21  labor.
22     Q     I want to understand, though, how --
23  how do you determine what is a policy question
24  that would be appropriate for you to weigh in on?
25     A     You know, I -- it's hard to give a

Page 106

1    general rule, right, because policy -- it depends,
2    right.  So the answer is it depends.  But I think
3    the place that maybe best described this is that
4    policy are questions about regulations versus what
5    the BD unit which is making decisions about an
6    individual borrower's application.
7        Q    So in your understanding, there is no
8    policy to govern step-one determinations; there's
9    only an individual attorney-driven adjudication of
10   evidence?
11            And I do not want to put words in your
12   mouth.  I want to understand.
13       A    No, I mean, I think the -- the policy
14   question on step one, as I, you know, explained
15   earlier, was which state standard, right.  So, you
16   know, I think we needed a general policy about how
17   do you figure out which state standard to use.
18            Now, I'm not the one who issued that
19   policy, but, for example, do you use the state
20   where the company is located?  Do you use the
21   state where the campus is located?  Do you use the
22   state where the borrower is located?
23       Q    So your understanding is the only
24   policy question with regard to adjudicating
25   borrower defense applications is which state

Page 107

1    standard to use?
2        A    Outside of the regulatory questions
3    about whether or not breach of contract is
4    considered, right.  So we have the high-level
5    policy decisions defining misrepresentation, and
6    obviously I'm involved in creating the 2019
7    regulation which sets forth a definition of
8    misrepresentation.
9            But when it comes to determining for an
10   individual borrower whether misrepresentation
11   occurred, that's not a policy decision beyond the
12   regulatory requirement that the definition of
13   misrepresentation be applied.
14       Q    I want to go back to your statement
15   about it being performance based and you being in
16   operations.
17            Can you clarify that for me and just
18   explain what you meant by that for me a little bit
19   more?
20       A    Sure.  Because FSA is a
21   performance-based organization, they have
22   different hiring authority; they have different
23   contracting authority; and they have a different
24   pay scale.  Senior leaders at FSA get bonuses.
25   The COO, the chief operating officer, has the

Page 108

1    potential to be the highest paid employee at the
2    department because of the bonus structure, and
3    when Congress created the PBO, which I believe was
4    in 1998, they felt as though FSA as a PBO had to
5    be held accountable for their performance and
6    therefore had to have semi-autonomous operational
7    control.
8            But Congress did not want them to be
9    the policy or the regulatory body, and Congress
10   assigned that role to the department.
11       Q    So it's your understanding of that
12   structure -- I hear you saying that that structure
13   determines in part your ability to involve
14   yourself in step-one determinations; is that
15   right?
16       A    Well, I mean, I think it's twofold;
17   right?  I mean, one that is an operational
18   protocol, so I would not be involved because under
19   the way we are managing FSA, I -- I don't get
20   involved in day-to-day operation decisions.  But
21   even if we did, I personally couldn't because I'm
22   not an attorney.
23       Q    Okay.  So what's the difference,
24   though, between step one and step two?
25       A    The difference between step one is it's

Page 109

1    the evaluation of legal evidence to make a legal
2    determination of whether misrepresentation
3    occurred.  That is very different than the policy
4    which defines misrepresentation in regulations.
5        Q    Right.
6            I suppose I'm getting at so the policy
7    that defines misrepresentation in regulations and
8    the policy that sets a schedule for determining,
9    you know, a percentage of relief borrowers on the
10   whole will be getting, why is your role different
11   with respects to step one and step two?
12       A    Well, again in step two, I am not
13   making the determination for any particular
14   borrower about what level of relief they're
15   getting.  All I'm trying to do is in the same way
16   that a policy process defined misrepresentation, I
17   was involved in a policy process to define
18   financial harm.  And then the BD unit applies that
19   definition.
20            So I think you could look at what I
21   refer to as the methodology as the policy
22   definition of what constitutes financial harm.  So
23   the policy is set at a very high level.  This is
24   how we define financial harm, but it's the BD unit
25   that applies it to any particular borrower.

Page 110
Page

1     Q    And why isn't it the case with step one
2  that policy would be set on --
3     A    Policy was set in establishing the
4  definition of misrepresentation.
5     Q    And that's the extent of your
6  involvement with that?
7     A    That is the extent of my involvement is
8  in defining misrepresentation in the 2019 regs.
9  Granted, I was not involved in defining
10  misrepresentation in the 2016 regs or the 1995
11  regs, but I was involved in defining
12  misrepresentation for the 2019 regs.
13         MS. O'GRADY:  Okay.  If we can go to
14  another exhibit.  This will be -- if I could just
15  ask the court reporter, Dana, did I actually mark
16  Exhibit 10 or did I not?  I'm hoping that I did
17  not, but just let me know either way.
18         THE COURT REPORTER:  Can you hear me?
19         MS. O'GRADY:  Now I can.
20         THE COURT REPORTER:  Okay.  Just give
21  me just a second.  I separated files, so I've got
22  to go into the last file.
23         MS. O'GRADY:  By my count, I'm now up
24  to Exhibit 10 because we didn't actually talk
25  about the Nevin declaration.  But if I'm wrong

Page 111
Page

1  about that and it's Exhibit 11, that's fine.  Just
2  please let me know so I don't mess up the
3  numbering.
4         THE COURT REPORTER:  I have 9 as the
5  last one you marked.
6         MS. O'GRADY:  I can tell you which
7  document we're going to open.  It's a PDF in the
8  main folder, Hearing Examining For-Profit College
9  Oversight.
10         THE COURT REPORTER:  I'm sorry, Maggie.
11  Nine is the last one you marked.  Ten is next.
12         Could you hear me then?
13         MS. O'GRADY:  No.  If you could just
14  tell me if the next exhibit is 10 or 11?
15         I see it in the chat.  Thank you.
16         So this exhibit will be Exhibit 10 for
17  this deposition.
18         (Jones Deposition Exhibit 10 was marked
19  for identification and attached to the
20  transcript.)
21         BY MS. O'GRADY:
22     Q    And, Ms. Jones, do you recognize this
23  document?
24     A    Sorry.  I had to get my cursor over to
25  my microphone.

Page 112
Page

1     Q    No problem.
2     A    Yes, this looks like the transcript of
3  my hearing before the House Oversight Committee.
4     Q    Okay.  And who prepared you for this
5  testimony?
6         MR. MERRITT:  Objection to the scope.
7         BY MS. O'GRADY:
8     Q    I believe you can still answer.
9         MR. MERRITT:  Okay.  Go ahead for now.
10         THE WITNESS:  Largely I prepared myself
11  for the hearing, but, you know, there were
12  meetings with, you know, attorneys in the Office
13  of General Counsel.  And -- and certainly people
14  on my team, you know, helped me pull documents to
15  review.
16         BY MS. O'GRADY:
17     Q    Okay.  And what kind of documents did
18  you review?
19         MR. MERRITT:  Objection as to calling
20  for privileged information as well.
21         BY MS. O'GRADY:
22     Q    I certainly don't want any privileged
23  information, but if there were members of your
24  team who were not lawyers that you worked with or
25  to the extent you prepared yourself by reviewing

Page 113
Page

1  previous memoranda, I'd like to know what those
2  were.
3     A    Well, this is a totally different
4  matter.  This has nothing to do with borrower
5  defense.
6     Q    Well, I believe -- I believe some does.
7  We can go to that.  But did -- I take from your
8  answer you mean you did not review any documents
9  about borrower defense in preparation for this
10  testimony?
11         MR. MERRITT:  Again, objection.  It's
12  calling for privileged company.
13         MS. O'GRADY:  That's fine.  I'll move
14  on.
15         BY MS. O'GRADY:
16     Q    I want to talk about your exchange with
17  Congresswoman Pressley, and this is about borrower
18  defense.  I think the easiest page numbering is
19  from the top of the page, and it's 49.
20     A    Yes, I remember this part of the
21  dialogue well.
22     Q    So at the bottom, Congresswoman
23  Pressley asked, Ms. Jones, at this moment, do you
24  know how many claims remain unprocessed?
25         And here she is talking about borrower

Page 114
Page

1    defense claims; correct?
2        A    Yes, so she's asking me about the
3    number of claims.
4        Q    If you want to just read your answer
5    for the record.
6        A    (Witness reviews document.)  Okay.
7        Q    So beginning there, It is a number that
8    changes from time to time.
9        A    Oh, you want me to read it out loud?
10       Q    Yes, if you don't mind.
11       A    Okay.  Let me scroll back up.
12            It is a number that changes from time
13   to time.  It is probably in the neighborhood of
14   160,000.  The last official count I got was
15   158,000, so I'm assuming it's somewhere in the
16   name of 160,000 by now.
17       Q    Okay.  And then on the next page, she
18   says -- this is at the top of the page 50 --
19   Ms. Jones, for the record, yes or no, is there
20   currently a policy which restricts the office of
21   Federal Student Aid from adjudicating or
22   processing any borrower defense claims that did
23   not stem from school closure?
24            And there's a little bit of
25   interruption there.  And the bulk of your answer

Page 115
Page

1    is then where you begin, There is not a policy
2    that prevents.
3        Q    Would you just read that part of your
4    answer out loud for the record?
5        A    Sure.
6            There is not a policy that prevents the
7    review of claims.  However, we are not able to
8    determine the level of harm or the level of relief
9    that a borrower should get because the methodology
10   we use is now being challenged by the California
11   courts, so we continue to process.
12       Q    Okay.  So I want to understand what you
13   mean here by there's not a policy that prevents
14   their view of claims.
15       A    Yes.  There was no policy in place to
16   prevent Colleen Nevin's team from continuing to
17   review evidence, to review claims, to evaluate the
18   merit of an application.
19       Q    And I think you said earlier today that
20   you do not know either way if she and her team
21   were doing that?
22       A    Right.  I mean, I -- you know, I was
23   told on a level that we're continuing to review,
24   but I don't have direct knowledge of that.  I
25   don't supervise her.

Page 116
Page

1        Q    Okay.
2        A    So it was my understanding that they
3    were continuing to look at evidence, but I don't
4    have direct knowledge.
5        Q    And of the pending claims that you've
6    stated were in the neighborhood of 160,000, what
7    schools do those 160,000 borrowers attend?
8            MR. MERRITT:  Objection.  It's
9    overbroad.
10           BY MS. O'GRADY:
11       Q    Are they all CCI?
12       A    I -- I would have to go back and look,
13   but I -- no.  I don't know what percentage of them
14   were CCI but, but, no, by this point in time, there
15   were claims from -- from, you know, a list of
16   institutions.
17       Q    Okay.  So I -- I guess I'm still trying
18   to understand why the injunction in the Calvillo
19   Manriquez matter would have prevented step-one and
20   step-two determinations from those who did not
21   attend CCI schools?
22       A    I don't think I've ever suggested that
23   step one stop.  I don't know.  I'm not involved in
24   step one.  I was told it continued, but I don't
25   have direct knowledge.  So I can't tell you for

Page 117
Page

1    certain whether it did or it didn't, but there was
2    certainly no policy to stop step one.
3        Q    Okay.  Assuming step one had continued,
4    what was preventing the department from doing step
5    two for non-CCI students?
6        A    A lack of a methodology to do step two.
7        Q    And what is the reason for the lack of
8    a methodology at this point?
9        A    Because the Northern District of
10   California had determined that our methodology
11   potentially involved a Privacy Act violation.
12       Q    So at the point of the injunction of
13   Calvillo Manriquez, was it Ed's intention to use
14   that partial relief methodology for all pending
15   borrower defense claims step-two determinations?
16       A    I don't know what the intent was of the
17   2017 methodology at the time.
18       Q    Here, you testified that there could be
19   no step-two determinations because of the
20   injunction, and --
21       A    Correct.
22       Q    -- those 160,000 borrowers are not only
23   CCI graduates.  So in effect, that methodology
24   being enjoined prevented all step-two
25   determinations; is that right?

Page 130
Page

1        A    Generally it was an email. There may
2    have at times been an attachment with a table, but
3    I think generally it was an email, and -- and then
4    ultimately I believe that the data warehouse at
5    FSA added this as a public feature. I believe
6    these data were then posted for public knowledge
7    on the data warehouse.
8        Q    Okay. And when were these updates --
9    when did they start getting sent?
10       A    I don't remember the exact date, but
11   I -- I recall that it was after the December 2019
12   implementation of the new methodology. So there
13   may have been, you know, earlier updates from time
14   to time on total numbers, but the regular updates
15   were after the methodology had been approved and
16   implemented.
17       Q    And how were the metrics used?
18       A    What do you mean by "how were the
19   metrics used"?
20       Q    The information was reviewed by the
21   secretary. What is your understanding of its
22   purpose? Was the -- I'll ask that question. If
23   you need clarification, I can add.
24       A    I mean, I think the purpose was
25   twofold. You know, general information.

Page 131
Page

1    Obviously, a policy decision had been made and
2    people wanted to know if the process was moving.
3        I believe that there -- there was a
4    significant amount of hiring as well, and I think
5    part of that was to, you know, evaluate, you know,
6    the size of the team, you know, do you need more
7    people; do you need fewer people.
8        I'm not involved in personnel
9    decisions, but, you know, I think part of that was
10   also, you know, viewed by people to see if the
11   team was large enough. I mean, the team expanded
12   significantly during this time period.
13       Q    So you said at the start of that answer
14   that people wanted to know the process was moving.
15   What do you mean by that?
16       A    At a general level, you know, it's one
17   thing to develop a policy, and it's another to
18   make sure that those implementing it can do so.
19       And, so, I think there was interest in
20   making sure that it was a policy that -- you know,
21   that operationally could be implemented.
22       Q    Prior to the -- prior to this time,
23   around December 2019, when these -- when the
24   partial relief methodology went into effect, had
25   there been updates about progress or lack thereof?

Page 132
Page

1        A    I believe at that time the updates were
2    about total number of claims. What I don't recall
3    is whether or not those updates included numbers
4    on adjudications. I just can't remember whether
5    they were included at that time. I just -- I -- I
6    can't remember.
7        Q    So you don't remember if updates had
8    included whether or not any claims -- any
9    decisions on the merits had been communicated to
10   students?
11       A    I -- I -- you know, I just can't
12   remember the specific, you know, updates that came
13   through. You know, I just can't remember.
14       Q    But at that point before the 2019
15   regulations were in effect and these updates
16   began, had you talked to anyone about the delay?
17       A    What do you mean by "talked to anyone
18   about the delay"?
19       Q    You know, were there any meetings or
20   conversations you had about the fact that
21   decisions were not being sent out?
22       A    Well, when I came into my role, you
23   know, the -- the decision had been made that
24   because the Northern District of California had
25   concerns about the Privacy Act that we could not

Page 133
Page

1    apply that methodology; that we had to wait and
2    find out whether or not it was going to be deemed
3    that the use of Social Security Administration
4    data was a violation of the Privacy Act.
5        Q    While you were waiting, were -- was
6    another method being developed?
7        A    I started developing the team -- you
8    know, I pulled together the team and we started
9    working on that methodology in, you know, I think,
10   that April, May, June time frame of 2019.
11       Q    I want to go back to the memos that
12   updated the secretary on the progress. Do you
13   know if those metrics were ever used to determine
14   anyone's bonus?
15       A    I'm not involved in the determination
16   of anyone's bonus, so I don't know.
17       Q    Do you know if those metrics were used
18   to determine anyone's job performance rating or
19   job performance review?
20       MR. MERRITT: Objection to the scope of
21   these questions.
22       BY MS. O'GRADY:
23       Q    Ms. Jones, I think you can still
24   answer.
25       MR. MERRITT: Go ahead.

Page 138

1   into your position, did you understand it to be
2   important to clear that backlog?  Not about what
3   caused it, but did you understand that it was
4   important to clear the backlog of claims?
5        A    Absolutely I understood it was
6   important to clear out the backlog of claims, but
7   we had been halted in our path by the judge of the
8   Northern District of California.
9        Q    So throughout the time before the --
10   before the methodology went into effect in
11   December 2019 and the claim decisions restarted,
12   was the backlog an ongoing concern of yours?
13             MR. MERRITT:  Again, objection.  That's
14   calling for mental impressions and deliberative
15   privileged information.
16             MS. O'GRADY:  I'll rephrase.
17   BY MS. O'GRADY:
18        Q    Ms. Jones, what steps did you take to
19   clear the backlog prior to the 2019 methodology
20   going into effect in December of 2019?
21        A    The instructions that the borrower
22   defense unit was operating under was that the
23   Northern District of California had determined
24   that we -- that the methodology was potentially a
25   violation of the Privacy Act.  Quite frankly, you

Page 139

1   know, the question that I asked is have we heard
2   from the Northern District of California.  I mean,
3   the Northern District of California was the
4   decision maker on this.  And, yes, I would have
5   loved for them to have issued a decision promptly.
6        Q    Are you aware that -- that the
7   Department of Education argued in the Ninth
8   Circuit that the methodology was only intended for
9   Corinthian students and not for those who had
10   attended schools other than Corinthian?
11        A    I'm not aware of the testimony one way
12   or the other in that case.
13        Q    So you'd be surprised to know that it
14   was Ed's position in that case that the
15   methodology was only ever intended for Corinthian
16   students?
17        A    I -- the -- I would not be surprised to
18   know that the methodology was developed for
19   Corinthian students.  Those were the students that
20   were at the center of that case.  The question of
21   whether or not that methodology would be applied
22   to additional borrowers was a question that we
23   didn't get to.  I never got an answer to that
24   question because before we finished adjudicating
25   the Corinthian borrowers, the Northern District of

Page 140

1   California enjoined the methodology.
2             So you're asking me to speculate what
3   could of, should of.  At the end of the day, we
4   hadn't completed adjudicating Corinthian claims
5   when the judge enjoined the methodology.
6        Q    So when the injunction came down, it
7   was -- you know, you essentially said pencils
8   down; we'll just wait for a decision?
9        A    I didn't say pencils down.
10        Q    Your understanding was that meant
11   because that was prior to your role, but your
12   understanding was that since the injunction, it
13   was pencils down on --
14        A    My understanding --
15        Q    -- on that methodology?
16        A    My understanding was that because the
17   judge had ruled that this was potentially a
18   violation of the Privacy Act, I -- you know, I
19   don't think the department is in the practice of
20   knowingly violating a law.
21             So when this was in question, I -- I
22   think that everybody was waiting for the judge to
23   determine whether or not it was a violation of the
24   Privacy Act.
25        Q    So when the new methodology was

Page 141

1   developed, was that developed with the express
2   purpose of applying to all schools, not just
3   Corinthian?
4        A    I -- I can't speak to what will
5   ultimately be determined about the borrowers, you
6   know, in -- in involve -- I can't predict what the
7   district -- the district court is going to --
8        Q    I'm not asking you about that.  What I
9   want to know is -- so now we have a new
10   methodology --
11        A    Yes.
12        Q    -- not enjoined by the court.
13             Is that new methodology for -- will
14   that be applied to every single step-one
15   determination?  So a step-one determination is
16   made.  The borrower defense claim is granted.  It
17   goes to step two.  And this new methodology is for
18   every single student?
19        A    The new methodology is for every
20   applicant; however, in the case that an applicant
21   has already been awarded more, certainly you're
22   not going to go back and apply the new methodology
23   and tell them that they owe us money back, right.
24   I mean, that -- that -- you know, we're not going
25   to go back in time.  But, yes, moving forward, the

Page 154
Page

1    loud for the record?
2        A    We acknowledge that there is a risk
3    that unsubstantiated claims could be filed in
4    large numbers to target institutions for the
5    purpose of damaging their reputations before the
6    department can adjudicate the claims as
7    unsubstantiated.  Indeed, we are aware of firms
8    and advocacy groups that are engaging in such
9    coordinated efforts against certain institutions.
10       Q    So what are you referring to or what is
11   this referring to here?
12       MR. MERRITT:  Objection to the scope.
13   We're not here to litigate the 2019 regulation.
14       MS. O'GRADY:  No, but I think it goes
15   to -- I'm asking the witness based on -- based
16   on policy views informed by what has happened and
17   what is understood to have happened prior.
18            So this is a -- I'm asking the witness
19   about what this means.  This is the basis for
20   developing new regulations.  So I'll ask my
21   question.  I think will be very much within the
22   scope.
23       BY MS. O'GRADY:
24       Q    What is the basis for the belief that
25   there's a risk of unsubstantiated claims filed in

Page 155
Page

1    large numbers?
2        A    You know, I -- again, I want to -- I
3    want to reiterate, you know, this reg is hundreds
4    of pages long, and there are lots of public
5    comments.  And, so, the answer or the response to
6    one single comment is not the basis for a
7    regulatory decision.  It's hundreds of pages long
8    because there are lots and --
9        Q    Okay.
10       A    -- lots of comments and considerations.
11            So I think you're trying to ask me
12   to --
13       Q    I can simplify the question.
14            Do you believe that there is a risk of
15   unsubstantiated claims that can be filed in large
16   numbers?
17       A    There is always the risk that somebody
18   would submit an application that would not qualify
19   for borrower defense relief.
20       Q    Okay.  One person or large numbers of
21   people?
22       A    I think there could be large numbers of
23   people.
24       Q    Do you think there have been large
25   numbers in the past?

Page 156
Page

1        A    I don't know what you mean by "the
2    past."  Could you -- what's your time frame?
3        Q    During your tenure at the Department of
4    Ed.
5        MR. MERRITT:  I'm going to object to
6    this line of questioning as not within the court's
7    order.
8        MS. O'GRADY:  I think it is within the
9    court's order based on the reason for the delay.
10       MR. MERRITT:  Again, at that level of
11   generality, that's not --
12       MS. O'GRADY:  I'm not being very
13   general.  I'm pointing to a sentence in the 2019
14   regs that these regulations are made based on a
15   belief of a risk of unsubstantiated claims filed
16   in large numbers.  If that is a belief of the
17   department as a whole, I think that's quite
18   germane to whether or not the delay was caused by
19   the difficulty of reviewing borrower defense
20   applications.
21       MR. MERRITT:  I don't see how that's
22   germane.  I mean, it's going to -- as Diane said,
23   the regulation was promulgated for a number of
24   reasons, and your -- and this was included in the
25   regulation, but it's not -- it doesn't apply to

Page 157
Page

1    pending claims, as she said.
2        MS. O'GRADY:  I want to understand the
3    reason for department policy and whether or not a
4    belief in a risk of unsubstantiated claims that
5    can be filed in large numbers is a basis for that
6    policy as written in the regulation.  It's a --
7        MR. MERRITT:  Are you asking her if
8    it's a reason for the delay in this case or -- or
9    whether it justified the 2019 regulation which is
10   not at issue in this case?
11       MS. O'GRADY:  Well, I can -- I can ask
12   the question about delay, but what I would like to
13   know is if the witness, who's in charge of policy,
14   agrees with this statement about the risk of
15   unsubstantiated claims.
16       MR. MERRITT:  You can answer that
17   question.
18       THE WITNESS:  Okay.  First of all, I'm
19   not in charge of policy.  I have oversight
20   responsibility over the policy-making process.  I
21   do not solely own it.  It --
22       BY MS. O'GRADY:
23       Q    I didn't mean -- I didn't mean to
24   misstate your responsibilities there, but if you
25   could answer the question, do you -- do you agree

Page 186

1       MS. O'GRADY:  And file name
2   A09-Borrower Defense to Repayment FSA PowerPoint
3   to the Secretary is marked as Exhibit 12.
4       (Jones Deposition Exhibit 12 was marked
5   for identification and attached to the
6   transcript.)
7   BY MS. O'GRADY:
8       Q    Okay.  And now we are going to go back
9   to Exhibit 2, your declaration.  And this time
10  we're going to look at paragraph 26.
11      A    Okay.  I found it.  Twenty-six?
12      Q    Yes.
13           So the bottom of this page, middle of
14  the paragraph, it states, The department has been
15  working to develop documents to provide a more
16  robust explanation for borrowers whose claims are
17  denied.
18      A    Yeah.  I must be in the wrong place.
19  Where are you again?
20      Q    I am at the bottom of page 10, the end
21  of paragraph 26 that begins on that page.
22      A    Ah, okay.  I'm there now.
23      Q    Okay.  So -- so here you write, The
24  department has been working to develop documents
25  to provide a more robust explanation for borrowers

Page 187

1   whose claims are denied.
2           And what documents is that sentence
3   referring to?
4       A    (Witness reviews document.)
5           I believe this is referring to the
6   letter that the servicer would send to the
7   borrower following a decision.
8       Q    And the servicer meaning what?
9       A    So federal student aid does much of its
10  operational business through contract servicers,
11  and so the servicers would be the entities that
12  would actually send the letter to the borrower.
13      Q    Does FSA draft the letter?
14      A    FSA creates the template and the
15  information to fill the servicer.  It is my
16  understanding that the servicer or some other
17  contractor does the merge file.  That's my
18  understanding.  I haven't -- I -- I don't work in
19  the systems.
20      Q    Right.
21      A    My understanding is that a servicer or
22  a contractor does the merge.
23      Q    And by doing the merge, you mean puts
24  the information about a certain borrower into the
25  template provided by FSA?

Page 188

1       A    Yes.
2       Q    Okay.  So the document -- the document
3   here is referring to a template denial notice?
4       A    Yes.
5       Q    And then on the next page -- well, it's
6   the continuing page of paragraph 26, which is
7   page 11.  So at the top it begins, Once these
8   documents are developed, the department needs to
9   work with each of its servicers to put the process
10  of loan relief and borrower notification in
11  process, which requires contract updates with each
12  of the federal student aid loan servicers that
13  service direct loans.
14           So that's what you were referring to
15  just now, the contractors doing the merge?
16      A    Right.  So every time we ask a servicer
17  to do anything, notify a borrower, create a new
18  letter, anything, it's a change order and an
19  additional fee that has to be negotiated.
20      Q    So that includes sending a denial
21  letter?
22      A    It is my understanding that the
23  servicers issued -- issued all the letters, but
24  you'd have to check with Colleen Nevin.  She would
25  know better than I.

Page 189

1       Q    When you say "servicer," you mean --
2   what is a servicer?  That's different from a loan
3   servicer?
4       A    It is a loan servicer.
5       Q    So you're referring to loan servicers,
6   okay.
7       A    And -- and -- and, you know -- yes.
8   Simply stated yes, we're talking about loan
9   servicers here.
10      Q    So the next sentence, it says, It takes
11  longer to develop decision letters that provide an
12  explanation for each borrower of why their claim
13  was denied, but we believe this investment of time
14  is important so that borrowers understand the
15  basis for the decision, which is vital to
16  instilling confidence in the process.
17           So in this paragraph, you've said the
18  departments are working to develop these
19  documents -- these denial letters.
20           Is that process complete?  Has the
21  department done so?
22      A    The department has developed denial
23  letters that cover the -- that cover the -- the
24  kinds of situations we have seen so far, but it is
25  always possible that some new category arises and

Page 190
Page

1      a new letter has to be developed.
2              So I can't say that this is the full
3      and complete final census, but the attempt was to
4      develop letters that -- that could be used to
5      communicate regardless of the school the borrower
6      attended.
7          Q    Okay.  And then the next sentence is,
8      This has taken longer than we hoped but the
9      notices are finished and we are now working with
10     our contracting officials and loan services to
11     enter these notices into servicer systems.
12             So this has taken longer than we hoped.
13     How long did you hope it would take to develop
14     these letters?
15         A    Our -- I can't remember what -- I can't
16     remember what I hoped.  I -- I just know that, you
17     know, it -- it took what felt like a long time.
18         Q    And what are the factors that made it
19     take what felt like a long time?
20         A    The complexity -- the complexity of the
21     situation.
22         Q    And what do you mean by that?
23         A    For example, there are some borrowers
24     who have loans that will be adjudicated under all
25     three regulations.  How do you -- you know, we

Page 191
Page

1      were trying to figure out what's the right way to
2      manage.  Do we send one letter for all three
3      adjudications?  Do we separate them into three
4      separate adjudications?
5              So it -- it gets complicated.  There's
6      a -- you know, when borrowers consolidate loans,
7      they don't always understand that they've reset,
8      you know, the clock, right.  So there are -- is
9      it -- the student loan program is a very
10     complicated program, and there's just a lot of
11     complexity around the potential combinations.
12         Q    Okay.
13         A    We have borrowers who, you know, left
14     the program and came back or maybe, you know,
15     completed one degree and now they're back for a
16     second.
17             So it's just a complicated --
18         Q    With respect to the letters that were
19     being developed, how do the letters reflect those
20     complications?
21         A    We had to decide, for example, whether
22     the letter should have a fill in the blank.  So
23     let's say a borrower had loans adjudicated under
24     the '95 regs and the 2016 regs, meaning under the
25     state standard and under the federal standard.

Page 192
Page

1              The complexity was do we try in one
2      letter to explain well, these loans were
3      adjudicated under California state law, blah,
4      blah, blah, but these loans were adjudicated under
5      a federal standard.  And the question was is it
6      better to try and do that all in one letter?
7      Should we send two letters, one for each set of
8      adjudications?
9              So it becomes complicated in deciding
10     what -- what content.
11             In addition, because for Corinthian
12     borrowers a decision had been made that all of
13     those borrowers would get a minimum of 10 percent
14     relief if they were part of the class, we had to
15     have letters that explained the 10 percent to
16     Corinthian borrowers, but that 10 percent had not
17     been -- it was not part of a policy for other
18     schools.  It just hadn't -- hadn't, you know,
19     gotten there yet.
20         Q    So the denial letters that identify or
21     that are dealing with loans that you say are under
22     different regulations, has that letter been
23     developed?
24         A    I believe that the letter has been
25     developed for under the state standard.  And let

Page 193
Page

1      me think about if it's been developed for
2      the regs -- and -- under the federal standard.
3              You know, the longer I recall seeing
4      was to respond under the state standard, which is
5      more complicated than the federal standard, I
6      don't recall whether I've seen a federal standard
7      letter yet.
8          Q    Okay.  So and when you say a letter
9      under the state standard, you're referring to a
10     letter under the '95 regulations?
11         A    Correct.
12         Q    Okay.  And that's -- okay.
13             So besides -- and I think my question a
14     couple of questions ago was, you know, what are
15     some of the factors that made the process of
16     developing this letter -- this denial template
17     take longer than you had hoped, and you said one
18     of them was having to do with a letter under the
19     state standard and the federal standard.
20             Is that right?
21         A    More than one.  That was one example.
22         Q    Yeah.  So my next question is what are
23     some other factors besides that one?
24         A    Some other factors are -- and this gets
25     very weedy, but the name of the school that the

Page 194
Page

1    borrower attended may not be the name of the
2    school officially in our records.
3        Q    And what bearing would that have on the
4    letter itself?
5        A    So the borrower may have submitted a
6    letter saying, you know, I went to school A, and
7    we had to figure out how to send a letter back
8    using school A because that school is actually
9    listed in our records as school B, but the
10   borrower might not have known that.
11           So how do you communicate to a
12   borrower -- so we either had to, you know,
13   communicate to the borrower why this looks to be a
14   different name, or they had to have a system
15   adjustment.
16       Q    Is that a -- is that a new problem,
17   though?  I mean, this is -- I guess I'm asking
18   about the development of these letters that are
19   providing, as you say in paragraph 26, a more
20   robust explanation.
21           So is the -- making sure the school
22   names match something that is a challenge to
23   develop a letter that provides a more robust
24   explanation?
25       A    I would say that that is the case, but

Page 195
Page

1    I don't think that was the primary reason for the
2    statement.  I think the primary reason for this
3    statement was the complexity of the many different
4    situations a borrower could be in.
5        Q    Okay.  And, so, what are some of those
6    situations?
7        A    You know, again, if the borrower -- so
8    depending upon how the state standard was decided,
9    you know, the -- the borrower could get one
10   decision under a state standard but his or her
11   friend could get a different decision under a
12   different state standard.
13           So one of the areas of complexity is
14   explaining to the borrower, or at least listing
15   for the borrower the state standard under which
16   the claim was adjudicated.
17       Q    So the effort to provide these decision
18   letters that provide, quote, an explanation for
19   each borrower why their claim was denied, is to
20   include the state standard used to adjudicate
21   their claim?
22       A    It should notify that -- the borrower
23   of the state standard.
24       Q    And does it?
25       A    It is supposed to.

Page 196
Page

1            MS. O'GRADY:  Okay.  So the next
2    exhibit is in the folder as ECF number 116,
3    Defendants Post-CMC Filing.
4            THE WITNESS:  Can you give me the
5    number?  ECF?
6        BY MS. O'GRADY:
7        Q    Sure.  ECF number 116.
8        A    Ah, okay.
9            MS. O'GRADY:  Okay.  And this exhibit
10   will be marked as Exhibit 13.
11           (Jones Deposition Exhibit 13 was marked
12   for identification and attached to the
13   transcript.)
14       BY MS. O'GRADY:
15       Q    Ms. Jones, have you ever seen this
16   filing before?  You may not have.
17       A    (Witness reviews document.)
18           I don't recall having seen this
19   document before.
20       Q    Okay.  Well, I would like to talk about
21   some much the attachments which I think you
22   probably have seen.  So I can represent to you
23   that this document was filed by defendants in this
24   case as a response to the judge -- a judge's
25   question about denial notices.

Page 197
Page

1            And, so, if you go to PDF -- let's
2    see --
3        A    Oh, so, you know, so may -- I do
4    remember seeing these exhibits as -- as part of my
5    review.  So may -- maybe -- maybe this will -- I
6    can't remember if we're talking --
7        Q    We're just going to talk about the
8    exhibits anyway.
9        A    Okay.
10       Q    So if we go to PDF -- so page 7 -- PDF
11   page 7 should be where exhibit A starts?
12       A    Yes.  Okay.  I'm at exhibit A.
13       Q    Okay.  So this -- and if it's all right
14   with you, I'm going to refer to these as form
15   denial A because I -- I think that's what it is.
16       A    (Witness nods head.)
17       Q    So -- so can you tell me what exhibit A
18   is just so I'm clear that we're on -- that
19   we're -- what we're both looking at?
20       A    Okay.  Let me -- let me look at this.
21           (Witness reviews document.)
22       Q    So maybe an efficient way to do this is
23   in the court filing on PDF page 3, there is kind
24   of a short index identifying what each of these
25   denial notices are.  And on the bottom of page 2,

Page 202

1     Q     Are you the person who would give final
2  sign-off on the use of these templates?
3     A     No.
4     Q     Who is that person?
5     A     Again, I -- I don't -- I don't know who
6  actually signs off on these.  I mean, there's a
7  departmental process, and I -- I can't tell you
8  who the final signer is on -- on this document.
9     Q     Would the secretary review these?
10    A     I don't -- I don't know.  I don't know
11 if the secretary would -- would review this
12 document.  It -- it's possible, but I don't know.
13    Q     And what was your involvement in
14 drafting these?
15    A     As -- as -- you know, it was an editing
16 role.  I -- it would have been an editing role in
17 response to somebody else's document.
18    Q     Okay.  Now, I want to look at -- well,
19 first -- first I'll ask, so C is for
20 non-Corinthian borrowers for schools that do not
21 have common evidence.  And D is for non-Corinthian
22 borrowers who went to school that do have common
23 evidence.
24          What is meant by "common evidence"?
25    A     You'd have to ask Colleen Nevin, but I

Page 203

1  think that means -- well, I think you should ask
2  Colleen Nevin, but I -- I think it means to
3  distinguish between evidence provided by the
4  student versus evidence that the department may
5  have in its possession, but you'd need to check
6  with her for the specific terminology.
7     Q     Well, let's look at the paragraph
8  applicable law, and that is -- on exhibit D, it is
9  the first page, middle, and it says, For direct
10 loans first disbursed prior to July 1st, 2017, a
11 borrower may be eligible for a discharge
12 (forgiveness) of part of all of one or more direct
13 loans if the borrower's school engaged in acts or
14 omissions that would give rise to a cause of
15 action against the school under applicable state
16 law.
17    A     Uh-huh.
18    Q     So is there more information about
19 which state law is being applied for these
20 adjudications in these letters?
21    A     Well, you know, if you go up to A
22 for -- I -- I can scroll through this one, but if
23 you go up through A, there's actually a place
24 where it would state the state law standard.
25    Q     Okay.  Let's look at that in A.

Page 204

1     A     I think it was A.  It might have been
2  B.  But let's go up to A and look.
3          (Witness reviews document.)
4     So A -- so for the Corinthian
5  borrowers, they were all adjudicated under the
6  California state law, so that's why this letter
7  says California in the template.
8     Q     Right.  On page 2 in the template.
9  Okay.
10    A     But in --
11    Q     And then --
12    A     -- in the others, the attorney in the,
13 you know, decision/reason or whatever, that's
14 where -- that's where they can state which
15 standard was used for the adjudication.
16    Q     Okay.  And on the template, where do
17 they insert the state law?
18    A     So in template B, for example, where it
19 says, Review recommendation reason, right, the
20 reason would be potentially dependent upon the
21 state law so -- so that -- that is -- that's
22 where -- I think that's the place where the
23 attorney would insert it.
24    Q     Okay.  And, so, that review
25 recommendation reason, that's also in -- that's

Page 205

1  also under the allegation template in C and D.
2          And, so, your understanding is that's
3  where an attorney would write what state law they
4  were applying?
5     A     That's my understanding.
6     Q     Okay.  And that's true for -- I'm
7  looking at template C, and also let's look at
8  template D, allegation type, so that
9  recommendation reason portion is where they would
10 insert the state law.
11         So when you reviewed these letters, is
12 that your understanding of what would happen?
13    A     Yes.
14    Q     I have a -- I want to go back to the
15 common evidence question.  If several borrowers
16 said the same thing, would that be considered
17 common evidence or individual evidence?
18    A     I don't know.  You'd have to ask
19 Colleen.  I don't know how they review evidence.
20    Q     And your understanding of the meaning
21 of common evidence as being something that the --
22 that the department has, if they had in their
23 possession, you know, a whole group of borrowers
24 making the same allegation, would that -- would
25 that be included just in your definition as you

Page 210
Page

1    just want to make sure I'm not missing it.
2        A    Yeah, I agree that this denial doesn't
3    include one, but I don't know why.
4        Q    You don't know why.
5            Do you have any idea as to why it might
6    not include one?
7        A    You know, again, I could speculate, but
8    I didn't review the --
9        Q    Speculate away.
10       A    You know, if -- if -- and I don't -- I
11   haven't read -- so, I mean, if -- if the student
12   actually didn't have a loan.
13       Q    If he didn't have a loan, would he
14   receive that form denial D template, or would
15   there be a different kind of notice he would
16   receive saying that you don't even have a loan?
17       A    I can't remember which template would
18   be used for I don't have a loan.  I'm just giving
19   you an example of where there could be a denial
20   that doesn't involve the state standard and it
21   would be because it doesn't involve -- you know,
22   it doesn't meet the federal standard, doesn't have
23   a loan or, you know --
24       Q    So it would be -- is it your view that
25   it would be an unusual case for a denial notice

Page 211
Page

1    based on form denial D to not include the state
2    standard used?
3        A    I don't know what's usual or not usual
4    because I don't do the adjudication.  I --
5        Q    Right.
6        A    -- don't --
7        Q    But when we were talking about the
8    template just now, your expectation was that it
9    would include the specific state standard when it
10   was sent out?
11       A    If the decision was based on the state
12   standard.
13       Q    Okay.  And under what circumstances
14   could a decision not be based on a state standard?
15       A    If it doesn't meet the federal
16   standard, the application was incomplete, no
17   evidence was submitted, no claim of
18   misrepresentation was made, those are some
19   examples I can think of.  But, again, I don't
20   adjudicate claims.  I can't imagine all the
21   examples because I haven't seen them.
22       Q    Okay.  But a standard application, say,
23   that alleges misrepresentation, the person has a
24   loan.
25           It's your expectation that a state

Page 212
Page

1    standard would be applied.  I mean, as the
2    template says, the temp- -- and his letter
3    actually says, For direct loans first disbursed
4    prior to July 1st, 2017, a borrower may be
5    eligible for a discharge, et cetera, for a cause
6    of action under -- against the school under
7    applicable state law.
8            So given that statement of applicable
9    law, that's saying we're going to apply the state
10   law.  And, so, when state law is going to be
11   applied, your expectation would be that the
12   borrower would be told the law of which state is
13   being applied?
14           MR. MERRITT:  Objection: speculative.
15           BY MS. O'GRADY:
16       Q    When a borrower receives a denial
17   notice that gives this notice about what law
18   applies, is it your expectation that the letter
19   would include which law applies?
20           MR. MERRITT:  Objection: speculative.
21           MS. O'GRADY:  I'm really just asking
22   about what the template -- how the template is
23   used and how the witness expects the template to
24   be used.  I do think it's already on the record so
25   I can move on.

Page 213
Page

1            MR. MERRITT:  You have her prior
2    answers, but --
3            MS. O'GRADY:  Okay.
4            MR. MERRITT:  But if you'd like to
5    clarify that answer, you can.
6            BY MS. O'GRADY:
7        Q    When you said one of the reasons it
8    might not include a state law statement was that
9    it didn't meet the federal standard, what did you
10   mean by that?
11       A    To be applicable, it has to meet, you
12   know, the federal definition, meaning it has to be
13   a direct loan.  It has to be a federal loan.  It
14   has to be, you know, associated within enrollment,
15   and --
16       Q    Okay.  So this threshold --
17       A    Yeah, threshold.
18       Q    -- determinations, okay.
19       A    And there has to be evidence against
20   which to make the determination.  I mean, I think
21   that's implicit.
22       Q    Right.
23       A    You know, there has to be evidence to
24   evaluate.
25       Q    So we're in agreement that this denial

Page 214

Page

1 letter that Mr. Deegan received is based on that
2 form D template. I think that's --
3      A    It appears that's --
4      Q    It appears to be.
5           But this one does not include a mention
6 of which state law applies?
7      A    I would agree.
8      Q    Would it surprise you to know that
9 thousands of these denial letters that have been
10 sent, none include which state law applies?
11          MR. MERRITT: Objection: Speculative.
12          MS. O'GRADY: I don't think that's
13 speculative, and I would like to know if the
14 witness would be surprised to learn that.
15          MR. MERRITT: She stated her -- that
16 show doesn't have the files before her for each
17 and every application.
18          MS. O'GRADY: No, but I'm not asking
19 her to look at each and every application. I want
20 to know if that would be a surprise.
21          MR. MERRITT: Go ahead.
22          THE WITNESS: It would -- you know, I'd
23 have to know more of the specifics.
24          BY MS. O'GRADY:
25      Q    But again, going back to the template

Page 215

Page

1 of form D, the intention of form D was to tell
2 borrowers what state law applied; right?
3      A    That was the intent.
4      Q    And when you wrote in your declaration
5 that you were developing documents so that, quote,
6 borrowers would understand the basis for the
7 decision, part of that basis is which state law
8 would apply; right?
9      A    If it -- if the state law is at this --
10 is the subject of the review and the decision,
11 right. If the state law is the source of the
12 determination.
13      Q    And other sources of determination
14 would be you don't have a loan not meeting those
15 threshold requirements of even being adjudicated;
16 correct?
17      A    Or you provided no evidence.
18      Q    Okay. Let's -- on Mr. Deegan's denial,
19 let's go to PDF page 10, and it says there, Why
20 was my application determined to be ineligible.
21           And it says, Ed reviewed your borrower
22 defense claims based on any evidence submitted by
23 you in support of your application, your loan data
24 from National Student Loan Data System and
25 evidence provided by other borrowers.

Page 216

Page

1      Q    Does this also include the common
2 evidence that Ed would have for certain schools?
3      A    You know, again that would be something
4 you'd have to ask the BD attorneys. I don't know
5 how they look at evidence, so I -- I can't answer
6 your question.
7      Q    Okay. You had said that no state law
8 would have to be applied for a borrower who did
9 not submit any evidence for their claim. What
10 denial letter would they get, what form?
11      A    You know, I -- I -- I don't know off
12 the top of my head. I don't -- I don't know.
13      Q    Okay. We're going to look at the next
14 exhibit which is file name ECF number 129-1,
15 Connor Declaration, Plaintiffs' Motion to Enforce.
16           (Jones Deposition Exhibit 14 was marked
17 for identification and attached to the
18 transcript.)
19           THE WITNESS: All right. Okay. I have
20 it open.
21           BY MS. O'GRADY:
22      Q    Okay. So this is kind of a bulky
23 document and I can -- it is a document that was
24 submitted to the court that includes an affidavit
25 from another one of the named plaintiffs. And

Page 217

Page

1 like the previous one we just looked at, I'd like
2 to look at her denial letter.
3           So if you scroll ahead, it's PDF
4 page 24 that that document begins.
5      A    Okay.
6           MS. O'GRADY: And, for the record, this
7 is Exhibit 15. And the previous Daniel Deegan
8 affidavit that we just looked at is Exhibit 14.
9           (Jones Deposition Exhibit 15 was marked
10 for identification and attached to the
11 transcript.)
12           BY MS. O'GRADY:
13      Q    Okay. It's actually page 27 of the PDF
14 it begins. I apologize. So like Mr. Deegan's
15 that we just looked at, this is Ms. Sweet's
16 borrower defense application. And the personal
17 information is redacted, but nothing besides that.
18      A    (Witness reviews document.)
19      Q    And if you can take a -- take a look at
20 the information she provides, she provides
21 narrative information about her experience at
22 Brooks.
23      A    And, so, I'm recused from -- from any
24 matter -- I have voluntarily recused myself from
25 any matter pertaining to a school that was owned

Page 218

1    or operated by Career Education Corporation, so
2    I'm recused from this one.
3       Q    Okay.  So how does that affect your --
4    how does that affect your role more generally?
5       A    I don't review -- I don't review -- I
6    don't make determinations, so --
7       Q    Okay.  You had a role in reviewing the
8    borrower defense denial templates we just looked
9    at, though; correct?
10      A    Yeah, the generic template.
11      Q    And some of those do go out to students
12   who attended the ECC schools?
13      A    That's not how the recusal process
14   works.  The recusal process at the Department of
15   Ed is based on particular matters for a particular
16   institution.
17      Q    How long has this voluntary recusal
18   been in place?
19      A    I voluntarily recused myself from the
20   particular matters with the particular
21   institutions related to CEC from the day I
22   returned to the department.
23      Q    And is there documentation of the
24   recusal?
25      A    Our -- our ethics -- I'm sure our

Page 219

1    ethics officer would have that.  I mean --
2       Q    And how -- so how -- how broad is it?
3    I mean, you're recusing yourself from reviewing
4    this denial letter for a Brooks student.
5       A    Right.  I would not --
6       Q    How else would it affect your job?
7       A    I would not make -- I would not issue a
8    decision on any matter regarding an institution
9    owned and operated by CEC.
10      Q    So can you explain further what that --
11   what that means operationally for your
12   policy-making role or any kind of review that you
13   do of -- of policies that might affect CEC?
14      A    That's not how recusals work.  Recusals
15   are not -- I mean, you know, I worked at Princeton
16   and Community College of Baltimore County.  I
17   don't -- you know, my recusal doesn't mean that I
18   can't look at any matter that might have an impact
19   on Ivy League colleges.  It's particular.
20           So anything -- so in particular, I
21   would not look at something about a student who
22   attended Brooks Institute.  I mean, first of all,
23   I wouldn't look at these anyway because I don't
24   adjudicate the decisions.  I don't review the
25   decisions.  But as a practice, anything that comes

Page 220

1    with the name of an institution -- and, in fact,
2    that includes -- you know, I have asked Mark to
3    mask the names, right, so I don't -- I don't get
4    statistics that would delineate the CEC schools or
5    outcomes.
6       Q    So he -- he you ask Mark to mask the
7    names when you receive, you know, like a list of
8    pending applications so you don't know how many
9    are from CEC schools?
10      A    Correct.  He sent -- after he sent the
11   first one, I sent an email back saying please
12   don't send me a list with the names of schools.
13      Q    So I want to understand how this works.
14   So he'll redact out all the names of all the
15   schools, then, or else you'd know that it was CEC;
16   right?
17      A    He's just stopped sending me the list
18   with the school names.
19      Q    So you get a list but no school names,
20   or you get no list?
21      A    I get the roll-up numbers.
22      Q    Okay.  So how else does this voluntary
23   recusal affect -- affect your role?
24           MR. MERRITT:  Objection.  She's
25   explained the basis of the recusal, and at this

Page 221

1    point it's getting beyond the scope of what the
2    court ordered.
3           BY MS. O'GRADY:
4       Q    Well, I want to understand if this
5    recusal affects in any way your decision to sign
6    off on -- or decision to sign off or not sign off
7    on decisions.
8           We talked a lot about the decision not
9    to send denials.  I want to understand the full
10   scope of it.
11          MR. MERRITT:  She's answered the
12   question.
13          BY MS. O'GRADY:
14      Q    Okay.  So nothing else to add?
15      A    (Witness shakes head.)
16      Q    Okay.  When you were developing your
17   partial -- working on developing the partial
18   relief methodology that went into effect in
19   December 2019, was that -- did you consider CEC
20   schools during that, or were you also --
21      A    There were no -- there were no data on
22   CEC schools, no.  We looked at the methodology
23   based on the data available, which at that point
24   in time was Corinthian and ITT.
25      Q    And no -- and no other schools?

Page 230
Page

1   document title is Article, Trump administration
2   hires McKinsey to evaluate student-loan portfolio.
3              And let's mark this as Exhibit 16.
4              (Jones Deposition Exhibit 16 was marked
5   for identification and attached to the
6   transcript.)
7   BY MS. O'GRADY:
8       Q    And have you seen this article?
9       A    No.
10      Q    Are you aware of McKinsey's analysis?
11      A    Yes.
12      Q    And is that what you're referring to,
13  discussion about valuation?
14      A    You know, I -- I think valuation is
15  probably the wrong word.  The determination was
16  to, you know, correctly identify the level of risk
17  in the portfolio, so I think -- I think valuation
18  is the wrong term.  But the idea is that we need
19  to project what the cost of managing the loan
20  program and what the cost of the loan program with
21  gains are going to be to the taxpayer, and so this
22  was a method to determine either the cost or the
23  source of revenue that the loan portfolio would be
24  to the taxpayer.
25      Q    And has a conclusion been reached?

Page 231
Page

1              MR. MERRITT:  Objection to scope.  I'm
2   just going to ask what is the relevance to this
3   line of questioning?
4              MS. O'GRADY:  I think discussions about
5   the valuation of the loan portfolio go into, you
6   know, the reasons for policy handling borrower
7   defense claims, whether or not there's a concern
8   about the cost of granting those claims and the
9   reasons for delaying decisions.
10             MR. MERRITT:  I don't think that goes
11  to the extent to which the difficulty of reviewing
12  borrower defense applications actually caused or
13  justified the Secretary's 18-month delay.
14             MS. O'GRADY:  Well, I think it goes to,
15  you know, the -- the loan portfolio includes
16  claims that are borrower defense claims, so the
17  decision on those borrower defense claims affects
18  the valuation of the portfolio and vice versa.  I
19  think those policies are intertwined.
20             MR. MERRITT:  But that's not a topic
21  the court authorized discovery on.
22             MS. O'GRADY:  The policy of Brown's
23  cancellation of student debt and cancellation of
24  loans based on borrower defense applications,
25  specifically -- I mean, can I ask a few questions

Page 232
Page

1   of the witness to narrow the -- to try to, you
2   know --
3              MR. MERRITT:  I mean, I'm inclined to
4   say this is all beyond the scope of the -- what's
5   been authorized.  I mean, if you think this is
6   going to be a short line of questioning --
7              MS. O'GRADY:  I can -- I can make it
8   short.  Let me -- I'm going to ask --
9   BY MS. O'GRADY:
10      Q    If I can ask you, Ms. Jones, in your
11  policy role at the Department of Ed in evaluating
12  or in determining policy regarding borrower
13  defense, did you consider the valuation of the
14  overall portfolio?
15      A    No.
16      Q    And is -- is the likelihood of
17  default -- has that been considered when you've
18  had a policy role regarding borrower defense?
19      A    Meaning?
20      Q    The population of borrowers who filed
21  borrower defense claims, their likelihood of
22  default, have you evaluated that in your position?
23      A    No.  I mean, I will say none of them
24  are at risk of default because when they file a
25  claim, they're in forbearance.  But, you know,

Page 233
Page

1   there is no analysis because they can't default
2   while they're in forbearance.
3       Q    That's true.  I suppose I'm asking,
4   though, you know, outside the forbearance granted
5   by having filed a borrower defense application, is
6   the population of borrowers who file borrower
7   defense applications their likelihood of default
8   once they are denied and back in repayment, has
9   that been a consideration that you've taken into
10  account in your role?
11      A    No.
12             MS. O'GRADY:  Okay.  The next -- the
13  next document is in the folder as Article, DeVos
14  orders partial loan relief.  And this I'm going to
15  mark as Exhibit 17 to this deposition.
16             (Jones Deposition Exhibit 17 was marked
17  for identification and attached to the
18  transcript.)
19  BY MS. O'GRADY:
20      Q    This is an article from December 6th,
21  2019.  And have you seen this article before?
22      A    Probably.
23      Q    Okay.  Okay.  And then in the middle of
24  this second page it says, DeVos in recent weeks
25  directed the Education Department to carry out a

Page 254
Page

1   2016 regulations, then they would be -- excuse me,
2   not the 2017 cut-off date, the 2020 cut-off date
3   for the 2019 regulations, they would get put into
4   the examples that you were adding that are fewer
5   than the examples for those under the 2016
6   regulation?
7       A    Well, no, the list is -- we've expanded
8   the list for the 2019 regulation.
9       Q    So there are more claims available
10  under the 2019 regulation than under the 2016
11  regulation?
12      A    There's more information about the
13  claims available.
14      Q    Okay.  So for 2019, there are fewer
15  claims available but more information about them.
16  And for the 2016, there are more claims available
17  but less information about them?
18      A    I don't know anything about the number
19  of claims.  I mean, that's to be determined.  But
20  the definition of misrepresentation under the 2019
21  reg does not include breach of contract, and the
22  definition of misrepresentation under the 2016
23  rule does include breach of contract.
24           What I'm talking about with regard to
25  the tool is giving more examples to borrowers of

Page 255
Page

1   the kinds of things that constitute
2   misrepresentation.  They would be covered under
3   the 2016 reg, but the department had not provided
4   those examples in -- in the past to borrowers.
5       Q    Okay.  So the smart tool, when you put
6   in your -- your date of loan disbursement -- I
7   mean, people -- most people are still going to be
8   under the 2016 regulations; right?
9       A    Well, you don't put in your date.  You
10  put in your social security number or your FSA ID
11  number and then --
12      Q    Okay.
13      A    -- NSLDS, which is our loan system,
14  serves it up.
15      Q    Thank you.  That's helpful.
16           So still for most people, it's going to
17  be under the 2016 regulations.  Did you add any
18  examples or suggest adding any examples for the
19  2016 regulations?
20      A    Yes.  Because it's a smart form, this
21  list of examples that I listed would show up for
22  both a borrower applying under 2014 and a borrower
23  applying under 2019.
24      Q    Okay.
25      A    I don't know what would happen for an

Page 256
Page

1   applicant under the state law standard.  I don't
2   know.  I don't know how the smart tool works for
3   them.
4       Q    So this Web tool, who developed it
5   initially?
6           MR. MERRITT:  Object on scope.  I'm
7   going to ask which topic is this -- all of this
8   relevant to on the Web tool?
9           MS. O'GRADY:  I would say it's relevant
10  to the reasons for delay because the delay to the
11  extent it's ongoing I think it's appropriate for
12  the reasons for it currently.
13          MR. MERRITT:  So that's not a topic.
14  The extent to which the difficulty of reviewing
15  borrower defense applications actually caused or
16  justified the 18-month delay that has now ended is
17  what the topic is, so I don't think that's --
18          MS. O'GRADY:  I think it's relevant to
19  discuss, though, how they're currently being
20  reviewed since this is the -- the evolution of how
21  they were reviewed, the evolution of the denial
22  notices, I would argue it's all part of the same
23  story, or I'm trying to understand if it is, for
24  the reasons behind the developments that occurred
25  after the 18-month delay shed light on the reason

Page 257
Page

1   for that 18-month delay.
2           MR. MERRITT:  Well, I guess, like, to
3   the extent the court authorized discovery to the
4   post-18-month delay would be for the development
5   used in the form denial letters which you've
6   discussed.  And the extent to which the secretary
7   has denied applications to students, pertaining to
8   school, subject to findings of misconduct, and I'm
9   not seeing how this line of questioning is
10  relevant to any of those topics.
11          MS. O'GRADY:  I think part of it,
12  though, is about systems generally so some of the
13  delay and some of the reasons given for the delay
14  in the past had been the need to develop systems.
15  My understanding is this computer program is one
16  of those systems.
17          So I can ask -- I can ask more
18  questions about the past development of this
19  computer system and -- and when it began.  I'm
20  happy to go there.  I was going to get there.  And
21  I think that falls squarely within the reasons --
22          MR. MERRITT:  I mean I disagree that
23  the development of systems is something the court
24  authorized discovery into.  You know, we've gone
25  into this a little bit.  I think at some point

Page 278
Page

1       Q     Okay.  So at some point, you signed off
2  on this text or something very similar to it?
3       A     Yeah.  I can't remember if it listed
4  those three points, but -- but, yeah, I mean,
5  there was instructions for reconsideration.
6       Q     Okay.  And when you were reviewing the
7  form denial letters, did you think about or
8  consider whether or not they would provide enough
9  information for a borrower to seek
10  reconsideration?
11            MR. MERRITT:  Objection: calling for
12  privileged information.
13            MS. O'GRADY:  Do you mean deliberative
14  process privilege?
15            MR. MERRITT:  I mean you're asking her
16  what she thought, you know, about the review of
17  the letters before they were final.
18  BY MS. O'GRADY:
19       Q     On this final letter, do you believe
20  there's enough information for a borrower to
21  request reconsideration?
22       A     I believe that there is -- yeah, I
23  believe there is enough information about a
24  borrower that they can request and how they would
25  go about it, like address it in an email or, you

Page 279
Page

1  know --
2       Q     Yes.  In terms of logistics, the email
3  address is there and the fact of the
4  reconsideration process has been described?
5       A     Yes.
6       Q     In terms of the substance in point two,
7  Why you believe that Ed incorrectly decided your
8  borrower defense to repayment application, what
9  information in this denial letter could a borrower
10  use to answer that question?
11       A     And that's the part of this that I -- I
12  don't have the expertise.  I -- you know, those
13  particular questions were developed by the BD
14  unit.
15       Q     Let me ask it a different way.  So if
16  you could put yourself in the shoes of the
17  borrower because the borrower is -- I can tell you
18  this borrower and probably most borrowers are not
19  themselves lawyers either.  How do they determine
20  what information to include to answer the
21  question, Why you believe that Ed incorrectly
22  decided your borrower defense to repayment
23  application?
24            MR. MERRITT:  Objection: speculative.
25            BY MS. O'GRADY:

Page 280
Page

1       Q     I'm looking at this particular
2  document.  So what information in this document
3  could a borrower point to to say, Ed, you got it
4  wrong, because?
5       A     I mean, I think they would explain why
6  they think we got it wrong.
7       Q     And what specifically -- how would that
8  explanation be different than their initial
9  application?  You know, what -- what other --
10  what -- why do you believe that Ed incorrectly
11  decided your borrower defense to repayment
12  application?
13       A     I mean, you know, again, I think a
14  borrower would give an explanation, and the -- the
15  one that I'm aware of is, you know, borrowers who
16  wrote in and said, you know, you assigned relief
17  because you said I was in this program but, you
18  know, the college called it this other program,
19  and -- and -- and that's different on the table.
20       Q     So the one example you can think of is
21  a -- is, again, a problem with the -- again,
22  properly identifying what program or what school
23  somebody went to.
24            If a borrower has included information
25  about a number of allegations and then this denial

Page 281
Page

1  letter, for example, if we just scroll up to
2  page 10 of the PDF, Allegation one, employment
3  prospects:  You allege that Keller Graduate School
4  of Management engaged in misconduct related to
5  employment prospects.  This allegation fails for
6  the following reasons:  Insufficient evidence.
7            Your claim for relief on this basis is
8  therefore denied.
9            What basis -- how would a borrower
10  interpret that paragraph?  I mean, I think you put
11  yourself -- well, that's my question.
12            How should a borrower interpret that
13  paragraph?
14       A     Because I don't know what the borrower
15  submitted originally, I -- I don't know.  I don't
16  know what was in the borrower's original
17  application.
18       Q     When you signed off on the initial form
19  denial letters, I think at one point you had said
20  this is the spot, you know, for the following
21  reasons, and that's where you had expected there
22  to be information about the state law standard
23  applied.
24            That's right?  You testified about that
25  earlier today; correct?

Deidre Jones
November 20, 2020                                      282 to 285

Page 282

1        A     I said that when -- yes, in the section
2    where the attorneys explain -- I can't remember
3    the words, but, right, that little bracketed place
4    that you would be evaluating evidence based on the
5    state standard.
6        Q     And here the only words in that
7    bracketed place, which I think was recommendation
8    reason, is the -- are the words "insufficient
9    evidence."
10              Is that -- when you first looked at the
11   template, is -- you know what, let me just take a
12   moment.  Let's look at the template.  My question
13   is about the template.
14              So we're going to go to Exhibit
15   Number 13 of this deposition, and the file is ECF
16   number 116, Defendants Post-CMC Filing.
17              And this, as you'll recall, have the
18   attachment of these form letters.  Let's go all
19   the way down --
20       A     I'm still looking for it.
21       Q     Oh, sure.  Sorry about that.
22       A     (Witness reviews document.)
23              Okay.  I -- I have it.  Which form do
24   you want me to look at?
25       Q     Okay.  So I want to go all the way to

Page 283

1    PDF page 23, and this is the form D denial
2    template.
3        A     Okay.
4        Q     And there in the highlighted -- it's
5    the highlighted text is what a reviewing attorney
6    would insert; correct?
7        A     It -- it would -- it would be what they
8    would enter into their work papers.
9        Q     Okay.  And we discussed before how your
10   expectation was that the highlighted text of
11   review recommendation reason would include the
12   state law standard.
13              And my question now is did you expect
14   any other information to be within those brackets
15   review recommendation reason?
16              What other information did you think
17   when you reviewed this template would be included
18   there?
19              MR. MERRITT:  Objection.  It's calling
20   for privileged and deliberative information.
21              MS. O'GRADY:  Well, I think the witness
22   has already testified about her expectation that
23   the state law standard would be included here, and
24   I want to know her -- when she signed off on the
25   form D template what she was signing off on.

Page 284

1              MR. MERRITT:  Well, it's still going to
2    what her thoughts and impressions were at the time
3    which is deliberative information, what you're
4    asking her now.
5              BY MS. O'GRADY:
6        Q     Did you discuss -- when these were
7    finalized, did you discuss what review
8    recommendation reason meant?
9              MR. MERRITT:  You can answer that.
10             THE WITNESS:  I -- I -- I don't -- I
11   don't know what date they were considered to be
12   finalized, but, yes, I was engaged in
13   conversations about what I believed that meant.
14             BY MS. O'GRADY:
15       Q     And I'm not asking about the
16   deliberation of the different drafts.  I'm asking
17   what your understanding of this template means
18   right here?  What is the review recommendation
19   reason?
20       A     I had to defer to the expertise of the
21   lawyers.  I -- I -- I don't write legal text, so,
22   you know, the expectation was that lawyers would
23   make a decision and that information would be
24   provided.
25       Q     But in your declaration -- we can go

Page 285

1    back to Exhibit 2 of your declaration which is
2    your declaration, I should say.  We'll go back
3    to -- it's PDF page 10 of Exhibit 2, the bottom of
4    paragraph 26.  And you write here, The department
5    has been working to develop documents to provide a
6    more robust explanation for borrowers whose claims
7    are denied.
8              Is this template the result of that
9    effort to develop documents to provide a more
10   robust explanation?
11       A     The development of these templates is
12   what I was referring to when I said that the
13   department was developing documents.
14       Q     Did you ever, before today, review a
15   form D denial notice as it was provided to a
16   borrower?
17       A     No.  The servicers send those.
18       Q     So you've seen the template, but you
19   have never before today seen what it looked like
20   to a borrower receiving it?
21       A     I -- I believe that there was one
22   letter that I saw that came in.  When I asked Mark
23   about it, he told me that the letter that I saw
24   was not a typical letter.  So I've only seen --
25       Q     Which letter was that?  Do you recall?