SARAH E. HARRINGTON
Deputy Assistant Attorney General
STEPHANIE HINDS
Acting United States Attorney
MARCIA BERMAN
Assistant Branch Director
R. CHARLIE MERRITT
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Telephone: (202) 514-3183
E-mail: kevin.p.hancock@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SUBPOENA SERVED ON FORMER SECRETARY OF EDUCATION ELISABETH DEVOS | No. 3:21-mc-80075-WHA<br><br>**DEFENDANT U.S. DEPARTMENT OF EDUCATION'S MOTION TO QUASH RULE 45 DEPOSITION SUBPOENA**<br><br>Date: May 18, 2021<br>Time: 8:00 a.m.<br>Honorable William Alsup |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

    I.      INITIAL PROCEEDINGS IN *SWEET V. CARDONA* ............................ 3

    II.     THE COURT'S DENIAL OF THE PARTIES' SETTLEMENT
           AGREEMENT AND ORDERING OF A FIRST ROUND
           OF DISCOVERY ............................................................................ 4

    III.    PLAINTIFFS' REQUEST TO DEPOSE FORMER
           SECRETARY DEVOS ..................................................................... 5

    IV.    THE MOTION TO QUASH PROCEEDINGS ..................................... 7

    V.     ADDITIONAL AND ONGOING DOCUMENT DISCOVERY
           IN *SWEET* ...................................................................................... 8

ARGUMENT ................................................................................................ 9

    I.      FORMER AND NON-PARTY CABINET OFFICIALS ARE
           PROTECTED FROM TESTIFYING ABOUT THE REASONS
           FOR THEIR OFFICIAL DECISIONS ................................................ 9

    II.     PLAINTIFFS CANNOT ESTABLISH EXTRAORDINARY
           CIRCUMSTANCES TO JUSTIFY DEPOSING A FORMER
           CABINET OFFICIAL ................................................................... 15

         A.     Plaintiffs Have Not Reasonably Exhausted Other Less
                Intrusive Means to Obtain the Information They Claim
                to Seek from the Former Secretary ......................................... 15

         B.     Plaintiffs Cannot Demonstrate that the Former Secretary
                Has First-Hand Knowledge that Is Unique and Essential
                to Their Case ........................................................................... 19

             1. Information Regarding the Form Denial Letters ................................. 20

             2. Information Regarding the Department's Alleged Delay.................... 22

             3. Information Regarding Borrower Defense Policy .............................. 23

CONCLUSION................................................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Apple Inc. v. Samsung Elecs. Co., Ltd,*
   282 F.R.D. 259 (N.D. Cal. 2012) ............................................................................ 12

*Bey v. City of New York,*
   No. 99 CIV.3873LMMRLE, 2007 WL 3010023 (S.D.N.Y. Oct. 15, 2007) ............................ 13

*Bogan v. City of Boston,*
   489 F.3d 417 (1st Cir. 2007) ................................................................................ 10

*California v. United States,*
   No. C 05-0328 JSW MEJ, 2006 WL 2621647 (N.D. Cal. Sept. 12, 2006) ............. 11, 17, 18, 22

*Conforti v. St. Joseph's Healthcare Sys., Inc.,*
   No. 2:17-cv-0050, 2019 WL 3847994 (D.N.J. Aug. 15, 2019) .................................... 10

*Croddy v. FBI,*
   No. 00-cv-0651, 2005 WL 8168910 (D.D.C. Mar. 30, 2005) .................................... 13

*Cusumano v. Microsoft Corp.,*
   162 F.3d 708 (1st Cir. 1998) ................................................................................ 13

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ........................................................................................ 10

*Dobson v. Vail,*
   No. C10-5233/KLS, 2011 WL 4404146 (W.D. Wash. Sept. 21, 2011) ..................................... 13

*FDIC v. Galan-Alvarez,*
   No. 1:15-MC-00752 (CRC), 2015 WL 5602342 (D.D.C. Sept. 4, 2015)............... 10, 12, 13, 20

*First Resort, Inc. v. Herrera,*
   No. CV 11-5534 SBA (KAW), 2014 WL 589054 (N.D. Cal. Feb. 14, 2014) ............. 11, 15, 20

*Franklin Sav. Ass'n v. Ryan,*
   922 F.2d 209 (4th Cir. 1991) ................................................................................ 10

*Gil v. Cty. of Suffolk,*
   No. CV06-1683(LDW)(ARL), 2007 WL 2071701 (E.D.N.Y. July 13, 2007)........................ 13

*Gray v. Kohl,*
   No. 07-10024-CIV, 2008 WL 1803643 (S.D. Fla. Apr. 21, 2008)................................... 12

*Harmston v. City & Cty. of San Francisco,*
   No. C07-01186 SI, 2007 WL 3306526 (N.D. Cal Nov. 6, 2007) .................................. 16, 18, 19

*In re Cheney*,
    544 F.3d 311 (D.C. Cir. 2008) ........................................................................................... 11

*In re Commodity Future Trading Comm'n*,
    941 F.3d 869 (7th Cir. 2019) ............................................................................................. 11

*In re Dep't of Commerce*,
    139 S. Ct. 16 (2018) .......................................................................................................... 10

*In re FDIC*,
    58 F.3d 1055 (5th Cir. 1995) ............................................................................................. 11

*In re McCarthy*,
    636 F. App'x 142 (4th Cir. 2015) ...................................................................................... 11

*In re United States (Bernanke)*,
    542 F. App'x 944 (Fed. Cir. 2013) .................................................................................... 13

*In re United States (Holder)*,
    197 F.3d 310 (8th Cir. 1999) ....................................................................................... 11, 15

*In re United States (Jackson)*,
    624 F.3d 1362 (11th Cir. 2010) ................................................................................... 10, 11

*In re United States (Kessler)*,
    985 F.2d 510 (11th Cir. 1993) ........................................................................................... 11

*Kyle Eng'g Co. v. Kleppe*,
    600 F.2d 226 (9th Cir. 1979) ....................................................................................... 11, 12

*Lederman v. New York City Dep't of Parks & Rec.*,
    731 F.3d 199 (2nd Cir. 2013) ................................................................................. 10, 12, 15

*Moriah v. Bank of China Ltd.*,
    72 F. Supp. 3d 437 (S.D.N.Y. 2014) .................................................................................. 13

*Raymond v. City of New York*,
    No. 15-cv-6885, 2020 WL 1067482 (S.D.N.Y. Mar. 5, 2020) .......................................... 13

*San Francisco Min. Exch. v. Sec. & Exch. Comm'n*,
    378 F.2d 162 (9th Cir. 1967) ............................................................................................. 12

*Simplex Time Recorder Co. v. Sec'y of Labor*,
    766 F.2d 575 (D.C. Cir. 1985) ........................................................................................... 11

*Sykes v. Brown*,
    90 F.R.D. 77 (E.D. Pa. 1981) ............................................................................................. 12

*United States v. Morgan*,
    313 U.S. 409 (1941) ................................................................................. *passim*

*United States v. Wal-Mart Stores, Inc.*,
    No. CIV.A.PJM-01-CV-152, 2002 WL 562301 (D. Md. Mar. 29, 2002) ......................... 13, 14

*Walker v. NCNB Nat'l Bank of Fla.*,
    810 F. Supp. 11 (D.D.C. 1993) .................................................................. 12, 19

*Warren Bank v. Camp*,
    396 F.2d 52 (6th Cir. 1968) ........................................................................ 11

*Willer v. Las Vegas Valley Water Dist.*,
    176 F.3d 486 (9th Cir. 1999) .................................................................. 10, 12

*William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 for Orange Cty.*,
    482 F. App'x 273 (9th Cir. 2012) .................................................................. 10

## **STATUTES**

5 U.S.C. § 706(1) ............................................................................................. 3

5 U.S.C. § 5312 ............................................................................................. 14

## NOTICE OF MOTION AND MOTION TO QUASH

Notice is hereby given that on May 18, 2021 at 8:00 a.m., before the Honorable William Alsup, the U.S. Department of Education ("Department") will move this Court under Federal Rule of Civil Procedure 45(d)(3)(A) to quash the non-party subpoena Plaintiffs have served upon former U.S. Secretary of Education Elisabeth ("Betsy") DeVos.[1]  *See* Ex. A (Subpoena and Notice of Deposition).  That subpoena orders Ms. DeVos to appear for a deposition in Vero Beach, Florida on "February 25, 2021 or a date mutually agreeable to the Parties."  *Id.*  The parties have agreed that the compliance date for the subpoena should be stayed pending a final order on this motion to quash.  *See* Ex. B.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The Department respectfully requests that this Court quash Plaintiffs' subpoena seeking a non-party deposition of a former Cabinet secretary.  The underlying lawsuit is an Administrative Procedure Act ("APA") case where a class of student-loan borrowers challenges the Department's adjudication of their loan-discharge applications.  *Sweet v. Cardona*, Civ. No. 3:19-cv-3675-WHA (N.D. Cal.).  The Department has produced a certified administrative record, and in response to the Court's discovery orders, provided four deponents who gave roughly 28 hours of testimony, responded to 49 requests for production of documents and 20 interrogatories, and produced thousands of documents.  Document discovery is still ongoing today.  As recently as March 31, 2021, Defendants produced approximately 500 documents, in addition to the more than 2,300 documents produced in December 2020 and January 2021.  On April 16, 2021, Plaintiffs propounded additional document requests.  Nothing in the record to date indicates that former Secretary DeVos had any first-hand involvement in, much less *unique* knowledge of, the facts relating to Plaintiffs' claims.

---

[1]  Former Secretary DeVos is represented in her official capacity by the U.S. Department of Justice ("DOJ") in light of DOJ's representation of Defendant U.S. Department of Education in the underlying litigation and the government's interest in the information that former officials acquire during their time in government.  The former Secretary is represented in her personal capacity by private counsel.  *See* ECF No. 31.  This filing should not be construed to waive any arguments raised by Ms. DeVos.

Plaintiffs' subpoena of a former Presidential Cabinet secretary is an extraordinary request: applying the "Apex Doctrine," courts have held that current and former heads of government agencies are almost never subject to deposition in civil litigation.  As those courts have explained, such officials rarely have unique information regarding administrative challenges and other civil litigation, and if the judiciary were to subject current and former high-level Executive branch officials to deposition in such cases, it would threaten the separation of powers, chill agency decisionmaking, discourage public service, and create potential for abuse or harassment.  These dangers are at their peak when, as here, the official at issue was a Cabinet secretary who reported directly to the President.  Indeed, the Supreme Court first warned in *United States v. Morgan*, 313 U.S. 409, 421-22 (1941), that it is "not the function of the court to probe the mental processes of [a Cabinet] Secretary" by subjecting them to deposition.

The extraordinary circumstances that must exist to justify a deposition of a former Cabinet official do not exist here.  Plaintiffs cannot show, as they must, (1) that the former Secretary has relevant first-hand knowledge, (2) that any such knowledge would be uniquely held by the former Secretary and thus not obtainable from another source, and (3) that any such knowledge would be essential to their case.

Plaintiffs cannot demonstrate that the knowledge they claim the former Secretary possesses is uniquely held by her because they have not exhausted other, less intrusive means to obtain that information.  Plaintiffs rejected the Department's offers to explore alternative sources, elected to use only four of the five depositions for other Department officials made available to them by the Court's October 19, 2020 discovery order, never took a Rule 30(b)(6) deposition, never served any requests for admission, did not use all of their available interrogatories, and did not use the interrogatories they did ask to inquire into topics they now claim—incorrectly—are uniquely within the former Secretary's knowledge.  Moreover, document discovery in this case remains ongoing; at the very least, Plaintiffs should be required first to receive and review the additional responsive documents the Department will produce before any determination is made whether the former Secretary has unique knowledge of facts that cannot be obtained through other, less intrusive means.  Indeed, the discovery Plaintiffs have taken from Department decisionmakers so far has

produced voluminous amounts of evidence, and Plaintiffs do not claim that they are unable to move for summary judgment based on the existing record, providing further evidence that the deposition is not necessary.

Even had Plaintiffs exhausted alternative sources, based on the current record, they could not establish that the former Secretary has any unique first-hand knowledge that is essential to their case. In fact, the still-growing record in this case, including the more than 500 documents Defendants produced just three weeks ago, does not show that the former Secretary had any first-hand involvement in the relevant facts of this case at all. Plaintiffs are left to argue that a deposition is justified solely on the basis that the former Secretary retained ultimate policymaking authority for the agency. But if that were enough, the Apex Doctrine would be a dead letter and every Cabinet secretary would be subject to deposition in every case challenging their agency's actions and policies.

Plaintiffs' subpoena should be quashed.

## BACKGROUND

### I.   INITIAL PROCEEDINGS IN *SWEET V. CARDONA*

In the underlying lawsuit in this matter with which the Court is familiar, *Sweet v. Cardona*, Plaintiffs filed a class action complaint in June 2019 challenging the Department's alleged delay in issuing borrower-defense decisions. *See* Compl. ¶¶ 377-89, *Sweet* ECF No. 1. The original complaint asserts a claim under APA § 706(1), which authorizes courts to "'compel agency action unlawfully withheld or unreasonably delayed.'" *See id.* ¶ 380 (quoting 5 U.S.C. § 706(1)). As relief, Plaintiffs seek an order compelling the Department to "start granting or deny-ing their borrower defenses." *Id.* ¶ 10.[2]

On November 14, 2019, the Department lodged a certified administrative record, *Sweet* ECF No. 56, and later moved for summary judgment, arguing that the Department's temporary delay in issuing final borrower-defense decisions was caused by multiple factors and reflected the

---

[2]     The Court certified a class consisting of all people who borrowed a qualifying Title IV loan "who have asserted a borrower defense to repayment," and "whose borrower defense has not been granted or denied on the merits," while carving out members of a separate class action. *Sweet* ECF No. 46 at 14. The original complaint's second count was dismissed in 2019. *Sweet* ECF No. 41.

agency's reasonable balancing of competing priorities and the needs of federal student loan borrowers, *Sweet* ECF No. 63 at 1-2.

While that motion was pending, in April 2020, the parties executed a class-action settlement agreement, in which the Department agreed to issue final borrower-defense decisions on the applications of class members according to a specified timeline. *Sweet* ECF No. 97-2. The Court preliminarily approved the proposed settlement agreement, *Sweet* ECF No. 103, and the parties subsequently worked toward final approval of the deal. In the meantime, both before and after the parties executed their settlement agreement, the Department continued to steadily issue final borrower-defense decisions, notwithstanding that the timelines set forth in the agreement had not yet begun to run. *See Sweet* ECF No. 116. On September 17, 2020, however, Plaintiffs moved to enforce the agreement in addition to seeking final approval. *Sweet* ECF No. 129. Plaintiffs' motion to enforce took issue with the substance of certain denial notices that the Department had been issuing, claiming that these notices provided insufficient reasoning. *Id.*

## II. THE COURT'S DENIAL OF THE PARTIES' SETTLEMENT AGREEMENT AND ORDERING OF A FIRST ROUND OF DISCOVERY

On October 19, 2020, the Court denied final approval of the settlement agreement, and denied the motion to enforce as moot, concluding that the parties had failed to reach a meeting of the minds on what constitutes a "final decision." *Sweet* ECF No. 146 at 7-10. The Court also ordered a two-month expedited discovery period. *Id.* at 16. The Court reasoned that discovery was warranted because the Department's administrative record indicated that reviewing borrower defense applications requires time-consuming effort, while the denial letters issued to borrowers did not on their face reflect such effort. *Id.* at 12-13.

The Court set several limits on Plaintiffs' ability to take "limited" discovery, "[b]earing in mind that discovery against agencies is disfavored." *Sweet* ECF No. 146 at 15-16. First, it limited the time for taking discovery to an approximately two-month period, with a deadline of December 24, 2020. *Id.* at 16-17. Second, the Court limited discovery to three discrete topics: (1) the Department's "development and use of the form denial letters"; (2) the "extent to which the difficulty of reviewing borrower-defense applications actually caused or justified the Secretary's eighteen-

month delay"; and (3) the "extent to which the Secretary has denied applications of students who have attended schools" subject to certain findings of misconduct. *Id.* at 16. Third, the Court allowed Plaintiffs to take written discovery and up to "five fact depositions of relevant decisionmakers" from offices "within the Office of the Under Secretary." *Id.* And fourth, most pertinent here, the Court specifically stated that "given [that] heads of government agencies are not normally subject to deposition, class counsel may not yet depose the Secretary. . . . Extraordinary circumstances, however — for example, if the Secretary has unique first-hand knowledge or necessary information cannot be obtained through other, less intrusive means — may justify such a deposition at a later date." *Id.* (internal quotations and cites omitted). Finally, the October 19 discovery Order allows Plaintiffs to "seek further depositions, or expansion or extension of discovery via letter brief." *Id.*

On November 6 and 11, 2020, Plaintiffs served Defendants with two sets of written discovery requests consisting of 49 requests for production and 20 interrogatories. After serving timely objections and responses, Defendants responded to Plaintiffs' first and second sets of interrogatories on December 7 and 10, 2020, respectively; made a substantial production of documents on December 23, 2020; and supplemented their interrogatory responses and document production on January 14, 2021. Additionally, Plaintiffs noticed and conducted four of the five depositions that the court made available to them for "relevant decisionmakers" other than the Secretary. The four deponents were then-Under Secretary Diane Jones, Borrower Defense Unit ("BDU") Director Colleen Nevin, then-Federal Student Aid ("FSA") Chief Operating Officer Mark Brown, and former Under Secretary and former Acting FSA Chief Operating Officer James Manning. Plaintiffs did not notice a fifth deposition.

## III.   PLAINTIFFS' REQUEST TO DEPOSE FORMER SECRETARY DEVOS

On January 6, 2021, Plaintiffs informed Defendants by telephone that they intended to seek to depose then-Secretary DeVos. *Sweet* ECF No. 171 at 5. The next day, January 7, Defendants sent Plaintiffs a letter requesting that they identify "the information that you seek to solicit from the Secretary that you have not been able to obtain elsewhere," and stating that they were "open to exploring other, less intrusive means of providing your requested discovery." *Id.* Defendants

pointed out that Plaintiffs had taken only four of their five available depositions for relevant deci-sionmakers from offices "within the Office of the Under Secretary, and that Defendants would be "open to further conferring about a different deponent who might have relevant knowledge." *Id.* Defendants also noted that the parties had seven days to work out any differences relating to De-fendants' responses to interrogatories. *Id.* Later that evening, Secretary DeVos announced her resignation, which was effective the next day, January 8, 2021.

On January 8, Plaintiffs responded to Defendants' letter, asserting that the four Department officials they deposed "all left holes that can only be filled by Secretary's DeVos's personal knowledge" on topics "including but not limited to" (1) "[t]he development and approval of" the form denial notices; (2) "[w]ho ordered FSA to stop issuing borrower defense decisions" and why; and (3) "Borrower Defense Policy." *Sweet* ECF No. 171 at 8-9 (emphasis omitted). Plaintiffs acknowledged that the parties had agreed that Defendants would let Plaintiffs know by January 14 whether Defendants would supplement their response to Interrogatory No. 16—which is similar to Plaintiffs' first proposed deposition category for the former Secretary. *Id.* at 9; *see also id.* at 1 & n.2. But Plaintiffs stated that their desire to depose the former Secretary "would not be satisfied by a more fulsome response to Interrogatory No. 16." *Id.* at 9. Plaintiffs' letter concluded by giving Defendants less than one business day to respond. *Id.*

Defendants responded the next business day, January 11, and informed Plaintiffs that the Department was exploring whether it could provide the information Plaintiffs sought through less intrusive means. *Sweet* ECF No. 171 at 11. Defendants requested a "reasonable amount of time for the Department to continue this investigation." *Id.* Two-and-a-half hours later, Plaintiffs re-sponded with a letter stating that they had "given [Defendants] enough time to consider our re-quest," and that "today we will move the Court accordingly." *Id.* at 14.

Later that same day, Plaintiffs filed a letter brief with this Court seeking leave to take the former Secretary's deposition. *Sweet* ECF No. 171. The next day, January 12, the Court ordered that Plaintiffs could only pursue a private party's deposition through a Rule 45 subpoena. *Sweet* ECF No. 172.

On January 27, 2021, the Department accepted service on behalf of the former Secretary of Plaintiffs' Rule 45 subpoena, *see* Ex. A, on the condition that the place of compliance would be Vero Beach, Florida, where Ms. DeVos resides part time, *see* Ex. C.  Plaintiffs further agreed that although the deposition would be noticed to take place on February 25, 2021, the deposition should not take place until after a final order on a motion to quash the deposition.  *See* Ex. B.

IV.    THE MOTION TO QUASH PROCEEDINGS

On February 8, 2021, the Department and former Secretary DeVos in her personal capacity filed a motion to quash Plaintiffs' subpoena in the U.S. District Court for the Southern District of Florida.  *See In re Subpoena Served on Elisabeth DeVos*, 2:21-mc-14073 (S.D. Fla.) ("*In re DeVos* (S.D. Fla.)"), ECF No. 1; *see also* Fed. R. Civ. P. 45(d)(3)(A) (explaining that a nonparty's challenge to a Rule 45 subpoena must be litigated in the "court for the district where compliance is required").  The motion to quash was assigned to a Magistrate Judge without the consent of the parties.  *In re DeVos* (S.D. Fla.), ECF No. 4.  Plaintiffs then filed a motion to transfer the motion to quash to this Court, which the Department and Ms. DeVos opposed.  *In re DeVos* (S.D. Fla.), ECF Nos. 12, 18-19.  On April 7, 2021, after the parties fully briefed the motion to quash and motion to transfer, the Magistrate Judge issued an order granting Plaintiffs' motion to transfer, closing the case, and directing the clerk of court to transfer the matter to this Court.  *In re DeVos* (S.D. Fla.), ECF No. 28.

Two days later, on April 9, 2021, former Secretary DeVos filed an expedited motion with District Judge Jose E. Martinez of the Southern District of Florida to stay the Magistrate Judge's transfer order to allow time "so that she may exercise her right under Rule 72 to file timely objections" with the District Judge by April 21, 2020.  *In re DeVos* (S.D. Fla.), ECF 30 at 3.  On April 12, that motion was denied.  *In re DeVos* (S.D. Fla.), ECF 31.  On April 13, this Court issued an order setting a briefing schedule for the motion to quash and set a hearing for May 18.  ECF No. 30.  Two days later, on April 15, former Secretary DeVos filed a petition for a writ of mandamus with the U.S. Court of Appeals for the Eleventh Circuit.  *See Emergency Petition for a Writ of Mandamus, In re Elizabeth DeVos*, No. 21-11239-D (11th Cir.) (Apr. 15, 2021).  That petition asks the Eleventh Circuit to reverse the Magistrate Judge's order transferring the motion to quash

to this Court, and to grant the motion to quash.  *See id.* at 10-11.  The next day, April 16, the Eleventh Circuit issued an order directing respondents, including the *Sweet* Plaintiffs, to answer Ms. DeVos's mandamus petition by Friday, April 23, 2021.  *See* ECF No. 31-1 at 5-6.

## V.   ADDITIONAL AND ONGOING DOCUMENT DISCOVERY IN *SWEET*

In parallel with the motion to quash proceedings, Plaintiffs have pursued additional document discovery before this Court in *Sweet*.  On February 4, 2021, shortly after serving their subpoena upon former Secretary DeVos, Plaintiffs filed a motion to compel the Department to produce additional documents responsive to the same topics on which Plaintiffs seek to depose the former Secretary, including, "why the Department delayed deciding any BD applications."  *Sweet* ECF No. 176 at 2.  After a hearing on Plaintiffs' motion, the Court issued an order on March 10 requiring the Department to produce five categories of additional documents from certain custodians— including former Secretary DeVos—by March 31, 2021.  *Sweet* ECF No. 191 at 2.  Among other documents, the March 10 Order requires the Department to produce further documents responsive to the first four of Plaintiffs' November 6, 2020 requests for production (as amended on Dec. 10, 2020).  *Id.* at 2, ¶ 3.  Those four requests seek documents sufficient to show any direction given to the Department's BDU to stop or resume processing any approvals or denials of borrower defense applications.  *See* Ex. D (Pls.' First Request for Prod. of Docs. to Defs. (Narrowed Proposal) at 7-8 (Dec. 10, 2020)).

The Department conducted the search required by the March 10 Order, and on March 31, produced approximately 500 responsive documents to Plaintiffs, followed by a privilege log on April 9.  As Plaintiffs have observed, the Department's "March 31 document production included only two emails sent to former Secretary DeVos . . . [and] did not include any emails from the former Secretary."  *See* Ex. E (Letter from Rebecca C. Ellis, Counsel for Plaintiffs to R. Charlie Merritt, Counsel for the Department at 2 (Apr. 16, 2021)).  Moreover, Plaintiffs admit that the Department's privilege log for the March 31 production does "not include a single email sent to or from former Secretary DeVos" and includes "only two documents with former Secretary DeVos listed as the custodian."  *Id.*  And although certain entries on the log mention former Secretary

DeVos, they indicate only that the former Secretary "receive[d] information relating to borrower defense" during the relevant time period from other Department employees. *Id.*

Four days ago, on April 16, pursuant to the Court's March 10 Order, *Sweet*, ECF No. 191 at 3, ¶ 7, Plaintiffs served Defendants with a request for the production of seven additional categories of documents. *See* Ex. E at 1-2. Two of those categories seek additional documents specifically relating to former Secretary DeVos. *Id.* at 2, ¶¶ 5-6. The date the Department's production is due has yet to be determined.

Finally, on April 13, the Court granted Plaintiffs' motion for leave to supplement their complaint, which adds three new APA claims to their § 706(1) claim. *Sweet* ECF No. 196. The new claims are based on "additional evidence" Plaintiffs "received through discovery in *Sweet*, *Sweet* ECF No. 192 at 3-4, and Plaintiffs' supplemental pleading attaches as exhibits hundreds of pages of those discovery materials, including deposition transcripts, interrogatory responses, and documents, *Sweet* ECF Nos. 192-193. Plaintiffs represent that "no further discovery" beyond what this Court has already addressed is needed to pursue any of these new claims. *Sweet* ECF No. 192 at 8.

## ARGUMENT

### I. FORMER AND NON-PARTY CABINET OFFICIALS ARE PROTECTED FROM TESTIFYING ABOUT THE REASONS FOR THEIR OFFICIAL DECISIONS

Applying the protections of Rule 45 and the Apex Doctrine, courts have routinely held that high-ranking government officials—especially Cabinet secretaries and including nonparty former officials—should not be deposed or called to testify regarding an agency's reasons for taking action, or facts regarding, official action, absent exceptional circumstances.

For any nonparty from whom discovery is sought, Rule 45 states that the Court "must quash or modify a subpoena that . . . subjects a person to undue burden," or that "requires disclosure of privileged or other protected matter, if no exception or waiver applies[.]" Fed. R. Civ. P. 45(d)(3)(A)(iii) & (iv). "Generally, courts afford greater protection to non-parties in discovery, and nonparty subpoenas must meet a higher standard of relevance than subpoenas directed toward

parties." *Conforti v. St. Joseph's Healthcare Sys., Inc.*, No. 2:17-cv-0050, 2019 WL 3847994, at *2 (D.N.J. Aug. 15, 2019).

Where the nonparty from whom discovery is sought is a high-ranking government official, as here, the nonparty is also protected by the Apex Doctrine, which bars requiring the official to testify absent "extraordinary circumstances" justifying the deposition. *See, e.g.*, *FDIC v. Galan-Alvarez*, No. 1:15-MC-00752 (CRC), 2015 WL 5602342, at *3 (D.D.C. Sept. 4, 2015).[3]  This principle was first articulated by the Supreme Court in *United States v. Morgan*, where it stated that the Secretary of Agriculture—who had already been "questioned at length" in a deposition authorized by the district court—"should never have been subjected to this examination" because it is "not the function of the court to probe the mental processes of the Secretary." 313 U.S. at 421-22.  More recently, the Supreme Court stayed a district court's order allowing the deposition of the Secretary of Commerce in an APA case, where the Solicitor General had argued that *Morgan* required the stay. *In re Dep't of Commerce*, 139 S. Ct. 16, 16-17 (2018).[4]  The Supreme Court later reaffirmed that it was appropriate for discovery to "not include the deposition of the Secretary himself," even though the Court had otherwise concluded that extra-record discovery in that case was justified. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2574 (2019).

Following *Morgan*, courts across the nation, including the Ninth Circuit and in this District, have routinely held under the Apex Doctrine that high-ranking government officials should not be "deposed or called to testify regarding the reasons for taking official action." *Lederman*, 731 F.3d 199, 203-204 (2nd Cir. 2013); *see also William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 for Orange Cty.*, 482 F. App'x 273, 274 (9th Cir. 2012); *In re United States (Jackson)*, 624 F.3d 1368, 1372-73 (11th Cir. 2010); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *Willer v. Las Vegas Valley Water Dist.*, 176 F.3d 486 (9th Cir. 1999) (table op.); *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993); *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209,

---

[3]    The Apex Doctrine shifts the burden of persuasion to the party seeking discovery, even though a party moving to quash ordinarily bears the burden of persuasion. *See, e.g.*, *Galan-Alvarez*, 2015 WL 5602342, at *3.

[4]    *See* Renewed Application for a Stay at 29-32, *In re Dep't of Commerce*, 139 S. Ct. 16 (2018) (No. 18A375) (citing *Morgan* and arguing that "in a challenge to an agency decision, it is 'not the function of the court to probe the mental processes of the Secretary'").

211 (4th Cir. 1991); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586-87 (D.C. Cir. 1985); *Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979); *Warren Bank v. Camp*, 396 F.2d 52, 56 (6th Cir. 1968); *California v. United States*, No. C 05-0328 JSW MEJ, 2006 WL 2621647, at *1 (N.D. Cal. Sept. 12, 2006); *First Resort, Inc. v. Herrera*, No. CV 11-5534 SBA (KAW), 2014 WL 589054, at *6 (N.D. Cal. Feb. 14, 2014).

Courts of appeals have even utilized the extraordinary remedy of a writ of mandamus to prevent such testimony.  *See, e.g.*, *In re Commodity Future Trading Comm'n*, 941 F.3d 869, 874 (7th Cir. 2019); *In re McCarthy*, 636 F. App'x 142, 145 (4th Cir. 2015); *In re United States (Jackson)*, 624 F.3d at 1369-70; *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008); *In re United States (Holder)*, 197 F.3d 310, 316 (8th Cir. 1999); *In re FDIC*, 58 F.3d 1055, 1057 (5th Cir. 1995); *In re United States (Kessler)*, 985 F.2d at 513.

Three separate rationales underlie this robust protection.  *First*, it "would have serious repercussions for the relationship between two coequal branches of government" to allow parties litigating against federal agencies to ascertain the thoughts and mental processes by which high-ranking agency officials exercise their official discretion (as opposed to those agencies' decisions). *In re United States (Jackson)*, 624 F.3d at 1372 (citation omitted); *see also Morgan*, 313 U.S. at 422 ("Just as a judge cannot be subjected to such a scrutiny, . . . so the integrity of the administrative process must be equally respected." (citations omitted)); *Willer*, 176 F.3d at 486 (Table Op.) (citing *Morgan*, and explaining that "[i]t is well settled that the decision making process of judges is generally not subject to discovery"); *Kyle Eng'g Co.*, 600 F.2d at 231 ("Heads of government agencies are not normally subject to deposition[.]"); *San Francisco Min. Exch. v. Sec. & Exch. Comm'n*, 378 F.2d 162, 168 (9th Cir. 1967) (citing *Morgan*, and stating that "an inquiry into the state of mind of administrative adjudicators during the decisional process is wholly improper"). The "threat to the separation of powers" presented by an order requiring an executive-branch official's testimony becomes "more substantial" as the official at issue is "higher-ranking."  *In re United States (Jackson)*, 624 F.3d at 1372 (issuing a writ of mandamus blocking testimony of a Cabinet-level official and stating that "*Morgan* does not suggest or even hint that a federal district

court should *ever* compel a member of the President's cabinet . . . to appear in a judicial proceeding to testify about the officials duties or decisions" (emphasis added)).

*Second* and relatedly, subjecting high-level government officials to depositions in civil actions involving their agency would impede the exercise of official duties by exerting a chilling effect on official decision-making. *See Lederman*, 731 F.3d at 203. That is, "subjecting officials to interrogation about how they reached particular decisions would impair that decision-making process by making officials less willing to explore and discuss all available options, no matter how controversial." *Walker v. NCNB Nat'l Bank of Fla.*, 810 F. Supp. 11, 12 (D.D.C. 1993); *see also Sykes v. Brown*, 90 F.R.D. 77, 78 (E.D. Pa. 1981) ("Should the agency head be subject to deposition in every resulting case and be repeatedly required to explain the various mental steps he took to reach his decision, the decision may be his last.").

*Third*, allowing depositions of high-ranking Government officials as a matter of course when their agencies are sued over one of their policies would create "a tremendous potential for abuse or harassment[,]" *Apple Inc. v. Samsung Elecs. Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) (citation omitted), and "the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service," *United States v. Wal-Mart Stores, Inc.*, No. CIV.A.PJM-01-CV-152, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002); *see, e.g., Gray v. Kohl*, No. 07-10024-CIV, 2008 WL 1803643, at *1 (S.D. Fla. Apr. 21, 2008) ("[Courts] generally restrict parties from deposing high ranking officials lacking personal knowledge of the issues being litigated because they are vulnerable to numerous, repetitive, harassing, and abusive depositions, and therefore need some measure of protection from the courts." (citation omitted)).

These rationales apply fully to high-ranking public officials after they leave office, and, as noted above, numerous courts have precluded depositions of *former* high-ranking officials regarding their decisionmaking while in office. *See, e.g., Lederman*, 731 F.3d at 203-04 (former deputy mayor) (cited by this Court's Oct. 19 discovery order, ECF No. 146 at 16); *Raymond v. City of New York*, No. 15-cv-6885, 2020 WL 1067482, at *5 (S.D.N.Y. Mar. 5, 2020) (former police commissioners); *Wal-Mart*, 2002 WL 562301, at *1 (former Chair of the Consumer Product Safety

Commission); *Galan-Alvarez*, 2015 WL 5602342, at *4-5 (former FDIC chair and senior deputy director).[5]  As the *Galan-Alvarez* court explained:

> The integrity of administrative proceedings and the underlying deci-sionmaking process of agency officials are just as important where the official to be questioned no longer serves in the same position.  And indiscriminate deposi-tions of high-ranking government officials would . . . likely discourage people from accepting positions as public servants irrespective of whether those deposed were current or former officials.

2015 WL 5602342, at *4 (citation omitted); *see In re United States (Bernanke)*, 542 F. App'x 944, 949 (Fed. Cir. 2013); *Wal-Mart*, 2002 WL 562301, at *5.  Although in the case of a former official, the "rationale based on interference with official duties is absent," the Apex Doctrine's other sup-porting rationales "apply to former officials and current officials with equal force."  *Galan-Alva-rez*, 2015 WL 5602342, at *4.  The Apex Doctrine's concerns thus do not dissipate the moment a former Cabinet secretary has left office; "[i]f the immunity *Morgan* affords is to have any meaning, the protections must continue upon the official's departure from public service."  *Wal-Mart*, 2002 WL 562301, at *3.

These concerns apply to Plaintiffs' attempt to depose former Secretary DeVos, a former member of the Cabinet reporting directly to the President.  5 U.S.C. § 5312.  Although she no longer holds that office, the Apex Doctrine protects the former Secretary just the same, as does Rule 45.  *See, e.g.*, *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs [under Rule 45].").  There is a substantial likelihood that Plaintiffs would indeed seek to question the former Secretary about her motivations at any deposition; Plain-tiffs' previous four depositions in this case featured questions probing the motivations, mental impressions, and deliberations of Department officials—including those of the former Secretary.

---

[5]     *See also Croddy v. FBI*, No. 00-cv-0651, 2005 WL 8168910, at *1 (D.D.C. Mar. 30, 2005) (former FBI director); *Moriah v. Bank of China Ltd.*, 72 F. Supp. 3d 437 (S.D.N.Y. 2014) (former House Majority Leader of the House of Representatives); *Gil v. Cty. of Suffolk*, No. CV06-1683(LDW)(ARL), 2007 WL 2071701, at *2 (E.D.N.Y. July 13, 2007) (former Suffolk County Police Commissioner); *Bey v. City of New York*, No. 99 CIV.3873LMMRLE, 2007 WL 3010023, at *3 (S.D.N.Y. Oct. 15, 2007) (former Commissioner of the New York City Department of Cor-rection); *Wal-Mart*, 2002 WL 562301, at *1 (former Chair of the Consumer Product Safety Com-mission); *Dobson v. Vail*, No. C10-5233/KLS, 2011 WL 4404146, at *1 (W.D. Wash. Sept. 21, 2011) (former Secretary of the Washington State Department of Corrections).

*See, e.g.*, Ex. F (Brown Dep. 78:20-79:16 (asking the witness, "what do you take that to mean, [Secretary DeVos's] comment?," and "what caused her extreme displeasure?"); 227:21-230:7 (asking the witness to read a statement the former Secretary made at a speech, and then asking, "what do you understand this statement to mean[?]," and "have you ever heard Ms. DeVos in your private meetings with her express these same sentiments?"), Dec. 15, 2020); Ex. G (Nevin Dep. 130:10-21 (asking the witness, "[w]hat did you take the Secretary's comment to mean[?]"), Dec. 9, 2020); Ex. H (Manning Dep. 69:20-70:4 ("After [the former Secretary] signed this document, did you talk to her about her extreme displeasure?"), Dec. 17, 2020).[6]

In addition, Plaintiffs used their depositions as an opportunity to question Department deponents on topics that lie outside of the limited boundaries set by the Court for discovery, despite Defendants' repeated objections.  For instance, Plaintiffs questioned witnesses about their bonuses and compensation, *see, e.g.*, Ex. I (Jones Dep. 133:11-19, Nov. 20, 2020); Brown Dep. 34:21-22; their performance reviews, *see, e.g.*, Jones Dep. 134:25-135:15; Brown Dep. 30:24; the valuation of the Department's loan portfolio, *see, e.g.*, Jones Dep. 230:8-231:21; decisions to recuse from certain matters, *see, e.g.*, *id.* at 217:23-221:12; matters relevant to other litigation against the Department, *see, e.g.*, *id.* at 154:12-13; events occurring both long before and after the alleged delay in this case, *see, e.g.*, *id.* at 256:18-257:1, such as consulting work one witness performed while not employed by the Department, *see* Manning Dep. 146:6-150:5; and another witnesses' routine "discussions about borrower defense with the Trump transition team in January, February of 2017," Nevin Dep. 112:3-25, among other irrelevant matters.  There is thus reason to expect that the same types of questions would be asked of the former Secretary, and that Plaintiffs would

---

[6]    *See also* Ex. I (Jones Dep. 138:9-12 ("[B]efore the methodology went into effect in December 2019 and the claim decisions restarted, was the backlog an ongoing concern of yours?"); 156:12-157:15 (Plaintiffs' counsel arguing that it was appropriate to ask whether "the witness, who's in charge of policy, agrees with this statement about the risk of unsubstantiated claims" appearing in the Department's 239-page regulation); 278:6-10 ("And when you were reviewing the form denial letters, did you think about or consider whether or not they would provide enough information for a borrower to seek reconsideration?"); 283:16-18 ("What other information did you think when you reviewed this template would be included there?"), Nov. 20, 2020); Brown Dep. 46:4-5 ("So was the stoppage a concern when you joined [the Department?]"); 51:1-3 ("And when you made those requests [for additional staff members], how did — for instance, how did the Secretary respond?"); 84:1-4 ("And, so, when BDU came up with its performance metric, what deliberations did you have with the BDU?").

thereby use a court-authorized subpoena to ascertain the former Secretary's thoughts and mental processes from when she served as a high-ranking agency official. A deposition of the former Secretary would therefore implicate all three of the serious concerns—separation of powers, preventing harm to agency decisionmaking, and preventing harassment and the deleterious effect harassment would have on public service—underlying the rule against depositions of current and former Cabinet officials.

## II.   PLAINTIFFS CANNOT ESTABLISH EXTRAORDINARY CIRCUMSTANCES TO JUSTIFY DEPOSING A FORMER CABINET OFFICIAL

Given these serious concerns, courts have held that a deposition of a current or former high-ranking government official can be justified only by a showing of extraordinary circumstances. *See, e.g.*, *Lederman*, 731 F.3d at 203 (citing *Morgan*, 313 U.S. at 422 and *In re United States (Holder)*, 197 F.3d at 316). Extraordinary circumstances have been found to exist only where it is shown that "'the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means.'" *See id*. This standard requires the party seeking discovery to make three distinct showings: (1) that the official has relevant first-hand knowledge, (2) that any such knowledge would be uniquely held by the former Secretary and thus not obtainable from another source, and (3) that any such knowledge would be "essential to his case." *In re United States (Holder)*, 197 F.3d at 313-14; *see also Sweet* ECF No. 146 at 16 (explaining that Plaintiffs may not depose the Secretary absent "[e]xtraordinary circumstances," such as "if the Secretary has unique first-hand knowledge or necessary information cannot be obtained through other, less intrusive means"). Plaintiffs have not made, and cannot make, these required showings.

### A.   Plaintiffs Have Not Reasonably Exhausted Other Less Intrusive Means to Obtain the Information They Claim to Seek from the Former Secretary

As an initial matter, Plaintiffs cannot demonstrate that the knowledge they claim the former Secretary possesses is uniquely held by her and thus not available by other, less intrusive means given that they have not attempted to reasonably exhaust potential alternative sources for that information. *See, e.g.*, *First Resort, Inc.*, 2014 WL 589054, at *6 (explaining that "extraordinary

1  circumstances" may exist only "provided that the party seeking discovery has shown that other
2  persons cannot provide the necessary information").

3      Plaintiffs filed a letter brief with this Court seeking the former Secretary's deposition just
4  three business days after raising the topic with Defendants on January 6. *See supra* pp. 5-6. During
5  those three days, the Department told Plaintiffs that it was "open to exploring other, less intrusive
6  means of providing your requested discovery." *Id.* at 5. After Plaintiffs specified what information
7  they sought, the Department responded that it had started investigating whether it could provide
8  that information and requested "a reasonable amount of time for the Department to continue this
9  investigation." *Id.* at 6. Plaintiffs, however, filed their request for the former Secretary's deposi-
10 tion that same day. *Id.* at 6. At that time, there was no deadline for Plaintiffs' deposition request
11 and summary judgment briefing was two months away. Today, the summary judgment briefing
12 schedule has been indefinitely continued, but Plaintiffs still have not attempted to exhaust alterna-
13 tive sources for the information they seek from the former Secretary. There are at least four spe-
14 cific unexhausted alternatives.

15     First, document discovery is still ongoing in this case. Less than three weeks ago, on March
16 31, the Department produced approximately 500 additional documents to Plaintiffs relating to the
17 same topics upon which they seek to depose Ms. DeVos. *See supra* p. 8. And four days ago, on
18 April 16, Plaintiffs served the Department with an additional set of document requests, which seeks
19 seven additional categories of documents, including two that specifically relate to the former Sec-
20 retary. *See supra* p. 9. In light of this continuing document discovery, Plaintiffs cannot maintain,
21 as they argued in January, that a deposition of the former Secretary is necessary because discovery
22 has "not fully answer[ed] the questions at the heart of this case." *Sweet* ECF No. 171. To be clear,
23 continuing to pursue document discovery is not sufficient for Plaintiffs to reasonably exhaust al-
24 ternatives to a deposition of a former Cabinet member. *See, e.g.*, *Harmston*, 2007 WL 3306526,
25 at *3. But at the very least, Plaintiffs should be required to review the documents that the Depart-
26 ment has recently produced and will produce, before the Court makes any determination of
27 whether the former Secretary has knowledge that "cannot be obtained through other, less intrusive
28 means." ECF No. 146 at 16.

Second, Plaintiffs used only four of the five depositions that the Court made available to them for relevant decisionmakers from offices within the Office of the Under Secretary before seeking the former Secretary's deposition. *See supra* p. 5; *cf. California*, 2006 WL 2621647, at *1 (following *Morgan* and barring deposition of the California attorney general because "Defendants have failed to demonstrate why they can not seek the information they desire by . . . noticing other witnesses for deposition"). When Plaintiffs first sought to depose the Secretary, Defendants offered to confer "about a different deponent who might have relevant knowledge." *Supra* pp. 5-6. Plaintiffs could not have been saving their fifth deposition for the former Secretary, because the Court's October 19 discovery order reserved those five depositions for subordinate decisionmakers. *See Sweet* ECF No. 146 at 16. With that fifth and unused deposition, Plaintiffs could have questioned another current or former Department employee with relevant knowledge, such as one of the 15 such individuals listed in Defendants' December 7, 2020 interrogatory responses whom Plaintiffs did not depose. Ex. J (Defs.' Resps. and Objs. to Pls.' First Set of Interrogs. at 3-4, Dec. 7, 2020). For example, Plaintiffs never inquired about Justin Riemer (who appears on that list), even though the Director of the BDU, Ms. Nevin, testified that Mr. Riemer told her in June 2018 of the decision to stop issuing borrower defense decisions, and that "[p]resumably," Mr. Riemer would "know who the ultimate decision maker was[.]" Ex. K (Nevin Dep. 147:12-148:10). The Department's list of potential witnesses shows that Plaintiffs are incorrect when they claim that "[t]aken together," their "four deponents account for . . . the operations of FSA and the Office of the Under Secretary (OUS) for the relevant time period." *Sweet* ECF No. 171 at 1. Alternatively, Plaintiffs could have conducted a Rule 30(b)(6) deposition. That approach would have allowed Plaintiffs to ask the designated witness about information known or reasonably available to the Department as a whole—including to the former Secretary.

Third, Plaintiffs chose not to exhaust available interrogatories, or to use the information already provided in Defendants' interrogatory responses, to obtain the information they seek from the former Secretary. Plaintiffs declined Defendants' January 7 offer to negotiate whether any of Defendants' interrogatory responses could be supplemented to provide the information Plaintiffs seek through the extraordinary deposition of the former Secretary. *See supra* pp. 5-6. Plaintiffs

used only 20 of their 25 available interrogatories, *see id.* at 8, and only one of those 20 (No. 16) asked about a specific topic upon which Plaintiffs claim to have a need to depose the former Secretary, *compare* Ex. J at 22, *with Sweet* ECF No. 171 at 8; *see Harmston v. City & Cty. of San Francisco*, No. C 07-01186SI, 2007 WL 3306526, at *3 (N.D. Cal. Nov. 6, 2007) (barring deposition of Mayor Newsom because "any information Mayor Newsom might have related to the [case] can be discovered through written interrogatories . . . addressed to the City," which Plaintiffs had failed to pursue); *cf. California*, 2006 WL 2621647, at *1 (following *Morgan* and barring deposition of the California attorney general because "Defendants have failed to demonstrate why they can not seek the information they desire by propounding additional interrogatories"). Plaintiffs rejected Defendants' offer, even though the parties still had six days to negotiate supplemental interrogatory responses. *See supra* p. 6. On January 8, Plaintiffs responded that the alleged basis to depose the former Secretary "would not be satisfied by a more fulsome response to Interrogatory No. 16." *Sweet* ECF No. 171 at 9. But three days later, Plaintiffs argued to this Court that the former Secretary's deposition was justified in part because Defendants' initial response to Interrogatory No. 16 was not fulsome enough. *Sweet* ECF No. 171 at 1 (objecting that the response was "one paragraph long, [and] provide[d] no names"). On January 14, Defendants supplemented their response to Interrogatory No. 16, providing further detail, including the names of additional individuals involved in the development of the denial letters. Ex. L (Defs.' Suppl. Resps and Objs to Pls' First Set of Interrogs. at 4-5). Plaintiffs chose not to seek to depose any of these additional individuals.

Fourth, Plaintiffs also could have propounded Rule 36 requests for admission seeking the information they want to elicit from a deposition of the former Secretary. But they chose not to propound a single request for admission during this case. *See Harmston*, 2007 WL 3306526, at *3 (barring deposition of Mayor Newsom because "any information Mayor Newsom might have related to the [case] can be discovered through . . . requests for admission addressed to the City," which Plaintiffs had failed to pursue).

In short, Plaintiffs elected not to exhaust the many avenues of discovery available short of an extraordinary deposition of a former Cabinet secretary. They therefore cannot demonstrate that the information they seek could not have been obtained through other, less intrusive means.

**B.      Plaintiffs Cannot Demonstrate that the Former Secretary Has First-Hand Knowledge that Is Unique and Essential to Their Case**

Even if Plaintiffs had exhausted other, less intrusive means, they could not show that extraordinary circumstances exist. Plaintiffs argue that a deposition of the former Secretary is necessary because they allegedly did not obtain certain information from the four Department officials they deposed during two months of expedited discovery, and "[t]his has made it clear that only Secretary DeVos, as the senior-most policy-setting individual at the agency," has unique first-hand relevant knowledge. *Sweet* ECF No. 171 at 1; *see also, e.g.*, *id.* at 14 ("In sum: the four depositions we have taken, and the approximately 2500 documents you have thus far produced do not fully answer the questions at the heart of this case. Secretary DeVos can.").

An allegation that questions have not been "fully answered" fails to satisfy the requirements for a deposition of a Cabinet secretary. Even if Department employees purportedly could not testify to certain alleged facts, this does not establish (1) that the former Secretary has any relevant *first-hand* knowledge, (2) that any such knowledge would be *unique* and thus not possessed by others, or (3) that any such knowledge would be *essential* to Plaintiffs' case. *Supra* p. 15. Moreover, the still-growing record in this case fails to show that the former Secretary has any relevant first-hand knowledge at all, unique or otherwise. After reviewing the Department's recent production of documents (in response to Plaintiffs' request for documents sufficient to show any direction give to the Department's BDU to stop or resume processing any approvals or denials of borrower defense applications), Plaintiffs conceded that it contains no documents demonstrating that former Secretary DeVos had any first-hand involvement in the facts relating to this case. *See* Ex. E at 2. This concession is consistent with the information the Department provided during the first round of discovery. None of the Department's four deponents, discovery responses, or document productions indicated that the former Secretary has any first-hand knowledge of the topics

about which Plaintiffs seek testimony, but those same deponents, response, and productions identified more than a dozen other individuals who do.  *See, e.g.*, Ex. J at 3-4, Ex. L at 4-5.

Plaintiffs' assumption that former Secretary DeVos must have first-hand knowledge of the claims at issue in this case cannot justify her deposition; if a Cabinet secretary's authority over an agency alone were enough, the Apex Doctrine would be rendered meaningless.  And even if, as head of the agency, the former Secretary gained knowledge relevant to this case through reports from subordinates, that would "merely reinforce the point that former [Secretary DeVos] was high-ranking," not "that any knowledge she gained . . . was unique."  *Galan-Alvarez*, 2015 WL 5602342, at *5; *see also First Resort, Inc.*, 2014 WL 589054, at *7 ("The more likely scenario is that any knowledge the [high-ranking official] has regarding the claims being litigated derives from briefing provided by support staff, summaries from counsel handling the litigation on a day-to-day basis, or other outside sources.").  Each of Plaintiffs' three claims that the former Secretary possesses unique and essential first-hand knowledge, *see Sweet* ECF No. 171 at 8-9, is flawed.

### 1.    Information Regarding the Form Denial Letters

First, the record does not show that the former Secretary has first-hand knowledge about the denial letters, or that if she did, such knowledge would be unique and essential.  Plaintiffs claim that they "have exhausted the available means of discovery and have been unable to extract information about [the denial letters]."  ECF No. 171 at 1.  This is incorrect.  Plaintiffs did not exhaust the available means of discovery, and the discovery they did take elicited relevant information about the development and use of the denial letters.  The three (of the four) deponents who were at the Department when the letters were developed and used testified *at length* about them.  For example, Ms. Nevin testified, among other things, about which denial letter would go to which borrowers, Nevin Dep. 80:24-81:9; how the Department determined how to insert the appropriate review recommendation reason in the letter, *id.* at 81:10-83:9; how the denial notices were developed by "an FSA communication team and our borrower defense program management team," along with "our senior leadership at the department and the Office of General Counsel," *id.* at 86:8-25; how her BDU team served "in a consulting role" on the development of the letters, *id.* at 87:9-88:3; how the development of the letters was "a weeks' long process," *id.* at 89:19-20; when the

letters would state the applicable legal standard, *id.* at 90:12-92:3; the meaning of particular language used in an actual denial notice received by an individual Plaintiff, *id.* at 93:2-95:13; 98:1-99:25; when the form denial letters were finalized, *id.* at 162:7-10; and the letters' discussion of the reconsideration process, *id.* at 211:24-216:23.[7]

In addition, Defendants' supplemental response to Interrogatory No. 16 generally describes the drafting and review process for the denial letters and ends with the statement that "there is no indication that former Secretary DeVos was involved in the review or approval of the template letters A, B, C or D." Ex. J at 5. Although Plaintiffs' January 11 letter brief objects that Defendants' initial response to Interrogatory No. 16 "provides no names," *Sweet* ECF No. 171 at 1, the Department's deponents named specific individuals or groups who drafted, reviewed, and provided input for the drafts, *see, e.g.*, Nevin Dep. 88:4-89:21 (stating that "a lot of people worked on" the letters, including "Nicki Meoli," "Chad Schrecengost," and OGC); Jones Dep. 202:18-203:6 (identifying Ms. Nevin); Brown Dep. 170:22-173:25 (stating that FSA's "policy liaison" team led by "Ian Foss" and BDU helped draft the letters, which were reviewed by OGC and the Office of the Under Secretary). Defendants' January 14 supplemental response provides additional names, stating that the letters were "sent to other officials in the Department, including Jed Brinton . . . and other attorneys in [OGC], as well as Diane Jones (the Principal Deputy Under Secretary) and Robert Eitel (then Counselor to the Secretary)." Ex. L at 5. The discovery Plaintiffs have already obtained on this topic was enough for Plaintiffs to include several pages worth of allegations in their supplemental pleading that the denial notices are unlawful, *e.g.*, *Sweet* Suppl. Compl. ¶¶ 289-317, and to represent that "no further discovery" is required, *Sweet* ECF No. 192 at 8.

In any event, the identity of the person "who gave the final sign-off on the form denial templates," *Sweet* ECF No. 171 at 2, is not essential—or indeed, even relevant—to the merits of

---

[7]    In addition, then-Under Secretary Jones described, among other things, how the Department sends those letters to borrowers, Jones Dep. 188:2-189:9; the Department's internal process for developing the denial letters, *id.* at 189:10-190:6; how long it took to develop the letters, *id.* at 190:7-17, the complexity and challenges involved with developing the letters, *id.* at 190:18-195:25; how she helped edit the letters, *id.* at 202:13-17; the meaning of particular language used in the letters, *id.* at 202:18-205:5; and when a denial letter would include the applicable legal standard, *id.* at 211:7-213:24. *See also* Brown Dep. 176:8-187:16 (testifying about the letters).

Plaintiffs' APA claims.  The subpoena can and should be quashed on that ground alone.  *See, e.g.*, *California*, 2006 WL 2621647, at \*1 (barring deposition of California attorney general because "the Court finds that [it] is not essential").  It is undisputed that the Department approved these letters and sent them to certain borrowers.  The name of the person "who gave the final sign-off" has no bearing on whether the Department's delay in issuing decisions was unreasonble, whether the letters contain insufficient analysis, or whether Plaintiffs are entitled to the order they seek compelling the Department to "start granting or denying their borrower defenses."  Compl. ¶ 10.

### 2.      Information Regarding the Department's Alleged Delay

Second, the record also does not show that the former Secretary has first-hand knowledge about "[w]ho ordered FSA to stop issuing borrower defense decisions . . . and why," *Sweet* ECF No. 171 at 8 (emphasis omitted), or that if she did, that such knowledge would be unique and essential.  Although Plaintiffs claim that James Manning identified the former Secretary as "the only individual with authority to stop or restart issuing borrower defense decisions," *id.*, Mr. Manning testified only that he would "expect the Secretary has that authority," Manning Dep. 123:24-25.  He did not say he knows anything regarding that issue at all, but just that he surmised or expected as much.  And he did not say that he expected she was the *only* individual who would have such authority, that she actually exercised that authority, or, most importantly, that she was the only individual with knowledge about how such a decision would be made or was made.  Instead, Mr. Manning stated that he "would expect that [the Secretary would] be briefed by others, including the general counsel on an issue before an action like that was taken," *id.* 123:25-124:3, which indicates that any knowledge Ms. DeVos might have had would be neither first-hand nor unique.

Furthermore, Plaintiffs claim that the former Secretary is the only person who knows why the agency's delay occurred, but their own January 11 letter brief cites and details testimony offered by the Department's witnesses on the multifaceted reasons for the delay (including the *Calvillo Manriquez* injunction, need for a new relief methodology, and staffing issues).  *Sweet* ECF No. 171 at 2; *see also Sweet* Suppl. Compl. ¶¶ 72-94 (referring to deposition testimony and agency

documents produced in discovery that describe several factors contributing to the claims backlog and delay in issuing borrower defense decisions).  Plaintiffs assert that there could be only one "real" reason for the agency's delay, but that is contrary to the record, *supra* pp. 3-4, and in any event does not mean that the former Secretary possesses any unique knowledge on the topic.  And even if the former Secretary had been uniquely responsible for the agency's pause of borrower-defense determinations, questioning her about her reasons would be precisely the kind of probing into a high-ranking agency official's thoughts and mental processes that the Apex Doctrine disallows.

Finally, the information Plaintiffs seek from the former Secretary is also non-essential and irrelevant to the case.  This Court allowed discovery on the "extent to which the difficulty of reviewing borrower-defense applications" actually caused Defendants' delay, *Sweet* ECF No. 146 at 16, not an unbounded inquiry into other potential causes that Plaintiffs believe might be behind the delay.

### 3.   Information Regarding Borrower Defense Policy

Third and finally, the record does not show that the former Secretary has unique and essential first-hand knowledge about the broad topic of "Borrower Defense Policy."  *Sweet* ECF No. 171 at 8-9 (emphasis omitted).  Each of the four witnesses Plaintiffs already deposed testified regarding their extensive knowledge of borrower-defense policies.  *See, e.g.*, Jones Dep. 103:1-110:12, 114:17-117:2; Nevin Dep. 72:16-75:12;100:10-104:10; Brown Dep. 91:21-92:21, 105:21-121:25; Manning Dep. 235:3-241:3, 268:2-270:20.  And those deponents also testified that persons other than themselves and the former Secretary would of course have knowledge of various Department policy decisions.  *See, e.g.*, Jones Dep. 22:15-23 (explaining that there are "a group of people" involved in policy decisions made by the Secretary's Office, including "the secretary's chief of staff, the Counselor to the secretary, [and] the deputy secretary"); 21:12-18 ("[T]he development of policy . . . involves the Office of Postsecondary Education, it involves my office, the Office of the Secretary and the Office of General Counsel.").  Not only is information about "Borrower Defense Policy" not *uniquely* within the former Secretary's knowledge, it extends well beyond the limited parameters for discovery set by this Court.  *See Sweet* ECF No. 196 at 16.

**CONCLUSION**

For the foregoing reasons, the motion to quash should be granted.  In addition, given the parties' agreement that any deposition, if required, should not take place until there is a final order on this motion to quash, *see* Ex. B, Defendants respectfully request that the Court stay the subpoena or any order requiring a deposition for 30 days to allow them to consider seeking appellate relief, and pending completion of any appellate proceedings.  Given the important issues implicated by this motion, Defendants would suffer prejudice without a stay granting them adequate time to consider and pursue their appellate options.

Dated:  April 20, 2021                                  Respectfully submitted,


                                                        SARAH E. HARRINGTON
                                                        Deputy Assistant Attorney General

                                                        MARCIA BERMAN
                                                        Assistant Branch Director

                                                        /s/ *Kevin P. Hancock*
                                                        R. CHARLIE MERRITT
                                                        KEVIN P. HANCOCK
                                                        Trial Attorneys
                                                        U.S. Department of Justice
                                                        Civil Division, Federal Programs Branch
                                                        1100 L Street, N.W.
                                                        Washington, DC  20530
                                                        Telephone: (202) 514-3183
                                                        Email: kevin.p.hancock@usdoj.gov

                                                        *Attorneys for Defendants*