# EXHIBIT F

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4      - - - - - - - - - - - - - - - X

 5      THERESA SWEET, et al., on      :

 6      behalf of themselves and all   :  Case No.:

 7      others similarly situated,     :  19-cv-03674-WHA

 8                   Plaintiffs,        :

 9      vs.                            :

10      ELISABETH DEVOS, in her        :

11      official capacity as           :

12      Secretary of the United        :

13      States Department of           :

14      Education, et al.,             :

15                   Defendants.       :

16      - - - - - - - - - - - - - - - X

17

18        Remote Videotaped Deposition of MARK BROWN

19               Tuesday, December 15, 2020

20                  10:03 a.m. (EST)

21

22

23      Job No. 332249

24      Pages:  1 - 250

25      Reported by:  Dana C. Ryan, RPR, CRR
```

Page 34

1    because things could go around for, you know,
2    different parts of the organization, so I -- I
3    won't say that none of the other organizations
4    work with the borrower defense unit.  I can only
5    say that they report to Robin Minor.
6         Q     Okay.  The BDU reports to Robin Minor?
7         A     That's correct.
8         Q     You say here -- we've talked about this
9    a bit.  You say here, Federal Student Aid is an
10   apolitical, performance-based organization.
11               Could you tell me a little bit more
12   about what that means?
13        A     That means that we go across -- we
14   don't change in or out based on political
15   appointments; that we go across administrations.
16   Much like the careers of public servants, we -- we
17   don't attribute or work toward any political end.
18   We work toward the execution of whatever
19   legislation and authorities that we are given
20   without regard to political affiliations.
21        Q     Okay.  And on that subject, how is your
22   compensation related to your performance?
23               MR. HANCOCK:  Objection: exceeds the
24   scope of the court-ordered discovery.
25   BY MS. TORCHIANA:

Page 35

1         Q     Okay.  How does your compensation
2    related to processing borrower defense claims?
3               MR. HANCOCK:  Objection: exceeds the
4    scope of the court-ordered discovery.
5    BY MS. TORCHIANA:
6         Q     You can still answer unless your
7    counsel instructs you not to.
8               MR. HANCOCK:  The witness may answer.
9               THE WITNESS:  I'm sorry.  I couldn't
10   hear the counsel.  Say that again?
11              MR. HANCOCK:  The witness may answer.
12              THE WITNESS:  How does my -- could you
13   repeat the question again?  I'm sorry.  I got
14   caught up in the --
15   BY MS. TORCHIANA:
16        Q     I said how -- how is your compensation
17   related to processing borrower defense
18   applications?
19        A     Well, my compensation is not related to
20   processing borrower defense applications.  I'm
21   a -- I'm a -- there is no relationship that I'm
22   aware of.
23        Q     Okay.  And when you started at FSA in
24   March 2018 -- 2019, sorry, what were your
25   understandings of the goals and priorities of FSA?

Page 36

1         A     When I started at Federal Student Aid?
2         Q     Well, as COO.
3         A     As COO?
4         Q     Uh-huh.
5         A     When I started at Federal Student Aid
6    as COO, I was not clear on what the goals and
7    objectives of Federal Student Aid was at the time,
8    so I couldn't -- if you were to ask me what were
9    they -- which I think you're asking me what were
10   the goals and objectives of Federal Student Aid in
11   March of 2019, I was not given a set of goals and
12   objectives in March of 2019.
13        Q     Okay.  So when you started -- so when
14   you started, it was not clear to you that FSA had
15   any goals?
16        A     That's not what I said.  No, what I --
17   I thought what you said was what were the goals
18   presented to me when I started at my job as the
19   chief operating officer at Federal Student Aid.
20              Is that your question or --
21        Q     Yes.  What were the goals and
22   priorities that were presented to you that FSA
23   had?
24        A     So my answer is that there were no
25   goals or priorities presented to me when I started

Page 37

1    the job as chief operating officer of Federal
2    Student Aid.  I -- I read the strategic plans of
3    Federal Student Aid to -- to learn what the -- the
4    goals and objectives had been across several years
5    and found them to be broad.
6         Q     Okay.  And did you -- when you started,
7    did you meet with anyone, you know, for example,
8    who onboarded you and explained to you the
9    direction that FSA wanted to go in?
10        A     So I did not go through a formal
11   onboarding process at Federal Student Aid.  My --
12   I simply started in March of 2019 and onboarding
13   of myself.
14        Q     Okay.  And what did you see as the
15   goals and priorities of FSA?
16        A     I -- I believe we needed -- broadly, we
17   needed to be a student center and responsive, and
18   we needed to deliver on a large transformational
19   objective which was called the next generation of
20   Federal Student Aid.
21        Q     Okay.  And when you joined, did you
22   know that the Department of Education had not
23   issued any borrower defense decisions since
24   June 2018?
25        A     I knew what I had read in the media.  I

Page 46

1    A    I -- I don't know.  As I said earlier,
2  I would classify it as confusion because I -- I
3  don't know why they -- why they thought that.
4    Q    Okay.  So was the stoppage a concern
5  when you joined or, you know, you . . .
6         MR. HANCOCK:  Objection.  Potentially
7  calls for deliberative information.
8         MS. TORCHIANA:  The witness can still
9  answer.
10         THE WITNESS:  I was just trying to make
11  sure I understood your question.  I didn't know if
12  you were through with your question.  You said was
13  this guidance a concern.  For -- for me when I
14  started?
15    BY MS. TORCHIANA:
16    Q    When you started, was it a concern that
17  no decisions had been issued?
18    A    When I started, the overall backlog in
19  production, borrower defense processes and system
20  were a concern to me because of -- of -- as I said
21  earlier, the sheer volume and the fact that they
22  were not moving.
23         And, so, not just -- not just the fact
24  that the decisions weren't going out, but that the
25  methodology and other things needed to be known so

Page 47

1  that we could move on with the cases.
2         So I would -- I would say borrower
3  defense as a whole was a concern for me when I
4  started in March of 2019.
5    Q    Okay.  And did you take any -- what
6  steps did you take about the backlog when you
7  started?
8    A    Specifically, and through -- through
9  the deliberation with the team, I concluded that
10  we needed more people.  Specifically, we needed
11  more attorneys and we needed more financial
12  resources if we were to fix the systems that --
13  that manage, collect, case management systems that
14  support the team.  And, so, as the operating
15  officer, I went about focusing on -- on that and
16  fixed it in the next several months.
17    Q    Okay.  So when you say "fixed it," what
18  do you mean?
19    A    Hire attorneys, recruit, hire, bring on
20  board attorneys so that there would be more hands
21  doing the work.
22    Q    Okay.  And do you know --
23    A    Secure the financial resources --
24  secure the financial resources necessary to
25  upgrade and fix the systems that those -- that

Page 48

1  borrower defense cases would be -- would be
2  managed by.  That's when I use the term "fix it."
3  To answer your question, that's what I mean,
4  getting those -- getting those things in place so
5  that this process could start moving.
6    Q    Okay.  And do you know -- we'll discuss
7  this more later, but do you know -- had there been
8  any staff requests for the BDU before you joined?
9    A    I -- I actually don't know if there had
10  been more staff requests for BDU before I joined
11  because I would not have necessarily seen those.
12    Q    Okay.  And how many -- how many staff
13  people were working at the BDU when you joined?
14  Do you remember?
15    A    I -- I don't know precisely, but it
16  was -- in terms of attorneys, I would say probably
17  10 to 12 at the most.
18    Q    Okay.  And how many staff people did
19  you estimate were needed to clear the backlog?
20    A    So estimate being the correct term,
21  I -- I did not estimate.  I -- I went to the
22  borrower defense team and worked with them to see
23  what they thought they needed based on the --
24  based on the caseload.  I can't tell you about
25  their internal workings.  I don't -- I don't know

Page 49

1  that, but collectively I do know we came out to a
2  number of something around 60 -- we needed
3  somewhere in that amount of attorneys in order to
4  have people to adjudicate what was a growing
5  backlog of cases, but I don't know how much -- I
6  could not tell you today that that was some
7  scientific equation.  I can tell you it was the
8  internal workers of BD team as you would go to
9  your experts and ask about what do we need to --
10  to tackle this issue.
11    Q    Okay.  And did you make any requests to
12  hire more staff for the BDU?
13    A    I did.
14    Q    Okay.  And when -- when was the
15  first -- or just how many times did you make --
16  did you request?
17    A    I don't know.  I don't know how many
18  times I -- I made a request.  I just know that my
19  request was approved.  I believe it was approved
20  the first time I asked, so I don't know that there
21  were more than one -- there was more than one time
22  that I had to ask.
23    Q    And when was the first time you asked?
24    A    Shortly after taking over, but I -- but
25  I can't tell you the exact time, but it was

Page 50

1  shortly after taking over, shortly after I had
2  been educated on the process of borrower defense
3  and -- and what we needed.
4      Q    Okay.  And who -- who did you -- when
5  you made a request to hire more staff, who did you
6  make that request to?
7      A    I -- I made it through our HR system.
8  I made it verbally to the under secretary, and I
9  made it to the secretary verbally.  And that's
10  what I'm calling the request.  In other words, it
11  was all the same one; right?  I was verbally
12  saying I would like to hire more people in order
13  to address the backlog.
14      Q    And do you have an estimate -- I know
15  you said you don't remember, but do you have a
16  rough estimate of when that was?
17      A    I do not other than what I just said,
18  which is shortly after I took over.
19      Q    Okay.  So sometime in the spring of
20  2019?
21      A    Yes, and -- and I would just emphasize
22  that that's rough.  I don't have a -- I can't -- I
23  can't tell you the exact -- I can't tell you the
24  exact time.  I just simply don't recall that exact
25  time.

Page 51

1      Q    Okay.  And when you made those
2  requests, how did -- for instance, how did the
3  secretary respond?
4      MR. HANCOCK:  Objection: calls for
5  deliberative information.
6      MS. TORCHIANA:  Are you instructing the
7  witness not to answer or --
8      MR. HANCOCK:  I am.
9      MS. TORCHIANA:  Okay.
10      BY MS. TORCHIANA:
11      Q    Okay.  And, generally, how -- when you
12  made those requests, what was the response?
13      A    Yes.
14      Q    Okay.  And do you know before -- you
15  said you don't remember, but what was your
16  understanding of why -- why there wasn't more
17  staff at the BDU?
18      A    I -- I didn't have an understanding of
19  why.  You know, historically, I just wouldn't -- I
20  don't know.  I wasn't -- you know, the borrower
21  defense unit is several years old.  They precede
22  me by several years, and I just don't know what
23  the -- you know, what all the deliberations were.
24      I think, as with most federal agencies,
25  you make decisions on resources and dollars and

Page 52

1  budget, and that normally drives hiring practices,
2  but I don't know what the decisions were prior to
3  March 2019.
4      Q    Okay.  And do you know if there had
5  been any requests for more staff?
6      A    I -- I do not know.  I would have no
7  firsthand knowledge of that.  I'd only started
8  working with issues related to borrower defense
9  March of 2019.  Prior to that, I did not have any
10  relationship with the borrower defense unit.
11      Q    Okay.  Before, when you were a senior
12  advisor and working on human capital management
13  which started in October of 2018, did you have
14  any -- any work relating to hiring for the BDU?
15      A    Again, I was dealing with the speed at
16  which we hire, not -- and there's a nuanced
17  difference here, I think, in your question and
18  what I did.  My job is about process improvement.
19  Why does it take long -- too long to hire a person
20  into -- why did it take too long to recruit them
21  or go find an expertise.  I wasn't dealing with
22  this section or that section, use this person or
23  that person.  I was looking to implement the
24  processing improving, and I don't remember any
25  conversations specifically about borrower defense.

Page 53

1      Q    Okay.  So when you were a senior
2  advisor before you were COO, you hadn't heard of
3  any issues with staffing the borrower defense
4  unit?
5      A    I don't -- I don't recall any
6  discussions about borrower defense group with me,
7  at least, before I became COO.  Our -- our
8  questions were about the process, as I just said,
9  that's required for hiring, the process.
10      Q    So if you could turn to -- still in
11  tab 25, if you could turn to paragraph 4 of your
12  declaration.
13      It says, Among FSA's responsibilities
14  is to make decisions on applications.
15      Could you tell me a bit about what that
16  means in terms of your -- your role?
17      A    One -- one minute, please, if I could
18  read it.
19      (Witness reviews document.)
20      So if -- if I could just make sure I
21  understand your question, what that means as it
22  pertains to my role as the chief operating
23  officer?
24      Q    Uh-huh.  Yes.
25      A    So the responsibilities of Federal

Page 78

1   heard of who instructed BDU to stop developing
2   these memoranda?
3               MR. HANCOCK:  Objection: calls for
4   speculation.
5               THE WITNESS:  I don't know, ma'am.
6   BY MS. TORCHIANA:
7       Q    Okay.  And did you ever hear of this
8   decision or learn of it?
9       A    So in -- I -- I would not -- ma'am, I
10  would not be able to tell you what -- you know,
11  what was -- what was told in 2017.  I -- I was not
12  a part of the Department of Education in 2017.
13      Q    Okay.  Okay.  We can move on, then.
14           If you could turn to Exhibit 7 in your
15  hard copies.
16           (Exhibit 7 referred to.)
17           THE WITNESS:  It says it's -- yes,
18  Exhibit 7.
19  BY MS. TORCHIANA:
20      Q    And are you familiar with this
21  document?
22      A    (Witness reviews document.)
23           I'm not familiar with the front part of
24  this memorandum at -- at all, the letter.  But I
25  am aware of the secretary's signature on the back

Page 79

1   that says "with extreme displeasure" because it
2   was a -- it was a matter of a media article that I
3   read.
4           So that's my knowledge of this
5   document.
6       Q    Okay.  And what do you take that to
7   mean, her -- her comment?
8           MR. HANCOCK:  Objection: exceeds the
9   scope of the court-ordered discovery.
10          BY MS. TORCHIANA:
11      Q    You can still answer.
12      A    I don't -- I don't know other than -- I
13  read it in a media article.  I don't know -- I
14  don't know that -- I don't know.
15      Q    Okay.  Do you know what -- what caused
16  her extreme displeasure?
17      A    So I -- I think this was signed in
18  2017, and -- and I was not a part of the
19  Department of Education then, so, no, ma'am, I
20  wasn't a part of this.  I don't know.
21      Q    Okay.  And when you -- since you've
22  started, has the secretary expressed any
23  displeasure with any aspects of the BDU's work?
24      A    With any aspects of the BDU work?
25      Q    Yes.

Page 80

1       A    Not -- not to me, no.  I -- I have
2   the -- no, I can't think of anything that would be
3   considered displeasure or -- if that's your
4   question.
5       Q    Okay.  Okay.  And, you know, to get
6   back to some general questions not about this
7   document specifically -- we'll get back to it
8   after.
9           But before -- just turning back to
10  something you've said, before you mentioned --
11  when we were talking about performance metrics for
12  the BDU, do you remember a couple of moments ago,
13  how -- how do you assess -- you said you -- you
14  installed performance metrics and, you know,
15  you -- you were trying to install metrics at the
16  department.
17          How do you measure the output of the
18  BDU unit?
19          MR. HANCOCK:  Objection: misstates
20  testimony.
21          BY MS. TORCHIANA:
22      Q    Okay.  How do you -- do you assess the
23  output of the BDU unit?
24      A    So with -- with all of Federal Student
25  Aid metrics, they normally are production

Page 81

1   oriented.  How many have -- so we are a
2   performance-based organization, so we're a
3   production organization.
4           And, so, we routinely look at input,
5   output and quality, and that would be the same for
6   the BDU -- BDU unit.
7       Q    Okay.  And how do you assess the input
8   and the output and the quality of the BDU unit's
9   work?
10      A    So keeping in mind that -- I can just
11  tell you generically, I'm not a borrower defense
12  unit expert.  What I can -- what I can tell you is
13  that we look at how many claims that we have in
14  and how many claims we have adjudicated either
15  positively or -- or negatively or approved or
16  disapproved, and at -- and how we're doing at the
17  overall process of -- of getting those answers
18  to -- to the students.
19          So all of those elements of it would --
20  would be at the macro level how the BDU unit is
21  doing.
22      Q    Okay.  And, so, when you came up with
23  the fiscal year 2020 -- not you, but when the
24  performance metric was set, did you have to
25  approve it or sign off on it?

Page 82

1    A    I signed off on all of the -- all of
2  the metrics that go into the strategic plan and
3  the annual plan, one of which is the metric.  And
4  in signing, I denote my confidence in the process
5  of the development of those things.
6    Q    Okay.  So would you ever agree to a
7  performance metric that wasn't reasonable or that
8  you think wasn't attainable?
9    A    So when I look at a performance metric
10  in general, I look to see if we provided the
11  resources necessary to achieve it.  And if we
12  provided the resources necessary to achieve it,
13  then, you know, I would feel comfortable that it
14  was reasonable.
15        But you asked me if I would ever sign
16  off on a performance metric that is not
17  reasonable; am I -- am I correct?
18    Q    Yes.
19    A    I would not knowingly do so; however, I
20  am not beyond flaw and -- and we have a large
21  organization, and as I've said, they all have
22  metrics.  I have to build and trust the process
23  that it would not bring me an unachievable metric,
24  and so -- but it is not without flaw.
25        So there -- there could be one that

Page 83

1  would have to be changed or adjusted if it were
2  not -- if it were found to be, I think as you
3  said, unrealistic.
4    Q    Okay.  And how did you inform yourself
5  that the BDU -- BDU unit's metrics were achievable
6  or attainable?
7        MR. HANCOCK:  Objection: vague; and
8  potentially calls for deliberative information.
9        BY MS. TORCHIANA:
10    Q    You can still answer.
11    A    So we have metrics updates as I was --
12  as I was saying, and -- and -- and a process by
13  which they are developed.  So the way I inform
14  myself in general is by listening and having
15  dialogue and asking questions that I think are
16  challenging that would make those who develop and
17  think deeply about them and looking at, you know,
18  their responses and the history and seeing if
19  together we can agree that this is something that
20  can be done.  And then ultimately they are
21  established that way.
22        So I -- I know that's not a one, two,
23  three answer, but neither is the process.  It is a
24  very deliberative back-and-forth process that
25  leads to what you are calling the metrics.

Page 84

1    Q    Okay.  And, so, when BDU came up with
2  its performance metric, what deliberations did you
3  have with the BDU?  Did you meet with them about
4  the performance metrics?
5        MR. HANCOCK:  Objection: calls for
6  deliberative privileged information.  I instruct
7  the witness not to answer.
8        BY MS. TORCHIANA:
9    Q    Okay.  And how -- when you signed off
10  on the performance metrics, how did you come to
11  understand that that was an achievable goal?  What
12  told you that?
13    A    So what -- so if -- what told me that
14  the goals were achievable?
15    Q    Uh-huh.  Yes.
16    A    From my level -- and I have to explain
17  this a little bit, though -- but from my level,
18  I'm more concerned that the process is in place
19  for the voices to be heard and the development to
20  occur.  And, so, I am spending my time on the
21  process; in other words, are they from the ground
22  up.  Do subject matter experts have an opportunity
23  to say something; are we, you know, not listening
24  to any voices; or how do they look on a historical
25  basis.

Page 85

1        Those kinds of questions when you
2  manage a large organization, you have to become
3  confident that those will help bring out the best
4  in those you manage.
5        And, so, the way -- the reason I'm
6  confident is because I spend an intense amount of
7  time on the process to make sure the process is in
8  place to deliver that.  I don't -- I'm not a
9  borrower defense attorney.  I don't -- I can't
10  tell you perhaps the intricacies that you're
11  looking for in terms of all of those things that
12  happen inside of the borrower defense unit, but I
13  can tell you what process I had used.
14    Q    And who told you about the processes at
15  the BDU?
16    A    Who told me about how borrower defense
17  unit processes the work?  Is that your question,
18  ma'am?
19    Q    Sure.
20        Well, you said you were listening to --
21  when you set the performance metrics you were
22  listening to different voices and it's a
23  deliberative process.
24        Who were you deliberating with to set
25  those numbers?

Page 90

```
 1   guess you would put it in a broad -- broad
 2   category of recruiting and -- and hiring.  That's
 3   what we went about doing in a very aggressive way.
 4        Q    Okay.  And when did that start or when
 5   did you start doing that?
 6        A    Again, I don't know when the very first
 7   hiring fair was and when the very first -- I -- I
 8   didn't -- I don't conduct the hiring fair myself.
 9   I don't physically go.  I tell our experts to do
10   that and I know that they had them.  I don't
11   actually go to the law school and visit and try
12   and -- you know, we send -- we send people who are
13   attorneys who know the business to do that.
14            I can tell you that shortly after my
15   arrival, we began to try and buildup the number of
16   attorneys after we were -- were given the approval
17   to do so as I said earlier, and then all of those
18   actions began to take place.  It wasn't an
19   overnight thing.  It was -- as you would expect,
20   you get ten, you get five more, you get seven
21   more, you know, until you build up your personnel.
22        Q    And would you say before you joined,
23   were there enough attorneys in the BDU unit?
24        A    So while I would not talk about --
25   because I don't know because enough is -- enough
```

Page 91

```
 1   would have to do with how many cases you had at
 2   the time, so I can't talk to you, ma'am, about
 3   anything prior to March 2019.  I really don't know
 4   what -- I can tell you that, as I have said
 5   earlier, there were around 10 or 12 when I started
 6   in March of 2019.  And that was not enough for the
 7   number of cases we had to get adjudicated and
 8   worked, and therefore we did all those things that
 9   I was just going through earlier.
10        Q    Okay.  And did you -- did you have any
11   sense of whether there were any requests to hire
12   more attorneys before you joined?
13        A    As I said earlier, I -- I really don't
14   know.  I don't know.
15        Q    Okay.  Okay.  All right.
16            We'll talk about the IT platform more
17   later.  I'd now like you to go to Exhibit 10.
18            (Exhibit 10 referred to.)
19        THE WITNESS:  Yes, ma'am.
20        BY MS. TORCHIANA:
21        Q    Okay.  And just before we get into
22   that, so when you started in March 2019, it sounds
23   to me like that you made your issues -- or --
24   or -- I guess when you started in March 2019, what
25   was your understanding of why no decisions had
```

Page 92

```
 1   been issued since June 2018?
 2            MR. HANCOCK:  Objection: asked and
 3   answered.
 4            THE WITNESS:  I think --
 5        BY MS. TORCHIANA:
 6        Q    You can answer.
 7        A    Yeah, I think as I said before, I
 8   believe there was confusion, and so it -- my -- my
 9   understanding was that there was confusion.
10   That's -- that's how I would classify it.
11        Q    Confusion about what?
12        A    The borrower defense unit believed that
13   they had guidance to -- to not do so, policy
14   guidance not -- not to do so, and had not done so
15   after the Manriquez case, and I'm not certain that
16   the -- at the time that the -- the department was
17   under the understanding that they had provided
18   that guidance.
19            So if you're asking about that time
20   frame when I initially took over in -- in March, I
21   would classify it as confusion.
22        Q    Okay.  So just looking at Exhibit 10,
23   are you familiar with this testimony by Diane Auer
24   Jones?
25        A    I am not familiar with this particular
```

Page 93

```
 1   testimony.  I know that Ms. Jones provided
 2   testimony, but I have not read this document that
 3   is -- that you have here as Exhibit 10.
 4        Q    So it was in -- on May 22nd, 2019, so
 5   after you joined.  Have you ever read through her
 6   testimony or looked at it?
 7        A    I -- I don't believe so.  At least I
 8   don't recall reading through this one.
 9        Q    Okay.  And at the top, could you turn
10   to page 50?
11        A    Uh-huh.
12        Q    Okay.  And at the top, could you read
13   the testimony that starts -- so Ms. Jones says,
14   There is not a policy.  Could you read that
15   sentence?
16        A    There is not a policy that prevents the
17   review of claims.  However, we are not able to
18   determine the level of harm or the level of relief
19   that a borrower should get because the methodology
20   we use is now being challenged by the California
21   courts.  So we continue to process.
22        Q    Okay.  And could you tell me what you
23   think this means or explain that statement?
24            MR. HANCOCK:  Objection:  Speculative.
25        BY MS. TORCHIANA:
```

Page 102
Page

1   Ms. Jones was using the term because, as I said
2   earlier, how someone uses the term, I think,
3   differs.
4           So I -- I can't tell you how Ms. Jones
5   was using the term.
6       Q    Okay.  And when you joined the
7   department and, you know, no decisions had been
8   made since June 2018, did you understand whether
9   either Step 1 eligibility determinations -- were
10  any of those proceeding?
11      A    Could you -- would you mind repeating
12  the -- the last part of that question?
13      Q    When you started in March 2019 and
14  going forward, did -- no decisions had been issued
15  since June 2018, did you understand whether any
16  Step 1 decisions were continuing, so as you
17  described it, eligibility?
18      A    Step 1, to my knowledge, never stopped.
19      Q    Okay.
20      A    Those -- that part which we now call
21  Step 1, we're talking about it as Step 1, to my
22  knowledge that had never stopped.
23      Q    Okay.  And -- and how -- was that being
24  reported to you?
25      A    So the metrics and the measurements and

Page 103
Page

1   all the things that we've been talking about
2   didn't exist on day one in March to my knowledge,
3   and -- and nothing was being reported to me other
4   than I was aware that we only had 10 to 12
5   attorneys, as I said before, and the numbers were
6   not that large of the number of claims we were
7   able to even get through Step 1 because BD claims
8   were growing, and as I've said earlier, we simply
9   did not have enough of those two things I
10  mentioned, attorneys and the resources against the
11  systems necessary.
12      Q    Okay.  And so how did you know that
13  Step 1 was continuing?
14      A    So in March I started an education --
15      Q    Not just in March, but, you know, when
16  you started and moving forward.
17           How about from March when you started
18  until December of 2019?
19      A    How did I -- how did I know that Step 1
20  was continuing?
21      Q    Uh-huh.  Yes.
22      A    So -- and I know -- I believe I
23  mentioned that when I first started in March, the
24  BD team immersed me into what they were doing.
25  And, so, part of that is we are adjudicating

Page 104
Page

1   claims.  However, we -- we're not able to
2   adjudicate as many as we would like because we
3   don't have enough resources.
4           And, so, when you say how do I know it
5   was continuing, they -- they told me that they
6   were continuing to adjudicate claims.  That didn't
7   automatically get boiled down to a metric that I
8   was getting automatic weekly updates on.  It took
9   a while, some time for that to come about.  And I
10  don't know exactly when that came about, but it
11  didn't happen immediately.
12          But that's -- that's how I knew that
13  that's what we were doing.
14      Q    Okay.  And as part of your performance
15  metrics, so you -- do you know how many claims
16  have gone through Step 1 eligibility or have been
17  processed at Step 1?
18          Was that ever reported?
19      A    Today you mean or --
20      Q    At any point.
21      A    So, yes, at some -- at some point
22  across during the process of metric building and
23  measurements, I would have an indication of how
24  many claims had been processed and adjudicated and
25  if we were at a point where notifications were

Page 105
Page

1   going out, how many notifications had been sent.
2           That would be a part of the metric.
3       Q    Okay.
4       A    Could I ask, ma'am, for a -- a
5   five-minute break?
6       Q    Sure.
7           MR. HANCOCK:  And, Claire, this might
8   be a good time to just talk generally about lunch
9   break.  It's now 12:43 here on the East Coast,
10  so --
11          THE VIDEOGRAPHER:  Do you want to have
12  this conversation off the record?
13          MR. HANCOCK:  Oh, sure.
14          THE VIDEOGRAPHER:  We're now off the
15  record.  The time is 17:43 UTC time.
16          (Lunch recess -- 12:43 p.m.)
17          (After lunch recess -- 1:18 p.m.)
18          THE VIDEOGRAPHER:  Okay.  We're now
19  back on the record.  The time is 18:18 UTC.
20  BY MS. TORCHIANA:
21      Q    Okay.  So, Mr. Brown, we were just
22  talking about the Calvillo or the Manriquez
23  injunction and what you understood the effect of
24  it to be.  You mentioned that there was confusion
25  within the BDU unit and the BDU unit believed that

Page 106
Page

1    it -- that they couldn't issue any decisions.
2         Do you know -- where would you say --
3    all right.  Let me rephrase it.
4         How did you seek clarification about
5    this confusion?
6         A    So I -- I wouldn't say -- and I
7    don't -- I don't believe I said that there was
8    confusion within the BD unit.  I think what I said
9    was that there was confusion, meaning the BD unit
10   believed they had guidance or policy not to go
11   further with decisions, meaning to send them out.
12        When I asked the department if, in
13   fact, that was the case, the answer I got back was
14   that they didn't believe they had told the BD unit
15   that.
16        That, it's those two positions early on
17   in my time, that I define as confusion.
18        Q    Okay.  So who did you ask from the
19   Department of Education about -- about this
20   confusion?  Who did you talk to?
21        A    I -- I spoke with Under Secretary Jones
22   to get clarification on what the -- you know, what
23   had been told to the BD unit.
24        Q    Okay.  And what did she tell you?
25        A    She responded at the time.  This is in

Page 107
Page

1    the March/April time frame.  I didn't know that
2    the BD unit was not sending out -- or I'm not sure
3    why the BD unit is not sending out decisions.
4    That was the initial response, and this was a
5    verbal conversation.  I don't have this in -- in
6    any form of documentation.
7         Q    So she -- she was the one who said to
8    you she wasn't sure why the BDU -- the BDU unit
9    wasn't issuing decisions?
10        A    Initially.
11        Q    Okay.  And did you seek any
12   clarification?
13        A    I -- I did.  At some point, and I -- I
14   cannot specify for you the exact point because I
15   don't recall the exact point, but at some point it
16   moves to the point of a new methodology was being
17   developed, and once that new methodology was
18   developed, it would allow for the issuance of
19   both -- on -- of decisions, meaning both approval
20   and denials.
21        Q    Okay.  That wasn't quite my question in
22   terms of -- so Ms. Diane Auer Jones told you the
23   BDU unit told you they couldn't issue decisions.
24        Did you seek clarification within the
25   BDU unit asking why they thought that they

Page 108
Page

1    couldn't issue decisions?
2         A    No.  No, no, I -- maybe I don't
3    understand -- understand you.  Ms. -- I asked the
4    BD unit as we were going through that educational
5    process, you know, what we were doing, why were
6    decisions not going out.
7         The BD unit believed that after the
8    Manriquez case decision that they were only to
9    adjudicate cases; they were not to send out any --
10   any answers.  They believed that was the guidance
11   that they had.
12        I asked --
13        Q    Did you seek clarify -- did you seek
14   clarification about why they believed that was the
15   guidance that had been issued?
16        A    Yes.  I -- I asked the under secretary
17   why was the BD unit not sending out decisions.
18   The initial answer or response, if you go back,
19   was I didn't know that the BD unit was not sending
20   out decisions.  That was the initial answer when I
21   first -- when I first started in March/April time
22   frame looking into this.
23        Q    Okay.  And did you ask anyone in the
24   BDU why they thought they'd received that
25   guidance?

Page 109
Page

1         MR. HANCOCK:  Objection: asked and
2    answered.
3         BY MS. TORCHIANA:
4         Q    I think he mentioned -- or you can go
5    ahead and answer.
6         A    No, it's -- as I had previously stated,
7    the BD unit believed, which I believe gets to your
8    why, that after the Manriquez case decision that
9    they were not to send out any notifications.  They
10   were simply to continue adjudicating cases.
11        Q    And did you talk to anyone in the BDU
12   unit about that belief?
13        A    I -- no, I don't believe that I -- I
14   didn't go any further into -- any further in the
15   history of it because it was answer right -- the
16   answer is they weren't sending any out because
17   they believed they weren't supposed to at the
18   time.
19        Q    And, so, did you do anything to clarify
20   that confusion?
21        A    Yes.  I stated earlier I asked the
22   under secretary, and the initial reply I got back
23   was I didn't -- I didn't know the BD unit was not
24   sending out, but that was only the initial reply
25   that I got back.

Page 110

1       Later on -- and I can't give you the
2   exact time of this -- it was decided that we would
3   continue that same posture while the new
4   methodology was being developed, and that once the
5   new methodology would be developed, we would be
6   going forward with all types, you know, both the
7   adjudications and the notifications.
8       Q   Okay.  When did you decide -- when you
9   say you decided to continue that posture, what do
10  you mean?
11      A   Not that I decided; that the department
12  at that point decided that we would continue the
13  same posture that we were in and not issue
14  notifications but continue to do adjudications
15  until the point at which the methodology was
16  completed, and then that -- and then we would
17  begin doing both.
18      Q   Okay.  And who made that decision?
19      A   I don't know exactly.  I can tell you
20  that that was a decision communicated to me
21  through the under secretary.  I don't know that I
22  could tell you, you know, if that was her sole
23  decision or if there was some other parties
24  involved.
25          I would not know that.

Page 111

1       Q   Okay.  And how was that communicated to
2   you?
3           When you say the under secretary
4   communicated that to you, how was that
5   communicated?  Was it -- in what form?
6       A   Yeah, to -- to my knowledge it was
7   verbal.  I don't -- I don't know that there's a
8   document that says effective this date.  My
9   recollection of that is just that it was given to
10  me verbally.
11      Q   Okay.  So would you say there was a
12  policy not to issue any decisions until a new
13  relief methodology was in place?
14      A   I don't know if I would go as far as to
15  define it as policy, but I would certainly go far
16  enough to call it a set path going forward.
17      Q   Okay.  And that guidance was coming
18  from the Office of the Under Secretary?
19          MR. HANCOCK:  Objection: asked and
20  answered.
21  BY MS. TORCHIANA:
22      Q   Okay.  You can still answer it.
23      A   Yeah -- yes, ma'am, as I just -- as I
24  just stated.  That's who it was communicated to me
25  from.  Exactly where it was coming from and how it

Page 112

1   was developed, I don't -- I don't know.  Only I
2   can relate to you what was communicated to me.
3       Q   Okay.  If you can turn back to your
4   declaration which is -- it should be behind
5   Exhibit 25 -- behind tab 25, sorry.
6       A   I have it.
7       Q   Okay.  And we'll start at -- we'll get
8   back to paragraph 5.  So, you know, you say, On
9   December 10th, 2019, the department issued a
10  policy statement setting forth a tiered relief
11  methodology.
12          So who -- who came up with this tiered
13  relief methodology?
14      A   Who came up with it?
15      Q   Yes.
16      A   So what I would -- what I would say is
17  that the -- the methodology itself is determined
18  by the department.  In terms of the building of
19  it, if that answers your who that came up with it,
20  I'm sure like most other things, it was collective
21  effort of providing information to help decision
22  makers, but the methodology is a statement of
23  policy of the secretary's, and so it would not be
24  inside of Federal Student Aid.
25      Q   Okay.  So who would you say was the

Page 113

1   main decision maker then in coming up with the
2   tiered relief methodology?
3       A   I -- I wouldn't say that because I --
4   you know, I don't know how to -- I don't know how
5   to measure what you mean by who was the main
6   decision maker.  The methodology is a statement of
7   policy, so it comes from the department.  And then
8   our job is to execute that -- that policy.  Who --
9   who weighed in the most or the least, I -- or
10  made, to use your term, I -- I don't know that
11  name.
12      Q   Okay.  And when was it decided to
13  develop on this tiered relief methodology?
14      A   I don't know exactly when it was
15  decided.  I know that we started using that.  I
16  can tell you that.  But exactly when it was
17  decided, I -- I don't know.
18      Q   Okay.  And when you -- let's say in
19  March 2019 when you joined the department, had
20  you -- was there any development of this
21  alternative methodology?
22          MR. HANCOCK:  Objection: misstates
23  testimony.
24          THE WITNESS:  I don't know if I
25  understand that question.  I'm not sure I

Page 114
Page

1   understand your question.
2       BY MS. TORCHIANA:
3       Q    My question was when did this tiered
4   methodology start being developed, and you say you
5   don't remember.  So, you know, in the spring of
6   2019 when you started, do you remember any
7   discussions about this new tiered relief
8   methodology?
9       A    I don't.
10      Q    Okay.  And when do discussions about
11  this tiered relief methodology begin?
12      A    I don't know when the -- again, I don't
13  know when the discussions or the decisions, the
14  inner workings of what would be the policy making,
15  I can't tell you exactly when that began.
16      What I can -- what I can tell you is
17  that in -- in March, I wasn't aware of it if
18  that's your -- if that's your question.
19      Q    Okay.  What about later on, let's
20  say -- when did you become aware that a tiered
21  methodology was being developed?
22      A    So what -- what I know is that as we
23  got into the April/May time frame -- and I don't
24  remember precisely that time frame, but somewhere
25  within there -- the answer to our question of

Page 115
Page

1   moving forward with notification was related to
2   the fact that a methodology was being developed.
3       But I'm not telling you that it started
4   then or it started before then or later because I
5   don't know other than at that point I became aware
6   that it was being developed.  I can't give you
7   the -- I can't give you the parameters of when it
8   started or when it ended or anything like that
9   other than I -- other than I know it was being
10  developed.
11      Q    Okay.  And did you ever discuss the
12  development of the tiered relief methodology with
13  Diane Auer Jones?
14      A    Did I ever discuss that we were -- that
15  she was -- that she and the department
16  collectively were working on this methodology?
17      Q    Yes.
18      A    Yes, I -- I knew that they were working
19  on it.  I -- I did know that.  After that time
20  frame, after that discussion, I -- I knew that.
21      Q    Okay.  And how was that communicated to
22  you?  How -- how -- what form did those
23  discussions take?
24      A    Just that, discussions in meetings, and
25  the reason it was -- would have been discussed is

Page 116
Page

1   because it was key to us moving forward in the
2   borrower defense.
3       Q    Okay.  And what was your involvement in
4   developing this tiered relief methodology?
5       A    So my personal involvement would have
6   been very limited.  If you mean "my", the
7   organization of Federal Student Aid, I would have
8   a slightly different answer.
9       Q    When you say it was very limited, what
10  did you do as part of developing this tiered
11  relief methodology?
12      A    Little -- little to nothing.  When I
13  say very limited, I am -- I'm referring to the
14  fact that I'm the chief operating officer at
15  Federal Student Aid, so anything that Federal
16  Student Aid might provide data for or those kind
17  of things, I can't totally detach myself from it
18  because they are -- it is my organization.
19      But in terms of my personal
20  involvement, that -- that's not what I do.  I
21  would not have personally been sitting with
22  someone developing methodology.
23      Q    Okay.  And who within FSA was working
24  on it?
25      A    So while I can't -- I wouldn't be able

Page 117
Page

1   to give you the details of who, I can tell you
2   that we have a policy -- the liaison office and we
3   have data people who pull data out of systems and
4   run algorithms and those kind of things.  They
5   provide the decision support to the policy makers
6   to help them understand kind of the -- the numbers
7   and the data and those kind of things that they're
8   trying to make decisions on.
9       So I could tell you organizationally we
10  have sections that do that.  We have data
11  analytics; we have data scientists, if you will,
12  that do those kinds of things, and policy liaisons
13  which do that.  And they would have been involved
14  with running various programs and pulling data to
15  be supportive of that effort.
16      Q    Okay.  And how many staff within FSA
17  would you say were working on developing this
18  partial relief methodology?
19      A    I would not know.  This is a dynamic --
20  dynamic kind of thing.  You know, today I need one
21  person; tomorrow I need two; I need a couple of
22  hours on the phone.
23      It's just -- it's very dynamic, and I
24  could not associate it with a particular number of
25  persons or times, nor do I believe we accounted

Page 118

1    for it in any kind of way.
2         So I would not want to speculate.  I
3    don't know, ma'am.
4         Q    Okay.  Was it time-consuming for FSA to
5    developed this tiered relief methodology?
6         A    So by "time-consuming," do you mean
7    that we had to put some time into it, or do you
8    mean that it took an inordinate amount of time?
9              Can you help me understand what you
10   mean by that?
11        Q    Did it take a lot of time for staff
12   members at FSA to develop this tiered relief
13   methodology?  Was it something that -- how much
14   time would you say staff spent on developing this?
15             MR. HANCOCK:  Objection: misstates
16   testimony.
17             MS. TORCHIANA:  You can still answer.
18             THE WITNESS:  Yeah, I wouldn't want to
19   give you a specific amount of time.  I don't know.
20   I could look back and see if we had written that
21   down somewhere, but, you know, I couldn't -- I
22   couldn't tell you exactly how much time was spent
23   on it, not -- not off the top of my head.
24        BY MS. TORCHIANA:
25        Q    Okay.  And did you have a sense that it

Page 119

1    was taking a lot of time for FSA to -- to develop
2    this partial relief methodology?
3              MR. HANCOCK:  Objection: misstates
4    testimony.
5              THE WITNESS:  So the methodology is
6    developed by the department.  The methodology is a
7    statement of policy, and so the -- the role of
8    FSA, and -- and by association my role, is to
9    provide data and analytics for the decision
10   makers.  But we don't develop that policy document
11   which -- which you referred to as a methodology.
12        BY MS. TORCHIANA:
13        Q    So within FSA, what staff was working
14   on developing this methodology?
15        A    So, again, I cannot give you names.  I
16   don't know all of the names.  I can tell you we
17   have a policy liaison office and that only has a
18   couple of people in it.  And we have data
19   analytics, people who pull data.  That could have
20   been one or -- you know, one or two people that
21   got that request and worked that particular
22   request, but it would have been a combination of
23   those kind of folks.
24        Q    Okay.  And -- and what resources would
25   you say were required to develop this partial

Page 120

1    relief methodology?
2              MR. HANCOCK:  Objection: misstates
3    testimony.
4              THE WITNESS:  Could you say it again,
5    ma'am?  I'm sorry.  I didn't understand.
6        BY MS. TORCHIANA:
7        Q    I said, what resources were required to
8    develop this methodology within FSA?
9              So you mentioned staff . . .
10       A    So we have people that pull out data,
11   do data analytics and metrics.  We have people
12   who -- who I would call policy liaison folks who
13   help -- help understand what -- what the policy
14   (audio distortion) locations of them are.  So
15   within their job jar would be to support this kind
16   of effort.
17             But if you're asking for me to quantify
18   it -- or are you asking for me just to give you
19   those organizational elements within FSA?
20       Q    What were the organizational elements
21   within FSA that were needed?
22       A    Data analytics and policy liaison.
23       Q    Okay.  Could you explain to me how this
24   partial relief methodology -- how it works?
25             MR. HANCOCK:  Objection: exceeds the

Page 121

1    scope of the court-ordered discovery.
2        BY MS. TORCHIANA:
3        Q    Okay.  Okay.  And then -- what is your
4    understanding of why loan relief tied to earnings
5    is a relevant measure, if relevant?
6        A    So I would -- would tell you that
7    that's not something I would have a deep
8    understanding of.  It is -- that's essentially, I
9    think, the policy that you're reading from of how
10   the methodology works, and -- and while we do have
11   technicians that compute it, the how or -- or why
12   of the policy would not be within my -- kind of my
13   statement of work.
14       Q    Okay.  Okay.  And then if we could go
15   to paragraph 6, could you just read the -- the
16   first sentence for me?
17       A    After adoption of the tiered relief
18   methodology discussed in the policy statement, FSA
19   resumed issuing decisions on pending borrower
20   defense claims.  If FSA determined that a borrower
21   had submitted an application which met the
22   requirements for a borrower defense discharge, FSA
23   used the methodology described in the policy
24   statement to determine the amount of relief that
25   would be provided to the borrower.

Page 170

Page

1   here.

2       Q    Okay.  We're going to switch tacks a

3   little bit and talk about something you mentioned

4   earlier in this declaration.  Sorry to keep going

5   back and forth, but if you go to paragraph 18, you

6   mention that since December 2019, borrower defense

7   applicants whose applications are found ineligible

8   receive one of four form ineligibility letters.

9            Do you know who drafted these form

10  ineligibility letters?

11      A    So the ineligibility letters are -- are

12  drafted.  Do you mean -- and, again, if I can just

13  make sure that I -- that we're using the words the

14  same way.  So the traditional draft, who is the

15  first person that -- that puts the words on a page

16  and -- and asks everyone else what they think

17  about it.

18           That -- drafts would begin in Federal

19  Student Aid inside of our borrower defense unit

20  and of our folks, drafts would begin there.  I'm

21  sure they were created there.

22      Q    Okay.  And who would have drafted them?

23      A    It would have come from our policy

24  liaison and borrower defense units.

25      Q    And who is your policy liaison?

Page 171

Page

1       A    So it's a team of folks.  The -- the

2   leader on the -- in the policy liaison area is a

3   Mr. Ian Foss, and the leader on the borrower

4   defense team I believe is Colleen Nevin.

5            And, so, something like preparing what

6   words should go on a form, which is preparing a

7   draft, would be done collectively between those

8   two parts of the organization.

9       Q    Okay.  So would you say Ian Foss helped

10  draft these form letters?

11      A    Yes, that's what I'm saying.  These

12  letters have been done collaboratively between

13  those two units, one providing --

14      Q    Anybody else?

15      A    Inside of FSA?  I can't say that

16  there's no one else, but from an organizational

17  perspective, it would be those two parts of the

18  organization.  It could be several other people

19  that are involved that have questions or those

20  kind of things, but those two parts of the

21  organization would be involved.

22      Q    Okay.  When you say could be several

23  other people, who do you think those several other

24  people are?

25      A    So what I'm trying to allude to here is

Page 172

Page

1   if they have a question and they go ask somebody

2   that question, it could be anybody in the

3   organization, right.  They may have to ask is this

4   the appropriate line for this or that, and they

5   may want to talk to someone on the loan servicing

6   side or one on the technical writing side.

7   They -- they're working, so they are -- they are

8   bringing their files together to produce a draft.

9            I couldn't tell you everybody they

10  talked to.  I'm just saying that it's possible.

11      Q    And were you involved at all in

12  drafting these form ineligibility letters?

13      A    So when you say "involved," you mean

14  that I knew what was going on?  That I saw the

15  staffing process?  Or do you mean that I was

16  helping to draft it?

17      Q    Any and all of those things.

18           How were you involved in drafting these

19  letters?

20      A    I was not helping to draft the letter.

21  I was not helping to write what words would go on

22  the letter.  I would not be the right person to do

23  that.

24           What I -- what I was doing was making

25  sure that we had an appropriate staffing process

Page 173

Page

1   and that the controls were in place to make sure

2   the right people saw the letter -- letters before

3   they go final.

4            I was very well aware of that.

5       Q    Okay.  And who would you say were the

6   right people to review those letters before they

7   went out?

8       A    The letters are a statement of policy,

9   and -- and so the final letters have to be

10  gone through the policy outline of the Department

11  of Education and -- and that might be a general

12  counsel review and an ultimate approval through

13  the under secretary.

14      Q    Okay.  So could you -- so would that be

15  Diane Auer Jones would have reviewed them before

16  they went out?

17      A    Yes, if it was a poll-- it's the

18  policy letter, she or -- now, I don't work inside

19  of her office, so she may have protocols

20  established where someone else in the office sees

21  it.  So I could not say it was absolutely her that

22  saw every letter.

23           I could tell you the Office of the

24  Under Secretary would be a part of the staffing

25  process.

Page 174

Page

1        Q      Okay.  And what was the process for
2    drafting these letters?
3        A      Inside of Federal Student Aid?
4        Q      Yeah.
5        A      I can -- I can tell you that -- I can
6    tell you the offices that worked to put
7    together -- put together these statements and then
8    put together a staff -- what I would call a staff
9    summary sheet for it to be seen by the relevant
10   parties and sent outside Federal Student Aid.
11   That's -- that's essentially the process.
12              So the borrower defense unit, knowing
13   what the law requires in order for a person to
14   come out and come back in with a -- with a claim
15   and then a policy team working to get that on
16   paper and get it approved.
17       Q      Do you know when that process
18   started -- when the process started for drafting
19   these letters?
20       A      No, I don't, and I don't believe it's a
21   specific time because there are four letters, and
22   they don't all begin or end at the same time.  I
23   think they evolved into -- into having four
24   letters.
25              So to answer your questions, no, I

Page 175

Page

1    don't believe I could tell you exactly when the
2    process began.
3        Q      Okay.  We'll -- we'll go through each
4    one and you can tell me when you think the
5    drafting of that specific letter began.
6               And -- and do you know how -- how long
7    it took to develop these letters?
8        A      I do not.
9        Q      Okay.  And in terms of who approved
10   them, it sounds like that was Diane Auer Jones?
11       A      The process --
12       Q      Is that right?
13       A      Yeah, what I would -- what I would say,
14   ma'am, is the approval process involves the policy
15   element, people that could review -- could require
16   review from the Office of General Counsel, and for
17   it to go through the Office of the Under
18   Secretary.
19              As I stated earlier, I can't tell you
20   their internal protocols, if the secretary,
21   Diane Jones, approved each particular letter.  But
22   I could tell you that the Office of the Under
23   Secretary would have been involved in the approval
24   of those letters.
25       Q      Do you have a sense of how many drafts

Page 176

Page

1    of these letters were produced?
2        A      I do not.
3        Q      Okay.  So if you could turn to
4    Exhibit 13, which has already been marked as
5    Exhibit 13.
6               (Exhibit 13 referred to.)
7        BY MS. TORCHIANA:
8        Q      It will be behind tab 13.  If you could
9    turn to the exhibits, the first one is Exhibit A.
10   There's a cover page that says Exhibit A?
11       A      Okay.
12       Q      So this letter, I can represent to you,
13   is for Corinthian borrowers who assert job
14   placement reclaims that do not meet the
15   eligibility criteria for such a claim.
16              So do you know who prepared this
17   particular letter?
18       A      I do not.
19       Q      Okay.  And do you know --
20       A      Regarding an individual.  When you say
21   "who," you're meaning an individual; correct?
22       Q      Or multiple individuals.  Which people?
23       A      So what I -- what I would say, just to
24   be clear, on none of the letters will I be able to
25   tell you what individual put pen to paper and

Page 177

Page

1    drafted the letter, but I can tell you from an
2    organizational perspective where those kinds of
3    things happen and where -- and where they come
4    from.
5               So if -- if that's the answer to who,
6    you know, that's -- that's what I know about --
7    about the letters and drafting them.
8        Q      Okay.  Sure.  So --
9        A      So if you ask me that question about
10   this particular letter, I would say it is most
11   likely the borrower defense unit and the policy
12   liaison working together collaboratively to
13   bring -- to come together with the draft and then
14   putting it through the staffing process to be seen
15   by the policy element of the Department of
16   Education.
17       Q      Okay.  And do you know if this form is
18   still being used?
19       A      (Witness reviews document.)
20              I don't know if this paper form is
21   still being used, but there is likely a version of
22   this form still being used.
23              So if you mean this exact form produced
24   in this exact way, I don't think so.  I think that
25   hopefully it's been digitized with the other forms

Page 178
Page

1    and being used in that manner.
2        Q    But is it still going out -- is this
3    format of the letter still going out to borrowers?
4    Obviously filled in with relevant information for
5    the borrower specifically.
6        A    I -- I believe in general that is true,
7    but there -- there may be -- you said format, so
8    it doesn't mean it's the exact same letter.  But
9    if you mean the general format is still continuing
10   on today, I don't believe we're sending out
11   notifications.
12       But if we were sending out
13   notifications, if that's your question, would this
14   form be in presence.  I believe in some form, it
15   would be.
16       Q    Okay.  Now could we turn to Exhibit B,
17   which is a couple of pages down.
18       A    Okay.
19       Q    And this is for current payment
20   borrowers who assert the claim other than job
21   placement rights -- or other than job placement
22   reclaim.
23       And if you turn to -- let's see.
24   Sorry.  If you turn to the bottom of page 2, it
25   says, In order to have a successful borrower

Page 179
Page

1    defense claim based on ED's CCI findings, you must
2    have enrolled in one of the covered programs
3    during a listed time period.
4        So do you -- do you know if it's
5    possible for a borrower defense claimant to have a
6    successful claim if he enrolled in CCI outside of
7    the listed time period?
8        A    There may be some other form of --
9    of -- of damage or concern for the borrower, so
10   I -- I wouldn't want to make a blanket statement
11   that said there is nothing.  I -- I would say it
12   just depends on how that attorney would adjudicate
13   the claim.  I don't -- it depends on the
14   circumstances.
15       Q    Okay.  And then if you could turn to
16   Exhibit C, and this form is for non-Corinthian
17   borrowers who attended a school for which the
18   department does not have any common evidence in
19   its possession.
20       And so do you -- what do you understand
21   as -- what is common evidence?
22       A    As I understand it, and I just want to
23   provide the context that I -- I don't adjudicate
24   borrower defense cases, so I'm not an attorney.
25       But my general understanding of this is

Page 180
Page

1    that common evidence is just that; it is things
2    that have been determined, like a program review,
3    where a finding was found against the school and
4    determined to be validated.
5        And, so, it's available for the
6    attorney doing the adjudication to use as a source
7    of evidence.  That could also be Attorney General
8    determinations or other determinations made
9    against a school where -- where if even if the
10   borrower doesn't submit it themselves, it's
11   common -- commonly known and available to be
12   utilized.
13       That's what I believe we -- we mean
14   when we use the term.
15       Q    Okay.  And do you know if --
16       A    I just want to clarify that -- that
17   last -- what I just -- what I just said, I'm
18   giving you my understanding of it as a lay -- from
19   a layman's perspective.  That's not something I
20   practice against a borrower defense claim because
21   I don't do it.  So I'm just telling you from a
22   layman's perspective and management of borrower
23   defense, the team, that's how the attorneys have
24   generally explained it.
25       Q    Right.

Page 181
Page

1        And if there's no common evidence, can
2    a borrower's claim be granted?
3        A    So in -- in general and for
4    generalities, can it be?  I would say every --
5    every claim is adjudicated on its own merit as
6    stated earlier, and it just depends on what other
7    things there are and what other things have been
8    brought forth.
9        And, so, I would never say it
10   absolutely could not be or absolutely could be.  I
11   could say that every -- every claim is adjudicated
12   based on its own merit.
13       Q    Okay.  And do you know whether since
14   you've started has any claim been granted for a
15   borrower who attended a school for which there is
16   no common evidence?
17       A    I don't know.
18       Q    Okay.  And if we could turn to the last
19   form, form D, this form is for non-Corinthian
20   borrowers who attended a school for which the
21   department does have common evidence.
22       Could you tell me when form D was
23   developed?
24       A    I -- I could not tell you exactly when
25   it was developed.

Page 182

1    Q    Do you know roughly when it was
2    developed?
3    A    I -- I do not.  I think it evolved over
4    time in the -- in the BD unit and possibly liaison
5    as circumstances dictated that an additional type
6    of form would be needed.
7    Q    Okay.  And what circumstances dictated
8    that an additional form would be needed?
9    A    I don't know exactly other -- other
10   than these -- these forms are created based on
11   what is seen in the claims that are being
12   adjusted.
13        So if you see a circumstance occur
14   enough and you believe that claimants need to be
15   able to have certain information in order to file
16   a particular claim, you might adjust or make sure
17   you design a form with that in mind.
18   Q    Okay.  And, again, for this form D, who
19   designed the form?
20   A    So, again, I would say -- I don't know
21   exactly who, other than forms are a collaboration
22   between our liaison office and our borrower
23   defense office.  That's how forms are drafted and
24   then approved through our policy element at the
25   Department of Education.

Page 183

1    Q    Okay.  And did you have to approve this
2    form before it started being used?
3    A    I don't necessarily approve each form.
4    They go -- they go through the staffing process.
5    The approval of a form is the -- is -- is the
6    policy element of what we do because the forms
7    represent an extension of policy.
8    Q    Okay.  So would you say the denial
9    forms are -- they're under policy?
10        MR. HANCOCK:  Objection: asked and
11   answered.
12        BY MS. TORCHIANA:
13   Q    Okay.  Are the denial forms part of
14   operations?
15   A    So what I -- what I would say is the
16   drafting of policy forms like the ones that we
17   just went through, A through -- through D, begins
18   inside of Federal Student Aid.
19        So it -- it begins as part of
20   operations, but the final form and the decision on
21   what the form -- that the form is appropriate is a
22   policy decision.
23   Q    Okay.  So if you look at form D, it
24   says, applicable law, and is this somewhere where
25   you would expect the state law standard under

Page 184

1    which an application was decided would be if it
2    was decided under the 1995 regs?
3    A    If the appropriate state law?
4    Q    Yes.
5        If -- if a borrower's application was
6    decided according to state law, do you think that
7    law would be stated under the applicable law
8    section?
9    A    Yeah, that would -- exactly where to
10   put something on the form would not be something
11   I'd be prepared to opine on.  Exactly where to put
12   it on the form, I don't know.  I would leave it to
13   those in charge with that to -- tell me --
14   Q    Okay.
15   A    -- the laws.
16   Q    Do you think it would be somewhere on
17   the form?
18   A    I don't know.  I would -- I would look
19   to my attorneys to tell me if state law needed to
20   be on the form or not.  And if -- and if they
21   believe that it would be, it would need to then be
22   put through that staffing process I described
23   earlier to make sure those in charge of the forms
24   and policy elements came to an agreement that, in
25   fact, it should be.

Page 185

1    Q    Okay.  And if you -- if you go to the
2    next page, the section it says, What if I do not
3    agree with this decision?
4    A    Yeah.
5    Q    And then it says, number three is,
6    Identify and provide any evidence that
7    demonstrates why ED should approve your borrower
8    defense repayment claim.
9        And, you know, you noted actually
10   earlier in your declaration -- and we can turn
11   back to it if you want to see that, but you say
12   that FSA will consider any evidence under
13   reconsideration which includes both new evidence
14   and evidence already submitted.
15        When was the choice made to consider
16   any evidence as opposed to new evidence?
17   A    So I don't -- I don't know the exact
18   point -- point in time when that became a matter
19   of policy and certainly a matter of our forms.  I
20   know that it is today, but exactly how -- how long
21   ago that was determined, I -- I don't know.
22   Q    Okay.  And would you say that was a
23   policy decision?
24   A    I'm -- I would -- I would say that
25   those kind of elements on a form, like, time

Page 186
Page

1   periods and what's allowed are policy decisions.
2        Q      Okay.  And if a borrower received a
3   letter, for instance, where the only reason for
4   denial under each allegation was insufficient
5   evidence, how would you expect them to reply?
6        MR. HANCOCK:  Objection: calls for
7   speculation.
8        THE WITNESS:  I'm not -- I'm not
9   certain, ma'am, on how they would reply.  So for
10  an individual, how they would react to that; is
11  that what you're asking me?
12  BY MS. TORCHIANA:
13       Q      If they were to submit a request for
14  reconsideration but the only thing that their
15  denial letter said was insufficient evidence, what
16  would you expect them to submit?
17       MR. HANCOCK:  Objection: calls for
18  speculation.
19       THE WITNESS:  So I don't -- I don't
20  believe I'm understanding your question.  Are you
21  asking me to kind of assume what -- what a
22  borrower should do if they get that letter?  What
23  does a borrower do if they have a question; is
24  that -- or -- they don't --
25  BY MS. TORCHIANA:

Page 187
Page

1        Q      No.
2        A      -- know what to do or --
3        Q      We'll get into this more -- we'll get
4   into a specific letter later, but -- but here you
5   say, Identify and provide any evidence that
6   demonstrates why ED should approve your borrower
7   defense to repayment claim.  And let's say that
8   the reason someone got the denial was just
9   insufficient evidence.
10       How do you think -- what would they put
11  in their request for reconsideration?
12       MR. HANCOCK:  Objection: calls for
13  speculation.
14       THE WITNESS:  I -- I don't know.  I
15  don't think I can answer your -- I don't think I
16  can answer your question.
17  BY MS. TORCHIANA:
18       Q      Okay.  Okay.  And do you know -- have
19  any requests for reconsideration been granted that
20  you know of?
21       A      One second, please.
22       (Witness reviews document.)
23       I don't know if any have been -- have
24  been granted.  I only know that some have -- have
25  come in through -- through the process.  I -- I

Page 188
Page

1   don't know -- I can't tell you if any have been
2   granted or where those that have come in stand
3   right now today.
4        Q      Okay.  And how many have come in
5   approximately?
6        A      I don't know.  It's a dynamic process
7   where, you know, things come in each day and
8   they're sorted out, and at some point when we do
9   our next update, if some new have come in, I
10  probably would see it visible through our metrics
11  or be told, but right now today I couldn't
12  speculate on how many would come in.
13       Q      Okay.  When was the last update -- when
14  did you receive the last update that had those
15  numbers?
16       A      I believe it was at end-of-November
17  time frame.
18       Q      Okay.  And at the end of November, do
19  you remember roughly how many requests for
20  reconsideration had been received?
21       A      I do not believe it was that many in
22  relative terms, meaning given the number of claims
23  that we do.  But I don't remember exactly how
24  many.
25       Q      And again, these are -- these are the

Page 189
Page

1   weekly performance metrics we discussed before,
2   correct, that have these numbers?
3        A      They -- they are the metrics for
4   borrower defense, correct.
5        MS. TORCHIANA:  Okay.  And I think I've
6   already asked, but I think we will be asking for
7   those to be produced.
8   BY MS. TORCHIANA:
9        Q      Okay.  Do you know if any requests for
10  reconsideration have been denied?
11       A      As I said earlier, I -- either way, I
12  don't know in the process if we have gotten around
13  to decisions one way or the other on those yet.
14       Q      Okay.
15       MS. TORCHIANA:  Okay.  Why don't we
16  take a ten-minute break if that's okay with
17  everyone.
18       THE WITNESS:  Okay.
19       MR. HANCOCK:  That's fine.
20       THE VIDEOGRAPHER:  Okay.  We are now
21  going off the record.  The time is 20:41 UTC time.
22       (Recess -- 3:41 p.m.)
23       (After recess -- 3:55 p.m.)
24       THE VIDEOGRAPHER:  We're now back on
25  the record.  The time is 20:55 UTC time.

Page 226

1    MR. HANCOCK:  Objection.  It exceeds
2  the scope of discovery.
3    THE WITNESS:  I don't know, ma'am.
4  BY MS. TORCHIANA:
5    Q    You don't know.
6    Okay.  Do you think knowing that
7  information would have been relevant to setting
8  your -- your target metrics for the number of
9  adjudications going out?
10    A    Just to be clear, I said I didn't know.
11  I didn't say that there wasn't someone who may
12  have known and may have been a part of that and it
13  may have been a part of the setting and the
14  establishing of metrics.
15    But if you are assuming the premise
16  that it wasn't used in that discussion, I can't
17  validate that that premise is correct.  I could
18  only say that I don't know.  You know, I couldn't
19  tell you which ones were in and which ones were
20  out at that time.  I couldn't tell you that the
21  subject matter experts and the technicians and the
22  policy liaison folks and the folks that are inside
23  the bowels of the organization, they may have been
24  familiar with that, and it could have been a part
25  of their deliberations, but I don't know

Page 227

1  personally.
2    Q    Okay.  And that 150,000 number of
3  targeted adjudications for borrower defense
4  applications, by adjudications, is that decisions
5  that have been processed and sent to borrowers, or
6  what do you consider an adjudicated decision that
7  counts towards that 150,000?
8    A    So when I look at the metric, I take a
9  holistic look at it.  And so to get a check in
10  that column, I'm looking for the full circle,
11  which is what we have called today Step 1 and Step
12  2, to have been completed.
13    Q    Okay.  Okay.  I have a couple more
14  things to go over, and then -- so -- so could you
15  turn to tab 33?
16    MS. TORCHIANA:  And could we mark that
17  as Exhibit 30?
18    (Deposition Exhibit 30 was marked for
19  identification and attached to the transcript.)
20  BY MS. TORCHIANA:
21    Q    And are you familiar with this speech
22  by Secretary DeVos?
23    A    (Witness reviews document.)
24    I'm familiar with the event.  The --
25  the speech itself, I have not read through this

Page 228

1  full -- through this full speech.  But if you --
2  by familiar, do you mean if I know when this was
3  given, the title that's up at the top and --
4    Q    Were you there?
5    A    It's all -- it was a virtual
6  conference.
7    Q    Okay.  Were you listening -- did you --
8  did you hear this speech?
9    A    I was virtually there.  I -- I was -- I
10  was on the -- on the platform, I think would be
11  the way to -- to explain it.  And I did the
12  introduction, and I listened while the speech was
13  given.
14    Q    Okay.
15    A    So if -- if that -- if that is what you
16  mean by am I familiar with it, in that regard, I
17  am.  But if -- but if you mean have I read this
18  speech, the script that was provided here in
19  information that you sent me, then the answer to
20  that is I have not.
21    Q    Okay.  And could you go to page 3 of 6?
22  It's in small -- it's on the bottom right-hand
23  side of the page.
24    A    Yes, ma'am.
25    Q    And could you read me the paragraph

Page 229

1  that starts with, Still more advance?
2    A    Still more advance the truly insidious
3  notion of government gift giving.  We've heard
4  shrill calls to cancel, to forgive, to make it all
5  free.  Any innocuous label out there can't
6  obfuscate what it really is: wrong.
7    Q    Okay.  And what do you -- what did you
8  understand this to mean, or what do you understand
9  this to mean?
10    MR. HANCOCK:  Objection: exceeds the
11  scope of discovery.  What's the relevance of this
12  to the court's three categories?
13    BY MS. TORCHIANA:
14    Q    You can still answer.
15    A    You're asking me what do I believe that
16  statement is?
17    Q    Yeah, what do you understand this
18  statement to mean.
19    MR. HANCOCK:  Calls for speculation.
20    THE WITNESS:  I am -- can you give me a
21  second to read it again?
22    BY MS. TORCHIANA:
23    Q    Yeah.
24    A    (Witness reviews document.)
25    I don't know what it means.  It was --

Page 230
Page

1   it was obviously written by a speechwriter.  Those
2   are not -- those are not terms I use.  I don't --
3   I don't know what it means.
4        Q    Okay.  And -- sure.
5             And have you ever heard Ms. DeVos in
6   your private meetings with her express these same
7   sentiments?
8        MR. HANCOCK:  Object to the scope of
9   discovery, and I'm going to instruct the witness
10  not to answer.
11       MS. TORCHIANA:  Okay.  Could -- could
12  we go off the record?
13       MR. HANCOCK:  Sure.
14       MS. TORCHIANA:  I think that's
15  exactly --
16            THE COURT REPORTER:  Wait, wait, wait.
17  Wait a minute.  Wait a minute.  You're not off.
18  He's got to read you off.
19       MS. TORCHIANA:  I'm sorry.
20            THE COURT REPORTER:  That's okay.
21            THE VIDEOGRAPHER:  We're going off the
22  record; right?
23            THE COURT REPORTER:  Yes.
24            MS. TORCHIANA:  It seems to be --
25            THE COURT REPORTER:  Yes.

Page 231
Page

1             Wait a minute.
2        MS. TORCHIANA:  -- relevant --
3        THE COURT REPORTER:  Wait a minute.
4        MS. TORCHIANA:  -- to point --
5        THE COURT REPORTER:  No.  He asked the
6   question.
7             Dan, yes, please take us off the
8   record.
9        THE VIDEOGRAPHER:  Thank you.  We're
10  now off the record at ten -- 23:07 UTC.
11            (Recess -- 5:07 p.m.)
12            (After recess -- 5:09 p.m.)
13       THE VIDEOGRAPHER:  We're now back on
14  the record.  The time is 22:09 UTC time.
15       BY MS. TORCHIANA:
16       Q    Okay.  And, so, Mr. Brown, are you --
17  are you declining to answer what you think this
18  sentence means?
19       A    The answer is I don't know.
20       Q    You -- you don't know.  Okay.
21            Okay.  Let's move on.  Let's go to our
22  final exhibit, and then we'll be done.
23            Could you turn to Exhibit -- let's
24  see -- Exhibit 12?
25            (Exhibit 12 referred to.)

Page 232
Page

1        THE WITNESS:  Yes.
2   BY MS. TORCHIANA:
3        Q    Okay.  And are you familiar with this
4   PowerPoint?  Have you seen it before?
5        A    (Witness reviews document.)
6             So, ma'am, I believe I have seen it
7   before.
8        Q    Okay.  So when did you see it?
9        A    I cannot -- I cannot tell you when, but
10  I believe in some of our staff at work and our
11  updates, I have seen these charts before.
12       Q    Okay.  And in what context would you
13  have seen it?
14       A    Updates from the borrower defense team,
15  preparing for updates, those kinds of things.
16       Q    Okay.  And did you receive regular
17  updates from the borrower defense team?
18       A    So I don't know.  I would say the
19  updates from the borrower defense team I receive
20  vary, as I stated earlier.  It just depends on
21  what's going on, you know, what needs to be
22  discussed, and I'm not sure if you would consider
23  that regular or not.
24       Q    Okay.  And this presentation is from
25  August 21st, 2019.  And if you turn to page 2, it

Page 233
Page

1   says, Total borrower defense applications as of
2   the week ending August 6th, 2019.
3             Do you know whether these presentations
4   were given weekly or . . .
5        A    (Witness reviews document.)
6             No, I can't tell you that they were
7   given weekly.
8        Q    Okay.  And were you -- was this
9   presentation given to you, or in what context did
10  you see this PowerPoint?
11       A    Because these -- because I have seen, I
12  think, most of these slides at different times and
13  perhaps some more than once over time.  Your
14  particular question of when was this presentation
15  given to me, I don't -- I don't know that date.  I
16  just can say for sure that I have seen the slides
17  that you are talking about.
18       Q    Okay.
19       A    It's not all at the same time is my
20  point.  Different things, different types,
21  different updates.
22       Q    Okay.  And the second line says, 38,700
23  applications have been adjudicated but not yet
24  processed.
25            As -- as we've been describing it,