1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10

11    In re                                      No.  MC 21-80075 WHA

12    SUBPOENA SERVED ON FORMER
      SECRETARY OF EDUCATION              **ORDER DENYING**
13    ELISABETH DEVOS.                     **MOTION TO QUASH**

14    _____

15          Former Secretary of the United States Department of Education Elisabeth DeVos\* moves

16    to quash a subpoena for her deposition, issued in co-pending litigation before the undersigned.

17    Exceptional circumstances warranting the deposition, the motion is **DENIED**.

18          Our underlying suit, *Sweet v. Cardona*, No. C 19-03674 WHA, concerns the lawfulness

19    of the Department of Education's eighteen-month halt in issuing decisions on student-loan

20    borrower-defense applications under Secretary DeVos.  Our story began in 1993 when

21    Congress directed the Secretary of Education to specify the sort of school misconduct that

22    borrowers may assert as a defense against repayment of their student loans.  This "borrower-

23    defense" apparatus lay dormant for its first several decades until May 2015 when the large for-

24    profit college, Corinthian Colleges, Inc., collapsed.  Students submitted a "flood" of borrower-

25    defense applications, so Secretary John B. King appointed a special master in June 2015 to

26    adjudicate claims and then updated the borrower-defense regulations in November 2016.  But

27    _____

28    \* Though Secretary DeVos and many named herein have since left their posts, this order affords
      them the dignity of their former offices.

*United States District Court*
*Northern District of California*

it remained a game of catch up.  By the end of the Obama Administration, the Secretary had approved 31,773 applications and found 245 ineligible, for a 99.2% grant rate.  Borrowers, however, had submitted 72,877 applications (AR 392–94, 502–05).  20 U.S.C. § 1087e(h); 81 Fed. Reg. 39,329 (June 16, 2016); 81 Fed. Reg. 75,926 (Nov. 1, 2016).

In 2017, newly-installed Secretary DeVos moved to rein in the previous administration's overzealous (as she put it) grant of relief to borrowers.  Between December 2017 and May 2018, the Secretary reportedly decided 26,000 claims from Corinthian students, approving 16,000 under a new relief methodology.  But a judge (in this district) preliminarily enjoined this partial-relief methodology for its likely violation of the Privacy Act, 5 U.S.C. § 552a (AR 006–007, 350).  *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) (Magistrate Judge Sallie Kim).

Up to that point in June 2018, the two administrations had granted 47,942 applications and denied or closed 11,940 since 2015.  Borrowers had submitted in total, however, 165,880 applications, leaving 105,998 still to be decided.  Then, despite the backlog, the decisions stopped.  *For eighteen months*, from that June 2018 until December 2019, the Secretary issued no decisions, even as the backlog mounted (AR 397–404, 587–88).

A putative class of student-loan borrowers, not already involved in *Calvillo Manriquez*, sued in June 2019 to compel the Secretary to restart the adjudication process.  An October 2019 order certified a nationwide class of approximately 160,000 borrower-defense applicants who still awaited decision.  In November, the Secretary certified an administrative record to explain her delay (though, without any declaration by the Secretary herself) and, at summary judgment, justified the eighteen-month delay on (among others) staffing shortages and competing priorities, such as developing the new relief method.  But most forcefully, the Secretary argued that:

> Issuing final decisions on such claims is time-consuming and complex, with many steps in the adjudicatory process, and agencies must be given, within reason, the time necessary to analyze the issues presented so that they can reach considered results.

1    (Dkt. No. 63) (cleaned up).  But before a ruling could be had, the parties reached a proposed

2    settlement, which would have imposed an eighteen-month deadline for the Secretary to decide

3    outstanding claims.  Preliminary approval followed, yet as the class fairness hearing

4    approached, major problems emerged.

5      We'd known at summary judgment that in December 2019, with around 225,000 claims

6    pending, the Secretary had released an updated "tiered relief methodology" and issued 16,045

7    decisions.  We'd also known that, in a marked departure from the previous grant-denial ratio,

8    she had approved only 789 applications and denied the remainder.  We had little indication,

9    however, how matters would progress (AR 587–601).

10     Not well, we learned.  While negotiating the proposed settlement, and while awaiting this

11   Court's final approval, the Secretary had been issuing alarmingly-curt denial notices for

12   several months, in violation (as class counsel put it) of both the spirit of the proposed

13   settlement and the Administrative Procedure Act.  And, in contrast to the previous

14   administration's 99.2% grant rate, the Secretary had run up a 94.4% *denial* rate for our

15   borrowers — denying 74,000 applications and granting only 4,400 (Dkt. No. 116).

16     An order dated October 19, 2020, recognized the apparent pretext for what it was.  The

17   perfunctory form-denial letters stood in contrast to the supposed basis for the delay — the

18   "'time-consuming,' 'complex,' legal analysis of both borrower-submitted and agency

19   evidence, 'under applicable State law,' to 'reach considered results.'"  *Sweet v. DeVos*, 495 F.

20   Supp. 3d 835, 844 (N.D. Cal. 2020).  As the United States Supreme Court has long held and

21   recently reemphasized, "meaningful judicial review" requires "an agency [to] 'disclose the

22   basis' of its action."  *Dep't of Commerce v. New York*, 588 U.S. ___, 139 S. Ct. 2551, 2573–76

23   (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

24   Given the extraordinary circumstances, the Court denied final approval of the proposed

25   settlement and ordered written discovery and the depositions of five Department officials

26   overseeing the borrower-defense apparatus (except for the Secretary herself) to determine the

27   actual bases for the eighteen-month delay and to probe the development, approval, and use of

28   the form-denial letters.  The Court also ordered the Secretary to show cause why she should

United States District Court
Northern District of California

not be enjoined from issuing further form denials to our classmembers, and the Secretary

agreed to abstain until further order (Dkt. No. 150). *Sweet*, 495 F. Supp. 3d at 847.

Plaintiffs have taken discovery over the past several months, including four depositions.

Secretary DeVos resigned her post on January 8, 2021, so a January 12 order authorized class

counsel to seek her deposition. Counsel then issued a subpoena for that deposition, and the

Secretary moved to quash. The District Court for the Southern District of Florida transferred

the matter to this district and the Court of Appeals for the Eleventh Circuit denied review (Dkt.

Nos. 1, 28). *In re Elisabeth DeVos*, No. 21-11239, Order (11th Cir. May 7, 2021). This order

follows full briefing and oral argument (held telephonically due to COVID-19).

\*          \*          \*

Even assuming Secretary DeVos retains some measure of executive prerogative, she

must answer an appropriately issued subpoena. Judicial process runs even to unwilling

executives. Chief Justice Marshall first ruled that a subpoena could require a president's

production of documents material to the defense when presiding over Vice President Burr's

treason trial. *United States v. Burr*, 25 F. Cas. 30 (No. 14,692d) (C.C. Va. 1807). For the same

reasons, in 1818, President Monroe answered written interrogatories on summons by the

defense in a court martial. In 1974, a unanimous Supreme Court ordered President Nixon's

compliance with a subpoena for the White House tapes. President Clinton twice gave

videotaped testimony for criminal proceedings and, most famously, sat for deposition in a civil

suit regarding his conduct as governor of Arkansas. *Clinton v. Jones*, 520 U.S. 681, 703–05

(1997) (citing Ronald D. Rotunda, *Presidents & Ex-Presidents as Witnesses: A Brief Historical

Footnote*, 1975 U. ILL. L. FORUM 1, 4–7 (1975)); *see Jones v. Clinton*, No. LR-C-94-290

SWW, Dkt. No. 229 (E.D. Ark. Jan. 14, 1998).

If judicial process runs to presidents, it runs to cabinet secretaries — especially former

ones. The Supreme Court, nevertheless, requires some deference to agency heads summoned

to explain their actions. In the seminal case on this point, the Supreme Court observed that

Secretary of Agriculture Henry Wallace (by then Vice President) "should never have been"

compelled to testify to the bases for certain challenged orders. *United States v. Morgan*, 313

U.S. 409, 422 (1941).  Setting aside that Congress would not pass the Administrative

Procedure Act for five more years, no United States Court of Appeals has read *Morgan* as a

rigid bar against the subpoena of a cabinet secretary for either production or testimony.

Our court of appeals has read *Morgan* as a word of caution that "[h]eads of government

agencies are not normally subject to deposition."  *Kyle Engineering Co. v. Kleppe*, 600 F.2d

226, 231 (9th Cir. 1979).  Though our court of appeals has spoken no further on this point, the

remaining courts of appeals have established several categories of "exceptional circumstances"

that warrant the deposition of a cabinet secretary:

1. A strong showing of bad faith or improper behavior.  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *In re United States (Holder)*, 197 F.3d 310, 314 (8th Cir. 1999); *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1139–40 (10th Cir. 1999); *In re F.D.I.C.*, 58 F.3d 1055, 1062 (5th Cir. 1995); *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 212 (4th Cir. 1991); *City of Des Plaines v. Metro. Sanitary Dist. of Chicago*, 552 F.2d 736, 739–40 (7th Cir. 1977); *Warren Bank v. Camp*, 396 F.2d 52, 56 (6th Cir. 1968).

2. The official has unique and relevant first-hand knowledge. *Lederman v. New York City Dep't Parks & Rec.*, 731 F.3d 199, 203 (2d Cir. 2013); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *In re United States (Bernanke)*, 542 F. App'x 944, 948 (Fed. Cir. 2013).

3. The necessary information cannot be obtained through other less burdensome or intrusive means.  *Lederman*, 731 F.3d at 203; *Bogan*, 489 F.3d at 423; *Holder*, 197 F.3d at 314; *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993); *Simplex Time Recorder Co. v. Sec. of Labor*, 766 F.2d 575, 587 (D.C. Cir. 1985).

Simply put, while rare, courts *do* authorize depositions of cabinet secretaries and similar

high-level officials where appropriate, and have authorized examination — over objection —

of:

- Secretary of Defense James N. Mattis.  *Karnoski v. Trump*, No. C 17-01297, 2020 WL 5231313 (W.D. Wash. Sept. 2, 2020) (Judge Marsha J. Pechman); *stayed on other grounds*, 2020 WL 6561525 (W.D. Wash. Nov. 9, 2020).

- Secretary of Commerce Wilbur L. Ross, Jr.  *New York v. Dep't of Commerce*, 333 F. Supp. 3d 282 (S.D.N.Y. 2018) (Judge Jesse M. Furman), *stayed sub nom. In re Dep't Commerce*, 139 S. Ct. 16 (2018).

- Secretary of the Interior Gale A. Norton. *Schaghticoke Tribal Nation v. Norton*, No. C 06-00081, 2006 WL 3231419 (D. Conn. Nov. 3, 2006) (Judge Peter C. Dorsey).

- Secretary of Transportation John A. Volpe. *D.C. Fed'n of Civic Ass'ns v. Volpe*, 316 F. Supp. 754 (D.D.C. 1970) (Judge John J. Sirica), *rev'd on other grounds*, 459 F.2d 1231 (D.C. Cir. 1971).

- Comptroller of the Currency James J. Saxon. *Union Savings Bank of Patchogue v. Saxon*, 209 F. Supp. 319 (D.D.C. 1962) (Judge Leonard P. Walsh).

And, for what it's worth, even the undersigned has done this before, though from the other side of the bench. In connection with the Department of Education's move to shut down a Native American university near Davis, California, the undersigned (then still a lawyer) attended the deposition of Secretary Terrel Bell in *United States v. Deganawidah-Quetzalcoatl University*, No. C 82-00531 PCW (E.D. Cal.).

The first ground of extraordinary circumstances we have already established. To recap, the Secretary justified the eighteen-month halt in issuing final decisions on student-loan borrower-defense applications on the time required for considered decisionmaking. But months later, we learned that her Department had resumed issuing decisions, not at measured but breakneck pace, in perfunctory and unreasoned form-denial letters, at an alarming rate. Such apparent pretext, the paradigm of agency bad faith, subverts the presumption of agency "conscience and intellectual discipline" underlying *Morgan*'s deferential review. 313 U.S. at 421; *Commerce*, 139 S. Ct. at 2573–76; *Sweet*, 495 F. Supp. 3d at 844. Moreover, pretext opens to question the credibility of Secretary DeVos's remaining justifications for the delay. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).

Our record also highlights the Secretary's personal involvement in the conduct under review here. The high-level officials already deposed have disclaimed authority for that conduct and have instead pointed to the Secretary. For one, the Department has in-part premised the eighteen-month halt upon the *Calvillo Manriquez* injunction regarding the

6

*separate* class of Corinthian student-loan borrowers.  Mark Brown, head of Federal Student Aid, testified that the decision to halt the rest of the borrower-defense apparatus would have been "relayed" to him by the "Office of the Under Secretary" (Brown Tr. at 223, Dkt. No. 37-1, Exh. D).  Yet Diane Jones, Under Secretary from May 2018 to January 2021, testified that she was not "a senior enough official to have" that sort of "decision-making authority."  She was simply "told that was the decision" (Jones Tr. at 182–85, Dkt. No. 37-1, Exh. B).  Nor could her predecessor, James Manning, explain the decision (Manning Tr. at 118–21, Dkt. No. 37-1, Exh. E).  Both reported directly to the Office of the Secretary and the Deputy Secretary — though the Department still has yet to identify a relevant Deputy Secretary here who, regardless, appears to focus on primary and secondary education matters unrelated to ours.  To wit, if an order came from above, it came from the Secretary (Dkt. Nos. 45, 46).

For another explanation of the delay, the Department has said that it did not want to confuse borrowers by only issuing claim denials while it still worked to develop a new method of awarding relief for successful claims.  Again, however, Under Secretary Jones did not know who made this decision (Jones Tr. at 174), and instead of shedding further light, Under Secretary Manning pointed to the Secretary (Manning Tr. at 98–101, 121–24).  Then, once the Department resumed issuing borrower-defense decisions, Colleen Nevin, Director of the Borrower Defense Unit, testified that the Secretary *herself* "set [targets for] the elimination of the backlog" and received regular status updates from Mr. Brown of Federal Student Aid.  The short of it is that Department officials keep pointing toward the Secretary when questioned (Nevin Tr. 101–02, Dkt. No. 37-1, Exh. C; Jones Tr. at 129).

Beyond illuminating her involvement, these material gaps at the highest rungs of the Department's decisionmaking record reveal the necessity of Secretary DeVos's testimony for an independent reason.  We lack an official and contemporaneous justification for the eighteen-month delay because this suit concerns agency *inaction*, and not the usual agency *action*.  *See Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997); *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).  In these circumstances, far afield from any consideration of agency bad faith, the Supreme Court has recognized that often "the only way

there can be effective judicial review is by examining the decisionmakers themselves." *Volpe*, 401 U.S. at 420.  Indeed, in a separate though contemporary case, the district court (as noted above) had required Secretary of Transportation Volpe to testify at trial for the same reason:

> The testimony of a cabinet officer was necessary in this case because of the somewhat unique circumstances surrounding the [agency action] . . . Several of the decisions required . . . were made personally by the Secretary [but] [s]ince some of these decisions were not committed to writing at the time they were made, it was only by allowing the questioning of the Secretary himself that the Court could ascertain whether the decisions were in fact made and what constituted the basis for the decisions.

> \*       \*       \*

> The Court is aware that the Supreme Court in *United States v. Morgan* prohibited the probing of the mental process of an administrative decision maker to determine his reasoning in reaching a decision.  The interrogation of Secretary Volpe here was limited to the actions which he took, and the materials which he considered as the basis for his determination, rather than his mental process in considering these materials.

> \*       \*       \*

> In retrospect, the Court feels that its decision to require the Secretary to testify was a wise one . . . The Secretary impressed the Court as a sincere and dedicated public servant with many years of experience, and his honest, straightforward testimony did much to elucidate the complex chain of events leading up to the [challenged agency decision].

*D.C. Fed'n*, 316 F. Supp. at 761 fn. 12 (cleaned up).  The court of appeals approved this move in light of the Supreme Court's intervening decision in *Citizens to Preserve Overton Park, Inc. v. Volpe*, explaining that "[a]bsent a record, judicial review of the Secretary's action can be little more than a formality *unless* the District Court takes the disfavored step of requiring the Secretary to testify as to the basis of his decision." *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1238–39 (D.C. Cir. 1971) (emphasis added).

    To be sure, the Secretary has submitted an administrative record here.  But that sparse submission, consisting primarily of declarations from other Department officials generated during the course of the litigation (along with, for the most part, public case law, regulations, and documents reflecting the views of the previous administration), has not answered our questions yet.  In fairness, we should not write off these declarations as *post-hoc* rationale.  *See*

1 *Indep. Mining*, 105 F.3d at 511.  But neither may we accept them without question.  *See D.C.*

2 *Fed'n II*, 459 F.2d at 1238.  Compounding matters, as noted above, the revelation of pretext

3 has opened to question the credibility of the Secretary's retroactive justifications for the delay.

4    There appears some question about the scope and effect of the deliberative process

5 privilege here.  Class counsel have disclaimed any attempt to traverse the privilege at this stage

6 and we will hold them to it.  But this does not undercut the relevance or efficacy of an

7 examination of the Secretary.  The "privilege permits the government to withhold documents

8 that reflect advisory opinions, recommendations and deliberations comprising part of a process

9 by which government decisions and policies are formulated." *F.T.C. v. Warner Commc'ns*

10 *Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).  It does not permit an agency to obscure the actual

11 bases for its conduct.  As recently emphasized:

12 
> [A]gencies [must] offer *genuine* justifications for important
> decisions, reasons that can be scrutinized by courts and the
13 > interested public.  Accepting contrived reasons would defeat the
> purpose of the enterprise.  If judicial review is to be more than an
14 > empty ritual, it must demand something better . . . .

15 *Commerce*, 139 S. Ct. at 2575–76.  In other words, we cannot determine whether the Secretary

16 has offered sufficient explanation for the eighteen-month delay until we address the threshold

17 question of whether those explanations *in fact* drove the delay in real time.  Some of this

18 information will be written; some will be unwritten and reside only in the Secretary's mind.

19 But regardless, the deliberative process privilege will shield neither the actual decisions to

20 engage in the challenged conduct nor their justifications, and class counsel will be free to probe

21 both.  *Volpe*, 401 U.S. at 420; *Warner*, 742 F.2d at 1161.

22    Along this line, class counsel will ask whether Secretary DeVos directed her subordinates

23 to cease issuing student-loan borrower-defense decisions, or whether she tacitly approved of

24 the halt once manifested.  They will then ask whether the justifications offered at summary

25 judgment, such as staffing, competing priorities, and the difficulty of review, *in fact* drove the

26 decision.  Counsel will draw out whether any other considerations played a role in the decision

27 when made.  Counsel may also supply considerations and probe the extent to which those

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    informed the decision in real time.  All of this may be accomplished without offending the

2    Secretary's privilege against revealing her *predecisional* deliberations.

3         A similar line will address the yet unanswered questions surrounding the flash flood of

4    blanket-form denial letters.  The Department notes that Ms. Nevin testified at some length to

5    the use and development of the form-denial letters.  But her answers leave us guessing who

6    approved the forms (though her testimony points to the Secretary's direct involvement) and,

7    more importantly, why?  When the decision was made to use the forms, how did Department

8    policymakers square the unreasoned form denials with the APA's requirement of reasoned

9    decisionmaking?  And, how did they justify the perfunctory flurry of denials after telling this

10   Court that those decisions needed time and consideration?  495 F. Supp. 3d at 842–43; *Butte*

11   *County, Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  These questions, after all, drove

12   the discovery here.  If the Department had answers, it presumably would have advanced them

13   already, if only to render the Secretary's deposition unnecessary.

14        Movants contend that plaintiffs have not exhausted other avenues of discovery, a

15   question other courts have correctly raised in these circumstances.  *See, e.g.*, *Bogan*, 489 F.3d

16   at 424.  But these cases cannot require literal exhaustion of alternatives.  Following the

17   October 19 order, plaintiffs have deposed four high-ranking Department officials, including

18   two prior Under Secretaries (Dkt. No. 46) and have taken targeted document discovery (No. C

19   19-03674 WHA, Dkt. No. 186).  Exhaustive discovery through line employees will reveal little

20   about the bases for Department policy, and, for that matter, though Department lawyers offer

21   guidance, they don't make policy — the policymakers do.  If our current set of policymakers

22   cannot answer questions, the only place left to look is up.  Movants' press for a Rule 30(b)(6)

23   deposition obscures reality; authority here lies with *the Secretary*.  20 U.S.C. § 3411.  Where

24   questions remain, a deposition of the Secretary offers the most efficient means of gathering her

25   candid testimony, asking follow-up questions, refreshing her recollection, and testing her

26   credibility as to the policy decisions at issue.  *See New York*, 333 F. Supp. 3d at 290; *ABC v.*

27   *United States Info. Agency*, 599 F. Supp. 765, 769 (D.D.C. 1984) (Judge John G. Penn).

28

United States District Court
Northern District of California

1       The remaining quibbles with the means of discovery used thus far fail to convince.  The

2   Secretary faults class counsel for taking only four of their five authorized depositions.  But

3   counsel have saved the last for the Secretary; doubtless if counsel had taken all five already,

4   she would have opposed the overreach.  So too with the scope of document discovery, about

5   which the Department has already complained.  The Department's further characterization of

6   the deposition subpoena as premature mistakes the record.  Discovery in the underlying case

7   should have been completed by December 24, 2020.  The parties stipulated to extend that

8   deadline until January 14.  And so, class counsel formally notified the Department of their

9   intent to depose the Secretary on January 7.  Any later and movants would have argued undue

10  delay.  Regardless, the Department's own intransigent document production has provided the

11  primary basis for our extended term of discovery over the last several months (No. C 19-

12  03674, Dkt. Nos. 170, 183, 186).

13      At the close, movants' reliance on the Supreme Court's recent stay of the deposition of

14  the Secretary of Commerce pales in view of the ultimate merits decision, which stressed that

15  "to permit meaningful judicial review, an agency *must* disclose the basis of its action."  When

16  "[w]e are presented . . . with an explanation for agency action that is incongruent with what the

17  record reveals about the agency's priorities and decisionmaking process . . . we *cannot* ignore

18  the disconnect between the decision made and the explanation given."  *Commerce*, 139 S. Ct.

19  at 2573–75 (emphasis added) (quotes omitted); 139 S. Ct. 16.  "With all its defects, delays and

20  inconveniences, men have discovered no technique for long preserving free government except

21  that the Executive be under the law."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

22  655 (1952) (Jackson, J., concurring).  So too for cabinet secretaries.

23      In sum, extraordinary circumstances warrant the deposition of Secretary DeVos for three

24  hours, excluding breaks.  No part of this order maligns the Secretary's deliberative-process

25  privilege.  But class counsel are entitled to probe matters broadly related to the *actual* cause for

26  the challenged eighteen-month delay, the development, approval, and use of the form-denial

27  letters, and the Secretary's involvement in clearing the backlog of our classmembers'

28  borrower-defense claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

This order shall be **STAYED** for fourteen days or until the resolution of any mandamus review, whichever comes later.  At that point, while class counsel will accommodate (within reason) the Secretary's convenience, this order impresses upon the parties that our failed settlement and term of discovery have delayed the just resolution of this case long enough already.  Diligent haste will be expected.  The motion to quash is **DENIED**.  A status conference in both this and in case No. C 19-03674 WHA is set for **JUNE 3 AT 11:00 A.M.**

**IT IS SO ORDERED.**

Dated:  May 19, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE