No. 21-_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

*In re* UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,

*Petitioners.*

UNITED STATES DEPARTMENT OF EDUCATION; and MIGUEL A. CARDONA, in his official capacity as Secretary of the Department of Education,

*Petitioners–Defendants,*

v.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

*Respondent,*

THERESA SWEET; ALICIA DAVIS; TRESA APODACA; CHENELLE ARCHIBALD; JESSICA DEEGAN; SAMUEL HOOD; and JESSICA JACOBSON, on behalf of themselves and all others similarly situated,

*Real-Parties-in-Interest–Plaintiffs,*

ELISABETH DEVOS,

*Real-Party-in-Interest–Movant.*

## PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
JOSHUA M. SALZMAN
SEAN JANDA
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*202-514-3388*

# INTRODUCTION

Pursuant to the All Writs Act, 28 U.S.C. § 1651, and Federal Rule of Appellate Procedure 21, the federal government respectfully petitions this Court to issue a writ of mandamus directing the district court to reverse its order of May 19, 2021, which authorizes plaintiffs to take the deposition of former Secretary of Education Elisabeth DeVos. The district court has stayed its order to permit this Court's review.

The underlying class action concerns applications for loan relief by students who attended, in many cases, for-profit, now-defunct institutions. Plaintiffs sought relief under Department of Education regulations that authorize such relief when a student can demonstrate some actionable misconduct of their school, such as a material misrepresentation about the school's job placement rates that induced the student to attend the school (and to take out a qualifying loan to do so). This petition does not concern the merits of the underlying case. The Department of Education is committed to providing the full relief to which qualifying students are entitled and is working to ensure that such relief is provided equitably and expeditiously and is actively engaged in determining whether policy changes would ensure that the program works well for all student borrowers. This petition addresses the narrow but significant question of whether the district court erred in taking the extraordinary step of compelling the deposition of the former Secretary.

Plaintiffs filed the underlying suit in 2019, claiming that the Department of Education had unreasonably delayed in acting on their applications for relief for a

period of approximately one year (a pause in decisions that eventually extended to approximately 18 months) after another district court enjoined the Department's methodology for determining loan relief in 2018. *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018), *appeal pending*, No. 18-16375 (9th Cir.). Since this suit was filed, the Department has issued determinations on a substantial number of applications—although many remain pending—and plaintiffs have filed a supplemental complaint that further alleges that those determinations lack adequate reasoning. The suit at this point thus presents questions regarding plaintiffs' assertions of unreasonable delay and the adequacy of determinations issued to date.

Claims regarding asserted unreasonable delay of agency action or the adequacy of agency explanations are not uncommon. It has never been thought that district courts can compel the testimony of Cabinet secretaries on the theory that they might supplement the administrative record (and, in this case, the extensive discovery already permitted by the district court). And there is no basis whatsoever for compelling such testimony here. It is firmly established that absent extraordinary circumstances, an agency decisionmaker may not be "subjected to [an] examination" "regarding the process by which he reached the conclusions of his [decision], including the manner and extent of his study of the record and his consultation with subordinates." *United States v. Morgan*, 313 U.S. 409, 422 (1941); *see also Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979) ("Heads of government agencies are not

2

normally subject to deposition[.]"). That principle applies with the same force today as it did when the Supreme Court issued its decision in *Morgan*. As the Supreme Court recently reiterated, the principle "reflects the recognition that further judicial inquiry into executive motivation represents a substantial intrusion into the workings of another branch of Government and should normally be avoided." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).

Discovery in this case was initiated *sua sponte* by the district court on the theory that one of the explanations offered by the Department for a delay in processing applications was pretextual. Even assuming that was the case, it would provide no warrant for compelling the deposition of the head of the Department, whose testimony is in no respect necessary to resolving plaintiffs' claims. Moreover, as discussed below, the explanation for the delay was not pretextual, and there is no indication that the former Secretary has any unique, relevant knowledge that could bear on plaintiffs' claims.

This Court has recognized that it is appropriate to exercise its mandamus authority to review discovery orders that raise significant separation of powers concerns. *See Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019) (per curiam). And, in light of the special concerns raised by attempts to probe the mental processes of decisionmakers, "[m]any decisions hold that mandamus is appropriate when a district judge inappropriately compels a ranking federal official to appear personally rather

than by counsel." *In re Commodity Futures Trading Comm'n*, 941 F.3d 869, 872 (7th Cir. 2019) (citing cases). Such relief is particularly warranted when a court orders a former Cabinet secretary to be deposed and is plainly appropriate here.

## STATEMENT

**1.** Under Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*, the Secretary of Education is charged with administering certain student loan programs, including the William D. Ford Federal Direct Loan Program, which allows students to receive Direct Loans from the federal government to pay for educational expenses, and the Federal Family Education Loan Program, which discontinued making new loans in 2010 and under which students obtained private loans that were subsidized and guaranteed by the federal government.

Congress has authorized the Secretary to relieve the borrower of the obligation to repay those loans in certain circumstances in which the borrower's institution has engaged in actionable misconduct, such as by providing prospective students with materially false information to induce their attendance. *See, e.g.*, 20 U.S.C. § 1087e(h). The Department first promulgated regulations specifying the particular conduct giving rise to a borrower-defense claim in 1994, *see* 59 Fed. Reg. 61,664 (Dec. 1, 1994), and the Department amended those regulations in 2016 and 2019, *see* 81 Fed. Reg. 75, 926, 76,080 (Nov. 1, 2016); 84 Fed. Reg. 49,788, 49,926 (Sept. 23, 2019). *Cf.* 34 C.F.R. § 685.206. In evaluating claims for loan relief, the Department determines whether the

4

borrower has established the existence of misconduct that gives rise to a claim under the applicable regulation. If the borrower has done so, the Department then determines the appropriate degree of loan obligation to discharge as relief. *See* Jones Decl. ¶ 24 (Add. 67-68).

In issuing the 2016 regulations, the Department noted that the borrower-defense process had been "rarely used" before 2015. *See* 81 Fed. Reg. 39,330, 39,330 (June 16, 2016). That year, however, Corinthian Colleges, Inc., a for-profit company that operated a number of postsecondary schools with a collective enrollment of more than 70,000 students, filed for bankruptcy. Responding to the resulting "flood" of borrower-defense claims submitted by Corinthian students, *id.* at 39,330-39,331, 39,335, the Department sought to develop internal processes and infrastructure to allow the consistent and timely adjudication of claims. *See generally* Nevin Decl. ¶¶ 9-54 (Add. 79-88). For the most part, the Department focused its efforts on claims related to certain schools' misrepresentations of their job-placement rates. For the limited classes of claims that the Department decided prior to 2017, the Department generally approved the claims where relevant misrepresentations were established and awarded full loan discharges as relief. *See* Nevin Decl. ¶¶ 10, 45 (Add. 79, 87); Federal Student Aid Enforcement Office, *Report on Borrower Defense* 2-3 (Oct. 28, 2016) (Add. 94-95).

In December 2017, after review of the then-existing procedures for evaluating borrower-defense claims, the Department announced the development of a new

methodology for determining the appropriate amount of loans to be discharged. That methodology generally resulted in fewer cases in which the Department determined that full loan discharges were appropriate. *See* Jones Decl. ¶¶ 15-16 (Add. 64-65); Nevin Decl. ¶¶ 62-64 (Add. 90)

In May 2018, a district court in another suit preliminarily enjoined use of the methodology on the ground that it likely violated the Privacy Act. *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018), *as amended by* Am. Order at 1, No. 3:17-cv-7210 (N.D. Cal. June 19, 2018) *and clarified by* Order at 1 (N.D. Cal. Aug. 30, 2018), *appeal pending*, No. 18-16375 (9th Cir.). By that point, the Department had resolved approximately 60,000 claims, but more than 100,000 claims remained pending. Dist. Ct. Op., Dkt. No. 53, at 2 (Add. 2).

After the injunction issued, the Department paused issuing final decisions on claims while it worked to develop a new methodology. *See* Jones Decl. ¶¶ 19-23 (Add. 65-67). While the Department was engaged in that process, a different court ordered the Department to implement provisions of the 2016 regulations that significantly altered the substantive standards for adjudicating some borrower-defense claims and changed the process for adjudicating all such claims. *See* Jones Decl. ¶¶ 7-8 (Add. 61-62); *cf. Bauer v. DeVos*, 332 F. Supp. 3d 181 (D.D.C. 2018); *California Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158 (D.D.C. 2018). The Department was thus simultaneously developing a new relief methodology while also responding to the

6

requirements of the new injunction, at a time when it was short-staffed and also spending significant resources on developing a claims-management platform. *See* Jones Decl. ¶¶ 8-11 (Add. 62-63); Foss Decl. (Add. 71-75); Nevin Decl. ¶¶ 23, 32-36 (Add. 82, 84-85).

**2.** When the Department had not issued new determinations by the following June, plaintiffs filed their class-action complaint alleging that the Department had "unreasonably delayed" adjudicating their claims and seeking an order pursuant to 5 U.S.C. § 706(1) to compel the Department to "start granting or denying their borrower defenses." *See* Compl. ¶¶ 10, 377-89, Dkt. No. 1, *Sweet v. Cardona*, No. 3:19-cv-3674 (N.D. Cal.).

After the district court certified a class of similarly situated borrowers, the Department lodged a certified administrative record and both parties moved for summary judgment. While the parties' cross-motions for summary judgment were pending, the parties reached, and the district court granted preliminary approval for, a proposed settlement, which contemplated a timeline for the Secretary to resolve pending claims. *See* Dkt. No. 103, *Sweet* (May 22, 2020) (order granting preliminary approval). A few months before that preliminary approval, in December 2019, the Department announced that it had finished developing a new relief methodology and resumed resolving claims, *see* Dist. Ct. Op. 3 (Add. 3), issuing final decisions on more than 130,000 claims by August 2020. *See* Dkt. No. 116, *Sweet* (Sept. 4, 2020), at 1 (Add.

7

99). Many of those decisions were provided to borrowers through "form denial letters" containing "standardized justifications based on common deficiencies that the Department has identified across thousands of applications, such as a failure to plead actionable misconduct or failure to provide evidence to support the claim." *See* Dkt. No. 116, *Sweet*, at 3 (Add. 101).

Plaintiffs complained that these denial letters failed to provide adequate explanations for the Department's determinations, which included an increased rate of claim denials. *See* Dkt. No. 115, *Sweet* (Aug. 31, 2020); Dist. Ct. Op. 3 (Add. 3).[1] Based on those concerns, the district court denied final approval of the parties' class-action settlement, concluding that there had been "no meeting of the minds" with respect to the detail required in a final decision. *See* Dkt. No. 146, *Sweet* (Oct. 19, 2020), at 7-10 (Add. 19-22).

At the same time, the court *sua sponte* ordered extra-record discovery. *See* Dkt. No. 146, *Sweet*, at 11-16 (Add. 23-28). The court concluded that discovery was justified on the ground that the Department's explanation for not issuing determinations between June 2018 and December 2019 was pretextual. *Id.* at 11-14 (Add. 23-26). The court noted that one of several reasons identified by the Department for the pause in claims determinations was that assessing claims is time-

---

[1] Plaintiffs have since filed a Supplemental Complaint adding claims that challenge the adequacy of the form denial notices under the Administrative Procedure Act and the Due Process Clause. *See* Dkt. No. 198, *Sweet* (May 4, 2021).

8

consuming and complex. The court concluded that this explanation was "incongruent" with the form denial letters, which "bear *no indication*" of such time-consuming work. *Id.* (quotation omitted). Declaring that "[w]e need to know what is really going on," the court ordered discovery into both the development of the form denial letters and the extent to which the difficulty of reviewing applications actually caused the previous 18-month pause. *Id.* at 15-16 (Add. 27-28).

**3.** Following the district court's discovery order, the Department produced thousands of documents, provided four deponents, and responded to twenty interrogatories. *See* Mot. to Quash, Dkt. No. 34, at 1 (Add. 35). Nevertheless, after receiving that discovery, plaintiffs asserted that the information already produced "left holes" related to the reasons for the pause and the development of the form denial notices "that can only be filled by Secretary DeVos's personal knowledge." *Id.* at 6 (quotation omitted) (Add. 40). On that basis, plaintiffs served a Rule 45 subpoena on now-former Secretary DeVos, seeking her deposition. Plaintiffs sought compliance with the subpoena in the Southern District of Florida; the Department thus filed its motion to quash in the District Court for the Southern District of Florida, and that court transferred the proceeding to the court hearing the underlying action. *See In re*

*Subpoena Served on Elisabeth DeVos*, 2:21-mc-14073 (S.D. Fla.), *transferred*, 3:21-mc-80075 (N.D. Cal.).[2]

After the transfer, the Department again moved to quash the subpoena, which the district court denied on May 19, 2021, relying primarily on its previous determination that the reasons for the pause articulated in the administrative record were pretextual. *See* Dist. Ct. Op. 6 (Add. 6). The court also noted statements, cited by plaintiffs, from various deponents suggesting that the Secretary took a general interest in the borrower-defense claims and that the deponents were unaware who had ordered the pause in issuing final decisions. *Id.* at 6-9 (Add. 6-9). And although the court recognized that the plaintiffs had not made "literal[ly] exhausti[ve]" efforts to obtain the requested information from other sources, it determined that they had made reasonable efforts. *Id.* at 10-11 (Add. 10-11). On this ground the court concluded plaintiffs should be able to depose former Secretary DeVos for three hours about the "*actual* cause for the challenged eighteen-month delay" and the development of the form denial letters. *Id.* at 11 (Add. 11). The court stayed its order "for fourteen days or until the resolution of any mandamus review." *Id.* at 12 (Add. 12).

---

[2] Former Secretary DeVos objected to the transfer order, both before the district court and, when that court denied relief, through a mandamus petition to the United States Court of Appeals for the Eleventh Circuit. *See* Dkt. No. 30, *In re DeVos*, No. 2:21-mc-14073 (S.D. Fla.); *In re DeVos*, No. 21-11239 (11th Cir.). After the Eleventh Circuit denied the petition, the former Secretary filed a petition for en banc review which remains pending. The government took no position with respect to the mandamus petition and informed the Eleventh Circuit accordingly.

## ARGUMENT

### THIS COURT SHOULD EXERCISE ITS MANDAMUS AUTHORITY TO BLOCK THE DEPOSITION OF THE FORMER SECRETARY OF EDUCATION

Mandamus relief is appropriate where a petitioner has "no other adequate means to attain the relief desired," where "the right to the writ is clear and indisputable," and where "'the writ is appropriate under the circumstances.'" *Karnoski v. Trump*, 926 F.3d 1180, 1203 (9th Cir. 2019) (per curiam) (quoting *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 381 (2004)). This Court considers "(1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression." *Id.* These factors "serve as guidelines," and "[n]ot every factor need be present at once" or even "point in the same direction" for a writ of mandamus to issue. *Hernandez v. Tanninen*, 604 F.3d 1095, 1099 (9th Cir. 2010) (quotations omitted).

### A.   Mandamus Review Is Appropriate to Preclude Litigants from Taking Depositions to Probe the Mental Processes of a Former Cabinet Secretary

**1.** Under the Administrative Procedure Act, a court's review of agency action is typically "based on the record the agency presents to the reviewing court." *Florida*

*Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). This "principle reflects the recognition that further judicial inquiry into executive motivation represents a substantial intrusion into the workings of another branch of Government and should normally be avoided." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (quotation omitted). "[T]he APA's record-review limitation reflects a desire to avoid interfering with the decisionmaking process of a co-equal branch of government." *Ramos v. Wolf*, 975 F.3d 872, 901 (9th Cir. 2020) (R. Nelson, J., concurring).

These concerns are significantly heightened when a party seeks to depose a Cabinet secretary. The Supreme Court crystalized the concerns in *United States v. Morgan*, 313 U.S. 409, 422 (1941), where it condemned the lower court's willingness in that case to permit the deposition of the Secretary of Agriculture "regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates." The Court stressed that "it was not the function of the court to probe the mental processes of the Secretary" and that, "[j]ust as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected." *Id.* (citation and quotations omitted).

It is thus firmly established that "[h]eads of government agencies are not normally subject to deposition." *Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979) (citing *Peoples v. U.S. Dep't of Agriculture,* 427 F.2d 561, 567 (D.C. Cir. 1970)). As

the Fourth Circuit explained three decades ago, "[s]ince *Morgan*, federal courts have consistently held that, absent 'extraordinary circumstances,' a government decision-maker will not be compelled to testify about his mental processes in reaching a decision, 'including the manner and extent of his study of the record and his consultations with subordinates.'" *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991) (quotation omitted) (citing *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985); *Sweeney v. Bond,* 669 F.2d 542, 546 (8th Cir. 1982), *abrogated on other grounds by O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996); *Kyle Eng'g*, 600 F.2d at 231-32; and *Warren Bank v. Camp,* 396 F.2d 52, 56 (6th Cir. 1968)). The court emphasized that the judiciary is not "to probe the mental processes of an executive or administrative officer," and that "[o]nly where there is a clear showing of misconduct or wrongdoing is any departure from this rule permitted." *Id.* (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 325-26 (D.D.C. 1966), *aff'd*, 384 F.2d 979 (D.C. Cir. 1967)).

That rule has remained constant over the following three decades, and the concerns animating the rule "hardly become[] inapplicable upon an official's departure from his office." *In re United States*, 542 F. App'x 944, 948-49 (Fed. Cir. 2013) (issuing mandamus to preclude testimony of Chairman of the Federal Reserve).

**2.** This Court has recognized that separation of powers concerns warrant the exercise of its mandamus authority to preclude discovery into agency decisionmaking

even when the direct testimony of the decisonmaker is not at issue. *See Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019) (per curiam). And, in light of the special concerns raised by attempts to probe the mental processes of decisionmakers, "[m]any decisions hold that mandamus is appropriate when a district judge inappropriately compels a ranking federal official to appear personally rather than by counsel." *In re Commodity Futures Trading Comm'n*, 941 F.3d 869, 872 (7th Cir. 2019) (citing *In re United States*, 624 F.3d 1368, 1372 (11th Cir. 2010) (EPA Administrator); *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (Vice President's Chief of Staff); *In re United States*, 197 F.3d 310, 313-14 (8th Cir. 1999)(Attorney General and Deputy Attorney General); *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (three FDIC Board members); *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993) (FDA Commissioner); and *U.S. Bd. of Parole v. Merhige*, 487 F.2d 25, 29 (4th Cir. 1973) (Parole Board members)).

That a proposed deposition is subject to significant limitations—even limitations much more significant than those at issue here—does not alter the analysis. For example, the Eleventh Circuit issued a writ of mandamus to quash an order directing the Commissioner of the Food and Drug Administration "to be available for thirty minutes" by telephone. *In re United States,* 985 F.2d at 511-13. As the Eleventh Circuit later explained in precluding the testimony of the EPA Administrator, even given that significant limitation, "compelling the testimony of the

Commissioner of the Food and Drug Administration 'would have [had] serious repercussions for the relationship between two coequal branches of government.'" *In re United States*, 624 F.3d at 1372 (quoting *In re United States*, 985 F.2d at 513).

**B.    The District Court Clearly Erred in Concluding that Extraordinary Circumstances Justified Secretary DeVos's Deposition**

**1.** The only asserted purpose for deposing former Secretary DeVos is to probe her mental processes related to official agency action. As discussed above, plaintiffs filed suit in 2019 to compel final decisions on pending applications for loan relief on the ground that those decisions had been unreasonably delayed. After the Department resumed issuing determinations and issued a number of form denials, plaintiffs further asserted that the explanations for those denials were inadequate.

Plaintiffs have identified no respect in which the testimony of the former Secretary is necessary to the determination of their claims. Indeed, it is unclear that she could provide testimony that is even relevant to their pending claims, much less provide information not available elsewhere.

The challenged agency actions here must "stand or fall on the propriety" of the explanation "on the administrative record," "not some new record made initially in the" district court, *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973). By the same token, as the decisions discussed above make clear, only "extraordinary circumstances" can justify a deposition of this kind. *NEC Corp. v. United States*, 151 F.3d 1361, 1375-76

(Fed. Cir. 1998) (quoting *Simplex Time Recorder Co.*, 766 F.2d at 586). Although precise articulations of the governing standard vary, it is generally agreed that to demonstrate "extraordinary circumstances," a plaintiff must show that the official possesses information that is "essential" to resolving her claims and that is "not obtainable from another source." *In re United States,* 197 F.3d at 313-14 (quotation omitted); *see also, e.g.,* *In re United States,* 542 F. App'x at 948; *In re United States*, 624 F.3d at 1372-73.

The views of any official at the Department of Education—including the former Secretary—have no bearing on the facial adequacy of the determinations issued by the Department or on their timeliness. Suits under the APA often challenge the adequacy of the explanation provided for agency determinations or assert that an agency has unreasonably delayed in discharging its responsibilities. It has never been thought that courts in such cases can order the testimony of an agency head except in the rarest circumstances.

This is plainly not such a case. Whether the letters issued to date are legally adequate is a question of law. That the Department did not issue new determinations for an extended period after its existing methodology was enjoined in *Calvillo Manriquez,* is a matter of record. Plaintiffs challenge the reasonableness of the Department's current efforts to resolve loan relief applications. But the former Secretary can provide no relevant, much less essential, information on that question. And the current Department is committed to resolving the applications for loan relief

16

at the earliest possible time and to providing the relief to which eligible borrowers are entitled.

The impropriety of requiring the testimony of the former Secretary is underscored by the discovery plaintiffs have already received. As part of its response to plaintiffs' discovery requests, the Department conducted a search of responsive documents from certain specified custodians, including Secretary DeVos. That search produced approximately 500 responsive documents in addition to a number of additional privileged documents—but only two emails sent to Secretary DeVos, two documents with Secretary DeVos as a custodian, and not a single email sent by Secretary DeVos. *See* Mot. to Quash 8-9 (Add. 42-43). In concluding that the Secretary would nevertheless possess relevant information, the district court simply noted snippets of testimony from other deponents disclaiming knowledge of who made the decision to pause issuing final determinations. *See* Dist. Ct. Op. 7 (Add. 7). But none of those deponents suggested that the explanation for the pause reflected in the administrative record was inaccurate or incomplete, belying any conclusion that further discovery is required here. Nor did any deponent suggest that Secretary DeVos herself directed the pause or developed the form letters, much less that she did so through a process that would have left her in sole possession of any relevant information.

Plaintiffs' inability to demonstrate that they cannot obtain the requested information through less burdensome means is further confirmed by their failure to reasonably exhaust even the already authorized avenues of discovery. Plaintiffs failed to seek a Rule 30(b)(6) deposition, even though such a deposition would have allowed the plaintiffs to ask a designated Department witness about information known or reasonably available to the Department as a whole. *See* Mot. to Quash 17 (Add. 51). Similarly, plaintiffs chose not to use all of their available interrogatories and declined the Department's offer to explore whether the Department might be able to supplement previous interrogatory responses to provide the information plaintiffs seek. *See id.* at 17-18 (Add. 51-52). In addition, even as plaintiffs were seeking to enforce their subpoena, they continued to serve document requests on the Department—and the Department continued to respond to those requests by producing additional documents. *See id.* at 8-9 (Add. 42-43).

**2.** The district court justified its sua sponte order for extra-record discovery on the ground that the Department's explanation for not issuing determinations between June 2018 and December 2019 was pretextual. Dkt. No. 146, *Sweet*, at 11-14 (Add. 23-26). Even assuming that conclusion were correct, it would not warrant the deposition of the former Secretary. The particular statement to which the district court objected was not made by the Secretary and there is no indication that the former Secretary can provide any relevant information, much less that she has any crucial information in

her sole possession. And the grounds for a delay two years ago are at best marginally relevant to the reasonableness of the agency's present actions.

Even on its own terms, moreover, the court's statement regarding pretext is without basis. The court noted that one of several reasons identified by the Department was that assessing claims is time-consuming and complex. The court found this explanation to be "incongruent" with the form denial letters, which the court believed "bear *no indication*" of such time-consuming work, Dkt. No. 146, *Sweet*, at 11-14 (quotation omitted) (Add. 23-26), and declared that "[w]e need to know what is really going on," *id.* at 15-16 (Add. 27-28). At most, the court's belief that the form denial letters did not reflect time-consuming work would be consistent with a finding that the agency's explanation for delay was unpersuasive and that the agency failed to meet its burden. It does not justify extra-record discovery in an APA case, much less the deposition of the former Secretary.

In any event, there is no basis for the court's characterization of the agency's explanation as relying "largely on the backbreaking effort required to review individual applications." Dkt. No. 146, *Sweet*, at 15 (Add. 27). On the contrary, as the administrative record explains, the Department's methodology for determining the extent of loan relief had been enjoined in May 2018 by the district court in *Calvillo Manriquez*. The Department then "prioritized development" of a new methodology, believing it "imperative to have [that new methodology] in place before finalizing

19

decisions approving borrower defense claims and awarding relief." Jones Decl. ¶ 25 (Add. 68); *see also* Jones Decl. ¶ 27 (Add. 69) (explaining that the Department "decided that it should not issue denials until it has a methodology in place that will also allow it to issue approvals" for fear that "borrowers could be confused and believe that the Department would not be approving any claims – which is not the case"). The administrative record also explains that the agency, which was already short-staffed, was required to devote resources at the same time to implementing provisions of the 2016 regulations in response to the district court orders in *Bauer* and *California Ass'n of Private Postsecondary Schools* and to developing a critical claims-management platform. *See* Jones Decl. ¶¶ 8-11 (Add. 62-63); Foss Decl. (Add. 71-75); Nevin Decl. ¶¶ 23, 32-38 (Add. 82, 84-85).

Far from being "contrived," *Department of Commerce*, 139 S. Ct. at 2575, the reasons identified by the agency were fully supported by the record. Indeed, even if the district court believed that those articulated reasons did not represent the full range of "*actual*" reasons for the pause, Dist. Ct. Op. 11 (Add. 11), the Supreme Court has explained that agency "decisions are routinely informed by unstated considerations of," among other things, "politics," "public relations," and "interest group relations," and that the influence of such routine, unstated considerations is not a basis to find impermissible pretext justifying extra-record discovery. *Department of Commerce*, 139 S. Ct. at 2573.

In short, the district court disregarded the primary bases of the agency's explanation to focus on a single secondary reason regarding the complexity of claims resolution that the court chose to deem pretextual. More crucially, even if the court were not mistaken in this regard, no basis would exist for requiring the deposition of the former Secretary. This Court should exercise its mandamus authority to correct that error and halt the deposition.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for a writ of mandamus and direct the district court to grant the government's motion to quash plaintiffs' subpoena seeking a deposition of former Secretary DeVos.

Respectfully submitted,

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
JOSHUA M. SALZMAN

*s/ Sean Janda*
SEAN JANDA
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *202-514-3388*

JUNE 2021

## CERTIFICATE OF COMPLIANCE

I hereby certify that this petition complies with the limit of Ninth Circuit Rule 21-2(c) and 32-3(2) because it totals 4923 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).  I further certify that this petition complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word 2016 in a proportionally spaced typeface, 14-point Garamond font.

*s/ Sean Janda*
SEAN JANDA

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2021, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system.  Service has been accomplished via email to the following counsel:

*Counsel for Real-Parties-in-Interest–Plaintiffs:*

Eileen M. Connor (econnor@law.harvard.edu)
Toby R. Merrill (tomerrill@law.harvard.edu)
Margaret E. O'Grady (mogrady@law.harvard.edu)
Rebecca C. Ellis (rellis@law.harvard.edu)
Joseph Jaramillo (jjaramillo@heraca.org)
Claire Torchiana (ctorchiana@heraca.org)
Manuel Juan Dominguez (jdominguez@cohenmilstein.com)

*Counsel for Real-Party-in-Interest–Movant:*

Jesse Panuccio (jpanuccio@bsfllp.com)

The district court will be provided with a copy of this petition for writ of mandamus pursuant to Federal Rule of Appellate Procedure 21(a).

*s/ Sean Janda*
SEAN JANDA