No. 21-_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

*In re* UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,

*Petitioners.*

UNITED STATES DEPARTMENT OF EDUCATION; and MIGUEL A. CARDONA, in his official capacity as Secretary of the Department of Education,

*Petitioners–Defendants*,

v.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

*Respondent*,

THERESA SWEET; ALICIA DAVIS; TRESA APODACA; CHENELLE ARCHIBALD; JESSICA DEEGAN; SAMUEL HOOD; and JESSICA JACOBSON, on behalf of themselves and all others similarly situated,

*Real-Parties-in-Interest–Plaintiffs*,

ELISABETH DEVOS,

*Real-Party-in-Interest–Movant*.

## ADDENDUM TO PETITION FOR A WRIT OF MANDAMUS

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
JOSHUA M. SALZMAN
SEAN JANDA
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*202-514-3388*

# TABLE OF CONTENTS

## DISTRICT COURT ORDERS

Order Denying Motion to Quash (May 19, 2021) (Doc. 53) ................................ 1

Order Denying Class Settlement, to Resume Discovery, and to Show Cause
    (Oct. 19, 2020) (*Sweet v. Cardona*, No. 3:19-cv-3674 (N.D. Cal.), Doc.
    146) ........................................................................................................... 13

## OTHER DOCUMENTS

Defendant U.S. Department of Education's Motion to Quash Rule 45
Deposition Subpoena (Apr. 20, 2021) (Doc. 34) .................................................. 30

Declaration of Diane Auer Jones (Nov. 14, 2019) (*Sweet* Doc. 56-3, at 1-12) ... 59

Declaration of Ian Foss (Nov. 14, 2019) (*Sweet* Doc. 56-3, at 325-29) .............. 71

Declaration of Colleen M. Nevin (Nov. 14, 2019) (*Sweet* Doc. 56-4, at 1-17) ... 76

Federal Student Aid Enforcement Office, Report on Borrower Defense (Oct.
28, 2016) (*Sweet* Doc. 56-4 at 63-67) ........................................................ 93

Defendants' Response to August 31, 2020 Order (Sept. 4, 2020) (*Sweet* Doc.
    116) ........................................................................................................... 98

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re | No. MC 21-80075 WHA |
| SUBPOENA SERVED ON FORMER SECRETARY OF EDUCATION ELISABETH DEVOS. | **ORDER DENYING MOTION TO QUASH** |

Former Secretary of the United States Department of Education Elisabeth DeVos\* moves to quash a subpoena for her deposition, issued in co-pending litigation before the undersigned. Exceptional circumstances warranting the deposition, the motion is **DENIED**.

Our underlying suit, *Sweet v. Cardona*, No. C 19-03674 WHA, concerns the lawfulness of the Department of Education's eighteen-month halt in issuing decisions on student-loan borrower-defense applications under Secretary DeVos. Our story began in 1993 when Congress directed the Secretary of Education to specify the sort of school misconduct that borrowers may assert as a defense against repayment of their student loans. This "borrower-defense" apparatus lay dormant for its first several decades until May 2015 when the large for-profit college, Corinthian Colleges, Inc., collapsed. Students submitted a "flood" of borrower-defense applications, so Secretary John B. King appointed a special master in June 2015 to adjudicate claims and then updated the borrower-defense regulations in November 2016. But

---

\* Though Secretary DeVos and many named herein have since left their posts, this order affords them the dignity of their former offices.

Add. 1

it remained a game of catch up. By the end of the Obama Administration, the Secretary had approved 31,773 applications and found 245 ineligible, for a 99.2% grant rate. Borrowers, however, had submitted 72,877 applications (AR 392–94, 502–05). 20 U.S.C. § 1087e(h); 81 Fed. Reg. 39,329 (June 16, 2016); 81 Fed. Reg. 75,926 (Nov. 1, 2016).

In 2017, newly-installed Secretary DeVos moved to rein in the previous administration's overzealous (as she put it) grant of relief to borrowers. Between December 2017 and May 2018, the Secretary reportedly decided 26,000 claims from Corinthian students, approving 16,000 under a new relief methodology. But a judge (in this district) preliminarily enjoined this partial-relief methodology for its likely violation of the Privacy Act, 5 U.S.C. § 552a (AR 006–007, 350). *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) (Magistrate Judge Sallie Kim).

Up to that point in June 2018, the two administrations had granted 47,942 applications and denied or closed 11,940 since 2015. Borrowers had submitted in total, however, 165,880 applications, leaving 105,998 still to be decided. Then, despite the backlog, the decisions stopped. *For eighteen months*, from that June 2018 until December 2019, the Secretary issued no decisions, even as the backlog mounted (AR 397–404, 587–88).

A putative class of student-loan borrowers, not already involved in *Calvillo Manriquez*, sued in June 2019 to compel the Secretary to restart the adjudication process. An October 2019 order certified a nationwide class of approximately 160,000 borrower-defense applicants who still awaited decision. In November, the Secretary certified an administrative record to explain her delay (though, without any declaration by the Secretary herself) and, at summary judgment, justified the eighteen-month delay on (among others) staffing shortages and competing priorities, such as developing the new relief method. But most forcefully, the Secretary argued that:

> Issuing final decisions on such claims is time-consuming and complex, with many steps in the adjudicatory process, and agencies must be given, within reason, the time necessary to analyze the issues presented so that they can reach considered results.

United States District Court
Northern District of California

(Dkt. No. 63) (cleaned up).  But before a ruling could be had, the parties reached a proposed settlement, which would have imposed an eighteen-month deadline for the Secretary to decide outstanding claims.  Preliminary approval followed, yet as the class fairness hearing approached, major problems emerged.

We'd known at summary judgment that in December 2019, with around 225,000 claims pending, the Secretary had released an updated "tiered relief methodology" and issued 16,045 decisions.  We'd also known that, in a marked departure from the previous grant-denial ratio, she had approved only 789 applications and denied the remainder.  We had little indication, however, how matters would progress (AR 587–601).

Not well, we learned.  While negotiating the proposed settlement, and while awaiting this Court's final approval, the Secretary had been issuing alarmingly-curt denial notices for several months, in violation (as class counsel put it) of both the spirit of the proposed settlement and the Administrative Procedure Act.  And, in contrast to the previous administration's 99.2% grant rate, the Secretary had run up a 94.4% *denial* rate for our borrowers — denying 74,000 applications and granting only 4,400 (Dkt. No. 116).

An order dated October 19, 2020, recognized the apparent pretext for what it was.  The perfunctory form-denial letters stood in contrast to the supposed basis for the delay — the "'time-consuming,' 'complex,' legal analysis of both borrower-submitted and agency evidence, 'under applicable State law,' to 'reach considered results.'"  *Sweet v. DeVos*, 495 F. Supp. 3d 835, 844 (N.D. Cal. 2020).  As the United States Supreme Court has long held and recently reemphasized, "meaningful judicial review" requires "an agency [to] 'disclose the basis' of its action."  *Dep't of Commerce v. New York*, 588 U.S. ___, 139 S. Ct. 2551, 2573–76 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  Given the extraordinary circumstances, the Court denied final approval of the proposed settlement and ordered written discovery and the depositions of five Department officials overseeing the borrower-defense apparatus (except for the Secretary herself) to determine the actual bases for the eighteen-month delay and to probe the development, approval, and use of the form-denial letters.  The Court also ordered the Secretary to show cause why she should

1    not be enjoined from issuing further form denials to our classmembers, and the Secretary

2    agreed to abstain until further order (Dkt. No. 150). *Sweet*, 495 F. Supp. 3d at 847.

3        Plaintiffs have taken discovery over the past several months, including four depositions.

4    Secretary DeVos resigned her post on January 8, 2021, so a January 12 order authorized class

5    counsel to seek her deposition. Counsel then issued a subpoena for that deposition, and the

6    Secretary moved to quash. The District Court for the Southern District of Florida transferred

7    the matter to this district and the Court of Appeals for the Eleventh Circuit denied review (Dkt.

8    Nos. 1, 28). *In re Elisabeth DeVos*, No. 21-11239, Order (11th Cir. May 7, 2021). This order

9    follows full briefing and oral argument (held telephonically due to COVID-19).

10                    *          *          *

11       Even assuming Secretary DeVos retains some measure of executive prerogative, she

12   must answer an appropriately issued subpoena. Judicial process runs even to unwilling

13   executives. Chief Justice Marshall first ruled that a subpoena could require a president's

14   production of documents material to the defense when presiding over Vice President Burr's

15   treason trial. *United States v. Burr*, 25 F. Cas. 30 (No. 14,692d) (C.C. Va. 1807). For the same

16   reasons, in 1818, President Monroe answered written interrogatories on summons by the

17   defense in a court martial. In 1974, a unanimous Supreme Court ordered President Nixon's

18   compliance with a subpoena for the White House tapes. President Clinton twice gave

19   videotaped testimony for criminal proceedings and, most famously, sat for deposition in a civil

20   suit regarding his conduct as governor of Arkansas. *Clinton v. Jones*, 520 U.S. 681, 703–05

21   (1997) (citing Ronald D. Rotunda, *Presidents & Ex-Presidents as Witnesses: A Brief Historical

22   Footnote*, 1975 U. ILL. L. FORUM 1, 4–7 (1975)); *see Jones v. Clinton*, No. LR-C-94-290

23   SWW, Dkt. No. 229 (E.D. Ark. Jan. 14, 1998).

24       If judicial process runs to presidents, it runs to cabinet secretaries — especially former

25   ones. The Supreme Court, nevertheless, requires some deference to agency heads summoned

26   to explain their actions. In the seminal case on this point, the Supreme Court observed that

27   Secretary of Agriculture Henry Wallace (by then Vice President) "should never have been"

28   compelled to testify to the bases for certain challenged orders. *United States v. Morgan*, 313

United States District Court
Northern District of California

United States District Court
Northern District of California

U.S. 409, 422 (1941). Setting aside that Congress would not pass the Administrative

Procedure Act for five more years, no United States Court of Appeals has read *Morgan* as a

rigid bar against the subpoena of a cabinet secretary for either production or testimony.

Our court of appeals has read *Morgan* as a word of caution that "[h]eads of government

agencies are not normally subject to deposition." *Kyle Engineering Co. v. Kleppe*, 600 F.2d

226, 231 (9th Cir. 1979). Though our court of appeals has spoken no further on this point, the

remaining courts of appeals have established several categories of "exceptional circumstances"

that warrant the deposition of a cabinet secretary:

> 1. A strong showing of bad faith or improper behavior. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *In re United States (Holder)*, 197 F.3d 310, 314 (8th Cir. 1999); *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1139–40 (10th Cir. 1999); *In re F.D.I.C.*, 58 F.3d 1055, 1062 (5th Cir. 1995); *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 212 (4th Cir. 1991); *City of Des Plaines v. Metro. Sanitary Dist. of Chicago*, 552 F.2d 736, 739–40 (7th Cir. 1977); *Warren Bank v. Camp*, 396 F.2d 52, 56 (6th Cir. 1968).
>
> 2. The official has unique and relevant first-hand knowledge. *Lederman v. New York City Dep't Parks & Rec.*, 731 F.3d 199, 203 (2d Cir. 2013); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *In re United States (Bernanke)*, 542 F. App'x 944, 948 (Fed. Cir. 2013).
>
> 3. The necessary information cannot be obtained through other less burdensome or intrusive means. *Lederman*, 731 F.3d at 203; *Bogan*, 489 F.3d at 423; *Holder*, 197 F.3d at 314; *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993); *Simplex Time Recorder Co. v. Sec. of Labor*, 766 F.2d 575, 587 (D.C. Cir. 1985).

Simply put, while rare, courts *do* authorize depositions of cabinet secretaries and similar

high-level officials where appropriate, and have authorized examination — over objection —

of:

> • Secretary of Defense James N. Mattis. *Karnoski v. Trump*, No. C 17-01297, 2020 WL 5231313 (W.D. Wash. Sept. 2, 2020) (Judge Marsha J. Pechman); *stayed on other grounds*, 2020 WL 6561525 (W.D. Wash. Nov. 9, 2020).
>
> • Secretary of Commerce Wilbur L. Ross, Jr. *New York v. Dep't of Commerce*, 333 F. Supp. 3d 282 (S.D.N.Y. 2018) (Judge Jesse M. Furman), *stayed sub nom. In re Dep't Commerce*, 139 S. Ct. 16 (2018).

**Add. 5** [5]

- Environmental Protection Agency Administrator Gina McCarthy. *Murray Energy Corp. v. McCarthy*, No. C 14-00039, 2015 WL 7017009 (N.D.W.Va. Nov. 12, 2015) (Judge John P. Bailey).

- Secretary of the Interior Gale A. Norton. *Schaghticoke Tribal Nation v. Norton*, No. C 06-00081, 2006 WL 3231419 (D. Conn. Nov. 3, 2006) (Judge Peter C. Dorsey).

- Secretary of Transportation John A. Volpe. *D.C. Fed'n of Civic Ass'ns v. Volpe*, 316 F. Supp. 754 (D.D.C. 1970) (Judge John J. Sirica), *rev'd on other grounds*, 459 F.2d 1231 (D.C. Cir. 1971).

- Comptroller of the Currency James J. Saxon. *Union Savings Bank of Patchogue v. Saxon*, 209 F. Supp. 319 (D.D.C. 1962) (Judge Leonard P. Walsh).

And, for what it's worth, even the undersigned has done this before, though from the other side of the bench. In connection with the Department of Education's move to shut down a Native American university near Davis, California, the undersigned (then still a lawyer) attended the deposition of Secretary Terrel Bell in *United States v. Deganawidah-Quetzalcoatl University*, No. C 82-00531 PCW (E.D. Cal.).

The first ground of extraordinary circumstances we have already established. To recap, the Secretary justified the eighteen-month halt in issuing final decisions on student-loan borrower-defense applications on the time required for considered decisionmaking. But months later, we learned that her Department had resumed issuing decisions, not at measured but breakneck pace, in perfunctory and unreasoned form-denial letters, at an alarming rate. Such apparent pretext, the paradigm of agency bad faith, subverts the presumption of agency "conscience and intellectual discipline" underlying *Morgan*'s deferential review. 313 U.S. at 421; *Commerce*, 139 S. Ct. at 2573–76; *Sweet*, 495 F. Supp. 3d at 844. Moreover, pretext opens to question the credibility of Secretary DeVos's remaining justifications for the delay. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).

Our record also highlights the Secretary's personal involvement in the conduct under review here. The high-level officials already deposed have disclaimed authority for that

conduct and have instead pointed to the Secretary. For one, the Department has in-part premised the eighteen-month halt upon the *Calvillo Manriquez* injunction regarding the *separate* class of Corinthian student-loan borrowers. Mark Brown, head of Federal Student Aid, testified that the decision to halt the rest of the borrower-defense apparatus would have been "relayed" to him by the "Office of the Under Secretary" (Brown Tr. at 223, Dkt. No. 37-1, Exh. D). Yet Diane Jones, Under Secretary from May 2018 to January 2021, testified that she was not "a senior enough official to have" that sort of "decision-making authority." She was simply "told that was the decision" (Jones Tr. at 182–85, Dkt. No. 37-1, Exh. B). Nor could her predecessor, James Manning, explain the decision (Manning Tr. at 118–21, Dkt. No. 37-1, Exh. E). Both reported directly to the Office of the Secretary and the Deputy Secretary — though the Department still has yet to identify a relevant Deputy Secretary here who, regardless, appears to focus on primary and secondary education matters unrelated to ours. To wit, if an order came from above, it came from the Secretary (Dkt. Nos. 45, 46).

For another explanation of the delay, the Department has said that it did not want to confuse borrowers by only issuing claim denials while it still worked to develop a new method of awarding relief for successful claims. Again, however, Under Secretary Jones did not know who made this decision (Jones Tr. at 174), and instead of shedding further light, Under Secretary Manning pointed to the Secretary (Manning Tr. at 98–101, 121–24). Then, once the Department resumed issuing borrower-defense decisions, Colleen Nevin, Director of the Borrower Defense Unit, testified that the Secretary *herself* "set [targets for] the elimination of the backlog" and received regular status updates from Mr. Brown of Federal Student Aid. The short of it is that Department officials keep pointing toward the Secretary when questioned (Nevin Tr. 101–02, Dkt. No. 37-1, Exh. C; Jones Tr. at 129).

Beyond illuminating her involvement, these material gaps at the highest rungs of the Department's decisionmaking record reveal the necessity of Secretary DeVos's testimony for an independent reason. We lack an official and contemporaneous justification for the eighteen-month delay because this suit concerns agency *inaction*, and not the usual agency *action*. *See Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997); *Thompson v. U.S. Dep't of*

Add. 7 [7]

*Labor*, 885 F.2d 551, 555 (9th Cir. 1989).  In these circumstances, far afield from any consideration of agency bad faith, the Supreme Court has recognized that often "the only way there can be effective judicial review is by examining the decisionmakers themselves."  *Volpe*, 401 U.S. at 420.  Indeed, in a separate though contemporary case, the district court (as noted above) had required Secretary of Transportation Volpe to testify at trial for the same reason:

> The testimony of a cabinet officer was necessary in this case because of the somewhat unique circumstances surrounding the [agency action] . . . Several of the decisions required . . . were made personally by the Secretary [but] [s]ince some of these decisions were not committed to writing at the time they were made, it was only by allowing the questioning of the Secretary himself that the Court could ascertain whether the decisions were in fact made and what constituted the basis for the decisions.
>
> *             *             *
>
> The Court is aware that the Supreme Court in *United States v. Morgan* prohibited the probing of the mental process of an administrative decision maker to determine his reasoning in reaching a decision.  The interrogation of Secretary Volpe here was limited to the actions which he took, and the materials which he considered as the basis for his determination, rather than his mental process in considering these materials.
>
> *             *             *
>
> In retrospect, the Court feels that its decision to require the Secretary to testify was a wise one . . . The Secretary impressed the Court as a sincere and dedicated public servant with many years of experience, and his honest, straightforward testimony did much to elucidate the complex chain of events leading up to the [challenged agency decision].

*D.C. Fed'n*, 316 F. Supp. at 761 fn. 12 (cleaned up).  The court of appeals approved this move in light of the Supreme Court's intervening decision in *Citizens to Preserve Overton Park, Inc. v. Volpe*, explaining that "[a]bsent a record, judicial review of the Secretary's action can be little more than a formality *unless* the District Court takes the disfavored step of requiring the Secretary to testify as to the basis of his decision."  *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1238–39 (D.C. Cir. 1971) (emphasis added).

To be sure, the Secretary has submitted an administrative record here.  But that sparse submission, consisting primarily of declarations from other Department officials generated during the course of the litigation (along with, for the most part, public case law, regulations,

Add. 8

8

United States District Court
Northern District of California

1    and documents reflecting the views of the previous administration), has not answered our

2    questions yet.  In fairness, we should not write off these declarations as *post-hoc* rationale.  *See*

3    *Indep. Mining*, 105 F.3d at 511.  But neither may we accept them without question.  *See D.C.*

4    *Fed'n II*, 459 F.2d at 1238.  Compounding matters, as noted above, the revelation of pretext

5    has opened to question the credibility of the Secretary's retroactive justifications for the delay.

6         There appears some question about the scope and effect of the deliberative process

7    privilege here.  Class counsel have disclaimed any attempt to traverse the privilege at this stage

8    and we will hold them to it.  But this does not undercut the relevance or efficacy of an

9    examination of the Secretary.  The "privilege permits the government to withhold documents

10   that reflect advisory opinions, recommendations and deliberations comprising part of a process

11   by which government decisions and policies are formulated."  *F.T.C. v. Warner Commc'ns*

12   *Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).  It does not permit an agency to obscure the actual

13   bases for its conduct.  As recently emphasized:

14              [A]gencies [must] offer *genuine* justifications for important
              decisions, reasons that can be scrutinized by courts and the
15              interested public.  Accepting contrived reasons would defeat the
              purpose of the enterprise.  If judicial review is to be more than an
16              empty ritual, it must demand something better . . . .

17   *Commerce*, 139 S. Ct. at 2575–76.  In other words, we cannot determine whether the Secretary

18   has offered sufficient explanation for the eighteen-month delay until we address the threshold

19   question of whether those explanations *in fact* drove the delay in real time.  Some of this

20   information will be written; some will be unwritten and reside only in the Secretary's mind.

21   But regardless, the deliberative process privilege will shield neither the actual decisions to

22   engage in the challenged conduct nor their justifications, and class counsel will be free to probe

23   both.  *Volpe*, 401 U.S. at 420; *Warner*, 742 F.2d at 1161.

24        Along this line, class counsel will ask whether Secretary DeVos directed her subordinates

25   to cease issuing student-loan borrower-defense decisions, or whether she tacitly approved of

26   the halt once manifested.  They will then ask whether the justifications offered at summary

27   judgment, such as staffing, competing priorities, and the difficulty of review, *in fact* drove the

28   decision.  Counsel will draw out whether any other considerations played a role in the decision

when made.  Counsel may also supply considerations and probe the extent to which those informed the decision in real time.  All of this may be accomplished without offending the Secretary's privilege against revealing her *predecisional* deliberations.

A similar line will address the yet unanswered questions surrounding the flash flood of blanket-form denial letters.  The Department notes that Ms. Nevin testified at some length to the use and development of the form-denial letters.  But her answers leave us guessing who approved the forms (though her testimony points to the Secretary's direct involvement) and, more importantly, why?  When the decision was made to use the forms, how did Department policymakers square the unreasoned form denials with the APA's requirement of reasoned decisionmaking?  And, how did they justify the perfunctory flurry of denials after telling this Court that those decisions needed time and consideration?  495 F. Supp. 3d at 842–43; *Butte County, Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  These questions, after all, drove the discovery here.  If the Department had answers, it presumably would have advanced them already, if only to render the Secretary's deposition unnecessary.

Movants contend that plaintiffs have not exhausted other avenues of discovery, a question other courts have correctly raised in these circumstances.  *See, e.g.*, *Bogan*, 489 F.3d at 424.  But these cases cannot require literal exhaustion of alternatives.  Following the October 19 order, plaintiffs have deposed four high-ranking Department officials, including two prior Under Secretaries (Dkt. No. 46) and have taken targeted document discovery (No. C 19-03674 WHA, Dkt. No. 186).  Exhaustive discovery through line employees will reveal little about the bases for Department policy, and, for that matter, though Department lawyers offer guidance, they don't make policy — the policymakers do.  If our current set of policymakers cannot answer questions, the only place left to look is up.  Movants' press for a Rule 30(b)(6) deposition obscures reality; authority here lies with *the Secretary*.  20 U.S.C. § 3411.  Where questions remain, a deposition of the Secretary offers the most efficient means of gathering her candid testimony, asking follow-up questions, refreshing her recollection, and testing her credibility as to the policy decisions at issue.  *See New York*, 333 F. Supp. 3d at 290; *ABC v. United States Info. Agency*, 599 F. Supp. 765, 769 (D.D.C. 1984) (Judge John G. Penn).

The remaining quibbles with the means of discovery used thus far fail to convince. The Secretary faults class counsel for taking only four of their five authorized depositions. But counsel have saved the last for the Secretary; doubtless if counsel had taken all five already, she would have opposed the overreach. So too with the scope of document discovery, about which the Department has already complained. The Department's further characterization of the deposition subpoena as premature mistakes the record. Discovery in the underlying case should have been completed by December 24, 2020. The parties stipulated to extend that deadline until January 14. And so, class counsel formally notified the Department of their intent to depose the Secretary on January 7. Any later and movants would have argued undue delay. Regardless, the Department's own intransigent document production has provided the primary basis for our extended term of discovery over the last several months (No. C 19-03674, Dkt. Nos. 170, 183, 186).

At the close, movants' reliance on the Supreme Court's recent stay of the deposition of the Secretary of Commerce pales in view of the ultimate merits decision, which stressed that "to permit meaningful judicial review, an agency *must* disclose the basis of its action." When "[w]e are presented . . . with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process . . . we *cannot* ignore the disconnect between the decision made and the explanation given." *Commerce*, 139 S. Ct. at 2573–75 (emphasis added) (quotes omitted); 139 S. Ct. 16. "With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (Jackson, J., concurring). So too for cabinet secretaries.

In sum, extraordinary circumstances warrant the deposition of Secretary DeVos for three hours, excluding breaks. No part of this order maligns the Secretary's deliberative-process privilege. But class counsel are entitled to probe matters broadly related to the *actual* cause for the challenged eighteen-month delay, the development, approval, and use of the form-denial letters, and the Secretary's involvement in clearing the backlog of our classmembers' borrower-defense claims.

United States District Court
Northern District of California

This order shall be **STAYED** for fourteen days or until the resolution of any mandamus review, whichever comes later. At that point, while class counsel will accommodate (within reason) the Secretary's convenience, this order impresses upon the parties that our failed settlement and term of discovery have delayed the just resolution of this case long enough already. Diligent haste will be expected. The motion to quash is **DENIED**. A status conference in both this and in case No. C 19-03674 WHA is set for **JUNE 3 AT 11:00 A.M.**

**IT IS SO ORDERED.**

Dated: May 19, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, et al.,

       Plaintiffs,

    v.

ELISABETH DEVOS, et al.,

       Defendants.

No.  C 19-03674 WHA

**ORDER DENYING CLASS SETTLEMENT, TO RESUME DISCOVERY, AND TO SHOW CAUSE**

### INTRODUCTION

Following preliminary approval of a proposed class settlement meant to restart Department of Education review of student-loan borrower-defense applications under the Higher Education and Administrative Procedure Acts, the Secretary's new perfunctory denial notices undermine the proposed settlement, contradict her original justification for delay, raise substantial questions under the APA, and may impose irreparable harm upon the class of student-loan borrowers.  Final approval of the proposed class settlement is **DENIED**.  **DISCOVERY** shall resume immediately.  Both parties shall **SHOW CAUSE** why the Secretary should not be enjoined from further perfunctory denials.  This case resumes on the merits.

### STATEMENT

Title IV of the Higher Education Act directs the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students" through financial-assistance programs.  Education affords most a significant opportunity, but all too

United States District Court
Northern District of California

often, for-profit colleges, using fraudulent enrollment tactics (such as inflated job-placement numbers), leave students saddled with debt and little to show for it. To remedy this misconduct, Title IV authorizes the Secretary to cancel a federal student loan (in whole or part) and directs her to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan." 20 U.S.C. §§ 1070, 1087e(h).

In 1994, Secretary Richard W. Riley promulgated the first variation of the "borrower defense" rule for certain federal loans, which allowed a borrower to "assert as a defense against repayment of his or her loan 'any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law.'" 60 Fed. Reg. 37,768, 37,770 (July 21, 1995). Yet the system lay dormant for the next twenty years (AR 505).

In May 2015, Corinthian Colleges, Inc., a for-profit college with more than 100 campuses and over 70,000 students, collapsed. Secretary John B. King found "that the college had misrepresented its job placement rates." Predictably, Corinthian students submitted a "flood" of student-loan borrower-defense applications. So, Secretary King quickly moved to update the infrastructure for adjudicating borrower-defense applications and appointed a special master in June 2015 "to create and oversee a process to provide debt relief for these Corinthian borrowers." 81 Fed. Reg. 39,329, 39,330, 39,335 (June 16, 2016). But it remained a game of catch up.

Over the next year, the special master granted full loan discharges to 3,787 applicants. Yet by December, borrowers had submitted 6,691 defense applications, and by June 2016, they'd submitted 26,603. The newly created "Borrower Defense Unit" ("BDU") took over and by October approved 11,822 applications and denied 245, for a total of 15,609 approvals and a 98.5% grant rate. But by that time, borrowers had submitted a total of 72,877 defense applications (AR 339–40, 347, 369, 384–85, 392–94, 502).

In November 2016, the BDU promulgated the new borrower-defense regulations — scheduled to take effect on July 1, 2017 — to codify the process for adjudication and to set a

new standard for borrower-defense claims.  81 Fed. Reg. 75,926 (Nov. 1, 2016).  The regulations would require a borrower to submit an application with evidence supporting his or her claim and allow the Secretary to designate an official to resolve the claim.  *See* 34 C.F.R. §§ 685.206, 685.222 (2018).

In the new year, the Secretary approved another 16,164 applications, but failed to discharge the loans before January 20.  In total, by the end of the Obama Administration, the Secretary had approved 31,773 applications for discharge (though not necessarily effected relief) and found 245 ineligible, for a 99.2% grant rate.  Borrowers, however, had had submitted 72,877 applications (AR 392–94, 502–03).

With the new administration came new policy.  In March 2017, newly-installed Secretary Elisabeth DeVos (our present defendant) created a Borrower Defense Review Panel to examine the entire review process and recommend changes.  After the panel also requested an Inspector General review, the BDU "was advised" that "no additional approvals would be processed" until the completion of both the panel and IG reviews.  Nevertheless, the panel honored — and the Secretary approved, though "with extreme displeasure" — the 16,164 borrower-defense applications that the prior administration had approved but not discharged before January 20, 2017.  By July, however, borrowers had submitted 98,868 applications in total (AR 348–49, 502–05; Dkt. No. 66-3, Ex. 7).

The IG ultimately recommended only "improved documentation and information systems" and "did not recommend any changes to existing review processes and protocols."  The Secretary, however, decided to develop new method for awarding relief to eligible borrowers.  She disagreed with the previous administration, which had granted full loan discharges on (as the Secretary puts it) the assumption that borrowers subject to school misconduct had received no value from their education.  Instead, the new method would discharge more or less of a loan based empirically upon the difference between the average earnings of borrowers subjected to school misconduct and of students who completed similar programs from other, misconduct-free schools (AR 006–007, 349–50, 590–91).

Between December 2017 and May 2018, the Department reportedly decided more than 26,000 more claims — approving over 16,000 and denying over 10,000 — before a court in this district preliminarily enjoined this new "partial relief methodology" for its likely violation of the Privacy Act, 5 U.S.C. § 552a (AR 006–07, 350). *Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) (Magistrate Judge Sallie Kim). So, in total by June 2018, the Secretary had granted 47,942 applications (though not necessarily effected relief) and denied or closed 12,314, for a 79.6% grant rate (or, Secretary DeVos's decisions taken alone, a 61.5% grant rate). Yet the flood continued. By that point, borrowers had submitted, in total, 165,880 applications, leaving 105,998 still to be decided (AR 401).[1]

Then, despite the backlog, the decisions stopped. By September, 139,021 applications awaited review. That count rose to 158,110 by the end of December, and to 179,377 by the end of March 2019. By June 2019, borrowers had filed 272,721 applications and 210,168 languished. *For eighteen months*, from June 2018 until December 2019 — *well into this suit* — the Secretary issued no decisions at all (AR 397–404, 587–88).

Plaintiffs Theresa Sweet, Chenelle Archibald, Daniel Deegan, Samuel Hood, Tresa Apodaca, Alicia Davis, and Jessica Jacobson filed borrower-defense applications. Contending the Secretary's delay to be unlawful stonewalling, they sued in June 2019 to compel the Secretary to begin deciding applications again. An October 2019 order certified a nationwide class of approximately 160,000 borrower-defense applicants who still awaited decision and were not already members of *Calvillo Manriquez v. DeVos*, No. C 17-07210 SK, 2018 WL 5316175 (N.D. Cal. Oct. 15, 2018) (Magistrate Judge Sallie Kim).

In November, the Secretary certified an administrative record to explain her delay and cross motions for summary judgment followed (Dkt. Nos. 56, 63, 67). On December 10, 2019, with around 225,000 claims pending, the Secretary released an updated "tiered relief methodology" which, similar to the previously enjoined method, would award partial loan

---

[1] Additionally, shortly before the 2016 regulations' effective date (July 1, 2017), the Secretary had stayed the regulations under Section 705 of the APA. In September 2018, the District Court for the District of Columbia found the delay arbitrary and capricious. *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) (Judge Randolph Moss).

discharges based upon the difference in earning potential between borrowers subjected to school misconduct and those not; though this method appeared to use data gathered at a higher level to assuage the earlier privacy concerns (AR 589–601).

The next day, the Secretary issued 16,045 decisions; but in a marked departure from the previous grant-denial ratio, she approved only 789 applications and denied the remaining 15,256 (AR 587–88). Previously, as noted, the Secretary's grant ratio had been 61.5%. These December decisions, however, represented a 95.1% *denial* rate. Though class counsel knew of these early numbers, they maintain that they did not learn of the form denials, and, it seems, could not know of the scope of their use, until later (Dkt. Nos. 121 at 13–14; 129-1 at 2–3).

Before the undersigned ruled on the motions for summary judgment, however, the parties apparently reached a proposed class settlement. A May 22, 2020, order preliminarily approved the proposal as it appeared to impose an adequate eighteen-month deadline for the Secretary to decide claims and a twenty-one month deadline to effect relief, penalties for the Secretary's failure, reporting requirements, and it did not prejudice the merits of borrowers' applications. Following preliminary approval, the parties distributed class notice and solicited comments in time for the October 1 fairness hearing. About one hundred thirty borrowers timely responded.

Then came the snag. Class counsel discovered that the Secretary had been issuing alarmingly-curt denial notices for several months, in violation (as class counsel put it) of both the spirit of the proposed settlement and the Administrative Procedure Act. The undersigned requested more information from the Secretary and, given the lack of briefing, reserved the problem for the October 1 fairness hearing (Dkt. No. 121).

In her requested response, the Secretary admitted to using four different form denial notices. Continuing her rate of denials from December, the Secretary had, as of April, granted only 8,800 applications and denied 36,200. By August, she had approved 13,500 applications, yet denied 118,300, for an 89.8% denial rate. Of those applications from our class of

United States District Court
Northern District of California

1    borrowers, the Secretary has denied 74,000 applications and granted only 4,400, for a 94.4%

2    denial rate (Dkt. No. 116).[2]

3        As the fairness hearing approached, it became clear the parties could not jointly move for

4    approval.  A September 16 order kept the fairness hearing on calendar to ensure borrowers

5    would be heard, whatever the outcome, but invited the parties to move for relief as they wished

6    on the standard 35-day track (Dkt. No. 123).

7        On October 1, approximately 620 participants, counsel, borrowers, and members of the

8    public joined the proposed-settlement fairness hearing by telephone.  Of the approximately

9    three hundred requests to speak, the Court chose fourteen representative borrowers to comment

10   on the proposed settlement.  The representatives expressed serious concern with the proposed

11   settlement, particularly in light of the Secretary's recent string of form denials.

12       In the meantime, class counsel have moved for approval of the proposed settlement *and*

13   for its enforcement, seeking an order requiring the Secretary, in denying applications, to issue

14   explanatory details under the Department's own regulations, the Administrative Procedure Act,

15   and due process.  The Secretary would consent to approval of the settlement *as written*, but

16   opposes class counsel's view of it.  This motion has been fully briefed.  Time is of the essence.

17   The parties have been heard at two recent hearings.  This motion is appropriate for disposition

18   on the papers.

19                                    **ANALYSIS**

20       One hundred sixty thousand student-loan borrowers, defrauded by for-profit schools and

21   saddled with debilitating debt, have asked the Secretary of Education for the relief which

22   Congress has provided.  All may not be entitled to relief, but all are entitled to a

23   comprehensible answer.  For eighteen months, the Secretary refused, largely on the grounds

24   that such answers required backbreaking effort and, thus, substantial time.  Now, the Secretary

25   has begun issuing decisions at breakneck speed.  But most are a perfunctory "Insufficient

26   Evidence" — without explanation.

27

28   _____
     [2] It remains unclear on this record when borrowers filed these newly-decided applications.

United States District Court
Northern District of California

1. **THE SETTLEMENT IS DENIED; ENFORCEMENT IS MOOT.**

A class settlement must offer fair, reasonable, and adequate relief. *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012). Our proposed settlement primarily offered a timeline for the Secretary to decide the delayed student-loan borrower-defense applications. Given the borrower-defense applications had already languished without decision for eighteen months (and some had languished much longer), allowing the Secretary another eighteen months from final approval to decide the applications hardly gave cause to celebrate. But the proposed settlement did offer the substantial benefit that neither party would seek appellate relief. Upon final approval, the class would face acceptable delay; the Secretary would hit the ground, well, not running, but at least moving forward.

Upon closer inspection, however, this long-awaited restart of borrower-defense application review brings cause for alarm. The Secretary has been issuing four different form denial notices over the past several months, since even before the settlement. The class appears to challenge only the fourth form (Dkt. Nos. 116-4, 129 at 9). This one reads, as received by class member Y. Colon:

> **Applicable Law**
>
> For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).
>
> **Why was my application determined to be ineligible?**
>
> ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.
>
> Allegation 1: Educational Services
> You allege that Sanford-Brown College engaged in misconduct related to Educational Services. This allegation fails for the

**Add. 19** [7]

following reason(s): Insufficient Evidence. Your claim for relief on this basis therefore is denied.

Allegation 2: Other
You allege that Sanford-Brown College engaged in misconduct related to Other. This allegation fails for the following reason(s): Insufficient Evidence. Your claim for relief on this basis therefore is denied.

Allegation 3: Transferring Credits
You allege that Sanford-Brown College engaged in misconduct related to Transferring Credits. This allegation fails for the following reason(s): Insufficient Evidence. Your claim for relief on this basis therefore is denied.

Allegation 4: Employment Prospects
You allege that Sanford-Brown College engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Insufficient Evidence. Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

NY Attorney General's Office
PA Attorney General's Office
Evidence obtained by the Department in conjunction with its regular oversight activities
Publicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)
Multi-State Attorney General Assurance of Voluntary Compliance (effective January 2, 2019)

(Dkt. No. 108-16 at 183–85). In both written letters to the court and in the Zoom chat at the October 1 fairness hearing, many borrowers reported receiving almost identical denial notices (Dkt. No. 141). Borrowers cannot possibly understand why their applications have been denied. They do not believe the Secretary has reviewed their borrower-defense applications in good faith and do not know, realistically, how to proceed.

It's no wonder borrowers are confused. The Secretary's perfunctory denial notice does not explain the evidence reviewed or the law applied. It provides no analysis. And, the borrower's path forward rings disturbingly Kafkaesque. Any request for reconsideration must: (1) explain "[w]hy you believe that ED incorrectly decided your borrower defense to repayment application;" and (2) "[i]dentify and provide any evidence that demonstrates why

1    ED should approve your borrower defense to repayment claim under the applicable law set

2    forth above" (Dkt. No. 116-4).  Without any meaningful analysis of the evidence under the

3    law, how might a borrower articulate such bases for reconsideration?  It is, after all, impossible

4    to argue with an unreasoned decision.

5         Class counsel contend this perfunctory denial notice violates the Administrative

6    Procedure Act, which (they argue) requires the Secretary's denial notices to contain not just the

7    conclusion but a meaningful statement of reasoning that could actually be reviewed for error.

8    Counsel acknowledge the APA does not require much, but it does at least require that a "notice

9    shall be accompanied by a brief statement of the grounds for denial."  5. U.S.C. § 555(e).  That

10   is, "[t]he agency's statement must be one of 'reasoning'; it must not be just a 'conclusion'; it

11   must 'articulate a satisfactory explanation' for its action."  *Butte County, Cal. v. Hogen*, 613

12   F.3d 190, 194 (D.C. Cir. 2010).  Counsel also argue that an unexplained application denial

13   violates due process, which requires a benefits determination to "provide claimants with

14   enough information to understand the reasons for the agency's action," and the Secretary's

15   own regulations, which require her to resolve applications "through a fact-finding process"

16   resulting in a notification "of the reasons for the denial [and] the evidence that was relied

17   upon."  *See Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005); 34 C.F.R. § 685.222.  Against

18   this backdrop, then, class counsel contend that the Secretary has not, in fact, been issuing "final

19   decisions" and move not only for approval of the settlement, but also for the Court to enforce

20   counsel's reading of "final decision" as used in the settlement agreement.

21        The Secretary responds that this case only concerns the timeline of decision —

22   emphatically *not* the substance of the decisions — and that the proposed settlement merely

23   requires her to "issue final decisions," *i.e.* "decision[s] . . . resolving . . . borrower defense

24   application[s]" (Prop. Agmt., Dkt. No. 97-2 at § IV.A.1).  In the Secretary's view, the form

25   denials do just that and the APA, to the extent it applies, requires no more.  The Secretary

26   stresses that she had been issuing this perfunctory denial notice for months *before and*

27   *throughout* the settlement negotiations and expected to continue that course.  At bottom, the

28   Secretary says that if she had understood a "final decision" to require any more then she would

United States District Court
Northern District of California

United States District Court
Northern District of California

1    not have agreed to the eighteen-month decision timeline.  Thus, the Secretary does not oppose

2    approval of the proposed settlement as written, but opposes any enforcement or approval of the

3    class's interpretation of the proposed settlement.

4          The essence of the problem is that we have no meeting of the minds.  Federal common

5    law governs contracts with the United States and "we look to general principles."  *Klamath*

6    *Water Users Prot. Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999).  "[W]here there

7    appears to be a manifestation of assent initially, but, following appropriate interpretation or

8    construction, it becomes clear that the parties' apparent assent did not in fact indicate assent at

9    all . . . there is no contract."  1 WILLISTON ON CONTRACTS § 3:4 (4th ed. 2020).  During

10   settlement negotiations, our parties used the term "final decision" to refer to the Secretary's

11   work product.  Each incorrectly believed its interpretation to be peerless.  The Secretary

12   interpreted "final decision" to encompass her perfunctory denial notices, while class counsel

13   (yet unaware of the new form of notice) believed otherwise.  The Secretary would not have

14   agreed to counsel's more rigorous interpretation, and counsel would not have agreed to the

15   Secretary's more liberal interpretation.  Simply put, the parties bargained for materially

16   different rights and duties and, thus, never reached an agreement.

17         Counsel appears to argue that under the APA and due process the Secretary could only

18   have agreed to counsel's interpretation of "final decision."  But the Secretary *didn't have to*

19   *agree* to the settlement at all.  *If* the Secretary agreed to anything, it would surely have been

20   *her* understanding of the proposed settlement.  On appeal, we will, first, lose any hope of

21   keeping to the eighteen-month timeline (the primary benefit offered by proposed settlement)

22   and, second, the Secretary will very reasonably argue that she negotiated under a consistent,

23   material course of conduct and fairly expected the agreement to encompass that course of

24   conduct.  We will not saddle the class with the risk of moving forward with a disputed

25   settlement that may fall out from underneath their feet on appeal.  In these circumstances, we

26   ought to step back and resolve the dispute on the merits, moving as expeditiously as

27   circumstances permit.  Final approval of the proposed class settlement is denied and counsel's

28   motion to enforce falls moot.

Add. 22[10]

*          *          *

The Court is disappointed that it has come to this.  This settlement was supposed to jumpstart a long delayed regulatory process, intended to at least get reasoned decisions, even if reasoned denials, to hundreds of thousands of student-loan borrowers.  We will return to litigating the merits.  Questions of legality plague the Secretary's new perfunctory denial notice, and the circumstances of its use appear to contradict one of the primary justifications for her original delay.  We need an updated record and updated discovery to determine what is going on before we again attempt to resolve the merits of this case.  And, in the meantime, we need to decide whether the Secretary may continue issuing this challenged form of denial to borrowers.

## 2.    EXPEDITED DISCOVERY IS ORDERED.

Absent a showing otherwise, an agency's certified record, in support of either action or inaction, enjoys a presumption of completeness and regularity.  *See Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993); *Dep't of Commerce v. New York*, 588 U.S. ___, 139 S. Ct. 2551, 2573–74 (2019).  Narrow circumstances, such as a showing of agency bad faith, permit consideration of evidence outside the administrative record.  *Lands Council v. Powell*, 395 F.3d 1019, 1029–30 (9th Cir. 2005).  Here, in reviewing agency *inaction*, the scope of review broadens (as no specific dates bound the record).  Even so, our review would ordinarily remain bounded by what the agency directly or indirectly considered.  *Independence Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997); *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

Yet meaningful review of agency conduct (activity or not) depends utterly on the record adequately reflecting the basis for that conduct.  *Commerce*, 139 S. Ct. at 2573.  "An incomplete record *must* be viewed as a 'fictional account of the actual decisionmaking process.'"  *Portland*, 984 F.2d at 1548 (citing *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54 (D.C. Cir. 1977)) (emphasis added).  In these cases, record supplementation and, in "compelling" cases, discovery become appropriate.  *Portland*, 984 F.2d at 1548–49; *Public*

1  *Power Council v. Johnson*, 674 F.2d 791, 793–95 (9th Cir. 1982) (Kennedy, J.). We have such

2  a case here.

3      Pretext is the paradigm of agency bad faith. Even where the challenged agency conduct

4  itself may ultimately be lawful,

5          [A]gencies [must] offer genuine justifications for important
          decisions, reasons that can be scrutinized by courts and the
6          interested public. Accepting contrived reasons would defeat the
          purpose of the enterprise. If judicial review is to be more than an
7          empty ritual, it must demand something better . . . .

8  *Commerce*, 139 S. Ct. at 2573–76.

9      Here, "[w]e are presented . . . with an explanation for agency action that is incongruent

10  with what the record reveals about the agency's priorities and decisionmaking process." *Id.* at

11  2575. In justifying her delay of borrower-defense decisions at summary judgment, the

12  Secretary expounded upon the work involved in evaluating each application:

13          [T]he Department must determine whether the borrower's school
          engaged in acts or omissions which would give rise to a cause of
14          action against the institution under applicable State law. Applying
          such a standard necessarily *involves a legal analysis of what state
15          law applies* to a given application and *whether evidence provided
          by the borrower establishes a cause of action* under the applicable
16          standard.

17                  *           *           *

18          [T]the Department has primarily focused its efforts to date on
          identifying certain categories of claims, based on systemic
19          institutional conduct. For each such category that has been
          approved, the Department's BDU has *analyzed and summarized
20          the relevant evidence, determined and applied applicable law,
          established criteria for approval of that type of claim*, and drafted
21          claim-specific review protocols.

22                  *           *           *

23          [F]or each claim that does not fit within an established category . . .
          the BDU must *individually review the application and any
24          accompanying evidence* from the borrower and determine whether
          the borrower has established a defense under the relevant
25          regulation.

26                  *           *           *

27          In addition to its work processing claims and determining their
          eligibility on the merits for borrower defense relief, the BDU has
28          also initiated review and analysis of evidence pertaining to

United States District Court
Northern District of California

additional schools and campuses, which will allow the Department to make streamlined determinations about whether borrowers who attended those programs can meet the regulatory standards for asserting a defense and, ultimately, whether they are entitled to loan relief as a result.

and, most importantly:

> *Issuing final decisions on such claims is time-consuming and complex, with many steps in the adjudicatory process*, and agencies must be given, within reason, the time necessary to analyze the issues presented so that they can *reach considered results*.

(Dkt. No. 63 at 18–19) (cleaned up) (emphasis added).

And yet, these form denial letters bear *no indication* of such "time-consuming," "complex," legal analysis of both borrower-submitted and agency evidence, "under applicable State law," to "reach considered results."  Recall the perfunctory recitation of law in Ms. Colon's denial notice:

> **Applicable Law**
>
> For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law.  See § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations).  ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided.  34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

the recitation of evidence:

> **What evidence was considered in determining my application's ineligibility?**
>
> We reviewed evidence provided by you and other borrowers who attended your school.  Additionally, we considered evidence gathered from the following sources:
>
> NY Attorney General's Office
> PA Attorney General's Office
> Evidence obtained by the Department in conjunction with its regular oversight activities
> Publicly available securities filings made by Career Education Corporation (now known as Perdoceo Education Corporation)

United States District Court
Northern District of California

Multi-State Attorney General Assurance of Voluntary Compliance
(effective January 2, 2019)

and analysis:

> Allegation 1: Educational Services
> You allege that Sanford-Brown College engaged in misconduct
> related to Educational Services.  This allegation fails for the
> following reason(s): Insufficient Evidence.  Your claim for relief
> on this basis therefore is denied.

(Dkt. No. 108-16 at 183–85).

This lack of explanation becomes more all the more galling given Ms. Colon, as so many of our borrowers did, attended a school that has since been found to have misled students. Indeed, after the New York Attorney General sued Sanford-Brown College, Ms. Colon received a restitution check.  Her denial notice even acknowledges that the Secretary had the NY AG's evidence (Dkt. Nos. 129 at 11; 142; 145).  Which begs the question, why did a student who already qualified for relief based on her school's misconduct under state law not now qualify for relief based on a claim "that would give rise to a cause of action against the school under applicable State law?"  *See* 34 C.F.R. § 685.206(c).  These cases call for adequate explanation — just as the Secretary told us they would when justifying her delay — and yet the Secretary's perfunctory denial notice does not come close to offering such an explanation.

We also cannot ignore that these perfunctory denial notices have accompanied a drastic increase in both the pace of decisions and the rate of denials.  In the 19 months leading up to January 2017, the previous administration decided 32,018 applications, granting 31,773 (including those 16,164 that had been approved and for which Secretary DeVos later authorized relief), for a 99.2% percent grant rate.  When Secretary DeVos took control and began deciding claims for the first time under her first iteration of the partial relief methodology, she approved about 16,000 applications and denied 10,000, for a 61.5% grant rate.  In the ten months since she began issuing decisions again, however, the Secretary has denied 118,300 of the 131,800 applications decided, an *89.8% denial rate*.  For our class of borrowers specifically, the Secretary has denied 74,000 of the 78,400 applications reviewed — a *94.4% denial rate*.

Simply put, where there's smoke, there's fire. After justifying eighteen months of delay largely on the backbreaking effort required to review individual applications, distill common evidence, and "reach considered results," the Secretary has charged out of the gate, issuing perfunctory denial notices utterly devoid of meaningful explanation at a blistering pace. Set aside even the question of whether this form denials is, in fact, a legally sufficient "final decision" under the proposed agreement, the APA, department regulations, and due process. The issue here is that "the evidence tells a story that does not match the explanation the Secretary gave for h[er] decision." Judicial review of agencies is deferential — not naïve. Courts will not suffer pretext in the review of agency conduct. *Ibid.*

In an ordinary case, pretext leads to remand so the agency may explain itself. *Id.* at 2576. Extraordinary circumstances, however, such as a pressing deadline, compel discovery. *See Public Power*, 674 F.2d at 793–95; *Portland*, 984 F.2d at 1548–49.

Here, time is of the essence. We don't enjoy the luxury of seeking simply to forestall harm — it descended upon the class long ago. Our borrowers live under the severe financial burden of their loans. They have waited for relief, or at least decision, for eighteen months. Many have waited much longer; and many are still waiting. In the meantime, we have lost a full eight months chasing this failed settlement. The time to direct supplementation of the record was eight months ago.

Atop this, the harm from delay has been compounding for the last eight months. This form denial puts borrowers in worse positions than they started. They may have a "decision" (though that is hotly contested), but they have neither a meaningful explanation nor (as discussed above) any meaningful opportunity to appeal or request the Secretary's reconsideration. The form denial, frankly, hangs borrowers out to dry.

In sum, we are faced with a strong showing of agency pretext and the class has been prejudiced by delay enough. We need to know what is really going on. This compels expedited discovery. Bearing in mind that discovery against agencies is disfavored, it will be limited, but broad enough to be effective.

United States District Court
Northern District of California

Two months should do it.  The class may take both written discovery and up to five fact depositions of relevant decisionmakers to inquire into, broadly:

> 1.  The development and use of the form denial letters, including: (a) the submission, timeline of review, and disposition of any requests for reconsideration; and (b) the form of denial issued before this suit and under the previous administration;

> 2.  The extent to which the difficulty of reviewing borrower-defense applications actually caused or justified the Secretary's eighteen-month delay;

> 3.  The extent to which the Secretary has denied applications of students who have attended schools subject to findings of misconduct by the Secretary or any other state or federal body or agency, and the rationale underlying those denials.

For now, discovery is limited to the offices of Federal Student Aid, Postsecondary Education, and Career, Technical, and Adult Education within the Office of the Under Secretary.  Additionally, at this time, given "[h]eads of government agencies are not normally subject to deposition," class counsel may not yet depose the Secretary.  *Kyle Engineering Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979).  Extraordinary circumstances, however — for example, if the Secretary has unique first-hand knowledge or necessary information cannot be obtained through other, less intrusive means — may justify such a deposition at a later date.  *See, e.g.*, *Lederman v. New York City Dep't of Parks & Rec.*, 731 F.3d 199, 203 (2d Cir. 2013).

The class may seek further depositions, or expansion or extension of discovery via letter brief, to which the Secretary will have the opportunity to respond.  At the end of this discovery period, the class shall move for summary judgment as to the lawfulness of the Secretary's delay and the lawfulness of the perfunctory denial notice.  The Secretary may then oppose and/or cross move for the same.

### 3.    ORDER TO SHOW CAUSE.

This leads to the final question.  May the Secretary keep issuing potentially unlawful perfunctory denials while we complete discovery and litigate the merits?

Through the class comment period and at the October 1 hearing, the undersigned has been struck by the scope of the problem here.  The consistency and passion with which the nearly one hundred thirty written commenters, three hundred speaking requests, and the

fourteen speakers at the fairness hearing have told their stories leads to the conclusion that their voices are not individual, special cases within the class, but representatives of the class's shared trauma. This is not an attorney-driven case. Class members have a genuine interest; they sought opportunity via higher education only to be to be deceived by for-profit institutions and, at least in some cases, saddled with crushing debt.

To maintain the status quo until the merits can be litigated, the question arises whether the denials ought to be preliminarily enjoined. Both parties shall show cause why the Secretary should not be enjoined from further denial of class members' borrower-defense applications until a ruling on that form of denial can be had.

**CONCLUSION**

Final approval of the proposed settlement is **DENIED**. Discovery (within the bounds described above) closes **DECEMBER 24**. The class's motion for summary judgment is due **JANUARY 7 AT NOON**, to be heard on the ordinary 35-day track (subject to the Secretary's cross motion). The October 22 hearing is **VACATED**. The parties **SHALL SHOW CAUSE** why the Secretary should not be enjoined as described above by **OCTOBER 30 AT NOON**.

**IT IS SO ORDERED.**

Dated: October 19, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**Add. 29**[17]

1   SARAH E. HARRINGTON
    Deputy Assistant Attorney General
2   STEPHANIE HINDS
    Acting United States Attorney
3   MARCIA BERMAN
    Assistant Branch Director
4   R. CHARLIE MERRITT
    KEVIN P. HANCOCK
5   Trial Attorneys
    U.S. Department of Justice
6   Civil Division, Federal Programs Branch
    1100 L Street, N.W.
7   Washington, DC 20530
    Telephone: (202) 514-3183
8   E-mail: kevin.p.hancock@usdoj.gov

9   *Attorneys for Defendants*

10

11                    **UNITED STATES DISTRICT COURT**
                  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12

13                       **SAN FRANCISCO DIVISION**

14

15  IN RE SUBPOENA SERVED ON FORMER
    SECRETARY OF EDUCATION              No. 3:21-mc-80075-WHA
16  ELISABETH DEVOS
                                        **DEFENDANT U.S. DEPARTMENT OF**
17                                      **EDUCATION'S MOTION TO QUASH**
                                        **RULE 45 DEPOSITION SUBPOENA**
18
                                        Date: May 18, 2021
19                                      Time: 8:00 a.m.
                                        Honorable William Alsup
20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

    I.      INITIAL PROCEEDINGS IN *SWEET V. CARDONA* .......................... 3

    II.     THE COURT'S DENIAL OF THE PARTIES' SETTLEMENT
            AGREEMENT AND ORDERING OF A FIRST ROUND
            OF DISCOVERY .................................................................................. 4

    III.    PLAINTIFFS' REQUEST TO DEPOSE FORMER
            SECRETARY DEVOS ......................................................................... 5

    IV.    THE MOTION TO QUASH PROCEEDINGS ..................................... 7

    V.     ADDITIONAL AND ONGOING DOCUMENT DISCOVERY
            IN *SWEET* ........................................................................................... 8

ARGUMENT .............................................................................................................. 9

    I.      FORMER AND NON-PARTY CABINET OFFICIALS ARE
            PROTECTED FROM TESTIFYING ABOUT THE REASONS
            FOR THEIR OFFICIAL DECISIONS ................................................ 9

    II.     PLAINTIFFS CANNOT ESTABLISH EXTRAORDINARY
            CIRCUMSTANCES TO JUSTIFY DEPOSING A FORMER
            CABINET OFFICIAL ....................................................................... 15

          A.     Plaintiffs Have Not Reasonably Exhausted Other Less
                  Intrusive Means to Obtain the Information They Claim
                  to Seek from the Former Secretary ......................................... 15

          B.     Plaintiffs Cannot Demonstrate that the Former Secretary
                  Has First-Hand Knowledge that Is Unique and Essential
                  to Their Case ............................................................................. 19

                1. Information Regarding the Form Denial Letters .................................. 20

                2. Information Regarding the Department's Alleged Delay .................... 22

                3. Information Regarding Borrower Defense Policy ............................... 23

CONCLUSION.......................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Apple Inc. v. Samsung Elecs. Co., Ltd*,
  282 F.R.D. 259 (N.D. Cal. 2012) ............................................................... 12

*Bey v. City of New York*,
  No. 99 CIV.3873LMMRLE, 2007 WL 3010023 (S.D.N.Y. Oct. 15, 2007) ........................... 13

*Bogan v. City of Boston*,
  489 F.3d 417 (1st Cir. 2007) ................................................................... 10

*California v. United States*,
  No. C 05-0328 JSW MEJ, 2006 WL 2621647 (N.D. Cal. Sept. 12, 2006) ............. 11, 17, 18, 22

*Conforti v. St. Joseph's Healthcare Sys., Inc.*,
  No. 2:17-cv-0050, 2019 WL 3847994 (D.N.J. Aug. 15, 2019) ................................. 10

*Croddy v. FBI*,
  No. 00-cv-0651, 2005 WL 8168910 (D.D.C. Mar. 30, 2005) ................................... 13

*Cusumano v. Microsoft Corp.*,
  162 F.3d 708 (1st Cir. 1998) ................................................................. 13

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ....................................................................... 10

*Dobson v. Vail*,
  No. C10-5233/KLS, 2011 WL 4404146 (W.D. Wash. Sept. 21, 2011) ........................... 13

*FDIC v. Galan-Alvarez*,
  No. 1:15-MC-00752 (CRC), 2015 WL 5602342 (D.D.C. Sept. 4, 2015) ............... 10, 12, 13, 20

*First Resort, Inc. v. Herrera*,
  No. CV 11-5534 SBA (KAW), 2014 WL 589054 (N.D. Cal. Feb. 14, 2014) ............. 11, 15, 20

*Franklin Sav. Ass'n v. Ryan*,
  922 F.2d 209 (4th Cir. 1991) ................................................................ 10

*Gil v. Cty. of Suffolk*,
  No. CV06-1683(LDW)(ARL), 2007 WL 2071701 (E.D.N.Y. July 13, 2007) ........................ 13

*Gray v. Kohl*,
  No. 07-10024-CIV, 2008 WL 1803643 (S.D. Fla. Apr. 21, 2008) ............................... 12

*Harmston v. City & Cty. of San Francisco*,
  No. C07-01186 SI, 2007 WL 3306526 (N.D. Cal Nov. 6, 2007) ............................ 16, 18, 19

*In re Cheney*,
   544 F.3d 311 (D.C. Cir. 2008) ............................................................. 11

*In re Commodity Future Trading Comm'n*,
   941 F.3d 869 (7th Cir. 2019) ............................................................. 11

*In re Dep't of Commerce*,
   139 S. Ct. 16 (2018) ............................................................. 10

*In re FDIC*,
   58 F.3d 1055 (5th Cir. 1995) ............................................................. 11

*In re McCarthy*,
   636 F. App'x 142 (4th Cir. 2015) ............................................................. 11

*In re United States (Bernanke)*,
   542 F. App'x 944 (Fed. Cir. 2013) ............................................................. 13

*In re United States (Holder)*,
   197 F.3d 310 (8th Cir. 1999) ............................................................. 11, 15

*In re United States (Jackson)*,
   624 F.3d 1362 (11th Cir. 2010) ............................................................. 10, 11

*In re United States (Kessler)*,
   985 F.2d 510 (11th Cir. 1993) ............................................................. 11

*Kyle Eng'g Co. v. Kleppe*,
   600 F.2d 226 (9th Cir. 1979) ............................................................. 11, 12

*Lederman v. New York City Dep't of Parks & Rec.*,
   731 F.3d 199 (2nd Cir. 2013) ............................................................. 10, 12, 15

*Moriah v. Bank of China Ltd.*,
   72 F. Supp. 3d 437 (S.D.N.Y. 2014) ............................................................. 13

*Raymond v. City of New York*,
   No. 15-cv-6885, 2020 WL 1067482 (S.D.N.Y. Mar. 5, 2020) ............................................................. 13

*San Francisco Min. Exch. v. Sec. & Exch. Comm'n*,
   378 F.2d 162 (9th Cir. 1967) ............................................................. 12

*Simplex Time Recorder Co. v. Sec'y of Labor*,
   766 F.2d 575 (D.C. Cir. 1985) ............................................................. 11

*Sykes v. Brown*,
   90 F.R.D. 77 (E.D. Pa. 1981) ............................................................. 12

*United States v. Morgan*,
   313 U.S. 409 (1941) ................................................................................ *passim*

*United States v. Wal-Mart Stores, Inc.*,
   No. CIV.A.PJM-01-CV-152, 2002 WL 562301 (D. Md. Mar. 29, 2002) ........................... 13, 14

*Walker v. NCNB Nat'l Bank of Fla.*,
   810 F. Supp. 11 (D.D.C. 1993) ........................................................... 12, 19

*Warren Bank v. Camp*,
   396 F.2d 52 (6th Cir. 1968) ............................................................ 11

*Willer v. Las Vegas Valley Water Dist.*,
   176 F.3d 486 (9th Cir. 1999) ........................................................... 10, 12

*William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 for Orange Cty.*,
   482 F. App'x 273 (9th Cir. 2012) ....................................................... 10

**STATUTES**

5 U.S.C. § 706(1) ................................................................................ 3

5 U.S.C. § 5312 ................................................................................ 14

## NOTICE OF MOTION AND MOTION TO QUASH

Notice is hereby given that on May 18, 2021 at 8:00 a.m., before the Honorable William Alsup, the U.S. Department of Education ("Department") will move this Court under Federal Rule of Civil Procedure 45(d)(3)(A) to quash the non-party subpoena Plaintiffs have served upon former U.S. Secretary of Education Elisabeth ("Betsy") DeVos.[1]  *See* Ex. A (Subpoena and Notice of Deposition).  That subpoena orders Ms. DeVos to appear for a deposition in Vero Beach, Florida on "February 25, 2021 or a date mutually agreeable to the Parties."  *Id.*  The parties have agreed that the compliance date for the subpoena should be stayed pending a final order on this motion to quash.  *See* Ex. B.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The Department respectfully requests that this Court quash Plaintiffs' subpoena seeking a non-party deposition of a former Cabinet secretary.  The underlying lawsuit is an Administrative Procedure Act ("APA") case where a class of student-loan borrowers challenges the Department's adjudication of their loan-discharge applications.  *Sweet v. Cardona*, Civ. No. 3:19-cv-3675-WHA (N.D. Cal.).  The Department has produced a certified administrative record, and in response to the Court's discovery orders, provided four deponents who gave roughly 28 hours of testimony, responded to 49 requests for production of documents and 20 interrogatories, and produced thousands of documents.  Document discovery is still ongoing today.  As recently as March 31, 2021, Defendants produced approximately 500 documents, in addition to the more than 2,300 documents produced in December 2020 and January 2021.  On April 16, 2021, Plaintiffs propounded additional document requests.  Nothing in the record to date indicates that former Secretary DeVos had any first-hand involvement in, much less *unique* knowledge of, the facts relating to Plaintiffs' claims.

---

[1]  Former Secretary DeVos is represented in her official capacity by the U.S. Department of Justice ("DOJ") in light of DOJ's representation of Defendant U.S. Department of Education in the underlying litigation and the government's interest in the information that former officials acquire during their time in government.  The former Secretary is represented in her personal capacity by private counsel.  *See* ECF No. 31.  This filing should not be construed to waive any arguments raised by Ms. DeVos.

Plaintiffs' subpoena of a former Presidential Cabinet secretary is an extraordinary request: applying the "Apex Doctrine," courts have held that current and former heads of government agencies are almost never subject to deposition in civil litigation. As those courts have explained, such officials rarely have unique information regarding administrative challenges and other civil litigation, and if the judiciary were to subject current and former high-level Executive branch officials to deposition in such cases, it would threaten the separation of powers, chill agency decisionmaking, discourage public service, and create potential for abuse or harassment. These dangers are at their peak when, as here, the official at issue was a Cabinet secretary who reported directly to the President. Indeed, the Supreme Court first warned in *United States v. Morgan*, 313 U.S. 409, 421-22 (1941), that it is "not the function of the court to probe the mental processes of [a Cabinet] Secretary" by subjecting them to deposition.

The extraordinary circumstances that must exist to justify a deposition of a former Cabinet official do not exist here. Plaintiffs cannot show, as they must, (1) that the former Secretary has relevant first-hand knowledge, (2) that any such knowledge would be uniquely held by the former Secretary and thus not obtainable from another source, and (3) that any such knowledge would be essential to their case.

Plaintiffs cannot demonstrate that the knowledge they claim the former Secretary possesses is uniquely held by her because they have not exhausted other, less intrusive means to obtain that information. Plaintiffs rejected the Department's offers to explore alternative sources, elected to use only four of the five depositions for other Department officials made available to them by the Court's October 19, 2020 discovery order, never took a Rule 30(b)(6) deposition, never served any requests for admission, did not use all of their available interrogatories, and did not use the interrogatories they did ask to inquire into topics they now claim—incorrectly—are uniquely within the former Secretary's knowledge. Moreover, document discovery in this case remains ongoing; at the very least, Plaintiffs should be required first to receive and review the additional responsive documents the Department will produce before any determination is made whether the former Secretary has unique knowledge of facts that cannot be obtained through other, less intrusive means. Indeed, the discovery Plaintiffs have taken from Department decisionmakers so far has

produced voluminous amounts of evidence, and Plaintiffs do not claim that they are unable to move for summary judgment based on the existing record, providing further evidence that the deposition is not necessary.

Even had Plaintiffs exhausted alternative sources, based on the current record, they could not establish that the former Secretary has any unique first-hand knowledge that is essential to their case. In fact, the still-growing record in this case, including the more than 500 documents Defendants produced just three weeks ago, does not show that the former Secretary had any first-hand involvement in the relevant facts of this case at all. Plaintiffs are left to argue that a deposition is justified solely on the basis that the former Secretary retained ultimate policymaking authority for the agency. But if that were enough, the Apex Doctrine would be a dead letter and every Cabinet secretary would be subject to deposition in every case challenging their agency's actions and policies.

Plaintiffs' subpoena should be quashed.

## BACKGROUND

### I. INITIAL PROCEEDINGS IN *SWEET V. CARDONA*

In the underlying lawsuit in this matter with which the Court is familiar, *Sweet v. Cardona*, Plaintiffs filed a class action complaint in June 2019 challenging the Department's alleged delay in issuing borrower-defense decisions. *See* Compl. ¶¶ 377-89, *Sweet* ECF No. 1. The original complaint asserts a claim under APA § 706(1), which authorizes courts to "'compel agency action unlawfully withheld or unreasonably delayed.'" *See id.* ¶ 380 (quoting 5 U.S.C. § 706(1)). As relief, Plaintiffs seek an order compelling the Department to "start granting or denying their borrower defenses." *Id.* ¶ 10.[2]

On November 14, 2019, the Department lodged a certified administrative record, *Sweet* ECF No. 56, and later moved for summary judgment, arguing that the Department's temporary delay in issuing final borrower-defense decisions was caused by multiple factors and reflected the

---

[2]    The Court certified a class consisting of all people who borrowed a qualifying Title IV loan "who have asserted a borrower defense to repayment," and "whose borrower defense has not been granted or denied on the merits," while carving out members of a separate class action. *Sweet* ECF No. 46 at 14. The original complaint's second count was dismissed in 2019. *Sweet* ECF No. 41.

agency's reasonable balancing of competing priorities and the needs of federal student loan bor-rowers, *Sweet* ECF No. 63 at 1-2.

While that motion was pending, in April 2020, the parties executed a class-action settle-ment agreement, in which the Department agreed to issue final borrower-defense decisions on the applications of class members according to a specified timeline. *Sweet* ECF No. 97-2. The Court preliminarily approved the proposed settlement agreement, *Sweet* ECF No. 103, and the parties subsequently worked toward final approval of the deal. In the meantime, both before and after the parties executed their settlement agreement, the Department continued to steadily issue final bor-rower-defense decisions, notwithstanding that the timelines set forth in the agreement had not yet begun to run. *See Sweet* ECF No. 116. On September 17, 2020, however, Plaintiffs moved to enforce the agreement in addition to seeking final approval. *Sweet* ECF No. 129. Plaintiffs' mo-tion to enforce took issue with the substance of certain denial notices that the Department had been issuing, claiming that these notices provided insufficient reasoning. *Id.*

## II. THE COURT'S DENIAL OF THE PARTIES' SETTLEMENT AGREEMENT AND ORDERING OF A FIRST ROUND OF DISCOVERY

On October 19, 2020, the Court denied final approval of the settlement agreement, and denied the motion to enforce as moot, concluding that the parties had failed to reach a meeting of the minds on what constitutes a "final decision." *Sweet* ECF No. 146 at 7-10. The Court also ordered a two-month expedited discovery period. *Id.* at 16. The Court reasoned that discovery was warranted because the Department's administrative record indicated that reviewing borrower defense applications requires time-consuming effort, while the denial letters issued to borrowers did not on their face reflect such effort. *Id.* at 12-13.

The Court set several limits on Plaintiffs' ability to take "limited" discovery, "[b]earing in mind that discovery against agencies is disfavored." *Sweet* ECF No. 146 at 15-16. First, it limited the time for taking discovery to an approximately two-month period, with a deadline of December 24, 2020. *Id.* at 16-17. Second, the Court limited discovery to three discrete topics: (1) the De-partment's "development and use of the form denial letters"; (2) the "extent to which the difficulty of reviewing borrower-defense applications actually caused or justified the Secretary's eighteen-

month delay"; and (3) the "extent to which the Secretary has denied applications of students who have attended schools" subject to certain findings of misconduct. *Id.* at 16. Third, the Court allowed Plaintiffs to take written discovery and up to "five fact depositions of relevant decisionmakers" from offices "within the Office of the Under Secretary." *Id.* And fourth, most pertinent here, the Court specifically stated that "given [that] heads of government agencies are not normally subject to deposition, class counsel may not yet depose the Secretary. . . . Extraordinary circumstances, however — for example, if the Secretary has unique first-hand knowledge or necessary information cannot be obtained through other, less intrusive means — may justify such a deposition at a later date." *Id.* (internal quotations and cites omitted). Finally, the October 19 discovery Order allows Plaintiffs to "seek further depositions, or expansion or extension of discovery via letter brief." *Id.*

On November 6 and 11, 2020, Plaintiffs served Defendants with two sets of written discovery requests consisting of 49 requests for production and 20 interrogatories. After serving timely objections and responses, Defendants responded to Plaintiffs' first and second sets of interrogatories on December 7 and 10, 2020, respectively; made a substantial production of documents on December 23, 2020; and supplemented their interrogatory responses and document production on January 14, 2021. Additionally, Plaintiffs noticed and conducted four of the five depositions that the court made available to them for "relevant decisionmakers" other than the Secretary. The four deponents were then-Under Secretary Diane Jones, Borrower Defense Unit ("BDU") Director Colleen Nevin, then-Federal Student Aid ("FSA") Chief Operating Officer Mark Brown, and former Under Secretary and former Acting FSA Chief Operating Officer James Manning. Plaintiffs did not notice a fifth deposition.

## III. PLAINTIFFS' REQUEST TO DEPOSE FORMER SECRETARY DEVOS

On January 6, 2021, Plaintiffs informed Defendants by telephone that they intended to seek to depose then-Secretary DeVos. *Sweet* ECF No. 171 at 5. The next day, January 7, Defendants sent Plaintiffs a letter requesting that they identify "the information that you seek to solicit from the Secretary that you have not been able to obtain elsewhere," and stating that they were "open to exploring other, less intrusive means of providing your requested discovery." *Id.* Defendants

pointed out that Plaintiffs had taken only four of their five available depositions for relevant deci-sionmakers from offices "within the Office of the Under Secretary, and that Defendants would be "open to further conferring about a different deponent who might have relevant knowledge." *Id.* Defendants also noted that the parties had seven days to work out any differences relating to De-fendants' responses to interrogatories. *Id.* Later that evening, Secretary DeVos announced her resignation, which was effective the next day, January 8, 2021.

On January 8, Plaintiffs responded to Defendants' letter, asserting that the four Department officials they deposed "all left holes that can only be filled by Secretary's DeVos's personal knowledge" on topics "including but not limited to" (1) "[t]he development and approval of" the form denial notices; (2) "[w]ho ordered FSA to stop issuing borrower defense decisions" and why; and (3) "Borrower Defense Policy." *Sweet* ECF No. 171 at 8-9 (emphasis omitted). Plaintiffs acknowledged that the parties had agreed that Defendants would let Plaintiffs know by January 14 whether Defendants would supplement their response to Interrogatory No. 16—which is similar to Plaintiffs' first proposed deposition category for the former Secretary. *Id.* at 9; *see also id.* at 1 & n.2. But Plaintiffs stated that their desire to depose the former Secretary "would not be satisfied by a more fulsome response to Interrogatory No. 16." *Id.* at 9. Plaintiffs' letter concluded by giving Defendants less than one business day to respond. *Id.*

Defendants responded the next business day, January 11, and informed Plaintiffs that the Department was exploring whether it could provide the information Plaintiffs sought through less intrusive means. *Sweet* ECF No. 171 at 11. Defendants requested a "reasonable amount of time for the Department to continue this investigation." *Id.* Two-and-a-half hours later, Plaintiffs re-sponded with a letter stating that they had "given [Defendants] enough time to consider our re-quest," and that "today we will move the Court accordingly." *Id.* at 14.

Later that same day, Plaintiffs filed a letter brief with this Court seeking leave to take the former Secretary's deposition. *Sweet* ECF No. 171. The next day, January 12, the Court ordered that Plaintiffs could only pursue a private party's deposition through a Rule 45 subpoena. *Sweet* ECF No. 172.

Add. 40

On January 27, 2021, the Department accepted service on behalf of the former Secretary of Plaintiffs' Rule 45 subpoena, *see* Ex. A, on the condition that the place of compliance would be Vero Beach, Florida, where Ms. DeVos resides part time, *see* Ex. C. Plaintiffs further agreed that although the deposition would be noticed to take place on February 25, 2021, the deposition should not take place until after a final order on a motion to quash the deposition. *See* Ex. B.

## IV.     THE MOTION TO QUASH PROCEEDINGS

On February 8, 2021, the Department and former Secretary DeVos in her personal capacity filed a motion to quash Plaintiffs' subpoena in the U.S. District Court for the Southern District of Florida. *See In re Subpoena Served on Elisabeth DeVos*, 2:21-mc-14073 (S.D. Fla.) ("*In re DeVos* (S.D. Fla.)"), ECF No. 1; *see also* Fed. R. Civ. P. 45(d)(3)(A) (explaining that a nonparty's challenge to a Rule 45 subpoena must be litigated in the "court for the district where compliance is required"). The motion to quash was assigned to a Magistrate Judge without the consent of the parties. *In re DeVos* (S.D. Fla.), ECF No. 4. Plaintiffs then filed a motion to transfer the motion to quash to this Court, which the Department and Ms. DeVos opposed. *In re DeVos* (S.D. Fla.), ECF Nos. 12, 18-19. On April 7, 2021, after the parties fully briefed the motion to quash and motion to transfer, the Magistrate Judge issued an order granting Plaintiffs' motion to transfer, closing the case, and directing the clerk of court to transfer the matter to this Court. *In re DeVos* (S.D. Fla.), ECF No. 28.

Two days later, on April 9, 2021, former Secretary DeVos filed an expedited motion with District Judge Jose E. Martinez of the Southern District of Florida to stay the Magistrate Judge's transfer order to allow time "so that she may exercise her right under Rule 72 to file timely objections" with the District Judge by April 21, 2020. *In re DeVos* (S.D. Fla.), ECF 30 at 3. On April 12, that motion was denied. *In re DeVos* (S.D. Fla.), ECF 31. On April 13, this Court issued an order setting a briefing schedule for the motion to quash and set a hearing for May 18. ECF No. 30. Two days later, on April 15, former Secretary DeVos filed a petition for a writ of mandamus with the U.S. Court of Appeals for the Eleventh Circuit. *See Emergency Petition for a Writ of Mandamus, In re Elizabeth DeVos*, No. 21-11239-D (11th Cir.) (Apr. 15, 2021). That petition asks the Eleventh Circuit to reverse the Magistrate Judge's order transferring the motion to quash

**Add. 41**

to this Court, and to grant the motion to quash.  *See id.* at 10-11.  The next day, April 16, the Eleventh Circuit issued an order directing respondents, including the *Sweet* Plaintiffs, to answer Ms. DeVos's mandamus petition by Friday, April 23, 2021.  *See* ECF No. 31-1 at 5-6.

## V.  ADDITIONAL AND ONGOING DOCUMENT DISCOVERY IN *SWEET*

In parallel with the motion to quash proceedings, Plaintiffs have pursued additional document discovery before this Court in *Sweet*.  On February 4, 2021, shortly after serving their subpoena upon former Secretary DeVos, Plaintiffs filed a motion to compel the Department to produce additional documents responsive to the same topics on which Plaintiffs seek to depose the former Secretary, including, "why the Department delayed deciding any BD applications."  *Sweet* ECF No. 176 at 2.  After a hearing on Plaintiffs' motion, the Court issued an order on March 10 requiring the Department to produce five categories of additional documents from certain custodians— including former Secretary DeVos—by March 31, 2021.  *Sweet* ECF No. 191 at 2.  Among other documents, the March 10 Order requires the Department to produce further documents responsive to the first four of Plaintiffs' November 6, 2020 requests for production (as amended on Dec. 10, 2020).  *Id.* at 2, ¶ 3.  Those four requests seek documents sufficient to show any direction given to the Department's BDU to stop or resume processing any approvals or denials of borrower defense applications.  *See* Ex. D (Pls.' First Request for Prod. of Docs. to Defs. (Narrowed Proposal) at 7-8 (Dec. 10, 2020)).

The Department conducted the search required by the March 10 Order, and on March 31, produced approximately 500 responsive documents to Plaintiffs, followed by a privilege log on April 9.  As Plaintiffs have observed, the Department's "March 31 document production included only two emails sent to former Secretary DeVos . . . [and] did not include any emails from the former Secretary."  *See* Ex. E (Letter from Rebecca C. Ellis, Counsel for Plaintiffs to R. Charlie Merritt, Counsel for the Department at 2 (Apr. 16, 2021)).  Moreover, Plaintiffs admit that the Department's privilege log for the March 31 production does "not include a single email sent to or from former Secretary DeVos" and includes "only two documents with former Secretary DeVos listed as the custodian."  *Id.*  And although certain entries on the log mention former Secretary

DeVos, they indicate only that the former Secretary "receive[d] information relating to borrower defense" during the relevant time period from other Department employees. *Id.*

Four days ago, on April 16, pursuant to the Court's March 10 Order, *Sweet*, ECF No. 191 at 3, ¶ 7, Plaintiffs served Defendants with a request for the production of seven additional categories of documents. *See* Ex. E at 1-2. Two of those categories seek additional documents specifically relating to former Secretary DeVos. *Id.* at 2, ¶¶ 5-6. The date the Department's production is due has yet to be determined.

Finally, on April 13, the Court granted Plaintiffs' motion for leave to supplement their complaint, which adds three new APA claims to their § 706(1) claim. *Sweet* ECF No. 196. The new claims are based on "additional evidence" Plaintiffs "received through discovery in *Sweet*, *Sweet* ECF No. 192 at 3-4, and Plaintiffs' supplemental pleading attaches as exhibits hundreds of pages of those discovery materials, including deposition transcripts, interrogatory responses, and documents, *Sweet* ECF Nos. 192-193. Plaintiffs represent that "no further discovery" beyond what this Court has already addressed is needed to pursue any of these new claims. *Sweet* ECF No. 192 at 8.

## ARGUMENT

## I.  FORMER AND NON-PARTY CABINET OFFICIALS ARE PROTECTED FROM TESTIFYING ABOUT THE REASONS FOR THEIR OFFICIAL DECISIONS

Applying the protections of Rule 45 and the Apex Doctrine, courts have routinely held that high-ranking government officials—especially Cabinet secretaries and including nonparty former officials—should not be deposed or called to testify regarding an agency's reasons for taking action, or facts regarding, official action, absent exceptional circumstances.

For any nonparty from whom discovery is sought, Rule 45 states that the Court "must quash or modify a subpoena that . . . subjects a person to undue burden," or that "requires disclosure of privileged or other protected matter, if no exception or waiver applies[.]" Fed. R. Civ. P. 45(d)(3)(A)(iii) & (iv). "Generally, courts afford greater protection to non-parties in discovery, and nonparty subpoenas must meet a higher standard of relevance than subpoenas directed toward

parties." *Conforti v. St. Joseph's Healthcare Sys., Inc.*, No. 2:17-cv-0050, 2019 WL 3847994, at *2 (D.N.J. Aug. 15, 2019).

Where the nonparty from whom discovery is sought is a high-ranking government official, as here, the nonparty is also protected by the Apex Doctrine, which bars requiring the official to testify absent "extraordinary circumstances" justifying the deposition. *See, e.g.*, *FDIC v. Galan-Alvarez*, No. 1:15-MC-00752 (CRC), 2015 WL 5602342, at *3 (D.D.C. Sept. 4, 2015).[3]  This principle was first articulated by the Supreme Court in *United States v. Morgan*, where it stated that the Secretary of Agriculture—who had already been "questioned at length" in a deposition authorized by the district court—"should never have been subjected to this examination" because it is "not the function of the court to probe the mental processes of the Secretary."  313 U.S. at 421-22.  More recently, the Supreme Court stayed a district court's order allowing the deposition of the Secretary of Commerce in an APA case, where the Solicitor General had argued that *Morgan* required the stay.  *In re Dep't of Commerce*, 139 S. Ct. 16, 16-17 (2018).[4]  The Supreme Court later reaffirmed that it was appropriate for discovery to "not include the deposition of the Secretary himself," even though the Court had otherwise concluded that extra-record discovery in that case was justified.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2574 (2019).

Following *Morgan*, courts across the nation, including the Ninth Circuit and in this District, have routinely held under the Apex Doctrine that high-ranking government officials should not be "deposed or called to testify regarding the reasons for taking official action."  *Lederman*, 731 F.3d 199, 203-204 (2nd Cir. 2013); *see also William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 for Orange Cty.*, 482 F. App'x 273, 274 (9th Cir. 2012); *In re United States (Jackson)*, 624 F.3d 1368, 1372-73 (11th Cir. 2010); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *Willer v. Las Vegas Valley Water Dist.*, 176 F.3d 486 (9th Cir. 1999) (table op.); *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993); *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209,

---

[3]      The Apex Doctrine shifts the burden of persuasion to the party seeking discovery, even though a party moving to quash ordinarily bears the burden of persuasion.  *See, e.g.*, *Galan-Alvarez*, 2015 WL 5602342, at *3.

[4]      *See* Renewed Application for a Stay at 29-32, *In re Dep't of Commerce*, 139 S. Ct. 16 (2018) (No. 18A375) (citing *Morgan* and arguing that "in a challenge to an agency decision, it is 'not the function of the court to probe the mental processes of the Secretary'").

**Add. 44**

211 (4th Cir. 1991); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586-87 (D.C. Cir. 1985); *Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979); *Warren Bank v. Camp*, 396 F.2d 52, 56 (6th Cir. 1968); *California v. United States*, No. C 05-0328 JSW MEJ, 2006 WL 2621647, at *1 (N.D. Cal. Sept. 12, 2006); *First Resort, Inc. v. Herrera*, No. CV 11-5534 SBA (KAW), 2014 WL 589054, at *6 (N.D. Cal. Feb. 14, 2014).

Courts of appeals have even utilized the extraordinary remedy of a writ of mandamus to prevent such testimony. *See, e.g.*, *In re Commodity Future Trading Comm'n*, 941 F.3d 869, 874 (7th Cir. 2019); *In re McCarthy*, 636 F. App'x 142, 145 (4th Cir. 2015); *In re United States (Jackson)*, 624 F.3d at 1369-70; *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008); *In re United States (Holder)*, 197 F.3d 310, 316 (8th Cir. 1999); *In re FDIC*, 58 F.3d 1055, 1057 (5th Cir. 1995); *In re United States (Kessler)*, 985 F.2d at 513.

Three separate rationales underlie this robust protection. *First*, it "would have serious repercussions for the relationship between two coequal branches of government" to allow parties litigating against federal agencies to ascertain the thoughts and mental processes by which high-ranking agency officials exercise their official discretion (as opposed to those agencies' decisions). *In re United States (Jackson)*, 624 F.3d at 1372 (citation omitted); *see also Morgan*, 313 U.S. at 422 ("Just as a judge cannot be subjected to such a scrutiny, . . . so the integrity of the administrative process must be equally respected." (citations omitted)); *Willer*, 176 F.3d at 486 (Table Op.) (citing *Morgan*, and explaining that "[i]t is well settled that the decision making process of judges is generally not subject to discovery"); *Kyle Eng'g Co.*, 600 F.2d at 231 ("Heads of government agencies are not normally subject to deposition[.]"); *San Francisco Min. Exch. v. Sec. & Exch. Comm'n*, 378 F.2d 162, 168 (9th Cir. 1967) (citing *Morgan*, and stating that "an inquiry into the state of mind of administrative adjudicators during the decisional process is wholly improper"). The "threat to the separation of powers" presented by an order requiring an executive-branch official's testimony becomes "more substantial" as the official at issue is "higher-ranking." *In re United States (Jackson)*, 624 F.3d at 1372 (issuing a writ of mandamus blocking testimony of a Cabinet-level official and stating that "*Morgan* does not suggest or even hint that a federal district

court should *ever* compel a member of the President's cabinet . . . to appear in a judicial proceeding to testify about the officials duties or decisions" (emphasis added)).

*Second* and relatedly, subjecting high-level government officials to depositions in civil actions involving their agency would impede the exercise of official duties by exerting a chilling effect on official decision-making. *See Lederman*, 731 F.3d at 203. That is, "subjecting officials to interrogation about how they reached particular decisions would impair that decision-making process by making officials less willing to explore and discuss all available options, no matter how controversial." *Walker v. NCNB Nat'l Bank of Fla.*, 810 F. Supp. 11, 12 (D.D.C. 1993); *see also Sykes v. Brown*, 90 F.R.D. 77, 78 (E.D. Pa. 1981) ("Should the agency head be subject to deposition in every resulting case and be repeatedly required to explain the various mental steps he took to reach his decision, the decision may be his last.").

*Third*, allowing depositions of high-ranking Government officials as a matter of course when their agencies are sued over one of their policies would create "a tremendous potential for abuse or harassment[,]" *Apple Inc. v. Samsung Elecs. Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) (citation omitted), and "the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service," *United States v. Wal-Mart Stores, Inc.*, No. CIV.A.PJM-01-CV-152, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002); *see, e.g.*, *Gray v. Kohl*, No. 07-10024-CIV, 2008 WL 1803643, at *1 (S.D. Fla. Apr. 21, 2008) ("[Courts] generally restrict parties from deposing high ranking officials lacking personal knowledge of the issues being litigated because they are vulnerable to numerous, repetitive, harassing, and abusive depositions, and therefore need some measure of protection from the courts." (citation omitted)).

These rationales apply fully to high-ranking public officials after they leave office, and, as noted above, numerous courts have precluded depositions of *former* high-ranking officials regarding their decisionmaking while in office. *See, e.g.*, *Lederman*, 731 F.3d at 203-04 (former deputy mayor) (cited by this Court's Oct. 19 discovery order, ECF No. 146 at 16); *Raymond v. City of New York*, No. 15-cv-6885, 2020 WL 1067482, at *5 (S.D.N.Y. Mar. 5, 2020) (former police commissioners); *Wal-Mart*, 2002 WL 562301, at *1 (former Chair of the Consumer Product Safety

Commission); *Galan-Alvarez*, 2015 WL 5602342, at *4-5 (former FDIC chair and senior deputy director).[5] As the *Galan-Alvarez* court explained:

> The integrity of administrative proceedings and the underlying decisionmaking process of agency officials are just as important where the official to be questioned no longer serves in the same position. And indiscriminate depositions of high-ranking government officials would . . . likely discourage people from accepting positions as public servants irrespective of whether those deposed were current or former officials.

2015 WL 5602342, at *4 (citation omitted); *see In re United States (Bernanke)*, 542 F. App'x 944, 949 (Fed. Cir. 2013); *Wal-Mart*, 2002 WL 562301, at *5. Although in the case of a former official, the "rationale based on interference with official duties is absent," the Apex Doctrine's other supporting rationales "apply to former officials and current officials with equal force." *Galan-Alvarez*, 2015 WL 5602342, at *4. The Apex Doctrine's concerns thus do not dissipate the moment a former Cabinet secretary has left office; "[i]f the immunity *Morgan* affords is to have any meaning, the protections must continue upon the official's departure from public service." *Wal-Mart*, 2002 WL 562301, at *3.

These concerns apply to Plaintiffs' attempt to depose former Secretary DeVos, a former member of the Cabinet reporting directly to the President. 5 U.S.C. § 5312. Although she no longer holds that office, the Apex Doctrine protects the former Secretary just the same, as does Rule 45. *See, e.g.*, *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs [under Rule 45]."). There is a substantial likelihood that Plaintiffs would indeed seek to question the former Secretary about her motivations at any deposition; Plaintiffs' previous four depositions in this case featured questions probing the motivations, mental impressions, and deliberations of Department officials—including those of the former Secretary.

---

[5]   *See also Croddy v. FBI*, No. 00-cv-0651, 2005 WL 8168910, at *1 (D.D.C. Mar. 30, 2005) (former FBI director); *Moriah v. Bank of China Ltd.*, 72 F. Supp. 3d 437 (S.D.N.Y. 2014) (former House Majority Leader of the House of Representatives); *Gil v. Cty. of Suffolk*, No. CV06-1683(LDW)(ARL), 2007 WL 2071701, at *2 (E.D.N.Y. July 13, 2007) (former Suffolk County Police Commissioner); *Bey v. City of New York*, No. 99 CIV.3873LMMRLE, 2007 WL 3010023, at *3 (S.D.N.Y. Oct. 15, 2007) (former Commissioner of the New York City Department of Correction); *Wal-Mart*, 2002 WL 562301, at *1 (former Chair of the Consumer Product Safety Commission); *Dobson v. Vail*, No. C10-5233/KLS, 2011 WL 4404146, at *1 (W.D. Wash. Sept. 21, 2011) (former Secretary of the Washington State Department of Corrections).

*See, e.g.*, Ex. F (Brown Dep. 78:20-79:16 (asking the witness, "what do you take that to mean, [Secretary DeVos's] comment?," and "what caused her extreme displeasure?"); 227:21-230:7 (asking the witness to read a statement the former Secretary made at a speech, and then asking, "what do you understand this statement to mean[?]," and "have you ever heard Ms. DeVos in your private meetings with her express these same sentiments?"), Dec. 15, 2020); Ex. G (Nevin Dep. 130:10-21 (asking the witness, "[w]hat did you take the Secretary's comment to mean[?]"), Dec. 9, 2020); Ex. H (Manning Dep. 69:20-70:4 ("After [the former Secretary] signed this document, did you talk to her about her extreme displeasure?"), Dec. 17, 2020).[6]

In addition, Plaintiffs used their depositions as an opportunity to question Department deponents on topics that lie outside of the limited boundaries set by the Court for discovery, despite Defendants' repeated objections. For instance, Plaintiffs questioned witnesses about their bonuses and compensation, *see, e.g.*, Ex. I (Jones Dep. 133:11-19, Nov. 20, 2020); Brown Dep. 34:21-22; their performance reviews, *see, e.g.*, Jones Dep. 134:25-135:15; Brown Dep. 30:24; the valuation of the Department's loan portfolio, *see, e.g.*, Jones Dep. 230:8-231:21; decisions to recuse from certain matters, *see, e.g.*, *id.* at 217:23-221:12; matters relevant to other litigation against the Department, *see, e.g.*, *id.* at 154:12-13; events occurring both long before and after the alleged delay in this case, *see, e.g.*, *id.* at 256:18-257:1, such as consulting work one witness performed while not employed by the Department, *see* Manning Dep. 146:6-150:5; and another witnesses' routine "discussions about borrower defense with the Trump transition team in January, February of 2017," Nevin Dep. 112:3-25, among other irrelevant matters. There is thus reason to expect that the same types of questions would be asked of the former Secretary, and that Plaintiffs would

---

[6] *See also* Ex. I (Jones Dep. 138:9-12 ("[B]efore the methodology went into effect in December 2019 and the claim decisions restarted, was the backlog an ongoing concern of yours?"); 156:12-157:15 (Plaintiffs' counsel arguing that it was appropriate to ask whether "the witness, who's in charge of policy, agrees with this statement about the risk of unsubstantiated claims" appearing in the Department's 239-page regulation); 278:6-10 ("And when you were reviewing the form denial letters, did you think about or consider whether or not they would provide enough information for a borrower to seek reconsideration?"); 283:16-18 ("What other information did you think when you reviewed this template would be included there?"), Nov. 20, 2020); Brown Dep. 46:4-5 ("So was the stoppage a concern when you joined [the Department?]"); 51:1-3 ("And when you made those requests [for additional staff members], how did — for instance, how did the Secretary respond?"); 84:1-4 ("And, so, when BDU came up with its performance metric, what deliberations did you have with the BDU?").

1  thereby use a court-authorized subpoena to ascertain the former Secretary's thoughts and mental

2  processes from when she served as a high-ranking agency official. A deposition of the former

3  Secretary would therefore implicate all three of the serious concerns—separation of powers, pre-

4  venting harm to agency decisionmaking, and preventing harassment and the deleterious effect har-

5  assment would have on public service—underlying the rule against depositions of current and

6  former Cabinet officials.

## II. PLAINTIFFS CANNOT ESTABLISH EXTRAORDINARY CIRCUMSTANCES TO JUSTIFY DEPOSING A FORMER CABINET OFFICIAL

8          Given these serious concerns, courts have held that a deposition of a current or former high-

9  ranking government official can be justified only by a showing of extraordinary circumstances.

10 *See, e.g.*, *Lederman*, 731 F.3d at 203 (citing *Morgan*, 313 U.S. at 422 and *In re United States*

11 *(Holder)*, 197 F.3d at 316). Extraordinary circumstances have been found to exist only where it is

12 shown that "'the official has unique first-hand knowledge related to the litigated claims or that the

13 necessary information cannot be obtained through other, less burdensome or intrusive means.'"

14 *See id.* This standard requires the party seeking discovery to make three distinct showings: (1)

15 that the official has relevant first-hand knowledge, (2) that any such knowledge would be uniquely

16 held by the former Secretary and thus not obtainable from another source, and (3) that any such

17 knowledge would be "essential to his case." *In re United States (Holder)*, 197 F.3d at 313-14; *see*

18 *also Sweet* ECF No. 146 at 16 (explaining that Plaintiffs may not depose the Secretary absent

19 "[e]xtraordinary circumstances," such as "if the Secretary has unique first-hand knowledge or nec-

20 essary information cannot be obtained through other, less intrusive means"). Plaintiffs have not

21 made, and cannot make, these required showings.

### A. Plaintiffs Have Not Reasonably Exhausted Other Less Intrusive Means to Obtain the Information They Claim to Seek from the Former Secretary

24         As an initial matter, Plaintiffs cannot demonstrate that the knowledge they claim the former

25 Secretary possesses is uniquely held by her and thus not available by other, less intrusive means

26 given that they have not attempted to reasonably exhaust potential alternative sources for that in-

27 formation. *See, e.g.*, *First Resort, Inc.*, 2014 WL 589054, at *6 (explaining that "extraordinary

28

circumstances" may exist only "provided that the party seeking discovery has shown that other persons cannot provide the necessary information").

Plaintiffs filed a letter brief with this Court seeking the former Secretary's deposition just three business days after raising the topic with Defendants on January 6. *See supra* pp. 5-6. During those three days, the Department told Plaintiffs that it was "open to exploring other, less intrusive means of providing your requested discovery." *Id.* at 5. After Plaintiffs specified what information they sought, the Department responded that it had started investigating whether it could provide that information and requested "a reasonable amount of time for the Department to continue this investigation." *Id.* at 6. Plaintiffs, however, filed their request for the former Secretary's deposition that same day. *Id.* at 6. At that time, there was no deadline for Plaintiffs' deposition request and summary judgment briefing was two months away. Today, the summary judgment briefing schedule has been indefinitely continued, but Plaintiffs still have not attempted to exhaust alternative sources for the information they seek from the former Secretary. There are at least four specific unexhausted alternatives.

First, document discovery is still ongoing in this case. Less than three weeks ago, on March 31, the Department produced approximately 500 additional documents to Plaintiffs relating to the same topics upon which they seek to depose Ms. DeVos. *See supra* p. 8. And four days ago, on April 16, Plaintiffs served the Department with an additional set of document requests, which seeks seven additional categories of documents, including two that specifically relate to the former Secretary. *See supra* p. 9. In light of this continuing document discovery, Plaintiffs cannot maintain, as they argued in January, that a deposition of the former Secretary is necessary because discovery has "not fully answer[ed] the questions at the heart of this case." *Sweet* ECF No. 171. To be clear, continuing to pursue document discovery is not sufficient for Plaintiffs to reasonably exhaust alternatives to a deposition of a former Cabinet member. *See, e.g.*, *Harmston*, 2007 WL 3306526, at *3. But at the very least, Plaintiffs should be required to review the documents that the Department has recently produced and will produce, before the Court makes any determination of whether the former Secretary has knowledge that "cannot be obtained through other, less intrusive means." ECF No. 146 at 16.

Second, Plaintiffs used only four of the five depositions that the Court made available to them for relevant decisionmakers from offices within the Office of the Under Secretary before seeking the former Secretary's deposition. *See supra* p. 5; *cf. California*, 2006 WL 2621647, at *1 (following *Morgan* and barring deposition of the California attorney general because "Defendants have failed to demonstrate why they can not seek the information they desire by . . . noticing other witnesses for deposition"). When Plaintiffs first sought to depose the Secretary, Defendants offered to confer "about a different deponent who might have relevant knowledge." *Supra* pp. 5-6. Plaintiffs could not have been saving their fifth deposition for the former Secretary, because the Court's October 19 discovery order reserved those five depositions for subordinate decisionmakers. *See Sweet* ECF No. 146 at 16. With that fifth and unused deposition, Plaintiffs could have questioned another current or former Department employee with relevant knowledge, such as one of the 15 such individuals listed in Defendants' December 7, 2020 interrogatory responses whom Plaintiffs did not depose. Ex. J (Defs.' Resps. and Objs. to Pls.' First Set of Interrogs. at 3-4, Dec. 7, 2020). For example, Plaintiffs never inquired about Justin Riemer (who appears on that list), even though the Director of the BDU, Ms. Nevin, testified that Mr. Riemer told her in June 2018 of the decision to stop issuing borrower defense decisions, and that "[p]resumably," Mr. Riemer would "know who the ultimate decision maker was[.]" Ex. K (Nevin Dep. 147:12-148:10). The Department's list of potential witnesses shows that Plaintiffs are incorrect when they claim that "[t]aken together," their "four deponents account for . . . the operations of FSA and the Office of the Under Secretary (OUS) for the relevant time period." *Sweet* ECF No. 171 at 1. Alternatively, Plaintiffs could have conducted a Rule 30(b)(6) deposition. That approach would have allowed Plaintiffs to ask the designated witness about information known or reasonably available to the Department as a whole—including to the former Secretary.

Third, Plaintiffs chose not to exhaust available interrogatories, or to use the information already provided in Defendants' interrogatory responses, to obtain the information they seek from the former Secretary. Plaintiffs declined Defendants' January 7 offer to negotiate whether any of Defendants' interrogatory responses could be supplemented to provide the information Plaintiffs seek through the extraordinary deposition of the former Secretary. *See supra* pp. 5-6. Plaintiffs

used only 20 of their 25 available interrogatories, *see id.* at 8, and only one of those 20 (No. 16) asked about a specific topic upon which Plaintiffs claim to have a need to depose the former Secretary, *compare* Ex. J at 22, *with Sweet* ECF No. 171 at 8; *see Harmston v. City & Cty. of San Francisco*, No. C 07-01186SI, 2007 WL 3306526, at *3 (N.D. Cal. Nov. 6, 2007) (barring deposition of Mayor Newsom because "any information Mayor Newsom might have related to the [case] can be discovered through written interrogatories . . . addressed to the City," which Plaintiffs had failed to pursue); *cf. California*, 2006 WL 2621647, at *1 (following *Morgan* and barring deposition of the California attorney general because "Defendants have failed to demonstrate why they can not seek the information they desire by propounding additional interrogatories"). Plaintiffs rejected Defendants' offer, even though the parties still had six days to negotiate supplemental interrogatory responses. *See supra* p. 6. On January 8, Plaintiffs responded that the alleged basis to depose the former Secretary "would not be satisfied by a more fulsome response to Interrogatory No. 16." *Sweet* ECF No. 171 at 9. But three days later, Plaintiffs argued to this Court that the former Secretary's deposition was justified in part because Defendants' initial response to Interrogatory No. 16 was not fulsome enough. *Sweet* ECF No. 171 at 1 (objecting that the response was "one paragraph long, [and] provide[d] no names"). On January 14, Defendants supplemented their response to Interrogatory No. 16, providing further detail, including the names of additional individuals involved in the development of the denial letters. Ex. L (Defs.' Suppl. Resps and Objs to Pls' First Set of Interrogs. at 4-5). Plaintiffs chose not to seek to depose any of these additional individuals.

Fourth, Plaintiffs also could have propounded Rule 36 requests for admission seeking the information they want to elicit from a deposition of the former Secretary. But they chose not to propound a single request for admission during this case. *See Harmston*, 2007 WL 3306526, at *3 (barring deposition of Mayor Newsom because "any information Mayor Newsom might have related to the [case] can be discovered through . . . requests for admission addressed to the City," which Plaintiffs had failed to pursue).

In short, Plaintiffs elected not to exhaust the many avenues of discovery available short of an extraordinary deposition of a former Cabinet secretary. They therefore cannot demonstrate that the information they seek could not have been obtained through other, less intrusive means.

### B. Plaintiffs Cannot Demonstrate that the Former Secretary Has First-Hand Knowledge that Is Unique and Essential to Their Case

Even if Plaintiffs had exhausted other, less intrusive means, they could not show that extraordinary circumstances exist. Plaintiffs argue that a deposition of the former Secretary is necessary because they allegedly did not obtain certain information from the four Department officials they deposed during two months of expedited discovery, and "[t]his has made it clear that only Secretary DeVos, as the senior-most policy-setting individual at the agency," has unique first-hand relevant knowledge. *Sweet* ECF No. 171 at 1; *see also, e.g.*, *id.* at 14 ("In sum: the four depositions we have taken, and the approximately 2500 documents you have thus far produced do not fully answer the questions at the heart of this case. Secretary DeVos can.").

An allegation that questions have not been "fully answered" fails to satisfy the requirements for a deposition of a Cabinet secretary. Even if Department employees purportedly could not testify to certain alleged facts, this does not establish (1) that the former Secretary has any relevant *first-hand* knowledge, (2) that any such knowledge would be *unique* and thus not possessed by others, or (3) that any such knowledge would be *essential* to Plaintiffs' case. *Supra* p. 15. Moreover, the still-growing record in this case fails to show that the former Secretary has any relevant first-hand knowledge at all, unique or otherwise. After reviewing the Department's recent production of documents (in response to Plaintiffs' request for documents sufficient to show any direction give to the Department's BDU to stop or resume processing any approvals or denials of borrower defense applications), Plaintiffs conceded that it contains no documents demonstrating that former Secretary DeVos had any first-hand involvement in the facts relating to this case. *See* Ex. E at 2. This concession is consistent with the information the Department provided during the first round of discovery. None of the Department's four deponents, discovery responses, or document productions indicated that the former Secretary has any first-hand knowledge of the topics

about which Plaintiffs seek testimony, but those same deponents, response, and productions identified more than a dozen other individuals who do. *See, e.g.*, Ex. J at 3-4, Ex. L at 4-5.

Plaintiffs' assumption that former Secretary DeVos must have first-hand knowledge of the claims at issue in this case cannot justify her deposition; if a Cabinet secretary's authority over an agency alone were enough, the Apex Doctrine would be rendered meaningless. And even if, as head of the agency, the former Secretary gained knowledge relevant to this case through reports from subordinates, that would "merely reinforce the point that former [Secretary DeVos] was high-ranking," not "that any knowledge she gained . . . was unique." *Galan-Alvarez*, 2015 WL 5602342, at *5; *see also First Resort, Inc.*, 2014 WL 589054, at *7 ("The more likely scenario is that any knowledge the [high-ranking official] has regarding the claims being litigated derives from briefing provided by support staff, summaries from counsel handling the litigation on a day-to-day basis, or other outside sources."). Each of Plaintiffs' three claims that the former Secretary possesses unique and essential first-hand knowledge, *see Sweet* ECF No. 171 at 8-9, is flawed.

### 1. Information Regarding the Form Denial Letters

First, the record does not show that the former Secretary has first-hand knowledge about the denial letters, or that if she did, such knowledge would be unique and essential. Plaintiffs claim that they "have exhausted the available means of discovery and have been unable to extract information about [the denial letters]." ECF No. 171 at 1. This is incorrect. Plaintiffs did not exhaust the available means of discovery, and the discovery they did take elicited relevant information about the development and use of the denial letters. The three (of the four) deponents who were at the Department when the letters were developed and used testified *at length* about them. For example, Ms. Nevin testified, among other things, about which denial letter would go to which borrowers, Nevin Dep. 80:24-81:9; how the Department determined how to insert the appropriate review recommendation reason in the letter, *id.* at 81:10-83:9; how the denial notices were developed by "an FSA communication team and our borrower defense program management team," along with "our senior leadership at the department and the Office of General Counsel," *id.* at 86:8-25; how her BDU team served "in a consulting role" on the development of the letters, *id.* at 87:9-88:3; how the development of the letters was "a weeks' long process," *id.* at 89:19-20; when the

letters would state the applicable legal standard, *id.* at 90:12-92:3; the meaning of particular language used in an actual denial notice received by an individual Plaintiff, *id.* at 93:2-95:13; 98:1-99:25; when the form denial letters were finalized, *id.* at 162:7-10; and the letters' discussion of the reconsideration process, *id.* at 211:24-216:23.[7]

In addition, Defendants' supplemental response to Interrogatory No. 16 generally describes the drafting and review process for the denial letters and ends with the statement that "there is no indication that former Secretary DeVos was involved in the review or approval of the template letters A, B, C or D." Ex. J at 5. Although Plaintiffs' January 11 letter brief objects that Defendants' initial response to Interrogatory No. 16 "provides no names," *Sweet* ECF No. 171 at 1, the Department's deponents named specific individuals or groups who drafted, reviewed, and provided input for the drafts, *see, e.g.*, Nevin Dep. 88:4-89:21 (stating that "a lot of people worked on" the letters, including "Nicki Meoli," "Chad Schrecengost," and OGC); Jones Dep. 202:18-203:6 (identifying Ms. Nevin); Brown Dep. 170:22-173:25 (stating that FSA's "policy liaison" team led by "Ian Foss" and BDU helped draft the letters, which were reviewed by OGC and the Office of the Under Secretary). Defendants' January 14 supplemental response provides additional names, stating that the letters were "sent to other officials in the Department, including Jed Brinton . . . and other attorneys in [OGC], as well as Diane Jones (the Principal Deputy Under Secretary) and Robert Eitel (then Counselor to the Secretary)." Ex. L at 5. The discovery Plaintiffs have already obtained on this topic was enough for Plaintiffs to include several pages worth of allegations in their supplemental pleading that the denial notices are unlawful, *e.g.*, *Sweet* Suppl. Compl. ¶¶ 289-317, and to represent that "no further discovery" is required, *Sweet* ECF No. 192 at 8.

In any event, the identity of the person "who gave the final sign-off on the form denial templates," *Sweet* ECF No. 171 at 2, is not essential—or indeed, even relevant—to the merits of

---

[7]    In addition, then-Under Secretary Jones described, among other things, how the Department sends those letters to borrowers, Jones Dep. 188:2-189:9; the Department's internal process for developing the denial letters, *id.* at 189:10-190:6; how long it took to develop the letters, *id.* at 190:7-17, the complexity and challenges involved with developing the letters, *id.* at 190:18-195:25; how she helped edit the letters, *id.* at 202:13-17; the meaning of particular language used in the letters, *id.* at 202:18-205:5; and when a denial letter would include the applicable legal standard, *id.* at 211:7-213:24. *See also* Brown Dep. 176:8-187:16 (testifying about the letters).

Plaintiffs' APA claims. The subpoena can and should be quashed on that ground alone. *See, e.g.*, *California*, 2006 WL 2621647, at *1 (barring deposition of California attorney general because "the Court finds that [it] is not essential"). It is undisputed that the Department approved these letters and sent them to certain borrowers. The name of the person "who gave the final sign-off" has no bearing on whether the Department's delay in issuing decisions was unreasonble, whether the letters contain insufficient analysis, or whether Plaintiffs are entitled to the order they seek compelling the Department to "start granting or denying their borrower defenses." Compl. ¶ 10.

### 2.    Information Regarding the Department's Alleged Delay

Second, the record also does not show that the former Secretary has first-hand knowledge about "[w]ho ordered FSA to stop issuing borrower defense decisions . . . and why," *Sweet* ECF No. 171 at 8 (emphasis omitted), or that if she did, that such knowledge would be unique and essential. Although Plaintiffs claim that James Manning identified the former Secretary as "the only individual with authority to stop or restart issuing borrower defense decisions," *id.*, Mr. Manning testified only that he would "expect the Secretary has that authority," Manning Dep. 123:24-25. He did not say he knows anything regarding that issue at all, but just that he surmised or expected as much. And he did not say that he expected she was the *only* individual who would have such authority, that she actually exercised that authority, or, most importantly, that she was the only individual with knowledge about how such a decision would be made or was made. Instead, Mr. Manning stated that he "would expect that [the Secretary would] be briefed by others, including the general counsel on an issue before an action like that was taken," *id.* 123:25-124:3, which indicates that any knowledge Ms. DeVos might have had would be neither first-hand nor unique.

Furthermore, Plaintiffs claim that the former Secretary is the only person who knows why the agency's delay occurred, but their own January 11 letter brief cites and details testimony offered by the Department's witnesses on the multifaceted reasons for the delay (including the *Calvillo Manriquez* injunction, need for a new relief methodology, and staffing issues). *Sweet* ECF No. 171 at 2; *see also Sweet* Suppl. Compl. ¶¶ 72-94 (referring to deposition testimony and agency

**Add. 56**

documents produced in discovery that describe several factors contributing to the claims backlog and delay in issuing borrower defense decisions). Plaintiffs assert that there could be only one "real" reason for the agency's delay, but that is contrary to the record, *supra* pp. 3-4, and in any event does not mean that the former Secretary possesses any unique knowledge on the topic. And even if the former Secretary had been uniquely responsible for the agency's pause of borrower-defense determinations, questioning her about her reasons would be precisely the kind of probing into a high-ranking agency official's thoughts and mental processes that the Apex Doctrine disallows.

Finally, the information Plaintiffs seek from the former Secretary is also non-essential and irrelevant to the case. This Court allowed discovery on the "extent to which the difficulty of reviewing borrower-defense applications" actually caused Defendants' delay, *Sweet* ECF No. 146 at 16, not an unbounded inquiry into other potential causes that Plaintiffs believe might be behind the delay.

### 3. Information Regarding Borrower Defense Policy

Third and finally, the record does not show that the former Secretary has unique and essential first-hand knowledge about the broad topic of "Borrower Defense Policy." *Sweet* ECF No. 171 at 8-9 (emphasis omitted). Each of the four witnesses Plaintiffs already deposed testified regarding their extensive knowledge of borrower-defense policies. *See, e.g.*, Jones Dep. 103:1-110:12, 114:17-117:2; Nevin Dep. 72:16-75:12;100:10-104:10; Brown Dep. 91:21-92:21, 105:21-121:25; Manning Dep. 235:3-241:3, 268:2-270:20. And those deponents also testified that persons other than themselves and the former Secretary would of course have knowledge of various Department policy decisions. *See, e.g.*, Jones Dep. 22:15-23 (explaining that there are "a group of people" involved in policy decisions made by the Secretary's Office, including "the secretary's chief of staff, the Counselor to the secretary, [and] the deputy secretary"); 21:12-18 ("[T]he development of policy . . . involves the Office of Postsecondary Education, it involves my office, the Office of the Secretary and the Office of General Counsel."). Not only is information about "Borrower Defense Policy" not *uniquely* within the former Secretary's knowledge, it extends well beyond the limited parameters for discovery set by this Court. *See Sweet* ECF No. 196 at 16.

**CONCLUSION**

For the foregoing reasons, the motion to quash should be granted.  In addition, given the parties' agreement that any deposition, if required, should not take place until there is a final order on this motion to quash, *see* Ex. B, Defendants respectfully request that the Court stay the subpoena or any order requiring a deposition for 30 days to allow them to consider seeking appellate relief, and pending completion of any appellate proceedings.  Given the important issues implicated by this motion, Defendants would suffer prejudice without a stay granting them adequate time to consider and pursue their appellate options.

Dated:  April 20, 2021                                    Respectfully submitted,

                                                          SARAH E. HARRINGTON
                                                          Deputy Assistant Attorney General

                                                          MARCIA BERMAN
                                                          Assistant Branch Director

                                                          /s/ *Kevin P. Hancock*
                                                          R. CHARLIE MERRITT
                                                          KEVIN P. HANCOCK
                                                          Trial Attorneys
                                                          U.S. Department of Justice
                                                          Civil Division, Federal Programs Branch
                                                          1100 L Street, N.W.
                                                          Washington, DC  20530
                                                          Telephone: (202) 514-3183
                                                          Email: kevin.p.hancock@usdoj.gov

                                                          *Attorneys for Defendants*

1  JOSEPH H. HUNT
   Assistant Attorney General
2  David L. Anderson
   United States Attorney
3  MARCIA BERMAN
   Assistant Branch Director
4  KATHRYN C. DAVIS
   R. CHARLIE MERRITT
5  Trial Attorneys
   U.S. Department of Justice
6  Civil Division, Federal Programs Branch
   1100 L Street, NW
7  Washington, DC 20530
   (202) 616-8298 (phone)
8  (202) 616-8470 (fax)
9  Kathryn.C.Davis@usdoj.gov
10

11 *Counsel for Defendants*

12             **UNITED STATES DISTRICT COURT**
              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
13

14 THERESA SWEET, *et al.*,

15              Plaintiffs,                    No. 19-cv-03674-WHA

16     v.

17 ELISABETH DEVOS, in her official capacity   **DECLARATION OF**
   as Secretary of Education, and the UNITED   **DIANE AUER JONES**
18 STATES DEPARTMENT OF EDUCATION
                                               Honorable William H. Alsup
19

20              Defendants.

21

22

23

24

25

26

27

28

# DECLARATION OF DIANE AUER JONES

I, Diane Auer Jones, declare as follows:

1. My name is Diane Auer Jones, I am over the age of 18, and serve as Principal Deputy Under Secretary, Delegated the Duties of the Under Secretary, in the United States Department of Education ("ED"). I have personal knowledge of the matters set forth herein and if called as a witness, I could and would testify competently thereto.

2. As Principal Deputy Under Secretary, I am the senior higher education official responsible for overseeing Federal Student Aid, the Office of Postsecondary Education, and the Office of Career, Technical and Adult Education at ED. In particular, I advise the Secretary of Education on policies and issues relating to the Federal student financial aid programs, authorized and administered by the Department under Title IV of the Higher Education Act of 1965, as amended, including the Federal Direct Loan Program.

3. I was appointed Principal Deputy Under Secretary at ED on June 25, 2018 and delegated the duties of Under Secretary on June 27, 2019. I also served as Acting Assistant Secretary for Postsecondary Education. Previously, I served as the Assistant Secretary for Postsecondary Education in ED during the administration of President George W. Bush. Earlier in my career, I was a biology professor at the Community College of Baltimore County in Maryland and I later worked at Princeton University and the Career Education Corporation. I have also worked at the National Science Foundation, the U.S. House of Representatives Committee on Science, and the White House Office of Science and Technology Policy, and as a senior policy advisor to the Secretary of Labor.

4. As part of my responsibilities in the Department, I have worked extensively on issues relating to the implementation and administration of the Department's regulations regarding borrower defenses to the collection of Federal student loans.

## The Department's Federal Student Aid Priorities 2018-2019

5. In November 2016, the Department promulgated new "borrower defense" regulations addressing, among other things, standards and procedures for student borrowers to seek relief from certain federal student loan obligations based on misconduct by an educational institution ("the 2016 regulations"). Those regulations were scheduled to become effective on July 1, 2017.  However, , the Department determined that the 2016 regulations did not reflect an appropriate balance of the responsibilities of the agency to protect taxpayers, and borrowers and to hold institutions accountable.  Also, the 2016 regulations did not provide due process rights to institutions during the claim adjudication process.  Accordingly, in June 2017, the Department initiated a process to develop new rules governing borrower defense.  The Department then delayed the effective date of the 2016 regulations pending, *inter alia*, the completion of that rulemaking process.

6. When I started in my current position in 2018, the Department had just completed the statutorily required negotiated rulemaking process to develop its new borrower defense regulations, a process that required the Department to solicit the input of a broad group of stakeholders and hold public hearings over a multiple-month period. When the negotiating parties failed to reach consensus, the Department drafted new regulations and issued a Notice of Proposed Rulemaking (NPRM) with proposed borrower defense regulations on July 31, 2018.

7. In the fall of 2018, the United States District Court for the District of Columbia found the Department's delays of the 2016 regulations unlawful under the Administrative Procedure Act and vacated them.  *See Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C.

2018); 332 F. Supp. 3d 181 (D.D.C. 2018).  Shortly thereafter, the court denied a motion to preliminarily enjoin the 2016 regulations, and so they took effect. *California Association of Private Postsecondary Schools v. DeVos*, 344 F. Supp. 3d 158 (D.D.C. 2018).  Copies of those decisions are Exhibits 1 and 2 to this Declaration.

8.  The 2016 regulations significantly changed the rules for considering borrower defense claims.  Under the Department's original regulations, the determination of whether a defense existed was based on whether the borrower defense claimant could establish a cause of action under applicable state law.  The 2016 regulations adopted a new federal standard that allowed a borrower to assert a defense on the basis of a school's substantial misrepresentation (as defined by the Department), breach of contract, or the existence of a favorable, nondefault contested judgment against the school.  In addition, the 2016 regulations established a new evidentiary standard for reviewing allegations made by students or others and required the Department to issue written decisions on borrower defense claims.

9.  The 2016 regulations also included other provisions unrelated to borrower defense that imposed new conditions on institutions participating in the Department's Title IV student loan program.  Among these were new "financial responsibility" standards that included a requirement that all institutions of higher education report to the Department all litigation filed against them; "repayment rate" provisions that created a number of new reporting requirements for institutions; provisions disallowing participating institutions' use of predispute arbitration agreements and class action waivers in their enrollment contracts with students; and new procedures governing loan discharges based on a school's closing.

10. Once the court decisions were issued and the 2016 regulations became effective, the Department had to implement them, including the development of mechanisms to collect information on years of litigation filed against institutions that participate in the Federal student financial aid programs and to identify borrowers who qualify for automatic closed school discharges and provide loan relief. The Department also had to develop processes for implementing the new financial responsibility requirements of the 2016 regulations, which included substantial reporting requirements. The Department spent considerable time and effort identifying which offices would handle different parts of the process and developing the necessary instructions.

11. The Department also needed to issue guidance to regulated parties in light of the delay of the 2016 regulations' effective date. On March 15, 2019, the Department issued an electronic announcement to inform institutions of higher education of their responsibilities under those regulations and published a Final Rule announcing the effective date of the regulations and providing further information for program participants on how the regulations would be implemented and enforced by the Department. The electronic announcement is included as Exhibit 3 and the Final Rule is included as Exhibit 4 to this Declaration.

12. At the same time, the Department was reviewing the public comments it received on the new borrower defense NPRM published on July 31, 2018, evaluating what changes, if any, were needed to those proposed regulations, and preparing a final rule responding to the comments received and explaining any changes from the NPRM. The Department received comments on the NPRM from 38,450 parties and made significant changes to those rules to respond to those comments. We also consulted

with other government agencies which provided comments during the agency review process for the final regulations.

13. The Department published its revised final regulations on borrower defenses to repayment on October 23, 2019.  The final regulations are included as Exhibit 5 to this Declaration.

Development of a new methodology for determining the amount of borrower relief

14. Neither the 1995 regulations, the 2016 regulations nor the new final regulations published in 2019 set forth a methodology to determine the appropriate relief once a borrower establishes a successful borrower defense claim.  Developing such a methodology has been an important priority of the Department under Secretary DeVos' leadership.  Given the difficulties associated with assessing the harm suffered by the hundreds of thousands of borrowers who have filed claims for relief based on the asserted misconduct of numerous institutions, the consideration and development of relief methodologies has required significant time and resources.

15. In 2017, the Department conducted a thorough review of its existing methods for adjudicating borrower defense claims and calculating relief and concluded that it did not have an adequate process to handle the growing list of borrower defense claims.  As a result of that review, the Department developed a new methodology for determining the amount of relief to be given to successful borrower defense claimants who attended certain schools operated by Corinthian Colleges, Inc. ("Corinthian").

16. In contrast with the Department's previous approach, which had assumed that all Corinthian students received nothing of value from their education, the new methodology developed in 2017 sought to rely on empirical evidence to measure the harm that students suffered as the result of Corinthian's violations of California state

law.  It did so by comparing the average earnings of borrower defense claimants who attended certain Corinthian programs with the average earnings of students who had completed similar programs at schools that received passing scores under the Department's then-operative gainful employment regulations.  To the extent that Corinthian students, on average, earned less than their peers at comparable programs, the Department determined that they were harmed by the misrepresentations giving rise to their borrower defense claims and awarded proportionally tiered relief based on the earnings comparison.

17. On May 25, 2018, the U.S. District Court for the Northern District of California concluded that the process used by the Department to obtain earnings data from the Social Security Administration for use in the Department's methodology likely violated the Privacy Act and preliminarily enjoined that methodology.  *Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018).  The Court enjoined the Department from using that methodology "as it currently exist[ed], to the extent that the Secretary relies upon information provided by the Social Security Administration in violation of the Privacy Act."  Amended Order at 1, *Manriquez v. DeVos*, 3:17-cv-7210 (N.D. Cal. June 19, 2018), ECF No. 70.

18. The Department appealed the District Court's decision in *Manriquez* and is still waiting for a decision from the appellate court.  In the meantime, the Department has undertaken significant efforts to explore and develop an alternative approach for determining the amount of relief to be given not just to Corinthian borrowers but to all borrowers with approved borrower defense claims.

19. The Department continues to believe that the relief awarded to a borrower should be based on the financial harm suffered by the borrower and the value received from the

borrower's institution. As the court found in *Manriquez*, the 2017 methodology's "attempt to create a policy to determine whether students obtained value and if so, how much, is a legitimate exercise of the Secretary's discretion under the Higher Education Act." 345 F. Supp. 3d at 1103. The value received by the participants in a program is best determined by using measures of aggregate outcomes for all participants rather than individual measures that are more dependent upon the individual circumstances of each participant.

20. While there are various sources of data for earnings, the Department does not have that information and it has taken the Department time to identify a source of such information that would allow for an accurate comparison of earnings across academic institutions. In particular, because the Department believes that the best way to assess financial harm is to compare earnings data for borrowers who attend academic programs that are asserted to have engaged in misconduct with the same information at comparator programs not affected by such misconduct, the Department needed data identifying earnings for occupations in terms similar to those used by educational institutions. Moreover, to avoid the problem identified by the court in *Manriquez*, the Department intends to use publicly available earnings data to impute earnings to both the applicant and the comparison group.

21. In some instances, a successful borrower defense applicant may have been enrolled in a program so small that median earnings are not available for use in the formula for determining the amount of relief to provide or that there is no comparable program to use for comparison purposes. This situation presents unique challenges to the Department's ability to fairly and efficiently determine financial harm and

corresponding borrower defense relief.  The Department is evaluating how best to ensure that these borrowers receive the appropriate level of debt relief.

22. The Department is working towards announcing and implementing a new partial relief methodology within the next few weeks.

23. As indicated above, the development of a new methodology has required significant time and resources for the Department.  The process has involved a team of employees from the Department's Federal Student Aid office and other experts from appropriate offices as well as senior officials in the Department. The Department has had to address a number of challenges in developing a new methodology, including the identification of an accurate, reliable and accessible source of earnings data that would not raise concerns about privacy.  In addition, since different institutions often assign different names to programs that are essentially the same, the Department had to determine how it would classify programs for the purpose of the earnings calculation.  Finally, we have had to develop an algorithm to use to calculate the level of financial harm suffered by a successful BD applicant and therefore the level of financial relief that should be provided.  It has taken months to develop the potential options, assess each option for validity, ensure that the Department would have access to the data needed to use the chosen method, and discuss the options with appropriate offices and leaders in the Department, while also avoiding the Privacy Act issues identified in *Manriquez*.  Our goal throughout this process has been to develop an approach that provides an appropriate evaluation of the level of harm experienced by the borrower and a fair level of relief.

24. The Department's consideration of a borrower's application for a borrower defense discharge includes two steps:  (1) a determination of whether the borrower has

submitted a borrower defense claim supported by evidence submitted by the borrower or otherwise available to the Department in accordance with the applicable standard; and if the borrower has satisfied the first step, (2) a determination of the amount of relief that the borrower should receive.

25. As explained in other declarations submitted as part of this administrative record, the Department has continued to adjudicate claims since the injunction was issued in *Manriquez*, consistent with that injunction, including making Step (1) determinations that some borrowers have established a successful borrower defense in accordance with the applicable standard. As explained above, however, the Department has not yet finished its development of a comprehensive methodology for determining the amount of relief to award successful claimants. The Department has prioritized development of this methodology and believes it is imperative to have it in place before finalizing decisions approving borrower defense claims and awarding relief. Once established, the new methodology will allow the Department to expeditiously determine the level of relief to award to successful BD applicants in a clear, consistent, and fair manner.

26. In some cases, the Department has determined that the borrower's claim for a discharge is not supported by the evidence submitted by the borrower or information otherwise available to the Department. For example, in some instances, the Department has determined that the borrower actually did not have a Federal loan to enroll at the institution that is the subject of the borrower's claim. In other instances, the borrower provided such scant information that the Department simply lacked a basis for making a determination favorable to the borrower. The Department has been working to develop documents to provide a more robust explanation for borrowers

whose claims are denied.  Once these documents are developed, the Department needs to work with each of its servicers to put the process of loan relief and borrower notification in process, which requires contract updates with each of the Federal student aid loan servicers that service Direct Loans.  It takes longer to develop decision letters that provide an explanation for each borrower of why their claim was denied, but we believe this  investment of time is important so that borrowers understand the basis for the decision, which is vital for instilling confidence in the process.  This has taken longer than we hoped but the notices are finished and we are now working with our contracting officials and loan servicers to enter these notices into servicer systems.

27. The Department plans to issue its decisions denying these borrowers' claims in the coming weeks.  The Department believes that if it issued denials in advance of issuing approvals, borrowers could be confused and believe that the Department would not be approving any claims – which is not the case.  Therefore, in order to prevent confusion or distress to borrowers who are eligible for relief, the Department decided that it should not issue denials until it has a methodology in place that will also allow it to issue approvals and relief.  As explained above, after the Department announces its new methodology, currently anticipated in the next few weeks, it can begin expeditiously processing approvals and issuing decisions.

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    Executed this _14th_ day of November 2019 in Washington, DC.

4

5

6

7

8                                                   Diane Auer Jones

JOSEPH H. HUNT
Assistant Attorney General
David L. Anderson
United States Attorney
MARCIA BERMAN
Assistant Branch Director
KATHRYN C. DAVIS
R. CHARLIE MERRITT
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 616-8298 (phone)
(202) 616-8470 (fax)
Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>        Defendants. | No. 19-cv-03674-WHA<br><br>**DECLARATION OF IAN FOSS**<br><br>Honorable William H. Alsup |

# DECLARATION OF IAN FOSS

I, Ian Foss declare as follows:

1. My name is Ian Foss, I am over the age of 18, and currently serve as a Program Specialist at Federal Student Aid office ("FSA") of the United States Department of Education ("ED" or "Department"). I have held this position since December 6, 2010. I have personal knowledge of the matters set forth herein and if called as a witness, I could and would testify competently thereto.

2. As a Program Specialist, I am a member of FSA's Policy Liaison and Implementation office, which, among other things, provides guidance for other FSA offices concerning the proper implementation of regulations about, or that affect, the federal student financial aid programs, including borrower defense.

3. Through my duties as a Program Specialist, my work on ED's Borrower Defense ("BD") effort, and my discussions with ED staff working on the BD effort, I am generally familiar with the process for implementing the BD framework.

## 2016 Rules Implementation Effort

4. The 2016 BD regulations ("2016 rule") were promulgated to modify the original 1995 BD regulation. However, in 2017 and 2018, the Department delayed the 2016 rule until July 1, 2019, while simultaneously engaging in a process to further revise the BD regulations. In October 2018, the U.S. District Court for the District of Columbia struck down the delay of the 2016 rule in *Bauer v. DeVos*, eventually causing the 2016 rule to go into effect.

5. The new regulations included several new provisions, including a change to a closed school discharge provision, which previously only provided upon an application of the borrower for a discharge of a loan taken to attend an educational institution that closed. 34 C.F.R.

§685.214. The new provision added an automatic closed school discharge, 34 C.F.R. §685.214(c)(2), which mandated that ED automatically discharge loans obtained by borrowers to attend educational institutions that closed on or after November 1, 2013 if the borrower did not subsequently re-enroll in any title IV-eligible institution within a period of three years from the date of school closure.

6.  The implementation of the new 2016 regulations necessitated multiple operational changes, based on both the new closed school discharge provision and other measures.  The changes included the following:

Implement new Automatic Closed School Discharge:

· Every month, the Department executes a program, which relies upon loan disbursement and enrollment information contained in National Student Loan Data System ("NSLDS"), to identify borrowers who are eligible for an automatic closed school discharge.

· After the program is executed, a pre-notification communication via email and U.S. Mail is sent to identified borrowers by loan holders.

· Also after the program is executed, the Department instructs loan holders and its contractors to 1) discharge the applicable loans and 2) officially notify borrowers after the loans have been discharged.

Implement new repayment rates policies and procedures under the 2016 BD rule where none previously existed:

· Under the 2016 BD regulations, schools are required to provide a notice to students if their repayment rate is below a specific threshold described in the regulations.

· To calculate the repayment rate, the Department needed to modify applicable contracts to instruct its contractor to calculate the rate (which relies on millions of records), and provide specific details about which data in Departmental systems were to be used, the fields within that system that must be used, as well as how the rate was to be calculated using the identified fields.

· In addition to systems modifications, the Department needed to develop procedures that would be used to permit schools to correct data in the system that would be used to calculate the repayment rate.

Implement new False Certification discharge process

· Create processes and triggers for new bases for borrowers to receive false certification discharge automatically.

Implement changes to BD claims adjudication

· The 2016 BD regulations established a procedural framework for the adjudication of borrower defense applications. This framework applied to both new applications and applications that were outstanding as of the date the 2016 BD regulations went into effect.

· One procedural difference that had to be accommodated under the 2016 BD regulations was providing notice to the school associated with the borrower's application that the borrower had filed a BD application based on the school's conduct and to give the school an opportunity to respond to the borrower's allegations.

· To implement this procedural change, ED has had to examine the technological mechanism by which such notice would be sent, what information, precisely, would be sent to the school, how long to give the school before proceeding as though no response would be forthcoming, where any data received from the school would be stored and whether any given solution complied with the Privacy Act of 1974, as amended, draft contract modification documents, and procedures to evaluate that information, if received.

· The foregoing change is just one modification that affected pending BD applications. It does not encompass all changes, and does not include the changes necessary to implement a new Federal standard that would be used to determine whether a borrower qualifies for a borrower defense discharge, among other changes.

See Exhibit A (Summary of Modifications Necessitated by 2016 BD Rules), p. 2.

7. In June of 2019, the Department initiated a modification of its contract with Senture, LLC to ensure the completion of changes necessitated by the implementation of the 2016 rule by January of 2020. See Exhibit B (Modification of Contract with Senture, LLC dated August 1, 2017), p. 3. The Department continues to monitor the progress of the process

Case 3:19-cv-03674-WHA   Document 65-3   Filed 10/14/19   Page 320 of 342

and system changes, as well as servicer compliance with the new requirements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  14   day of November, 2019 in Washington, DC.

_____

Ian Foss

1   JOSEPH H. HUNT
    Assistant Attorney General
2
    David L. Anderson
3   United States Attorney

4   MARCIA BERMAN
    Assistant Branch Director
5
    R. CHARLIE MERRITT
6   KATHRYN C. DAVIS
    KEVIN P. HANCOCK
7   Trial Attorneys
    U.S. Department of Justice
8   Civil Division, Federal Programs Branch
    919 East Main Street, Suite 1900
9   Richmond, VA 23219
    (202) 616-8098 (phone)
10  (804) 819-7417 (fax)
    robert.c.merritt@usdoj.gov
11
12  *Counsel for Defendants*

13

14                  **UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
15

16  THERESA SWEET, *et al.*,

17            Plaintiffs,                    No. 19-cv-03674-WHA

18       v.

19  ELISABETH DEVOS, in her official capacity    **DECLARATION OF**
    as Secretary of Education, and the UNITED    **COLLEEN M. NEVIN**
20  STATES DEPARTMENT OF EDUCATION

21            Defendants.

22

23

24

25

26

27

28

I, Colleen M. Nevin, hereby declare under the penalty of perjury as follows:

1.  I am over the age of 18 and competent to testify to the matters herein.

2.  I am the Director of the Borrower Defense Unit ("BDU") of the Enforcement Office within the Office of Federal Student Aid ("FSA") for the United States Department of Education ("Department"). I have been in my current position since October of 2016. Prior to joining the Department, I was an Assistant Attorney General at the Massachusetts Attorney General's Office for three years, where I investigated and civilly prosecuted consumer protection violations. In my over twenty-year career as an attorney, I have worked in both private practice and state and federal government.

3.  I certify that I am qualified to make the statements contained in this Declaration regarding the Department's process for reviewing applications filed by borrowers to obtain borrower defense to repayment ("BD") discharges of their Federal student loans under the Department's statutory and regulatory authorities. The statements contained herein are based on my personal knowledge as an employee of the Department, information that I have received in the performance of my official duties, and my review of the pertinent records.

4.  As the Director of the BDU, I manage the BDU and oversee its work. That work includes conducting legal research and analyses of borrower defense claims; corresponding with institutions of higher education and third parties to obtain information and records needed to evaluate BD applications; developing systems and processes to adjudicate applications and to track the status of the applications; adjudicating BD applications and recording decisions on the applications that constitute the final decision of the Secretary; implementing policy and instructions from Department leadership regarding relief to be provided for approved

applications, prioritization of claims, and other work to be performed by BDU; and advising the Chief Enforcement Officer on matters related to BD applications.

5.     Through my role as the Director of the BDU, I am familiar with the Department's efforts to adjudicate and process borrower defense applications, as well as with the human and technological resources available to the BDU and FSA to do so.

***Relevant Borrower Defense to Repayment Regulations***

6.     Under the Direct Loan Program, the Department makes loans to students and parents to pay the costs of attendance at participating institutions of higher education.  Under certain conditions, borrowers can have their loans cancelled or discharged.

7.     Under § 455(h) of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1087e(h), the Department is authorized to establish regulations under which borrowers may assert "acts or omissions of an institution of higher education . . . as a defense to repayment" of a Direct Loan.  In 1994, the Department implemented the statutory requirement by publishing 34 C.F.R. § 685.206(c).  That regulation provided that a borrower could assert a defense against repayment on a Direct Loan based on an act or omission of the institution which would give rise to a cause of action against the institution under applicable State law.

8.     On November 1, 2016, the Department published a new borrower defense regulation (the "2016 BD Regulation") with an effective date of July 1, 2017.  The Department delayed the effective date of the regulation, but the delay was vacated and the regulation went into effect on October 12, 2018 as the result of court orders in *Bauer v. DeVos*, No. 17–cv–1330 (D.D.C.) and *California Association of Private Postsecondary Schools v. DeVos*, 17-cv-999 (D.D.C.).  A notice published by the Department in the *Federal Register* describing these events and

memorializing that the 2016 Borrower Defense Regulations were in effect as a result of the

court's order is attached as Exhibit 1.

**Borrower Defense Applications Received Since 2015**

9.      Based upon my review of relevant documents and from speaking to others

knowledgeable about such events within the Department in the course of the performance of my

duties, it is my understanding that prior to 2015, the Department had received only a very small

number of requests for Federal student loan discharges under the Department's borrower defense

to repayment authorities.  It further is my understanding that those requests were decided by the

Department's Office of General Counsel.

10.     However, in 2015, the number of borrower defense applications increased significantly

following the collapse of Corinthian Colleges, Inc. ("CCI") and the Department's announcement

of investigative findings that certain CCI-operated schools had made misrepresentations

regarding certain of its job placement rates.

11.     To address the unprecedented number of pending borrower defense claims, on or about

June 25, 2015, the Department announced the appointment of a Special Master, Joseph Smith.

12.     It is my understanding from the Special Master's reports that the number of borrower

defense applications received by the Department escalated dramatically during the following

year, as follows:

| Date of Special Master Report | BD Applications Received |
|---|---|
| 9/3/15 | 4,140 |
| 12/3/15 | 6,691 |
| 3/25/16 | 11,000 |
| 6/29/16 | 26,603 |

Copies of the Special Master's four quarterly reports are attached as Exhibits 2 through 5.

13.     As the Special Master's tenure drew to a close in or about June 2016, a newly created FSA Enforcement Office began oversight of the borrower defense adjudication process.  On October 28, 2016, Enforcement issued a Report on Borrower Defense (the "Enforcement Report") indicating that between June and October 2016, the number of applications increased three-fold to approximately 82,000 borrower defense applications received.  A copy of that report is attached as Exhibit 6.

14.     The Enforcement Report noted that about 60% of the 82,000 applications pending in October 2016 appeared to be from borrowers who had attended CCI schools during the time periods covered by the Department's CCI job placement rate ("JPR") misrepresentation findings, as discussed below.  *Id.*  The report also noted that only approximately 4,000 of the applications received at that time were from borrowers from other schools. *Id.*

15.     The Department has produced quarterly reports with borrower defense data since June 2018.  The report for the period ending June 30, 2019  states that the Department had received 272,721 borrower defense applications since 2015.  In the quarter ending on June 30, 2019 alone, the Department reported having received 32,784 applications.  210,168 of the total applications remained pending as of that point in time.  These reports are attached as Exhibit 7  and are available on the Department's website at https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/borrower-defense-data.

16.     As of November 12, 2019, the Department has received over 290,000 applications and more than 225,000 remain pending.  Approximately 74,000 of the pending applications are from

borrowers who attended CCI.  The remaining applications are from borrowers who attended other schools.

### *Creation and Staffing of the Borrower Defense Unit*

17.     BDU currently has the responsibility of adjudicating these hundreds of thousands of borrower defense claims.  The processing of adjudicated applications, which includes notifying the borrowers of decisions and all loan handling issues (including forbearance, interest credits, and discharges), is performed by other FSA staff working with a contractor and student loan servicers.

18.     In the fall of 2015, the Special Master hired four attorneys to assist in reviewing the roughly 4,000 applications that the Department had received at that time and to develop a framework for their adjudication.  The Special Master hired three additional attorneys in early 2016 to address the increase in borrower defense claims that the Department was receiving.

19.     On February 8, 2016, the Department announced that it had formed the aforementioned Enforcement Office which would include a new division, the present-day Borrower Defense Unit or Group (also known as the BDU).  A copy of the February 8, 2016 announcement is attached as Exhibit 8. The seven attorneys hired by the Special Master subsequently became the first employees in the new BDU.

20.     As the volume of applications received was increasing, FSA added to the BDU staff.  When I joined the Department as Director of BDU in October of 2016, BDU had ten full-time attorneys (in addition to myself), as well as twenty (20) contractor paralegals and attorneys.

21.     In the fall of 2016, Enforcement also had requested approval to hire several additional attorneys for BDU.  That request was tabled pending the transition to the new administration in January 2017.

22.     As discussed below, adjudications were halted in 2017 pending a review of the borrower defense program and processes, and the contractor staff was reduced to six individuals at that time.

23.     Four of the BDU attorneys voluntarily left the Department between December 2016 and early 2018, leaving five full-time attorneys and one part-time attorney. Starting in 2018, after processing of adjudications resumed, we were given authority to increase our contractor staff. As of November 2018, BDU had eleven contractor attorneys.  For the past year, the contractor staff size was between 7 and 12 contractor attorneys.

24.     BDU again requested additional hiring authority and recently was given approval to significantly increase the BDU staff to include permanent positions to replace the attorneys who left the Department, as well as sixty (60) term-appointed law clerks and attorneys to assist in expeditiously adjudicating the large number of pending borrower defense applications.  A copy of the posting for permanent BDU attorneys is attached as Exhibit 9.  Additionally, a copy of one of the announcements that was posted at law schools to recruit law clerks/attorneys is attached as Exhibit 10.

25.     Currently, the BDU has five full-time attorneys and one part-time attorney on the permanent BDU staff; nine contractors; and twenty (20) new term-appointed law clerks and attorneys who joined BDU in the last two months. We are in the process of hiring and onboarding additional attorneys for the remaining above-noted positions.

*Applying for a Borrower Defense Loan Discharge*

26.     On June 8, 2015, the Department announced a streamlined process for borrowers who had relied upon the Department's CCI JPR misrepresentation findings and who wished to assert

claims for the discharge of their Federal student loans under the Department's regulatory and statutory authority. A copy of the June 8, 2015 announcement is attached as Exhibit 11.

27.     Subsequently, as part of the streamlined process, the Department created a simple application form (the Heald JPR "attestation form") for borrower defense applicants who had borrowed Direct Loans to attend CCI-operated Heald College and who were relying on the Department's CCI JPR misrepresentation findings to support their claims. A copy of the Heald JPR attestation form is attached as Exhibit 12.

28.     Additionally, the Department created a simple application form (the "Everest and WyoTech JPR attestation form") for borrower defense applicants who had borrowed Direct Loans to attend CCI-operated Everest and WyoTech schools and who were relying on the Department's JPR misrepresentation findings to support their claims; the form mirrors the Heald JPR attestation form. A copy of the Everest and WyoTech JPR attestation form is attached as Exhibit 13.

29.     The streamlined application forms for CCI JPR claims enabled BDU to more efficiently identify, prioritize, and adjudicate the JPR claims.

30.     However, there was no such application form for borrowers who attended schools other than CCI or for CCI borrowers who were asserting claims other than JPR claims in 2015 or 2016. The Department created a "Universal Borrower Defense Form" that could be used by all borrower defense claimants; the form was published and available for use by borrowers on or about December 31, 2016. A copy of the universal borrower defense form is attached as Exhibit 14.

31.     Prior to the release of the universal borrower defense form, applications for borrowers other than CCI borrowers asserting JPR claims were generally long, narrative emails, letters and

other documents.  These claims were difficult for FSA to categorize at intake, and there was no established system for reviewing and adjudicating them.

**Borrower Defense Claims Management Systems**

32.    In addition to not having an application for non-CCI borrowers, there also was no borrower defense claims management system.  From 2015 to the fall of 2017, BDU tracked borrower defense applications and their statuses and adjudication decisions on excel spreadsheets.

33.    Recognizing the tremendous limitations in not having any claims management system, BDU worked with U.S. Digital Services personnel to design and build a Microsoft Access review platform for the BDU as a short-term solution. Design discussions began in November 2016, significant work continued well into 2017, and the platform was fully implemented and used in adjudicating applications by October 2017.  The review platform was used to record intake data, as well as adjudications, and to assist with both reporting BD data and tracking applications from intake through issuance of a final decision.

34.    Also, to improve the Department's ability to track borrower defense claims, from as early as January 2018, FSA began developing a more advanced claims management system/platform as part of FSA's Customer Engagement Management System ("CEMS").

35.    For much of 2018, three members of the BDU staff spent considerable time working through multiple phases of requirements and design to customize the CEMS platform so that it could be used for borrower defense adjudications. The time that the BDU staff was required to spend working on requirements for and design and implementation of the CEMS platform necessarily diverted those human resources away from adjudicating BD claims.

36.     Preliminary construction of the borrower defense component of the CEMS platform was completed in the fall of 2018, but the platform was not available for use in adjudicating claims until April 2019.  To use the CEMS platform, FSA had to transfer or "migrate" all of its borrower defense application data into the system.  Data migration and related work was completed in April 2019.  Prior to that time, BDU staff could not change or add data to the platform.

37.     Additional changes to the platform were required as a result of the 2016 BD regulation, which went into effect by court order in October 2018 and includes a new review standard for loans first disbursed after July 1, 2017.  FSA now has to determine and record the regulation applicable to a given borrower defense application, which also requires that the platform include the borrower's loan history.  Additionally, the 2016 Regulation required FSA to develop a process to give notice to schools when their students file borrower defense claims and to track responses and receive and store evidence.  There also are other components of the review process that required changes to the CEMS platform, such as the different statutes of limitations depending on the regulation.

38.     All of the BDU permanent staff were involved in developing new processes to comply with the 2016 BD Regulation, and three of the staff in particular have spent a significant amount of time working with FSA's vendor on the design and requirements to implement the new processes.

***Borrower Defense Review***

39.     As described below, the Department has identified certain categories of claims, based on systemic institutional conduct, with established criteria for approval.  For each of the categories of approvals to date, BDU analyzed and summarized the relevant evidence, determined and

applied applicable law, established criteria for approval of that type of claim, and drafted claim-specific review protocols.  The protocol may be specific to a school, campus, program and/or type of claim, depending on the nature of the conduct alleged.  The process to develop review protocols currently is ongoing with respect to several schools other than CCI.

40.     BDU and its contractors then use the protocols to individually adjudicate each borrower defense application to determine whether it meets the criteria for approval.  Copies of the CCI and ITT (CA) review protocols are attached as Exhibits 15 through 17.

41.     For borrowers who attended schools for which BDU is not aware of relevant evidence from the Department or from other sources such as law enforcement partners, BDU and contractors must review the application and any accompanying evidence from the borrower and determine whether the borrower has established by a preponderance of the evidence that the claim should be approved under either the applicable state law (1995 BD Regulation) or the federal standard (2016 BD Regulation), depending on the loan issuance date.  Otherwise, the borrower's application is denied.  A copy of the review protocol for such claims is attached as Exhibit 18.

42.     BDU and its contractors specify certain information that will be included in the written decision to the borrower, such as the evidence considered and whether a statute of limitations applies, and they also perform quality control reviews on a percentage of adjudicated applications.

43.     For approved applications, BDU and its contractors also input the relief (the percentage of the borrower's loans to be discharged) as determined by the Secretary.

44.     An adjudicated application is processed when FSA issues a written decision to the borrower and notifies the loan servicer through the CEMS platform to discharge and/or put the

11
Declaration of Colleen M. Nevin
No. 19-cv-03674-WHA

borrower's loans back into repayment in accordance with the decision and the relief provided, if any.

***Adjudicated Borrower Defense Applications***

45.     In 2015 and 2016, the Special Master and his team focused primarily on CCI and, specifically, JPR claims and reported the following adjudications:

| Date of Special Master Report | CCI JPR Applications Adjudicated |
|---|---|
| 9/3/15 | N/A |
| 12/3/15 | 1,312 |
| 3/25/16 | 736 |
| 6/29/16 | 1,739 |

46.     No decisions were issued on any claims other than JPR claims prior to the creation of BDU.

47.     In October 2016, Enforcement reported that it anticipated resolving all then-pending CCI JPR findings claims by spring 2017. (Ex. 6. at 1, 2).  The Enforcement Report did not provide an anticipated timeline for deciding borrower defense claims other than the CCI JPR claims.

<u>Approved Applications other than CCI JPR Claims</u>

48.     By the fall of 2016, BDU had made progress on Corinthian claims that were not related to the Department's CCI JPR misrepresentation findings.

49.     In October 2016, BDU developed two new categories of borrower defense claims. Generally, those categories (the "CCI transfer of credit claims") related to borrower defense claims asserted by borrowers who attended certain CCI schools and campuses alleging that CCI misrepresented that the credits earned at such schools were generally transferable.

50.     Borrower defense claims were approved and loans discharged on this basis from December, 2016 to January, 2017.  Additional CCI transfer of credit claims have been adjudicated and are pending a relief determination and processing.

51.     In January 2017, the BDU developed two other categories of borrower defense claims: (a) those asserted by borrowers who attended certain CCI schools and campuses and alleged that CCI promised that the borrowers would receive jobs upon graduation or that all graduates would obtain employment (the "CCI guaranteed employment claims") and (b) those asserted by borrowers who attended California campuses of ITT Technical Institute ("ITT") and alleged that ITT promised that the borrowers would receive jobs upon graduation or that all graduates would obtain employment (the "ITT guaranteed employment claims").

52.     Borrower defense claims were approved and loans discharged on these bases in January 2017.  Additional CCI and ITT (California campuses) guaranteed employment claims have been adjudicated and are pending a relief determination and processing.

53.     Also in January 2017, the Enforcement Unit recommended to the Under Secretary that all students who had attended American Career Institute's Massachusetts campuses receive borrower defense relief.  That recommendation was approved, and all such students received relief.

54.     From January 20, 2017 through March 2017, the BDU continued to adjudicate CCI transfer of credit and guaranteed employment borrower defense claims and from January 20, 2017 through May 4, 2017, BDU continued to adjudicate CCI JPR claims.

<u>Borrower Defense Review Panel and Inspector General Review</u>

55.     In March 2017, the Department's leadership convened a Borrower Defense Review Panel (the "Review Panel") to make recommendations on the borrower defense process.  It is my

13
Declaration of Colleen M. Nevin
No. 19-cv-03674-WHA

understanding that the Review Panel recommended, and the Secretary subsequently requested, a comprehensive review of the borrower defense work and processes by the Department's Office of the Inspector General ("IG").

56.     Enforcement was advised in the spring of 2017 that the Department might make significant changes to the BDU processes and that no additional approvals would be processed until the completion of the work of the Review Panel and, subsequently, by the IG.

57.     In the summer and fall of 2017, the IG performed a thorough review of the BDU and its adjudication processes and systems, as well as the related loan processing work performed by other FSA staff.  The review generally covered the period of time that the borrower defense adjudications were handled by the BDU as part of Enforcement, or from the end of June 2016 to July 31, 2017.

58.     While claim adjudication was on hold during the IG review, BDU staff spent a substantial amount of time gathering information and materials in response to IG requests.  BDU also worked with U.S. Digital Servicers to finalize the design and building of the above-referenced Access platform.  Additionally, BDU reviewed evidence and also developed improved review protocols.

59.     BDU received permission to resume adjudication of CCI JPR claims (only) on or about October 30, 2017.

60.     The IG's report (the "IG Report") detailing its review of the BD processes was issued on December 8, 2017 and is attached as Exhibit 19.

61.     The IG Report recommended improved documentation and information systems.  The IG did not recommend any changes to existing review processes and protocols.

### New CCI Relief Methodology – Application Processing Resumes

62.     In December of 2017, the Department finalized a new methodology for determining the amount of relief that the Department would approve for CCI borrowers with successful JPR, transfer of credits, or guaranteed employment claims.  The memorandum discussing the new CCI relief methodology ("CCI Relief Memo") and directing FSA in how to apply it is attached as Exhibit 20.

63.     Immediately thereafter, BDU was instructed to apply the new CCI methodology to the CCI JPR claims that had previously been adjudicated and approved.  BDU quickly developed new processes to implement the new relief methodology in accordance with the CCI Relief Memo, and between December 2017 and May 2018, BDU submitted for approval over 16,000 CCI JPR claims.

64.     Additionally, between December 2017 and May 2018, OUS authorized the denial of over 10,000 applications.

### Adjudication of Applications Continues

65.     While no additional decisions have been issued to borrowers since in or about June 2018, BDU has continued to make progress on adjudicating applications.  Specifically, nearly 50,000 applications have been adjudicated on the merits and are pending relief and/or processing.  This includes approximately 31,000 applications that are approved JPR claims for class members in *Manriquez v. DeVos*, No. 17-cv-7210 (N.D. Cal.).  Additionally, approximately 1,000 applications from CCI and ITT borrowers have been adjudicated as approvals and are not subject to the *Manriquez* injunction.  BDU also has adjudicated nearly 7,000 applications from CCI and ITT borrowers that were not successful, as well as several thousand denials from numerous schools other than CCI and ITT.

66.     Because BDU has been instructed to maximize the number of applications adjudicated per week, the streamlined JPR claims have been prioritized.  For the same reason, BDU also has focused on applications from borrowers who did not provide any evidence and who attended schools for which BDU is not aware of evidence that would support approval of the applications.

67.     Over the last several months, BDU has adjudicated on the merits an average of close to 1,000 applications per week.

68.     BDU expects to adjudicate the remaining CCI applications in the next few months. Additionally, BDU has initiated its review and analysis of the evidence relating to ITT (including campuses outside of California), DeVry University, and Brooks Institute but has not had available staff to complete that work and proceed to adjudicate applications from borrowers who attended those schools.  BDU has not yet initiated its work with respect to the remaining named plaintiffs' schools.

69.     However, as discussed above, FSA has approved BDU's request for a substantial increase in staffing so that attorneys can be assigned to review and analyze evidence regarding, and applications from borrowers who attended, schools for which the Department has a substantial amount of evidence that must be reviewed and analyzed before the related applications can be adjudicated.

I declare under penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 14th day of November, 2019.

Colleen M. Nevin
Director, Borrower Defense Unit
Enforcement Office
Office of Federal Student Aid
United States Department of Education

## Federal Student Aid Enforcement Office
## Report on Borrower Defense
## October 28, 2016

This is the first periodic report of the Federal Student Aid ("FSA") Enforcement Office regarding the work of its Borrower Defense Unit ("BD Unit"). The Enforcement Office assumed management of borrower defense in June 2016, taking over responsibilities that had previously been assigned to the Special Master. Since then, due to the Department of Education's ongoing outreach efforts to former students of Corinthian Colleges, Inc. ("Corinthian" or "CCI"), there has been a considerable increase in borrower defense claims. Accordingly, the BD Unit's focus has been to accelerate adjudication of the rapidly increasing number of claims based on the Department's findings concerning Corinthian's misleading job placement rates ("findings claims"), as well as to initiate adjudication of claims filed by Corinthian students based on other allegations of misconduct ("non-findings claims"). To that end, as detailed below, since the issuance of the Special Master's fourth and final report of June 29, 2016, the Department has approved an additional 11,822 findings claims for a total of more than 15,000 findings claim approvals, constituting a total of $247,370,853 of relief. At the current pace, the Department expects to resolve all pending eligible findings claims by spring 2017. The Department also has identified its first approvals of non-findings claims for students harmed by CCI misrepresentations that their credits were generally transferable to other institutions.

This report will focus on: (1) the ongoing development of the Borrower Defense Unit to meet the demands of submitted claims; (2) the growth of claims submitted and the Department's progress toward resolving those claims; and (3) the Department's borrower defense outreach efforts. The report also will provide an update on closed school discharges for former CCI students.[1]

### I.   FSA Enforcement's Borrower Defense Unit

As stated in the June 29 report, the Borrower Defense Unit is now under the supervision of FSA's new Enforcement Office. Chief Enforcement Officer Robert Kaye and Deputy Chief Enforcement Officer Laura Kim lead the Office, which encompasses four divisions: Borrower Defense, Investigations, Administrative Actions and Appeals, and the Clery Group. The work of the Borrower Defense Unit will be enhanced by its close interactions with its sister units, which all work to quickly and efficiently identify misconduct at institutions receiving Title IV aid and take appropriate action to protect students and taxpayers.

On October 17, Colleen Nevin joined the Enforcement Office as the new Director of the Borrower Defense Unit, where she oversees a team dedicated to investigating and adjudicating borrower defense claims. Nevin joins the Department after working most recently as an Assistant Attorney General at the Massachusetts Attorney General's Office, where she investigated and civilly prosecuted consumer protection violations.

---

[1] While the Enforcement Office does not process closed school discharge applications, we include this information because we recognize that many stakeholders are interested in updated information about the issuance of closed school relief to eligible Corinthian students.

1

In addition, to meet the rapid increase in claims, the BD Unit also recently added contract attorneys and analysts, on a temporary basis, to assist with ongoing claim review. These additional resources have contributed to the Unit's substantial progress resolving claims.

## II.     Borrower Defense Claims

### a.   Claims Received

As a result of the ongoing outreach efforts to borrowers detailed below, the Department has seen a large increase in the number of claims submitted. Significantly, the recent postal mail campaign to Everest and WyoTech borrowers nearly doubled the total number of claims received. The Department has now received a total of approximately 82,000 claims.[2] Once a claim is submitted and processed through intake, borrowers' loans are placed in forbearance or stopped collections until their claim is resolved, unless they opt-out.[3]

Based on the number of claims that have been processed through intake, approximately 60% of the Corinthian claims have been filed by borrowers who enrolled in CCI schools during the time periods covered by the Department's findings. Many of these claims are from borrowers who attended programs that the Department found had been publicized with misleading job placement rates. All of these claims that are not granted on the basis of the Department's findings will also be reviewed to determine whether relief is warranted on other bases. We also have more than 4,000 pending applications from borrowers who attended non-CCI schools.

### b.   Claims Adjudicated

#### i.   Corinthian Findings Claims

As of the last report on June 29th, the Department had approved a total of 3,787 claims based on the Department's findings. As of October 12, the Department has approved an additional 11,822 findings claims. Details on the amount of the discharges associated with these claims are in the table below. Assuming the current rate of approval is sustained, the Department expects to resolve all pending eligible findings claims by the spring of 2017.

| School | Findings Claims Approved for Discharge through 10/12/16 | Total Amount of Loans Approved for Discharge through 10/12/16 |
|---|---|---|
| Heald | 5,490 | $104,085,830 |
| Everest | 8,146 | $116,874,687 |
| WyoTech | 2,058 | $26,410,336 |
| **Total** | **15,694**[4] | **$247,370,853** |

---

[2] This total number may include some duplicate or incomplete claims that will not be identified until all of the claims have been processed through intake.

[3] Note that, in limited circumstances, borrowers will not be placed in forbearance because they are still in their grace period, or otherwise in a status where forbearance would not be beneficial.

[4] This number is higher than the total number of findings applications approved because some borrowers attended multiple schools.

2

### ii.  Corinthian Non-Findings Claims

In addition to this significant progress on findings claims, the BD Unit also has made progress on the pending non-findings claims submitted by former Corinthian students. The BD Unit has conducted a thorough investigation into the practices of Corinthian personnel, including reviewing thousands of pages of internal documents, documents obtained from other state and federal agencies, publicly available documents, as well as the personal narratives contained in thousands of borrower defense applications. Based on this work, the BD Unit has identified the most common categories of claims made by CCI borrowers and whether and under what circumstances borrowers should qualify for relief on the basis of the claim. While these efforts are ongoing, the Department is now prepared to issue relief for the first category of such claims.

At the time of this publication, the BD Unit has identified 293 claims for approval on the basis of misrepresentations CCI made about the general transferability of its credits. These applicants will be eligible for relief subject to the applicable state statute of limitations. Although this is a limited number compared to the universe of claims, additional claims alleging this misrepresentation will now be processed for relief.

### iii.  Denial of Claims Not Eligible for Borrower Defense

Finally, in addition to the approvals noted above, the BD Unit also has resolved 245 claims that do not qualify for relief. These claims are being denied because the claims are not eligible under the Department's findings (*e.g.*, the applicants did not enroll during the findings time periods or did not enroll in eligible programs) and do not allege any other basis for borrower defense relief. The Department will inform these borrowers of the basis for the denial. The Department also will inform borrowers that they may re-apply if they have new information bearing on their claim or if they would like to allege another basis for relief not included in their original application. The Department also is updating its borrower defense hotline to ensure that it can assist these borrowers who may have questions about their loans or the status of their loan forbearance. In addition, for any of these borrowers who may also be eligible for closed school discharge, the Department will inform them of their potential eligibility.

### III.  Outreach to Potentially Eligible Corinthian Borrowers

The Department has pursued various methods to inform borrowers that they may be eligible for borrower defense relief and other forms of loan discharges. In addition to accelerating its adjudication of claims, the Department has expanded its direct outreach to potentially eligible Corinthian borrowers who have not yet submitted applications. As detailed below, this ongoing work includes expanded postal mail outreach, a Facebook advertisement pilot, a servicer pilot that relies on emails, postal mail, phone calls, and texts, an outreach partnership with state attorneys general, and publication of a new "universal form" for public comment. The Department expects that the finalization of the universal form will facilitate future outreach and educational efforts to borrowers who may be eligible for borrower defense relief. Finally, the Department also has made considerable efforts to inform students of recently closed schools about their options, whether through transfer or closed school discharge.

3

Case 3:21-mc-00075-WHA   Document 59-2   Filed 06/14/21   Page 98 of 125

### a. Postal Mail Campaign

Since the last borrower defense report, the Department completed its postal mail campaign to over 280,000 Everest and WyoTech borrowers who enrolled between 2010 and 2014, the period covered by the Department's findings. The Department estimates that this postal campaign yielded over 30,000 additional borrower defense applications.

### b. Facebook Pilot

The Department also has experimented with new types of outreach. The Department recently conducted a pilot that deployed 219,000 Facebook ads to users who had expressed an interest in Heald College, one of the Corinthian schools. For example, the pilot directed ads to users who had indicated they attended Heald College. Evidence from the pilot suggests that this type of outreach may be effective to direct certain borrowers – including those relying on mobile devices – to relevant information on the Department's website. The Department continues to evaluate the appropriate circumstances for this type of outreach to borrowers.

### c. Servicer Pilot

Additionally, the Department is launching an outreach pilot with all of its servicers. Through the pilot, each servicer will communicate with a subset of Corinthian borrowers using emails, letters, outbound calls, or texts. The pilot will help the Department determine the efficacy of each of these modes of communication, as well as whether emails and letters from the servicer may be more effective for reaching eligible borrowers than communications directly from the Department. The results of this pilot, which we expect to have this winter, should provide the Department with information to guide its future outreach to students from other institutions.

### d. Partnership with State Attorneys General

In addition to these internal efforts, the Department also is working closely with state attorneys general from across the country to conduct outreach to former CCI students from their states. These 42 state partners, as well as the Attorney General of the District of Columbia, will use a variety of methods – including email, postal mail, telephone calls, and events – to reach more Corinthian borrowers. The Borrower Defense Unit would like to especially thank the Illinois and Maryland Attorney General's Office for their leadership and coordination of these efforts, as well as the Massachusetts Attorney General's Office, which has already gathered and submitted a large number of claims from borrowers who attended campuses in Massachusetts. The BD Unit thanks all of these state partners for their commitment to helping the eligible borrowers in their states.

### e. Universal Form

The Department is in the final stages of developing a "universal form" that would provide more guidance to all borrowers on how to apply for borrower defense. The Department revised the form based on the many useful comments received through the first round of required Paperwork Reduction Act clearance and, as of October 17, 2016, is in its second round of comments (see https://www.gpo.gov/fdsys/pkg/FR-2016-09-28/pdf/2016-23400.pdf). The Department expects to publish the final form along with additional guidance about the application process on its website later this year.

4

As noted in the last Special Master report, the universal form also will include detailed information specific to FFEL borrowers. In the meantime, eligible students should visit StudentAid.gov/borrower-defense to learn what to include in a borrower defense submission and how to submit an application. Application materials may be submitted via email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 429060, San Francisco, CA 94142.

## IV.    CCI Closed School Claims

Although it has now been more than a year since the April 27, 2015 closure of Corinthian schools, the Department continues to process claims from former Corinthian students that opt to pursue a closed school discharge. The Department last reported that, as of June 24, CCI borrowers had filed 12,254 applications for closed school relief, of which 7,386 were eligible, resulting in $97,613,625 of relief to borrowers. As of October 12, there are now a total of 13,010 closed school discharge applications that have been received, resulting in 7,858 approvals, for a total of $103,050,594 of relief granted. Approximately 189 closed school discharge applications are pending. To date, 4,963 applicants for closed school discharge (38%) have been denied relief, most commonly because:  (1) the application was incomplete; (2) the borrower withdrew from their program prior to the June 20, 2014 deadline; or (3) the borrower completed their program of study (either at the closed school or another school to which they were able to transfer their credits). The chart below shows the number of claims granted by school.

| School | Applications Received as of October 8 | Applications Granted as of October 12 | Total Loans Approved for Discharge |
|--------|---------------------------------------|---------------------------------------|------------------------------------|
| Heald | 7,623 | 5,062 | $73,321,497 |
| Everest | 3,929 | 2,282 | $25,544,812 |
| WyoTech | 1,458 | 514 | $4,184,285 |
| **Total** | **13,010** | **7,858** | **$103,050,594** |

The Department is also taking steps to ensure that all Corinthian borrowers who are eligible for a closed school discharge receive that discharge. Through the Borrower Defense final rule, the Secretary is exercising his authority to implement new and amended regulations specific to automatic closed school discharges on a faster timeline than other elements of the new regulation. As a result, all Corinthian borrowers who may be eligible for closed school discharge stand to benefit from a streamlined discharge process over the next year.

## V.    Conclusion

Adjudicating borrower defense claims is an important part of the Department's ongoing efforts to protect students and ensure greater accountability among institutions receiving federal student aid. While the Department has laid a strong foundation for this process, much work remains ahead — not only for former Corinthian students but also for students subject to misconduct by other institutions. This work includes implementation of the Department's final Borrower Defense rule, which goes into effect on July 1, 2017, and creates a new federal standard for borrowers whose loans disbursed on or after that date. The Enforcement Office looks forward to working with its stakeholders to ensure that the BD program fulfills its mission and the important goals of the new regulation. To that end, the Enforcement Office will continue to publish periodic reports on the Borrower Defense program and its work on behalf of students and taxpayers.

5

ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

MARCIA BERMAN
Assistant Branch Director

R. CHARLIE MERRITT
KATHRYN C. DAVIS
KEVIN P. HANCOCK
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
919 East Main Street, Suite 1900
Richmond, VA 23219
Telephone: (202) 616-8098
Fax: (804) 819-7417
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al.*,<br><br>         Plaintiffs,<br><br>   v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>         Defendants. | No. 3:19-cv-03674-WHA<br><br><br>**DEFENDANTS' RESPONSE TO AUGUST 31, 2020 ORDER** |

On August 20, 2020, Plaintiffs moved the Court for a case management conference to address their concerns with the substantive borrower defense decisions that some members of the Plaintiff class have received. ECF No. 108. The Court granted the motion and held a case management conference on August 31, 2020, after which it entered an Order requiring that Defendants file "information regarding statistics of the at-issue denials," as discussed during the conference. ECF No. 115.

<u>Statistics on Claims Adjudication Since December 2019</u>

Since the Department resumed issuing final borrower defense decisions in December 2019, it has issued final decisions on approximately 131,800 applications The Department has approved (*i.e.*, determined that they are eligible for relief) approximately 13,500 of these applications and denied (*i.e.*, determined that they are ineligible for relief) approximately 118,300 applications.

The individuals covered by the substantive provisions of the parties' settlement agreement are those who had pending borrower defense claims as of the April 7, 2020 date on which the parties executed their agreement. *See* Proposed Settlement Agreement § IV, ECF No. 97-2 (Agreement). Approximately 162,000 individuals met the class definition on that date, comprising approximately 168,000 borrower defense applications. As of August 24, 2020, the Department had adjudicated approximately 90,000 of these applications and issued approximately 78,400 final decisions (the rest are in various stages of quality control and processing). Of those final decisions, approximately 4,400 were approvals and 74,000 were denials.

The Court requested statistics from the period before the parties executed their settlement agreement on April 7. During that period, while the parties were negotiating the settlement agreement, Plaintiffs were on notice, via a declaration filed with Defendants' merits briefing on January 9, 2020, that the Department had issued 16,045 final decisions since the announcement of its new relief methodology, approving 789 claims and denying 15,256 claims. *See* Defs.' Opp'n to Pls.' Mot. for Summ. J. & Reply in Supp. of Defs.' Mot. for Summ. J. at 3-4, ECF No. 72. As of April 7, 2020, the Department had issued decisions on approximately 8,800 eligible applications and approximately 36,200 applications that it determined were ineligible.

These statistics show that the Department is approving some borrower defense claims and denying others – and that it is plainly not operating under a blanket policy of summarily denying all borrower defense claims. The fact that the number of denials has been relatively high in comparison to the number of approvals should be no cause for concern. As Defendants have previously explained, the Department has, in an effort to maximize its efficiency in reducing the massive claims backlog, prioritized deciding borrower defense applications that, based on facial deficiencies, can be most quickly denied. *See* Admin. R. 351, ECF No. 56 (Decl. of Collen Nevin ¶ 66, Nov. 14, 2019). These include "applications from borrowers who did not provide any evidence and who attended schools for which [the Borrower Defense Unit] is not aware of any evidence that would support approval," *id.*, and claims involving no allegations that a misrepresentation (or other conduct made actionable by the governing regulations) was directed to the borrower or that otherwise fail to allege a claim for borrower defense relief, *see* Exhibit B to Decl. of Eileen Connor, ECF No. 108-2 (Letter From Kathryn C. Davis to Eileen Connor at 3, Aug. 10, 2020). At the same time, the Department continues its review of evidence related to additional schools beyond those for which it has so far approved claims. As it develops review protocols and eligibility criteria based on this common evidence, the Department anticipates that the ratio of approvals to denials could increase with respect to the more than 75,000 applications that are covered by the settlement agreement and that have not yet been adjudicated. *See id.*

### Form of Denial Letters Utilized by the Department since December 2019

The Court also requested information about the form of the Department's denial letters. Since December 2019, the Department has used four standard letter templates to notify borrowers of its decisions to deny their claims. *See* Exhibits A-D, attached hereto. These vary depending on the type of claim asserted: (1) Corinthian borrowers who assert only job placement rate claims but who do not meet the eligibility criteria for such a claim (sample attached as Exhibit A); (2) Corinthian borrowers who assert other claims in addition to job placement rate claims (sample attached as Exhibit B); (3) non-Corinthian borrowers who attended schools for which the Department does not have any common evidence in its possession (sample attached as Exhibit C); and (4) non-Corinthian borrowers who attended schools for which the Department does have

common evidence in its possession (sample attached as Exhibit D). The letters have varying amounts of detail – for example, the Corinthian letters incorporate the Department's eligibility criteria for claims based on Corinthian's misleading job placement rates and provide an accounting of the borrower's failure to meet those criteria – but Plaintiffs primarily direct their complaints at the fourth category of letter. Although that specific form (Exhibit D) has only been utilized after the date the parties executed their settlement agreement, it is nearly identical to the third form listed above (Exhibit C), which the Department used throughout the period between December 2019 and April 7, 2020, when the parties executed the settlement agreement.

The use of these form denial letters is entirely appropriate and unsurprising here. The letters provide standardized justifications based on common deficiencies that the Department has identified across thousands of applications, such as a failure to plead actionable misconduct or failure to provide evidence to support the claim. As the record in this case makes clear, the Department has faced a very large backlog of borrower defense claims, including more than 168,000 that would be subject to the timelines set forth in the Agreement. In a federal program of that scope, it is not realistic to expect the Department to issue detailed, personalized decisions in every case. Indeed, the Administrative Procedure Act (APA) imposes only a "minimal" burden on agencies to explain their decisions to deny an application. *See Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

Most importantly, the Department would not have agreed to clear the backlog of more than 168,000 cases in 18 months if that meant issuing the type of personalized, detailed decisions Plaintiffs now suggest are required. The Department is committed to complying with its regulations and the APA in adjudicating borrower defense claims and notifying borrowers of final decisions. It will not, however, move for final approval of the settlement agreement if Plaintiffs continue to press their interpretation, since there clearly would not be a meeting of the minds by the parties on whether the agreement governs the content or substance of borrower defense decisions. *Cf., e.g.*, *Tai Ham v. Selectron Int'l Optronics*, LLC, 324 F. App'x 583, 584 (9th Cir. 2009) (affirming denial of motion to enforce settlement agreement where parties had no "meeting of the minds" as to the meaning of a "material term"). The Department's understanding that it

would continue to utilize the types of form denial letters that it had been using for as many as four months prior to executing the Agreement—including during the course of this litigation and the parties' lengthy settlement negotiations—was an important factor in the Department's determination of the amount of time that is necessary to issue decisions on all class members' claims and, ultimately, the timeline it would commit to in any settlement agreement.

Consistent with the Department's understanding, the parties' settlement agreement requires only that borrower defense decisions be issued according to prescribed timelines, not what any particular decision must say about the merits of the claim. *E.g.*, Agreement § IV.A.1.i (defining the "final decision" that must be issued to each class member as a "decision by Defendants resolving a borrower defense application, including a determination of how much relief the claimant is entitled to, if any"). The Agreement also expressly recognizes that, if any plaintiff has a dispute regarding the Department's decision to deny their borrower defense claim, they retain the right to challenge that decision, as the Court pointed out in granting preliminary approval. *See* Order Granting Prelim. Settlement Approval at 3, ECF No. 103. Plaintiffs can also seek reconsideration from the Department. All of this is consistent with the fact that this case is, and has always been, solely about the Department's obligation to restart the conveyor belt of deciding borrower defense claims, not the substance of those decisions or the process for issuing them. *See, e.g.*, Compl., Prayer for Relief, ECF No. 1; Class Notice, ECF No. 97-2 at 27 ("The lawsuit is ONLY about the fact that final decisions were not issued during that period of time, NOT whether those applications should results in loan cancellation or not."); Pls.' Reply in Supp. of Mot. for Class Certification at 5, ECF No. 42 (Plaintiffs do "not ask the [C]ourt to opine on the substance or process for adjudicating their individual borrower defenses"); Order Granting Mot. for Class Certification at 12, ECF No. 46 (granting class certification based on the fact that this lawsuit was filed "to ultimately obtain *a* decision" – not to dictate "the outcome of each application").[1]

---

[1] Even if the Court were nonetheless inclined to agree with Plaintiffs that the parties' agreement *should* govern the content or substance of borrower defense decisions, it is "not permitted to modify settlement terms or in any manner to rewrite agreements reached by parties." *Jeff D. v. Andrus*, 899 F.2d 753, 758 (9th Cir. 1989); *see also In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 326 (N.D. Cal. 2018) (noting that a court "may grant or deny approval of [a class action settlement], not revise its terms").

Dated: September 4, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar # 89400)
KATHRYN C. DAVIS
KEVIN P. HANCOCK
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
919 East Main Street, Suite 1900
Richmond, VA 23219
Telephone: (202) 616-8098
Fax: (804) 819-7417
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

**Exhibit A**

**Subject for email:** Borrower defense discharge ineligibility information for you


DATE

Borrower Defense Application#: [Case Number]

Dear [Primary Contact Name]:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at a school operated by Corinthian Colleges, Inc. (CCI), including Everest Institute, Everest College, Everest University, Heald College, and WyoTech. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. *See* § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Borrower Defense Claims Based on CCI Job Placement Rates**

ED has determined that students who first enrolled in certain programs at certain schools operated by CCI between 2010 and 2014 have borrower defense claims arising from the publication of misleading job placement rates for many of their programs of study and are eligible for a discharge of part or all of their loans under ED's Borrower Defense regulation. Lists of covered programs and time periods are available online at these links for Everest/WyoTech and Heald, respectively: StudentAid.gov/ev-wy-findings and StudentAid.gov/heald-findings (the "covered programs").

In order to have a successful borrower defense claim based on ED's Corinthian Colleges, Inc. findings, you must have enrolled in one of the covered programs during a listed time period. ED has established a process for the review of borrower defense to repayment claims for job placement rates asserted by borrowers enrolled in the covered programs at CCI schools during the eligibility period. Each CCI borrower's application is reviewed under the same process to determine whether the borrower qualifies for borrower defense to payment relief based on a CCI school job placement rate claim.

**Why was my application determined to be ineligible?**

ED reviewed your application regarding the campus(es) you attended, the program(s) in which you enrolled, and the date(s) that you enrolled. ED also reviewed data from the National Student Loan Data System (NSLDS®) and, if available, school-provided data regarding your program(s) and enrollment date(s), in addition to the enrollment information on any official school documents that you provided with

your application. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at a CCI-operated institution.

Based on that review, ED has determined that you did not enroll in a covered program at a CCI school during the eligibility period. Either (a) the initial enrollment date(s) or program(s) you provided in your application fell outside the eligibility period for a covered program(s) at one or more of the CCI campuses or (b) both NSLDS data and the school's data demonstrated that you were not enrolled in a covered program at one or more of the CCI schools during the eligibility period.

Moreover, your borrower defense application did not describe any other act or omission by the CCI schools that related to the making of your Direct Loan(s) for enrollment or the provision of educational services for which the Direct Loan(s) was made and that would be actionable under state law. Accordingly, ED has determined that your borrower defense to repayment application is ineligible and will not discharge your Direct Loan(s).

Your borrower defense application was evaluated based on California state law and the following circumstances: [Decision Reason].

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [Reference ID]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Why you believe that ED decided incorrectly your CCI job placement rate borrower defense to repayment claim; and

2. Identify and provide any evidence that demonstrates why ED should approve your CCI job placement rate borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance during the reconsideration process. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your

borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know

the name of your federal loan servicer, you may go to [StudentAid.gov](StudentAid.gov) to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid

**Exhibit B**

**Subject for email:** Borrower defense discharge ineligibility information for you

DATE

Borrower Defense Application#: [Case Number]

Dear [Primary Contact Name]:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at a school operated by Corinthian Colleges, Inc. (CCI), including Everest Institute, Everest College, Everest University, Heald College, and WyoTech. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at a CCI-operated institution. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. *See* § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Borrower Defense Claims Based on CCI Job Placement Rates**

ED has determined that students who enrolled in certain programs at certain schools operated by CCI between 2010 and 2014 have borrower defense claims arising from the publication of misleading job placement rates for many of their programs of study and are eligible for a discharge of part or all of their loans under ED's Borrower Defense regulation. Lists of covered programs and time periods are available online at these links for Everest/WyoTech and Heald, respectively: StudentAid.gov/ev-wy-findings and StudentAid.gov/heald-findings (the "covered programs").

In order to have a successful borrower defense claim based on ED's CCI findings, you must have enrolled in one of the covered programs during a listed time period. ED has established a process for the review of borrower defense to repayment claims for job placement rates asserted by borrowers enrolled in the covered programs at CCI schools during the eligibility period. Each CCI borrower's application is reviewed under the same process to determine whether the borrower qualifies for borrower defense to payment relief based on a CCI school job placement rate claim.

**Why was my application determined to be ineligible for CCI Job Placement Rates?**

ED reviewed your application regarding the campus(es) you attended, the program(s) in which you enrolled, and the date(s) that you enrolled. ED also reviewed data from the National Student Loan Data

Add. 110

System (NSLDS®) and, if available, school-provided data regarding your program(s) and enrollment date(s), in addition to the enrollment information on any official school documents that you provided with your application.

Based on that review, ED has determined that you did not enroll in a covered program at a CCI school during the eligibility period. Either (a) the initial enrollment date(s) or program(s) you provided in your application fell outside the eligibility period for a covered program(s) at one or more of the CCI campuses or (b) both NSLDS data and the school's data demonstrated that you were not enrolled in a covered program at one or more of the CCI schools during the eligibility period.

Accordingly, based upon our review of your job placement rate allegation, ED has determined that your borrower defense to repayment application is ineligible and will not discharge your Direct Loan(s).

**Why was my application determined to be ineligible for other allegations?**

In addition, ED reviewed your other borrower defense claims based on any evidence submitted by you in support of your application, your loan data from NSLDS, and evidence provided by other borrowers.

Allegation 1: [Allegation Type]

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

Allegation 2: [Allegation Type]

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

[Allegation X: Repeat as needed]

**What evidence was considered in determining my application's ineligibility for other allegations?**

We reviewed evidence provided by you, other borrowers, and the school. Additionally, we considered evidence gathered from the following sources:

**[INSERT EVIDENCE CONSIDERED SET A for applicants whose primary school name begins with Everest, Las Vegas, Bryman, Altierus, or WyoTech]**

1. Documents from the Illinois, California, Massachusetts and Wisconsin Attorneys General

2. Data from National Center for Education Statistics

3. *Transfer Credit Practices of Designated Educational Institutions*, American Association of Collegiate Registrars and Admissions Officers (the 1994-1996, 1996-1998, 1998-2000, 2006, 2009, 2012, and 2015 editions.)

4. Government Accountability Office report, *Transfer Students Postsecondary Institutions Could Promote More Consistent Consideration of Coursework by Not Basing Determinations on Accreditation* (GAO-06-22, October 2005)

5. Statements from former Corinthian Colleges Inc., executive Mark Pelesh

6. Heald Fine Letter. *See* https://www.ed.gov/news/press-releases/us-department-education-fines-corinthian-colleges-30-million-misrepresentation.

**OR**

**[INSERT Evidence Considered Set B for applicants whose primary school begins with Heald]**

1. Documents from the California and Massachusetts Attorneys General

2. "Heald College Transfer Guide," Student Guide to Transfer, 10/14/14 (Aug. 23, 2016); Heald College Academic Catalog, Effective July 2014

3. California State University transfer policies

4. *Transfer Credit Practices of Designated Educational Institutions*, American Association of Collegiate Registrars and Admissions Officers (the 2012 and 2015 editions)

5. Heald Fine Letter. *See* https://www.ed.gov/news/press-releases/us-department-education-fines-corinthian-colleges-30-million-misrepresentation.

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [Reference ID]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance during the reconsideration process. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid

**Exhibit C**

**Subject for email:** Borrower defense discharge ineligibility information for you

DATE

Borrower Defense Application #: [Case Number]

Dear [Primary Contact Name]:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at [Primary School]. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. *See* § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claim based on any evidence submitted by you in support of your application, your loan data from the National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

Allegation 1: [Allegation Type]

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This claim fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

Allegation 2: [Allegation Type]

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This claim fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

[Allegation X: Repeat as needed]

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [Reference ID]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Why you believe that ED decided incorrectly your borrower defense to repayment claim; and

2. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance during the reconsideration process. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

Add. 117

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid

**Exhibit D**

**Subject for email:** Borrower defense discharge ineligibility information for you

DATE

Borrower Defense Application#: [Case Number]

Dear [Primary Contact Name]:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at [Primary School]. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at [Primary School]. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. *See* § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

<u>Allegation 1: [Allegation Type]</u>

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

<u>Allegation 2: [Allegation Type]</u>

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

[Allegation X: Repeat as needed]

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

[Evidence Considered]

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [Reference ID]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

Add. 121

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2021, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system.  Service has been accomplished via email to the following counsel:

*Counsel for Real-Parties-in-Interest–Plaintiffs:*

Eileen M. Connor (econnor@law.harvard.edu)
Toby R. Merrill (tomerrill@law.harvard.edu)
Margaret E. O'Grady (mogrady@law.harvard.edu)
Rebecca C. Ellis (rellis@law.harvard.edu)
Joseph Jaramillo (jjaramillo@heraca.org)
Claire Torchiana (ctorchiana@heraca.org)
Manuel Juan Dominguez (jdominguez@cohenmilstein.com)

*Counsel for Real-Party-in-Interest–Movant:*

Jesse Panuccio (jpanuccio@bsfllp.com)

The district court will be provided with a copy of this addendum pursuant to Federal Rule of Appellate Procedure 21(a).

*s/ Sean Janda*
SEAN JANDA