**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE U.S. DEPARTMENT OF EDUCATION; MIGUEL A. CARDONA, in his official capacity as Secretary of the Department of Education, | No. 21-71108 D.C. No. 3:21-mc-80075-WHA |
| U.S. DEPARTMENT OF EDUCATION; MIGUEL A. CARDONA, in his official capacity as Secretary of the Department of Education, *Petitioners*, | |
| v. | |
| UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO, *Respondent*, | |
| THERESA SWEET; ALICIA DAVIS; TRESA APODACA; CHENELLE ARCHIBALD; JESSICA DEEGAN; SAMUEL HOOD; JESSICA JACOBSON, on behalf of themselves and all others similarly situated; ELISABETH DEVOS, Former U.S. Secretary of Education, *Real Parties in Interest.* | |

| | |
|---|---|
| IN RE ELISABETH DEVOS, Former U.S. Secretary of Education, | No. 21-71109 |
| | D.C. No. 3:21-mc-80075-WHA |
| ELISABETH DEVOS, Former U.S. Secretary of Education,<br>*Petitioner*, | |
| | OPINION |
| v. | |
| UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO,<br>*Respondent*, | |
| CHENELLE ARCHIBALD; TRESA APODACA; ALICIA DAVIS; JESSICA DEEGAN; SAMUEL HOOD; JESSICA JACOBSON; THERESA SWEET; U.S. DEPARTMENT OF EDUCATION; MIGUEL A. CARDONA, in his official capacity as Secretary of the Department of Education,<br>*Real Parties in Interest*. | |

Petitions for a Writ of Mandamus

Argued and Submitted October 6, 2021
Seattle, Washington

Filed February 4, 2022

Before:  RICHARD A. PAEZ, MILAN D. SMITH, JR.,
and JACQUELINE H. NGUYEN, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Paez

## SUMMARY[*]

### Writ of Mandamus / Subpoena

The panel granted in part, and denied in part, petitions for a writ of mandamus brought by former U.S. Secretary of Education Elisabeth DeVos, the current Secretary of Education, and the U.S. Department of Education seeking to direct the U.S. District Court for the Northern District of California to quash a subpoena for the deposition of former Secretary DeVos and to transfer the subpoena motion back to the Southern District of Florida.

The case arose out of a lawsuit alleging that the Department of Education unlawfully delayed making decisions on student loans during DeVos's tenure as Secretary of Education.

The panel denied the request for a writ of mandamus ordering the district court to transfer the subpoena motion to the Southern District of Florida.  The panel held that it did not have jurisdiction to review the procedural or substantive propriety of the Florida court's transfer order.  Here,

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

however, the panel was not asked to review the propriety of the Florida court's transfer order, but rather its jurisdiction to enter such an order. The panel held that it did have jurisdiction to review the Florida court's jurisdiction to enter the order. The magistrate judge had jurisdiction to issue the transfer order where the transfer order was nondispositive. Jurisdiction remained even though the Florida district court did not review objections to the magistrate judge's transfer order. Applying the *Bauman* factors for granting a writ of mandamus, the panel declined to issue a writ of mandamus on this jurisdictional issue because there was no error, any alleged error was unlikely to often be repeated, there was no prejudice, and there was no new or important issue at stake.

Turning to the writ of mandamus to quash the subpoena for DeVos's deposition, the panel applied separation of powers principles, and held that extraordinary circumstances sufficient to justify the taking of a cabinet secretary's deposition exist when the party seeking the deposition can demonstrate: (1) a showing of agency bad faith; (2) the information sought from the secretary is essential to the case; and (3) the information sought from the secretary cannot be obtained in any other way.

First, the Department's bad faith was apparent to the district court, and the panel saw no reason to question the finding. The Department, during the process of negotiating a settlement, sent out many application denials in unreasoned form letters despite having previously claimed that the eighteen-month delay in deciding the applications were due, in part, to the time-intensive process of considered decision-making.

Second, the district court erred in allowing DeVos's deposition because the information sought from DeVos,

while perhaps relevant, was not essential to the claims alleged by plaintiffs. Plaintiffs did not satisfy the second prong of the required three-prong showing necessary to establish extraordinary circumstances.

Third, the panel held that there was no indication that DeVos held information that was essential to plaintiffs' case or that it was otherwise unobtainable. Accordingly, the district court clearly erred in denying the motion to quash the subpoena to take the deposition of DeVos.

The panel held that its reasoning applied even though DeVos was no longer serving as the Secretary. The panel noted that the other *Bauman* factors, besides clear error, supported the issuance of the mandate.

Dissenting, Judge Paez disagreed with the majority for two principal reasons. First, the district court did not clearly err because no court of appeals has addressed the "extraordinary circumstances" requirement in the context of a *former* cabinet secretary who no longer has greater duties and time constraints, and is otherwise protected by the deliberative process privilege. Second, the district court did not err at all because the majority's new standard amounted to mere distinctions without any meaningful difference and the majority provided no support for rejecting the district court's holistic assessment of the record. Judge Paez would deny the government's petition for a writ of mandamus. He concurred with the majority's holding denying the writ of mandamus concerning transfer of the subpoena motion back to the Southern District of Florida.

**COUNSEL**

Sean Janda (argued), Mark R. Freeman, Mark B. Stern, and Joshua M. Salzman, Appellate Staff; Sarah E. Harrington, Deputy Assistant Attorney General; United States Department of Justice, Civil Division; Washington, D.C.; for Petitioners United States Department of Education and Miguel A. Cardona.

Jesse Panuccio (argued), Boies Schiller Flexner LLP, Fort Lauderdale, Florida; David Boies, Boies Schiller Flexner LLP, Armonk, New York; for Petitioner Elisabeth Devos.

Margaret E. O'Grady (argued) and Rebecca C. Ellis, Harvard Law School Federal Tax Clinic at Legal Services Center, Jamaica Plain, Massachusetts; Joseph Jaramillo, Housing and Economic Rights Advocates, Oakland, California; for Real Parties in Interest.

## OPINION

M. SMITH, Circuit Judge:

This case presents an important question concerning the appropriate separation and balance of power between two branches of our government: When can the judicial branch compel a cabinet secretary to submit to a deposition in which questions are propounded regarding her official actions? Former United States Secretary of Education Elisabeth DeVos, as well as the U.S. Department of Education (Department), and the current Secretary of Education, ask us to direct the United States District Court for the Northern District of California (district court) to quash a subpoena for the deposition of former Secretary DeVos.  Although granting this request is an extraordinary action, so too is compelling the testimony of a cabinet secretary about the actions she took as a leader in the executive branch.  Such questioning can only occur in extraordinary circumstances. The circumstances demonstrated here fail to meet that standard, so we grant the writ of mandamus, and direct the district court to quash the subpoena.  We also deny DeVos's petition to direct the district court to transfer the motion to quash back to the Southern District of Florida.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a lawsuit alleging that the Department of Education unlawfully delayed making decisions on student loans during DeVos's tenure as Secretary of Education.  The federal government assists students with higher education loans in various ways. Congress has allowed for the cancellation of federal student loans in certain cases of school misconduct.  20 U.S.C. § 1087e(h).   This loan cancellation process is called borrower defense.  In 2015, the number of borrower defense

applications dramatically increased when Corinthian Colleges, Inc., a large for-profit institution, shut down after incurring a $30 million fine from the Department for misleading students concerning job placement success.

By the end of President Barack Obama's administration in January 2017, the Department had granted 99.2% of the borrower defense applications it had evaluated, many of which were from Corinthian College students. When President Donald Trump took office, he appointed DeVos to head the Department. Starting in December 2017, the Department began using a new methodology to decide borrower defense claims. In May 2018, the Department was preliminarily enjoined from using this methodology because a federal district court concluded that it resulted in likely violations of the Privacy Act, 5 U.S.C. § 552a. *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1109 (N.D. Cal. 2018). From June 2018 through December 2019, the Department issued no borrower defense decisions.

In June 2019, several persons with pending borrower defense applications brought suit against the Department and then-Secretary DeVos in the district court pursuant to Section 706 of the Administrative Procedure Act. They alleged unlawful withholding, or unreasonably delayed action, on their borrower defense applications. At the time the suit was filed, over 210,000 such applications were pending. Plaintiffs asked the district court to compel defendants to restart the process of adjudicating their applications. The district court certified a class of 160,000 borrower defense applicants, and the Department compiled an administrative record of documents that supported its decision making. The parties filed cross motions for summary judgment. Defendants claimed that the agency inaction was not a "policy" but rather a lawful result of

staffing shortages, competing priorities, and that the delays were unavoidable because "[i]ssuing final decisions on such claims is time-consuming and complex, with many steps in the adjudicatory process, and agencies must be given, within reason, the time necessary to analyze the issues presented so that they can reach considered results."

Before the district court ruled on the summary judgment motions, the parties negotiated a proposed settlement that included an eighteen-month deadline to resolve all outstanding claims. The district court preliminarily approved the settlement, but before the class fairness hearing was held, the Department sent out form letters denying 118,000 borrower defense applications at a denial rate of 89.8%. The letters were brief and offered no reasoning for the Department's decisions.

The district court denied final approval of the settlement after finding no "meeting of the minds." The district court ordered updated written discovery and depositions of up to five Department officials to inquire into topics including "[t]he development and use of the form denial letters" and "[t]he extent to which the difficulty of reviewing borrower-defense applications actually caused or justified the Secretary's eighteen-month delay." The district court did not authorize the deposition of then-secretary DeVos, stating "class counsel may not yet depose the Secretary. . . Extraordinary circumstances, however—for example, if the Secretary has unique first-hand knowledge or necessary information [that] cannot be obtained through other, less intrusive means—may justify such a deposition at a later date."

Plaintiffs took four depositions of current and former high-ranking Department officials involved in borrower defense policy and received about 2,500 documents from

defendants.  On January 6, 2021, plaintiffs informed defendants that they would be asking the district court for leave to depose DeVos.  DeVos resigned as secretary on January 7, for unrelated reasons, and on January 12, the district court authorized class counsel to take her deposition. The court reasoned that its "prior order restricted deposition of '*the Secretary*' . . . [but] imposed no such restriction regarding Citizen DeVos."  The court instructed counsel to "subpoena Ms. DeVos" for any such deposition.  Plaintiffs then served a subpoena for a nonparty deposition on DeVos pursuant to Federal Rule of Civil Procedure 45.

DeVos and the Department moved to quash the subpoena in the Southern District of Florida.  That court referred the matter to a magistrate judge, and no party objected. Plaintiffs moved to transfer the motion to quash to the Northern District of California, where the parties are litigating the underlying class action.  DeVos and the Department opposed the motion, but the magistrate judge in Florida granted the transfer.  Before the Department or DeVos sought review of the transfer order by the Florida district court judge, the case was electronically transferred to California.  DeVos and the Department asked the Florida district court to stay the transfer pending an opportunity to object to the magistrate judge's order pursuant to Federal Rule of Civil Procedure 72.  The Florida district court denied the motion because the case had already been transferred. The Florida district court noted, however, that "applying the review standards of Rule 72(a), the Court agrees that 'exceptional circumstances' exist here and warrant a transfer to the Northern District of California . . .  Put differently, although the transfer was effectuated prior to the objections period, the same result would follow—rendering [DeVos's] procedural concern harmless."

DeVos petitioned the Eleventh Circuit for a writ of mandamus, arguing that the magistrate judge exceeded his authority in transferring the case before the district judge considered her Rule 72(a) objections and that the Florida district judge erred in failing to stay the transfer. The Eleventh Circuit denied her petition because she had not established that her right to relief was clear and indisputable.

The Department and DeVos filed motions to quash the subpoena in the Northern District of California. The district court denied the motions, finding that "exceptional circumstances" warranted the taking of DeVos's deposition. Drafting what it believed to be the appropriate test that must be met before a cabinet secretary's deposition may be taken, the district court concluded that cabinet secretaries can be deposed when: (1) there is "[a] strong showing of bad faith or improper behavior"; (2) "[t]he official has unique and relevant first-hand knowledge"; and (3) "[t]he necessary information cannot be obtained through other less burdensome or intrusive means." The district court concluded that deposing DeVos was justified because the agency showed bad faith and DeVos had "unique and relevant first-hand knowledge" which could not be obtained in a less burdensome way. The district court authorized a three-hour deposition of DeVos to "probe matters broadly related to the actual cause for the challenged eighteen-month delay, the development, approval, and use of the form-denial letters, and the Secretary's involvement in clearing the backlog of our [class members'] borrower-defense claims." The district court noted that the order does not "malign[] the Secretary's deliberative-process privilege" or her ability to assert it.

The Department and DeVos now petition our court for a writ of mandamus ordering the district court to reverse its

order denying the motion to quash the subpoena of the former secretary. DeVos also seeks a writ of mandamus directing the district court to transfer the subpoena motion back to the Southern District of Florida.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to issue a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651, and Federal Rule of Appellate Procedure 21.

A writ of mandamus is an extraordinary remedy. *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004). We consider five factors (herein referred to as the *Bauman* factors) before granting the writ: (1) the petitioner has no other adequate way to obtain the relief sought; (2) the petitioner will suffer damage or prejudice that cannot be corrected on appeal; (3) the district court clearly erred as a matter of law; (4) the error is often repeated or shows the district court's persistent disregard for the federal rules; and (5) there are new and important issues at stake. *In re Mersho*, 6 F.4th 891, 897–98 (9th Cir. 2021) (citing *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 654–55 (9th Cir. 1977)). These factors "are not exhaustive." *Barnes v. Sea Haw. Rafting, LLC*, 889 F.3d 517, 535 (9th Cir. 2018) (quoting *In re Bundy*, 840 F.3d 1034, 1041 (9th Cir. 2016)).

We have determined that satisfaction of the third factor, that the district court made a clear error of law, is almost always a necessary predicate for the granting of the writ. *In re Walsh*, 15 F.4th 1005, 1008 (9th Cir. 2021). Clear error is a deferential standard, and we find clear error only when we have a "firm conviction" that the district court has made a mistake in interpreting the law, or there has been a "clear abuse of discretion." *Id.* (internal quotation marks and citation omitted). We can develop a firm conviction that the

district court has erred when our court has already directly
addressed the question at issue or when similar cases from
our court, cases from the Supreme Court, cases from other
circuits, the Constitution, or statutory language definitively
show us "that a mistake has been committed." *In re Mersho*,
6 F.4th at 898 (quoting *Cohen v. U.S. Dist. Ct. for N. Dist.
of Cal.*, 586 F.3d 703, 708 (9th Cir. 2009)); *see also In re
Williams-Sonoma, Inc.*, 947 F.3d at 540 n.8.

## ANALYSIS

### I.

Before reaching the gravamen of this appeal, we first
consider DeVos's petition for a writ of mandamus ordering
the district court to transfer the motion to quash back to the
Southern District of Florida. The crux of DeVos's argument
is that the California district court does not have subject
matter jurisdiction because a magistrate judge, not a district
judge, ordered the transfer to California and the matter
transferred before the Florida district court could review that
order. Because DeVos's petition does not satisfy the
*Bauman* factors, we deny the request for a writ of mandamus
ordering the district court to transfer the motion to the
Southern District of Florida.

Our case law is clear that we do not have jurisdiction to
review the procedural or substantive propriety of the Florida
court's transfer order. *See Posnanski v. Gibney*, 421 F.3d
977, 980 (9th Cir. 2005) ("[N]o principle in American law
. . . permits a circuit court of appeals to review, as such, a
transfer order issued by a district court in another circuit.").
Here, however, we are not asked to review the propriety of
the Florida court's transfer order, but rather its jurisdiction
to enter such an order. We do have jurisdiction to review the
Florida court's jurisdiction to enter the order because if the

Florida court did not have jurisdiction, its order would have no effect. *See Herklotz v. Parkinson*, 848 F.3d 894, 898 (9th Cir. 2017) (reviewing a Pennsylvania district court's jurisdiction to enter a transfer order).

The magistrate judge had jurisdiction to issue the transfer order. The limits of a magistrate judge's jurisdiction are established in 28 U.S.C. § 636. According to that statute, a district "judge may designate a magistrate judge to hear and determine any pretrial matter," with some enumerated exceptions. 28 U.S.C. § 636(b)(1)(A). These exceptions "as well as 'analogous' matters" are "dispositive matters" and should not be heard by a magistrate judge. *Mitchell v. Valenzuela*, 791 F.3d 1166, 1168 (9th Cir. 2015). To determine whether a motion is dispositive, we look to whether the effect of the motion is to deny the ultimate relief sought or foreclose a defense of a party. *Flam v. Flam*, 788 F.3d 1043, 1046 (9th Cir. 2015). The order here merely transferred the action to another federal court and did not affect the viability of a claim or defense or the federal appellate courts' ability to correct errors. Thus, the transfer order was nondispositive, and the magistrate judge had jurisdiction to enter it.

Jurisdiction remains even though the Florida district court did not review the objections to the magistrate judge's transfer order. In arguing that the magistrate judge lacked the authority to issue the transfer order, DeVos relies on Federal Rule of Civil Procedure 72. That rule allows parties to object to a magistrate judge's order within fourteen days and requires the district judge to consider those objections. Fed. R. Civ. P. 72(a). Here, the matter transferred to California before the Florida district court could review the objections to the transfer order. Whether or not DeVos had an opportunity to file objections does not affect the

magistrate judge's jurisdiction to enter the transfer order, because "it is axiomatic that the Federal Rules of Civil Procedure do not create or withdraw federal jurisdiction." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 (2017) (cleaned up) (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 370 (1978)).

We decline to issue a writ of mandamus on this jurisdictional issue because there was no error, any alleged error is unlikely to often be repeated, there is no prejudice, and there are no new or important issues at stake. *See Bauman*, 557 F.2d at 654–55. We turn now to the petition for a writ of mandamus directing the district court to quash the subpoena for DeVos's deposition.

## II.

On this issue, we are tasked with determining whether the district court, by denying the motion to quash the subpoena to depose the former secretary, inappropriately breached the barrier separating one co-equal branch of the federal government from another. The executive branch is required by the Constitution to execute the laws passed by Congress and the courts are to decide, among other duties, cases or controversies related to the executive's implementation of those laws. *See* U.S. Const. art. II, § 3; U.S. Const. art. III, §§ 1–2. Courts are not, however, to second-guess policy decisions properly delegated to the executive branch by the legislative branch. *See, e.g.*, *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324 (1994). This balance is essential to the constitutional design. As Alexander Hamilton wrote, "[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department, the necessary constitutional means, and personal motives, to resist encroachments of the others."

The Federalist No. 51, at 286 (Alexander Hamilton) (E.H. Scott ed., 1898).

Congress gave courts some power to review agency action in the Administrative Procedure Act. "The Administrative Procedure Act embodies a 'basic presumption of judicial review [of administrative actions],'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)), but ordinarily that review should not involve probing the "mental processes" of administrative decisionmakers, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). To that end, judicial review is generally limited to the administrative record, which is the agency's compilation of all the materials before it when it made the decision. *See Dep't of Com.*, 139 S. Ct. at 2573. When courts find a "strong showing of bad faith or improper behavior [by the agency]," however, a court may look beyond the administrative record. *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 420. Discovery beyond the administrative record does not necessarily include the deposition of a cabinet secretary. The rules for when a court may allow the questioning of a cabinet secretary are more restrictive than those for extra-record discovery.[1] *See Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979).

In 1941, before the Administrative Procedure Act became law, the Supreme Court explored the questioning of a cabinet secretary in *United States v. Morgan*, 313 U.S. 409 (1941). In the course of litigation about an agency action, the district court allowed the deposition of the Secretary of Agriculture. *Id.* at 421–22. The Secretary also testified at

---

[1] These rules rest on a constitutional foundation, and we see our analysis in this opinion as distinct from the "apex doctrine."

trial on "the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates." *Id.* at 422. Criticizing the district court's decision to allow such questioning, Justice Frankfurter wrote for the Court:

> [T]he short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary has a quality resembling that of a judicial proceeding. Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that it was not the function of the court to probe the mental processes of the Secretary. Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected. It will bear repeating that although the administrative process has had a different development and pursues somewhat different ways from those of courts, they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other.

*Id.* (internal quotation marks and citations omitted). *Morgan* is the seminal authority on the deposition of cabinet secretaries and other high-ranking government officials, but some courts have, nevertheless, allowed for the taking of such depositions in extraordinary circumstances.

In addition to concerns about the maintenance of a proper separation of powers, courts are reluctant to distract cabinet secretaries from their executive duties. "High

ranking government officials have greater duties and time constraints than other witnesses. . . . [Their] time is very valuable." *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993) (per curiam). The "duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere." *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (per curiam) (citing *Simplex Time Recorder Co. v. Sec'y of Lab.*, 766 F.2d 575, 586 (D.C. Cir. 1985)). Cabinet secretaries face a potentially greater amount of litigation than most other witnesses. "If the Commissioner [of an agency] was asked to testify in every case which the [agency] prosecuted, his time would be monopolized by preparing and testifying in such cases. In order to protect officials from the constant distraction of testifying in lawsuits, courts have required that defendants show a special need or situation compelling such testimony." *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993) (footnote omitted). In short, the executive branch's execution of the laws can be crippled if courts can unnecessarily burden secretaries with compelled depositions.

The significant protection from depositions that cabinet secretaries enjoy does not mean that they are above the law. Illustrative of that fact is what happened in the case of Aaron Burr. John Marshall in deciding, as a trial judge, that it was appropriate to call the president to testify at Aaron Burr's trial for treason, wrote about what separates our president from the British king:

> [T]he crown is hereditary, and the monarch can never be a subject. . . [T]he president is elected from the mass of the people, and, on the expiration of the time for which he is

elected, returns to the mass of the people
again. . . .

> If, upon any principle, the president could
> be construed to stand exempt from the
> general provisions of the constitution, it
> would be, because his duties as chief
> magistrate demand his whole time for
> national objects.  But it is apparent that this
> demand is not unremitting . . . .

*United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807)
(No. 14,692d).  More recently, as the dissent emphasizes, the
Supreme Court wrote, quoting James Madison, that the
separation between the powers does not mean that the courts
can never burden the executive.  *See Clinton v. Jones*,
520 U.S. 681, 703 (1997).

    The issue of cabinet secretary depositions has not often
come before circuit courts, but when it has, they have
recognized that *Morgan* is not an absolute bar against the
taking of such depositions, and that cabinet secretaries may
be deposed under extraordinary circumstances.  The D.C.
Circuit, for example, suggested that in "extraordinary
circumstances, [top executive department officials can] be
called to testify regarding their reasons for taking official
actions."  *Simplex Time Recorder Co.*, 766 F.2d at 586.  Our
court has only once before addressed a similar question.  In
that case, the district court compelled the Administrator of
the Small Business Administration to participate in
discovery but allowed him to answer "interrogations" on a
contract dispute in lieu of a deposition.  We concluded that
the district court had not abused its discretion and
commented that "[h]eads of government agencies are not

normally subject to deposition." *Kyle Eng'g Co.*, 600 F.2d at 231.

Although district courts have occasionally ordered such depositions, circuit courts have issued writs of mandamus to stop them when asked to, generally finding that the circumstances before them were not extraordinary. *See, e.g., In re Clinton*, 973 F.3d 106, 109 (D.C. Cir. 2020), *cert. denied sub nom. Jud. Watch, Inc. v. Clinton*, 141 S. Ct. 1740 (2021); *In re United States*, 624 F.3d 1368, 1377 (11th Cir. 2010); *In re United States*, 197 F.3d 310, 316 (8th Cir. 1999); *In re F.D.I.C.*, 58 F.3d 1055, 1060 (5th Cir. 1995); *In re United States*, 985 F.2d 510, 512–13 (11th Cir. 1993); *see also In re McCarthy*, 636 F. App'x 142, 142 (4th Cir. 2015); *In re United States*, 542 F. App'x 944, 947 (Fed. Cir. 2013).

The Supreme Court was confronted with a request to take the deposition of a cabinet secretary in 2018. *See In re Dep't of Com.*, 139 S. Ct. 16 (2018) (mem.). There, a district court in the Southern District of New York had allowed a subpoena for the deposition of Secretary of Commerce Wilber Ross and other high-ranking officials, including an Assistant Attorney General at the Department of Justice. In a brief order, Justice Ginsburg stayed the deposition of the secretary and allowed the other depositions to proceed. *Id.* The parties in our case each contends that the Supreme Court's stay of Secretary Ross's deposition supports its arguments here. In its unreasoned order, however, the Court did not address the propriety of deposing a cabinet secretary on the merits. Without any understanding of how the Court decided the issue, we have no guidance on how to apply its decision to the deposition sought here. *See Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 960 (2009) (per curiam) ("A denial of a stay is not a decision on the merits of the underlying legal issues.").

### III.

Here, the district court denied the Department's and DeVos's motion to quash the subpoena because it concluded that exceptional circumstances warranted the taking of DeVos's deposition. The district court cobbled together three categories of exceptional circumstances it claimed can justify the deposition of a cabinet secretary. The district court described the three categories as: (1) "[a] strong showing of [agency] bad faith or improper behavior"; (2) the secretary "has unique and relevant first-hand knowledge"; and (3) "[t]he necessary information cannot be obtained through other less burdensome or intrusive means." Having reviewed the record, and pertinent law, we are left with a firm conviction that the district court clearly erred in describing the requirements of the second two categories, and how, properly described, they apply in this case.[2] Looking to the separation of powers principles discussed above and further case law discussed below, we hold that extraordinary circumstances sufficient to justify the taking of a cabinet secretary's deposition exist when the party seeking the deposition can demonstrate: (1) a showing of agency bad faith; (2) the information sought from the secretary is essential to the case; and (3) the information sought from the secretary cannot be obtained in any other way. All three factors must be satisfied in order to take a

---

[2] As discussed at length in this opinion, our determination that the district court clearly erred is based on constitutional principles, guidance from the Supreme Court in in *United States v. Morgan*, 313 U.S. 409 (1941), our court in *Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226 (9th Cir. 1979), and other circuit court decisions. Respectfully, the dissent is incorrect that we "exclusively rel[y] on out-of-circuit opinions and unpublished decisions to support [our] decision to grant the petition."

secretary's deposition.  We discuss each of the three factors below.

## A.

A showing of bad faith is a threshold issue to justifying taking a cabinet secretary's deposition.  This factor comes to us from the Supreme Court's guidance and long-standing administrative law.  The Supreme Court has noted:

> [C]ourt[s] may require . . . administrative officials . . . to give testimony explaining their action.  Of course, such inquiry into the mental processes of administrative decisionmakers is usually to be avoided.  And where there are administrative findings that were made at the same time as the decision . . . , there must be a strong showing of bad faith or improper behavior before such inquiry may be made.  But . . . it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves.

*Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 420 (citation omitted) (citing *Morgan*, 313 U.S. at 422).  Bad faith is a requirement because when the agency has been dishonest, further judicial scrutiny is justified and, in fact, necessary to effectuate judicial review.

Here, the Department's bad faith was apparent to the district court.  The district court found that the agency acted in bad faith when the Department, during the process of negotiating a settlement, sent out many application denials in unreasoned form letters despite having previously claimed that the eighteen-month delay in deciding these applications

was due, in part, to the time-intensive process of considered decision making.  We see no reason to question this finding of bad faith.

**B.**

To take a secretary's deposition, the information sought in the deposition must be essential to the case.  If the information is not absolutely needed for a case, we cannot allow a deposition to disrupt the normal governmental balance of powers.  Some of our sister circuits have previously granted writs of mandamus to prevent cabinet-level depositions when the information sought was not essential to the case, and we are persuaded by the reasoning of those cases.  For example, when a man on death row sought to take the depositions of Attorney General Janet Reno and Deputy Attorney General Eric Holder, the Eighth Circuit held that he "must . . . establish at a minimum that the [deponents] possess information essential to his case . . . . This means . . . that the discovery sought is relevant and necessary. . . .  Without establishing this foundation, 'exceptional circumstances' cannot be shown sufficient to justify a subpoena." *In re United States*, 197 F.3d 310, 312–13 (8th Cir. 1999) (citations omitted) (first citing *In re United States*, 985 F.2d 510, 512–13 (11th Cir. 1993); and then citing *In re F.D.I.C.*, 58 F.3d 1055, 1062 (5th Cir. 1995)).  The record in that case contained "sufficient evidence to establish" all of the facts essential to the claim and so the depositions of the officials were not necessary. *Id.* Were we to allow the taking of depositions of cabinet-level officials in which relevant, but unnecessary information, was sought, we would risk distracting cabinet secretaries from their essential duties with an inundation of compulsory, unnecessary depositions and upsetting the proper balance of powers.  The potentially disruptive nature

of such a possibility can be seen when one considers the sheer number of lawsuits filed against, for example, the Attorney General or the Secretary of Health and Human Services.[3]

The district court clearly erred in allowing DeVos's deposition because the information sought from DeVos, while perhaps relevant, is not essential to the claims alleged by plaintiffs. The district court looked only for "relevant" information in the second prong of its test, and although it mentioned "necessary information" in describing the third prong, the focus of that inquiry was on whether the information can be obtained through a less burdensome means. In fact, plaintiffs do not allege that DeVos has information that is essential to their case. Instead, plaintiffs claim that they are entitled to relief in the underlying case if the Department does not have a lawful reason for its actions. At oral argument, plaintiffs' counsel admitted to the court that they have already established that the Department's reasons do not withstand scrutiny, saying "if there were a lawful reason for the delay in processing borrower defense claims, I think the Department of Education would have given it to us already. But right now what we have is a lot of smoke and fog." Counsel even acknowledged that

---

[3] Every year, the Attorney General, in his official capacity, is named in thousands of civil suits across the country. Brief searches of the electronic dockets in the District Court for the District of Columbia, for instance, show that there are currently about 148 open cases against the Attorney General and about 133 against the Secretary of Health and Human Services just in that district alone. The preparation for, and participation in, even two depositions each month would leave a cabinet secretary with little time to attend to the actual business of executing the country's laws. This demand on secretaries' time is a key reason why depositions must be limited to those instances where the deposition is absolutely essential to the case.

plaintiffs likely could win relief on the existing record, and that they already know that DeVos opposed granting borrower defense applications.  Plaintiffs have not demonstrated that the taking of DeVos's deposition is essential to their case.  Thus, they have failed to satisfy the second prong of the required three-prong showing necessary to establish "extraordinary circumstances."

## C.

Finally, to take the deposition of a cabinet secretary, the information sought cannot be obtainable in any other way. We cannot intrude into the workings of the executive branch and the time of that branch's leaders if there is another way to obtain the necessary information.   We endorse the reasoning of our sister circuits to the effect that those seeking the deposition must establish "that the [deponents] possess information . . . which is not obtainable from another source." *In re United States*, 197 F.3d 310, 312–14 (8th Cir. 1999).  "If other persons can provide the information sought, discovery will not be permitted against [a high-ranking] official."   *Id.*    In disallowing the deposition of the Administrator of the Environmental Protection Agency, the Fourth Circuit noted that "Plaintiffs have not demonstrated a need for [the Administrator's] testimony beyond what is already in the public record."  *In re McCarthy*, 636 F. App'x 142, 144 (4th Cir. 2015); *see also In re United States*, 985 F.2d 510, 512–13 (11th Cir. 1993)) ("This case does not present extraordinary circumstances or a special need for the Commissioner [of the Food and Drug Administration's] testimony; on the contrary, the facts weigh against allowing the subpoena.   The record discloses that testimony was available from alternate witnesses . . . .").

Plaintiffs have not established that the information they seek from DeVos is unobtainable in any other way.

Plaintiffs' counsel admitted at oral argument that the district court had not considered less intrusive means of discovery, and in their briefing, plaintiffs argue that they are not required to exhaust all other means of discovery before taking DeVos's deposition.  Plaintiffs did not exhaust their alternatives here.  For example, they did not use all of their interrogatories and never took a Rule 30(b)(6) deposition.  Indeed, the district court held that "literal exhaustion of alternatives" was not required.  This was error.  Exhaustion of all reasonable alternative sources is required, and that requirement was not met here.

Further, plaintiffs contend that the information they seek cannot be obtained through other means because they have not obtained it through discovery thus far.  They point to comments in four prior depositions to infer that DeVos has unique knowledge.  For instance, then-Under Secretary Diane Auer Jones testified that she was not "a senior enough official to have" the "decision-making authority" on borrower defense policies.  Another undersecretary, James Manning, similarly said he was not responsible for the decision to stop processing borrower defense applications. Plaintiffs claim that only the Secretary herself has more authority than an undersecretary and, therefore, must have made the relevant decisions.  Although that may be true, the deponents' vague references to their own scope of authority are not sufficient to show that DeVos herself has information that cannot be obtained elsewhere, especially when plaintiffs allege that they already know that DeVos opposed granting borrower defense applications.

The district court clearly erred in denying the motion to quash the subpoena to take the deposition of DeVos.  There is no indication that DeVos holds information that is essential to plaintiffs' case or that is otherwise unobtainable.

**D.**

Our reasoning applies even though DeVos is no longer serving as secretary. The requested deposition concerns her actions taken during her tenure as secretary and "[w]e note that the process-inquiry rationale of *Morgan* and its successors hardly becomes inapplicable upon an official's departure from [her] office." *In re United States*, 542 F. App'x 944, 949 (Fed. Cir. 2013). The time constraint concerns discussed above similarly continue to apply. The threat of having to spend their personal time and resources preparing for and sitting for depositions could hamper and distract officials from their duties while in office. If allowed the minute cabinet secretaries leave office, overwhelming and unnecessary discovery could also discourage them from taking that office in the first place or leaving office when there is controversy.

**E.**

We further note that the other *Bauman* factors, besides clear error, support the issuance of a writ of mandamus. On the adequacy of other relief, courts have routinely found that, in cases involving high-level government officials, there are no other means of relief beyond mandamus because to disobey the subpoena, face contempt charges, and then appeal would not be appropriate for a high-ranking government official. *In re United States*, 542 F. App'x 944, 947 (Fed. Cir. 2013) ("[S]erious repercussions for the relationship between different branches of government could result if an official was required to place him or herself in contempt to seek immediate review. The right to not appear during deposition would be lost if review was denied

until final judgment." (citation omitted)).[4]   These serious repercussions for the relationship between two coequal branches of government can remain even if the official is no longer in office when the official faces the subpoena because of their role in the executive branch.  On the second *Bauman* factor, the harm to DeVos is the intrusion of the deposition itself, and so the harm is not correctable on appeal, even if her testimony is excluded at trial.  For the fourth and fifth factors, although the district court's error is not new or often repeated, it is an important issue implicating constitutional concerns.

## CONCLUSION

The petitions for a writ of mandamus directing the district court to quash the subpoena for DeVos's deposition are GRANTED.  The district court is ordered to quash the subpoena for the deposition of former Secretary of Education, Elisabeth DeVos.  The petition for a writ of mandamus directing the district court to transfer the motion to Florida is DENIED.

**PETITIONS FOR WRITS OF MANDAMUS ARE GRANTED IN PART AND DENIED IN PART.**

---

[4] The dissent mistakenly understands this point to be part of our analysis as to whether there are extraordinary circumstances warranting the taking of DeVos's deposition.  We mention the threat of contempt charges only in evaluating the first *Bauman* factor and concluding that DeVos has no other adequate way besides the writ of mandamus to obtain the relief she seeks.

PAEZ, Circuit Judge, dissenting:

My decision to dissent from the majority's holding is guided by the principle that "[m]andamus is a 'drastic and extraordinary remedy,'" reserved for "exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380, 390 (2004) (internal citations and quotations omitted). A necessary condition to granting a writ of mandamus—which I believe is lacking here—is that the district court "clear[ly] err[ed] as a matter of law." *In re Van Dusen*, 654 F.3d 838, 841 (9th Cir. 2011). I do not agree with the majority for two principal reasons. First, the district court did not clearly err because neither we nor any other court of appeals has addressed the "extraordinary circumstances" requirement in the context of a *former* cabinet secretary who no longer has "greater duties and time constraints," *In re United States* (*Kessler*), 985 F.2d 510, 512 (11th Cir. 1993) (per curiam), and is otherwise protected by the deliberative process privilege. Second, the district court did not err at all because the majority's new standard amounts to mere distinctions without any meaningful difference and the majority provides no support for rejecting the district court's holistic assessment of the record.

## I.

When there is "no prior Ninth Circuit authority prohibit[ing] the course taken by the district court," or the court is addressing a "question of first impression not yet addressed by any circuit court in a published opinion," the district court's ruling cannot be clearly erroneous. *In re Morgan*, 506 F.3d 705, 713 (9th Cir. 2007); *see also Medhekar v. U.S. Dist. Ct. for the N. Dist. of California*, 99 F.3d 325, 327 (9th Cir. 1996); *In re Mersho*, 6 F.4th 891, 898 (9th Cir. 2021) ("A ruling usually cannot be clearly

erroneous if there is no Ninth Circuit authority on point, or the question has not been addressed by any circuit court.") (citations omitted)).

The majority elides our precedent by suggesting it can find clear error because the Supreme Court, other circuits, and the Constitution has "show[n] us" a mistake has been committed. Maj. Op. 12–13, 21 n.2. Not so. No party asserts that the Supreme Court has clearly spoken on this issue. *See In re Williams-Sonoma, Inc.*, 947 F.3d 535, 540 n.8 (9th Cir. 2020) (concluding that the Supreme Court had "clearly spoken" on the relevant issue).[1] The majority cites no case where mandamus was granted by relying on the Constitution *without* also relying on binding authority. But even assuming a writ of mandamus could be granted by simply pointing to the Constitution, nothing in the majority's opinion or authority supports the notion that the Constitution "definitively" prohibits the deposition of a former cabinet secretary under the present circumstances. Rather, even in circumstances where we have addressed an issue but not prohibited the district court's action, we have declined to find clear error.

In *Morgan*, for example, we considered whether the district court's categorical rejection of certain plea bargain agreements was proper. 506 F.3d at 710. We recognized that although the "precise issue" had not previously been considered by our court, "our cases provide[d] the necessary guidance to resolve [the disputed] question." *Id.* We held that, under our existing caselaw, the district court erred—but it did not *clearly* err—because "no prior Ninth Circuit

---

[1] The majority also relies on *Mersho*, but we found clear error there because the district court took an action that "the plain text of the statute prohibit[ed]." 6 F.4th at 902.

authority prohibited the course taken by the district court."
*Id.* at 713.   In the absence of clear error, we denied the
mandamus petition.   *Id.*   The present case is even further
removed from the circumstances in *Morgan*.

The issue presented by the government's petition is
whether the district court clearly erred in denying the motion
to quash the deposition subpoena served on former Secretary
DeVos.   The majority's opinion exclusively relies on out-of-
circuit opinions and unpublished decisions to support its
decision to grant the petition.   Maj. Op. 21–28.   The majority
has no choice but to look to out-of-circuit caselaw because
our court has yet to provide guidance on the "extraordinary
circumstances" that may warrant the testimony of a cabinet
secretary (whether in or out of office) on matters related to
their official duties.   That dearth of caselaw is sufficient to
conclude that the district court did not clearly err.   Although
other courts of appeals have addressed the issue, they have
done so in situations where the high-ranking official is in
office.   No court of appeals, however, has considered
whether the "extraordinary circumstances" doctrine ought to
apply to a *former* secretary or to what extent.[2]   In my view,

---

[2] While the Second Circuit applied the doctrine to both a current and
former deputy mayor, the standard it set out discussed only "high-
ranking government officials" without giving a reasoned explanation for
applying it to a former official.   *See Lederman v. New York City Dep't
Parks & Rec.*, 731 F.3d 199, 203 (2d Cir. 2013).   The court also noted
that the plaintiffs did not preserve that issue for appeal because they had
failed to brief the issue.   *Id.* at n.1.   In my view, there is no persuasive
value to the court's conclusory reference to the former deputy mayor.
District courts are also divided on this question.   *Compare, e.g.*,
*Consumer Fin. Prot. Bureau v. Weltman, Weinberg & Reis Co., L.P.A.*,
No. 1:17CV817, 2017 WL 6042221, at *1 (N.D. Ohio Dec. 6, 2017)
(allowing deposition of former director of Consumer Financial
Protection Bureau because he "is no longer a 'high-level government
official' that warrants protection from being deposed"), *Toussie v. Cty.*

the majority's attempt to extend the rationales underlying that doctrine to a former official is not persuasive.

The majority dismisses the distinction between a current and former secretary in four brief sentences when, in fact, the rationales behind the "extraordinary circumstances" doctrine do not have the same force in the context of a former official.   First, the majority's lone citation is to dictum in *In re United States* (*Bernanke*), 542 F. App'x 944, 949 (Fed. Cir. 2013), Maj. Op. 27–28, an unpublished order that, on closer inspection, supports the plaintiffs' position.   In quoting from the unpublished *Bernanke* order, the majority omits the part of the sentence where the Federal Circuit expressly declined to decide how the rationales "would play out if" the plaintiffs sought to depose Chairman Bernanke after he left office.  *Id.*  The court left open the possibility

---

*of Suffolk*, No. CV 05-1814(JS)(ARL), 2006 WL 1982687, at *2 (E.D.N.Y. July 13, 2006) (ordering deposition of former County Executive because "[t]he specific rules governing depositions of high level government officials d[id] not apply to" him after he left office but requiring that former official be "personally involved in the events at issue"), *Sanstrom v. Rosa*, No. 93 CIV. 7146 (RLC), 1996 WL 469589, at *5 (S.D.N.Y. Aug. 16, 1996) (allowing deposition of former Governor M. Cuomo on the same basis), *with Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 252 (S.D.N.Y. 2015) (applying "exceptional circumstances" doctrine to former official but allowing deposition because rationales of doctrine were undermined), *Givens v. Newsom*, No. 20-cv-0852-JAM-CKD, 2021 WL 65878, at *6 (E.D. Cal. Jan. 7, 2021) (holding that the "extraordinary circumstances" doctrine applies to former officials but "[s]everal of the doctrine's rationales apply with less force when the proposed deponent is not currently serving in office"), *United States v. Wal-Mart Stores, Inc.*, No. CIV.A. PJM-01-1521, 2002 WL 562301, at *4 (D. Md. Mar. 29, 2002) ("In the absence of controlling case law to the contrary, this Court is of the opinion that the *Morgan* doctrine is applicable to efforts by parties to depose former high-ranking officials.").

that Bernanke could be deposed after he left office and ordered as a cautionary measure that the discovery deadline be extended, if necessary, to allow for further consideration of that possibility. *Id.* Ultimately, former Chairman Bernanke testified at trial. *See Starr Int'l Co. v. United States*, 121 Fed. Cl. 428, 431 (Fed. Cl. 2015), *vacated in part on other grounds*, 856 F.3d 953 (Fed. Cir. 2017).

Second, as the majority acknowledges, Maj. Op. 17–18, the doctrine "is based on the notion that '[h]igh ranking government officials have greater duties and time constraints than other witnesses' and that, without appropriate limitations, such officials will spend an inordinate amount of time tending to pending litigation." *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007) (quoting *Kessler*, 985 F.2d at 512); *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (same); *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) ("The duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere."). The majority, likewise, relies heavily on the time constraints on high-ranking officials and disruptions that a deposition would impose upon their duties to preclude the deposition of former Secretary DeVos. *See* Maj. Op. 17–18 ("[C]ourts are reluctant to distract cabinet secretaries from their executive duties.); *id.* ("[T]he executive branch's execution of the laws can be crippled if courts can unnecessarily burden secretaries with compelled depositions."); *id.* at 23 (allowing a deposition when it is unjustified would "distract[] cabinet secretaries from their essential duties"); *id. at 25* (deposition would intrude into official's time). Further, the majority identifies these time demands as a "key reason" supporting its new standard. Maj. Op. 24 n.3. I fail to see how these concerns apply where the official is no longer in office, as is the situation here. Neither the majority, nor the government, nor former

Secretary DeVos has identified any essential governmental duties that she would be distracted from by having to prepare and sit for a three-hour deposition.  Nothing in the record or the majority's authorities supports the notion that the threat of a potential deposition after leaving office would affect a cabinet secretary's actions while in office, the decision to accept an appointment, or the decision to remain in office. *See* Maj. Op. 18–19, 28.

Third, the majority points to the "process-inquiry rationale," Maj. Op. 27, but the deliberative process privilege accounts for concerns of intruding into an official's decision-making process.  The district court properly preserved that privilege in its order denying the motion to quash by stating that "[n]o part of this order maligns the Secretary's deliberative-process privilege."  Former Secretary DeVos is free to invoke the privilege and decline to answer questions that intrude on her deliberative process while in office.  In fact, she and other officials have invoked the privilege during the course of discovery.  The deliberative process privilege also accounts for any potential chilling effect on the official's decision-making discourse because one of the four factors considered when determining whether an exception to the privilege is warranted is "the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Karnoski v. Trump*, 926 F.3d 1180, 1206 (9th Cir. 2019) (per curiam) (internal citation omitted).  Thus, apart from the "extraordinary circumstances" doctrine, the deliberative process privilege shields a former official's decision-making process and remains available to DeVos.

Finally, the majority's remaining concerns are the "serious repercussions for the relationship between two coequal branches of government." *In re USA*, 624 F.3d 1368,

1372 (11th Cir. 2010) (quoting *Kessler*, 985 F.2d at 512). *See* Maj. Op. 15–19. The animating force behind this rationale is that forcing an official to "fight the subpoena by placing [themselves] in contempt implicates separation of power concerns and would harm the public perception." *In re USA*, 624 F.3d at 1372. The majority omits that the D.C. Circuit has rejected that reasoning because it relies on *United States v. Nixon*, 418 U.S. 683 (1974), and "[does] not take into account sufficiently the constitutional distinction between the President himself and subordinate officers in the executive branch." *In re Kessler*, 100 F.3d 1015, 1017 (D.C. Cir. 1996); *see also In re USA*, 624 F.3d at 1374 (discussing the D.C. Circuit's *Kessler* decision as "disagree[ing] with [our] analysis). Indeed, the D.C. Circuit has observed that, "[c]ontempt orders have been levied against executive branch officials and agencies without even so much as a hint that such orders offend separation of powers." *In re Kessler*, 100 F.3d at 1017 (citing cases).[3]

In sum, no court of appeals decision has resolved whether the "extraordinary circumstances" doctrine should apply with the same force to a *former* secretary where the underlying rationales have limited applicability. These differences remain unresolved by the majority's opinion.

---

[3] The majority dismisses this point as a misunderstanding on my part. Maj. Op. 28 n.4. It is the majority that misunderstands the threshold flaw in its reasoning. The separation of powers concerns that the majority heavily relies on to find clear error, *see* Maj. Op. 15–19, are rooted in concerns that a *current* official would face a contempt charge. Those concerns do not apply to *former* Secretary DeVos. For the same reason, those concerns also do not support the first *Bauman* factor, but that is a separate error by the majority that I do not address. Because clear error is necessary to grant a writ of mandamus, *Van Dusen*, 654 F.3d at 841, and I do not believe the district court clearly erred, I see no need to address the remaining *Bauman* factors.

The majority's conclusory statements that the rationales apply equally are questionable at best and far from "indisputable." *In re Walsh*, 15 F.4th 1005, 1010 (9th Cir. 2021). Because there is no binding precedent addressing when a former secretary may be required to testify, I would hold that the district court did not commit clear error when it denied the motion to quash. *See, e.g.*, *Mersho*, 6 F.4th at 898 ("A ruling usually cannot be clearly erroneous if there is no Ninth Circuit authority on point, or the question has not been addressed by any circuit court."). For this reason alone, I would deny the petition.

## II.

Even if the "extraordinary circumstances" doctrine applies equally to a former high-ranking official such as former Secretary DeVos, I would deny the petition for the independent reason that the district court did not err at all. The majority concludes that the district court erred in articulating the doctrine and in applying it to the record, but the district court did neither. The majority's framing of the rule requires (1) a threshold showing of bad faith or improper behavior to warrant extra-record discovery, (2) that the information sought is "essential to the case," and (3) that the "information sought from the secretary cannot be obtained in any other way." Maj. Op. 21. The district court formulated the rule as: (1) a "strong showing of bad faith or improper behavior," (2) "unique and relevant first-hand knowledge," and (3) the "necessary information cannot be obtained through other less burdensome and intrusive means." Although the majority agrees with the district court that extra-record discovery is warranted in light of the "strong showing of bad faith" by the Department, Maj. Op. 22–23 (citing *Volpe*, 401 U.S. at 420), it holds that the district court erred in considering the second and third

factors. I find no meaningful difference between the standard applied by the district court and the majority's, much less a "clear and indisputable" difference, *Walsh*, 15 F.4th at 1010. I also find no basis for rejecting the district court's careful and thorough findings.

## A.

For judicial review to encompass evidence beyond the administrative record, plaintiffs must make a threshold showing that the agency engaged in "bad faith or improper behavior." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–74 (2019). (quoting *Volpe*, 401 U.S. at 420). When no formal findings are "made at the same time as the decision," *effective* judicial review also requires "examining the decisionmakers themselves." *Volpe*, 401 U.S. at 420. Such extra-record discovery is a deviation from the general rule in Administrative Procedure Act (APA) claims, 5 U.S.C. § 706, where judicial review is limited to the "contemporaneous examination" documented in the administrative record. *Dep't of Com.*, 139 S. Ct. at 2573. The rationale behind the exception is that "meaningful judicial review" requires that the agency "disclose the basis" of its action, or inaction (delay). *Id.*

I agree with the majority and district court that the plaintiffs have met the threshold showing of bad faith which enables them to pursue extra-record evidence as authorized by the district court. The majority does not take issue with the district court's finding that the Department acted in bad faith when it issued "perfunctory and unreasoned form-denial letters" at a "breakneck pace" although the Secretary had previously "justified the eighteen-month halt . . . on the time required for considered decision making." The district court also found that the administrative record "lacked an official and contemporaneous justification." As the district

court's order explained, the information sought from DeVos would allow the plaintiffs and court to discern the actual basis for the Department's conduct.

## B.

As to the second factor, the majority holds that the information sought must be "essential to the case," *In re United States* (*Holder*), 197 F.3d 310, 314 (8th Cir. 1999), and that the district court erred in its articulation of that standard. Maj. Op. 21. In my view, there is no meaningful difference between the "essential" standard adopted by the majority and the "necessary" standard adopted by the district court. The district court determined that the information former Secretary DeVos possessed was "unique and relevant first-hand knowledge," and also found that the information she had was "necessary." The cases on which the district court relied in adopting the "unique and relevant" standard also require the information to be "necessary." *Lederman*, 731 F.3d at 203; *Bogan*, 489 F.3d at 423.[4] Indeed, both cases cited to the majority's key decision. *Id.* (citing *Holder*, 197 F.3d at 314). Viewed in that context, the district court's use of "necessary" in the third prong was clearly a reference to the information's necessity as established in the second prong.

Moreover, the district court did not look for only "relevant" information. *See* Maj. Op. 24. The district court thoroughly explained why former Secretary DeVos had unique information that was necessary, or "essential," to the plaintiffs' APA claims. To adjudicate the underlying APA

---

[4] The First Circuit used the disjunctive "or" instead of the conjunctive "and," suggesting that only one factor was necessary. *See Lederman*, 731 F.3d at 203.

claims, the district must decide whether the Department's eighteen-month halt in processing borrower defense applications was justified or unreasonable, 5 U.S.C. § 706(1), whether the perfunctory denial notices violate the requirement that denials include a "brief statement of the grounds for denial," 5 U.S.C. § 555(e), and whether the perfunctory denials were arbitrary, capricious, an abuse of discretion, or otherwise unlawful, 5 U.S.C. § 706(2)(A); *see Sweet v. DeVos*, 495 F. Supp. 3d 835, 847 (N.D. Cal. 2020) (ordering plaintiffs to "move for summary judgment as to the lawfulness of the Secretary's delay and the lawfulness of the perfunctory denial notice" after the additional discovery, and allowing the Department to do the same).

In assessing the deposition testimony of the officials that the Department had indicated would be most likely to have responsive information, the district court found "material gaps at the highest rungs of the Department's decisionmaking record" that revealed DeVos's personal involvement in the challenged conduct. These gaps in information demonstrated "the necessity" for her testimony. The court also explained that given the basis for the plaintiffs' original claims—agency *inaction*—there was no "official and contemporaneous justification," and therefore it was necessary to examine "the decisionmakers themselves." Although the Department filed a certified administrative record, the district court described it as "sparse," largely consisting of post-hoc litigation affidavits that did not answer the central questions in dispute.

Further, as noted above, the district court found that the Department's bad faith placed the credibility of its justifications for the inaction in question. The district court explained that it "cannot determine whether the Secretary has offered sufficient explanation for the eighteen-month

delay until we address the threshold question of whether those [proffered] explanations *in fact* drove the delay in real time." To that end, the district court considered the nature of the APA claims, the history of the litigation (including the pending cross-motions for summary judgment), and the existing discovery responses to conclude that former Secretary DeVos's testimony was needed to determine the basis of the Department's delay. *See Dep't of Com.*, 139 S. Ct. at 2573.

The majority fails to explain why we should disregard the district court's findings, given its familiarity with the litigation and assessment of the record, that former Secretary DeVos's testimony is necessary to properly resolve the plaintiffs' claims. The majority does not point to any support in the record and resorts instead to grand inferences based on the plaintiffs' counsel's statements at oral argument. Maj. Op. 24–25. Neither the plaintiffs' "preview" of their summary judgment argument, nor DeVos's public statements that she opposes borrower defense applications,[5] changes the fact that the district court will ultimately need to decide whether any of the Department's asserted justifications drove the Department's decisions, and whether those justifications were reasonable.

## C.

As to the third factor, the majority takes issue with the district court's conclusion that "literal exhaustion of alternatives" is not required and faults the plaintiffs for not showing that they cannot obtain the information "in any other way." Maj. Op. 26. None of the majority's cited authorities require "[e]xhaustion of all reasonable alternative

---

[5] *See* Dkt. 17, Oral Arg. at 34:30; 32:10.

sources." Maj. Op. 26. Even if they did, the district court properly found that there were no *reasonable* alternatives to obtain the necessary information by less intrusive means.

To begin, the district court's articulation of the third factor is not necessarily inconsistent with the majority's holding that all *reasonable* alternatives must be exhausted. The relevant cases also do not require exhaustion of all possible discovery tools. What other courts ask is whether the information is "obtainable from another source," *Holder*, 197 F.3d at 314, and, in particular, whether the government can point to specific, "alternate witnesses." *Kessler*, 985 F.2d at 512 (finding that the record showed that the information sought was available from a former and current FDA official); *see also In re USA*, 624 F.3d at 1375 (finding that another presidential appointee, the Assistant Administrator, was an "adequate substitute for the Administrator"). Although *Bogan*, a Second Circuit case cited by the district court, stated that the plaintiffs had not "exhausted other available avenues," the plaintiffs there had not "pursue[d] other sources" and "[i]n particular," had not sought discovery from the mayor's aides who "likely" were involved and "could have clarified the Mayor's role." 489 F.3d at 424. By contrast here, the plaintiffs heeded the Department's sworn statements about which officials were most likely to have relevant information, but those officials then disclaimed authority to make the decisions at issue and intimated that the decisions rested with former Secretary DeVos. No court of appeals has stated that *all* discovery methods must be exhausted in order to show that the information is not available from another source.

But even accepting the majority's rule, the district court's finding was still proper. When we engage in mandamus review, we must assess the district court's

challenged order "in the context of the history of [the] litigation." *Plata v. Brown*, 754 F.3d 1070, 1076 (9th Cir. 2014). Far from merely making "vague references to [the previous deponents'] own scope of authority," Maj. Op 26, the district court determined that the information sought could not be obtained through other sources given the nature of the APA claims, the history of the case, and the existing administrative record. Put differently, "all *reasonable* alternative sources" had been exhausted, Maj. Op. 26, to no avail.

Further, the district court explained why other discovery tools, including document discovery and a Rule 30(b)(6) deposition were not reasonable alternatives. The Department had previously identified in a sworn statement the four high-level ranking officials who were most likely to have relevant information *and* stated that attempting to seek information from other officials was likely to be duplicative. Before seeking former Secretary DeVos's testimony, the plaintiffs deposed those officials, including the then-Under Secretary and former Under Secretary. Those officials disclaimed the authority to make the decision to halt adjudication of the borrower defense applications, disclaimed knowledge of who made the decision, and testified that DeVos had the authority to make such a decision. The Director of the Borrower Defense Unit testified that DeVos was directly responsible for making the Department's decision in 2019 to "eliminate the backlog and adjudicate any new case that comes in within 90 days."

In effect, the parties had already conducted the essential functions of a Rule 30(b)(6) deposition. *See* Fed. R. Civ. P. 30(b)(6) (describing that named organization "must designate one or more officers" who "must testify about information known or reasonably available to the

organization").  The district court also reasonably concluded that alternatives like "line employees" would likely reveal little about the policy decisions in light of the statements made by the four high-ranking officials, and that Department lawyers do not make policy decisions.  Because the "current set of policymakers cannot answer [the remaining] questions," and the government could not identify an alternative witness, *see e.g.*, *Kessler*, 985 F.2d at 512; *In re USA*, 624 F.3d at 1375, the "only place left to look," as the district court put it, "[was] up."[6]

The majority brushes aside the district court's comprehensive assessment of the plaintiffs' discovery and hangs its hat again on the fact that former Secretary DeVos publicly opposed granting borrower defense applications. Maj. Op. 26.  That reasoning is neither persuasive nor properly deferential under our standard for granting mandamus relief, particularly in the discovery context where we should give considerable deference to the district court's familiarity with the details of the case.  *Cf. Walsh*, 15 F.4th at 1010 (recognizing that mandamus is "especially difficult" in the discovery context because of the reluctance to interfere with the district court's case management).  Taking the depositions of the other Department officials and the document discovery into account, along with the "sparse" and questionable administrative record, the district court properly found that all reasonable alternatives had been exhausted and that pursuing other discovery would be futile. I see no reason to reject that determination.

---

[6] At the district court's direction, the government provided the court with the Department's relevant organizational hierarchy.

**III.**

In my view, the district court did not clearly err in denying the motion to quash, particularly because of the salient feature that DeVos is a *former* secretary. Even under the majority's newly adopted standard, the district court did not err. Our court has developed guidelines to guard against the "dangers of unprincipled use" of the extraordinary mandamus power, including undermining the "mutual respect" that "marks the relationship between federal trial and appellate courts." *Bauman*, 557 F.2d at 653–54. The majority justifies its approach by invoking separation of powers concerns. As the Supreme Court once explained, James Madison wrote in Federalist No. 47 that,

> separation of powers does not mean that the branches 'ought to have *no partial agency* in, or *no controul* over the acts of each other.' The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution.

*Clinton v. Jones*, 520 U.S. 681, 703 (1997) (emphasis in original). "Surely, if this burden can be exerted upon the Chief Executive, then it necessarily follows that Cabinet level officials can be so burdened as well." *In re USA*, 624 F.3d at 1380 (Martin, J., dissenting). The majority's opinion is misguided and unnecessarily expands the scope of our authority under the All Writs Act. 28 U.S.C. § 1651.

For all the above reasons, I would deny the government's petition for a writ of mandamus.  I respectfully dissent.[7]

---

[7] I concur in the majority's holding in Part I.  *See* Maj. Op. 13–15.